1

2                IN THE UNITED STATES DISTRICT COURT FOR THE
                      WESTERN DISTRICT OF MISSOURI
3                            WESTERN DIVISION

4

UNITED STATES OF AMERICA,      ) Case No. 16-00110-01-CR-W-DGK
5                              )
            Plaintiff,         ) Kansas City, Missouri
6                              ) January 4, 2017
v.                             )
7                              )
JAMES E. EVERETT, JR.,         )
8                              )
            Defendant.         )
9   _____   )

10

            TRANSCRIPT OF INITIAL APPEARANCE, ARRAIGNMENT
11               AND HEARING ON MOTION TO SUPPRESS
              BEFORE THE HONORABLE ROBERT E. LARSEN
12               UNITED STATES MAGISTRATE JUDGE

13  APPEARANCES:

14  For the Plaintiff:         Mr. Jeffrey Q. McCarther
                               Mr. Bradley K. Kavanaugh
15                             Assistant United States Attorney
                               400 E. Ninth St., Ste. 5510
16                             Kansas City, MO  64106
                               (816) 426-3122
17
    For the Defendant:         Mr. W. Marc Ermine
18                             Federal Public Defender's Off.
                               818 Grand Blvd., Ste. 300
19                             Kansas City, MO  64106
                               (816) 471-8282
20
    Court Audio Operator:      Ms. Dorothy Myers
21
    Transcribed by:            Rapid Transcript
22                             Lissa C. Whittaker
                               1001 West 65th Street
23                             Kansas City, MO  64113
                               (816) 914-3613
24

25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

1    (Court in Session at 2:18 p.m.)

2        THE COURT:  Okay.  Good afternoon, everyone.  I have an

3   initial appearance and arraignment.  Is this on James Everett?

4   Is that right?

5        MR. McCARTHER:  Yes, sir.

6        THE COURT:  And so, let me go ahead and get the -- well,

7   the number of the case is 16-110-01-CR-W-DGK.  Let me have the

8   AUSA's appearance, please.

9        MR. McCARTHER:  Jeff McCarther on behalf of the United

10  States.  I'm joined at counsel table by AUSA Brad Kavanaugh who

11  will be sitting with me at trial in this matter, Your Honor.

12       THE COURT:  Okay.  And let me have counsel for Mr.

13  Everett.

14       MR. ERMINE:  Marc Ermine on behalf of Mr. Everett.

15       THE COURT:  Okay.  We have it set for an initial

16  appearance and arraignment on the Indictment.  You've had a copy

17  of the Indictment in advance?

18       MR. ERMINE:  Yes, sir, we have.

19       THE COURT:  Any problem with waiving the formal reading

20  and discussion of the penalty ranges here?

21       MR. ERMINE:  No, sir.  That's fine.  We've -- I've

22  discussed it with Mr. Everett.

23       THE COURT:  Okay.  Mr. Everett, I'm not going to read

24  this Indictment to you.  It's apparently in three counts.  Have

25  you had a chance to review it and talk about it with your counsel

1  here?

2          MR. EVERETT:  No, Your Honor.

3          THE COURT:  Pardon me?

4          MR. EVERETT:  No, Your Honor.  I just seen it before

5  coming into the courtroom.

6          THE COURT:  Okay.  That's all right.  We'll just go

7  through it then.  If you would, look at the Indictment.  Do you

8  have a copy of it there in front you?

9          MR. EVERETT:  Yes, Your Honor.

10          THE COURT:  Okay.  There are three counts.  The first

11  count is threatening a federal law enforcement official or

12  officer.  There you're charged with an event on March 10th of

13  2016.  It says that you did threaten to assault a Federal

14  Protective Service officer with intent impede, intimidate,

15  interfere with or retaliate against the officer while engaged in

16  the performance of official duties in violation of 18 U.S.C.

17  Section 115(a)(1)(B) and (b)(4).  The second count is the same

18  date, March 10th of 2016.  There it says that you, having been

19  convicted of a felony, that's a term exceeding one year in

20  prison, that you possessed this -- you possessed a firearm

21  described as a Ruger 9mm pistol, Serial Number 316-67472.  And

22  the Government alleges that it had gone in interstate commerce

23  before it's alleged that you had it.  The third count is a

24  misdemeanor count that's an event again, March 10th of 2016.  It

25  says there that you knowingly and intentionally possessed a

quantity or a substance containing heroin. It's a Schedule I controlled drug in violation of the Federal Code. If you look back here at the first page of the Indictment, on the right-hand side of that it will tell you about the penalty ranges here you face on these counts. On Count One, that carries a sentence of not more than six years in prison, a $250,000 fine, a three years supervised release term to follow incarceration and a $100 special assessment. Count Two is a felon in possession count. That carries a penalty of not more than ten years in prison, a $250,000 fine, three years on supervised release and a $100 special assessment. Count Three carries a penalty range of not more than one year, a fine of not more than $1,000, supervised release of not more than one year and a $25 mandatory special assessment. And, of course, those penalties, upon conviction of any or all of them, could be stacked one on top of the other. I need to remind you of your rights, Mr. Everett. Under the Fifth Amendment, you have the right to remain silent. Anything that you say about this matter to anyone other than your counsel could be and would be used against you here in court. Under the Sixth Amendment, you continue to have your right to counsel here, and the Federal Defenders we've brought in to represent you and will continue to represent you here as we process this case. Concerning the three counts, Mr. Ermine, what are the pleas?

        MR. ERMINE: Not guilty to all counts, Your Honor.

        THE COURT: Mr. Everett, your pleas are not guilty, is

1  that right?

2          MR. EVERETT:  (No audible response).

3          THE COURT:  I will assume that to be the case and we'll

4  go ahead and enter those pleas into the record here at the

5  District Court.  Is there any need for us to do anything with

6  regard to the pretrial filings?  We have it set on the February

7  12ᵗʰ trial docket.  Is there anything new in this Indictment?

8          MR. McCARTHER:  Your Honor, there is an additional count

9  in this Indictment which is Count One, threatening a federal law

10  enforcement officer.  Defense counsel has received all the

11  discovery that the United States has in its possession --

12          THE COURT:  Okay.

13          MR. McCARTHER:  -- and all discovery relevant to this

14  issue, so.

15          THE COURT:  Okay.  So I'm going to do an order

16  indicating that defense counsel is required to file any

17  additional motions that you want to have filed within ten days

18  and the Government will have seven days to respond.  And, you

19  know, let us know if you want to have a hearing on something.

20  We'll go ahead and set it down and do it.  Okay.  So that's that

21  on the initial appearance and arraignment on the Indictment.  We

22  also have a hearing set on the matter for -- and I didn't mean to

23  cut you off.  Did you want to be heard about any of that?

24          MR. ERMINE:  No, sir.

25          THE COURT:  I assumed not, so.

1    MR. ERMINE:  Thank you.

2    THE COURT:  Yeah.  So anyway, the next piece is the

3 issue of the suppression issue here.  And I've read the

4 information supplied by the parties and I think we're ready to

5 proceed with the evidence here.  And so you've got laboring oar.

6    MR. McCARTHER:  Thank you, Your Honor.  The United

7 States would call FPS Inspector David Yadon to the stand.

8    THE COURT:  Okay.  Officer, if you just come up here,

9 I'll place you under oath, sir.  Just come right up here.  Raise

10 your right hand, please.

11        DAVID YADON, GOVERNMENT'S WITNESS, SWORN

12    THE COURT:  Go ahead and take the stand over here on

13 your left.  When you get up there, it's going to make a noise, it

14 just adjusts for weight, so don't get concerned about it.

15                 DIRECT EXAMINATION

16 BY MR. McCARTHER:

17 Q.  Sir, could you please state your name for the record?

18 A.  David Yadon.

19 Q.  What's your occupation, sir?

20 A.  I'm a federal police officer with the Federal Protective

21 Service.

22 Q.  What's your total length of service in law enforcement?

23 A.  Three years.

24 Q.  As part of the Federal Protective Service, what your duties

25 and responsibilities?

A.  Duties and responsibilities are the safeguard of federal

occupants in federal facilities under GSA control.

Q.  And what's your current assignment area?

A.  Current assignment area is the Kansas City metro area.

THE COURT:  Officer, why don't you move up a little bit.

Scoot the thing up a little bit closer.  You kind of need to get

picked up a little bit better.

BY MR. McCARTHER:

Q.  I'll ask that question again.  What's your current assignment

area, sir?

A.  The Kansas City metro area.

Q.  And what types of crimes do you wind up investigating in your

role as a FPS Inspector?

A.  Any types of normal crimes, thefts, assaults, drugs, anything

that a normal police officer would investigate, we investigate as

well.

Q.  And these would be crimes that would take place on federal

property, is that correct?

A.  Correct.

Q.  I want to take you to the date of March 10th, 2016, do you

remember that date?

A.  I do.

Q.  Were you working on that day?

A.  I was.

Q.  Specifically, around 8:30 in the morning, where were you?

1  A.  I was at 601 East 12th Street, Kansas City, Missouri.

2  Q.  And is that in the Western District of Missouri?

3  A.  It is.

4  Q.  What is at that address?

5  A.  That is the Richard Bolling Federal Building.

6  Q.  And why were you at the Richard Bolling Federal Building?

7  A.  That is where my office is at.

8  Q.  At the time you were in your office, were you carrying a

9  communications radio on your person?

10  A.  I was.

11  Q.  And what's the purpose of having that radio?

12  A.  For dispatch to any types of incidents that would need law

13  enforcement response.

14  Q.  Did anything unusual come across your radio around 8:30 in

15  the morning that day?

16  A.  It did.  The Protective Security Officers or PSOs that we

17  have stationed in the lobby stated they had a disorderly person

18  in the lobby and they needed assistance with that person.

19  Q.  And what was your response?

20  A.  That I said go ahead, show me en route to the 12th Street

21  entrance of 601 East 12th Street.

22  Q.  And where did you report?  Where did you go?

23  A.  I went down from the second floor to the first floor of the

24  building.

25  Q.  And what did you observe upon your arrival in the lobby of

1  that building?

2  A.  The guards indicated that the person had come into the

3  facility, asked for a federal judge, they told him there was none

4  here and that he was -- had to leave.  And they indicated that he

5  was outside in the street.

6  Q.  And at that point did you turn and look towards the street?

7  A.  I did.  I immediately started walking out to the street to

8  find out what was going on.

9  Q.  And when you made it outside to the street, what did you see?

10 A.  I seen the defendant in the street, screaming and yelling,

11 pacing back and forth.

12 Q.  And let me go ahead and take care of that.  The man you saw

13 in the street that day, is he present in this courtroom?

14 A.  He is.

15 Q.  Could you please describe what he's wearing and where he's

16 seated?

17 A.  Orange jumpsuit.  The table right behind you to your -- to

18 your right.

19        MR. McCARTHER:  Your Honor, may the record reflect that

20 the witness has identified the defendant, James E. Everett?

21        THE COURT:  Without objection, it will show that.

22 BY MR. McCARTHER:

23 Q.  And I believe you said he was in the street at this time, is

24 that correct?

25 A.  Yes, sir.

1  Q.  And what was he doing in the street?

2  A.  Screaming, yelling, waiving his arms.

3  Q.  And what did you do in response to seeing this behavior from

4  the defendant?

5  A.  I hollered at him.  Asked him what was going on, what the

6  issue was and started walking towards him.

7  Q.  And in response, what did you observe the defendant do?

8  A.  He started walking towards us.

9  Q.  Now when you say "us," who are you talking about?

10 A.  Myself and two other inspectors that exited the lobby with

11 me.

12 Q.  And did the three of you and the defendant have a

13 confrontation?

14 A.  We did.

15 Q.  Could you explain what happened during that confrontation?

16 A.  The defendant came up to us yelling obscenities, saying "I'll

17 kick your ass."  We were asking him what he was angry about, what

18 seemed to be the problem.  When I tried to engage him, he had --

19 didn't want to say anything to me.  He looked at another

20 Inspector and at that point he said, "I'll fucking kill you."

21 Q.  Was that in -- did he say that in response to any action on

22 your part or on the other Inspector's part?

23 A.  No.  We were simply standing there trying to have a

24 conversation with him at that point.

25 Q.  So after he stated, "I'll fucking kill you" to a different

1   Inspector, what did you do after that?

2   A.  At that point, I circled around behind him and grabbed his

3   arms and tried to place them behind his back and handcuff the

4   defendant.

5   Q.  And why did you try to restrain the defendant at that point?

6   A.  For his safety and ours.  If he's saying he's going to kill

7   us, we don't know what he has on him, what his intentions -- we

8   know what his intention is but we want to make sure everybody's

9   safe.

10  Q.  Was it difficult to restrain the defendant?

11  A.  It was very difficult.

12  Q.  How many people did it take?

13  A.  It ended up taking six in total.

14  Q.  What was the defendant doing while you were attempting to

15  restrain him?

16  A.  Twisting, kicking, biting, anything he could to try to get

17  free and escape.

18  Q.  Was he eventually restrained?

19  A.  He was.

20  Q.  And where was he finally restrained at?

21  A.  He was restrained on the ground right in front the main

22  entrance of the Federal Building.

23  Q.  And would that have been on the north or south side of the

24  building?

25  A.  It was the north side of the building.

Q.  And after he was restrained, was an EMT called to the

location?

A.  It was.

Q.  Why?

A.  For his protection.  It was fairly obvious that he was on

some type of narcotic, through experience and training where we

could tell that there was something definitely going on with him.

Whether it was mental or some type of drug he might on, for his

protection we want EMS to come and make sure that he was going to

be okay.

Q.  While the defendant was restrained on the ground, did you

notice a set of keys in close proximity to the defendant?

A.  There was.  There was a set of keys laying almost directly in

front of him.

Q.  When did you first notice these keys?

A.  As soon as we took him to the ground, the keys were sitting

there.  I noticed them come out of his hand as he was going down

to the ground.

Q.  And while he was restrained, did you ask him about those car

keys?

A.  I did.  I asked him if he had drove to my location, to the

building.

Q.  Why exactly would you ask him that question?

A.  The PSOs had indicated that he had come from a silver car

over on the south -- or the north side of the building, south

1  side of the street, of 12th Street.  And I wanted to make sure

2  that he had not drove that vehicle.  It's emergency vehicle

3  parking only and would have been a safety hazard to continue to

4  have that vehicle parked there.

5  Q.  And what was his response to your question, did you drive

6  here?

7  A.  His response was, "Yes, I drove and I have a gun in the car."

8  Q.  Did you ask him if he had any weapons in the car?

9  A.  No, I did not.

10 Q.  Did you ask whether he had any weapons on his person?

11 A.  No, I did not.

12 Q.  Did you ask any question that would have reasonably prompted

13 a response like that?

14 A.  No, I did not.

15 Q.  Did it seem to you as though he had voluntarily conveyed that

16 information to you?

17 A.  Yes, sir.

18 Q.  Were you hurting the defendant at time you asked this

19 question?

20 A.  No, sir.

21 Q.  Were you yelling at him?

22 A.  No, sir.

23 Q.  Did you use anything that could be reasonably described as

24 coercive in asking these questions?

25 A.  No, sir.

1  Q.  Is it your understanding that a gun was located inside of the

2  vehicle the defendant had pointed out?

3  A.  Yes, sir.

4  Q.  And would that have Ruger Model P95 9mm caliber handgun,

5  Serial Number 316-67472?

6  A.  Yes, sir.

7  Q.  And is that the same gun for which the defendant is being

8  charged with being a felon in possession of a firearm in Count

9  Two of the Superseding Indictment in this case?

10  A.  Yes, sir.

11        MR. McCARTHER:  No further questions for this witness,

12  Your Honor.

13        THE COURT:  Okay.  Are we concerned at all about the

14  alleged heroin here or not?

15        MR. McCARTHER:  The motion is simply to suppress the

16  statement, Your Honor.

17        MR. ERMINE:  That's correct.

18        THE COURT:  Okay.  All right.  Thank you.

19                          CROSS-EXAMINATION

20  BY MR. ERMINE:

21  Q.  Is it Officer or Inspector?

22  A.  It's Inspector.

23  Q.  Inspector Yadon, correct?

24  A.  Yes, sir.

25  Q.  Inspector, when you got the call, you came from the second

1  floor and you responded outside the main entrance to the Federal

2  Building, is that right?

3  A.  That is correct.

4  Q.  I think you mentioned on your direct testimony that there was

5  a total of three people, you and two other people, is that what

6  you testified to?

7  A.  Yes, sir.

8  Q.  Who were those other two people with you?

9  A.  Inspector Wright and Inspector Patterson.

10  Q.  Was there an Inspector Burnetta there as well?

11  A.  Area Commander Burnetta responded after we have already made

12  contact with the suspect.  He came eventually but he didn't

13  respond to the call immediately.

14  Q.  Okay.  And what about Inspector Schwarz?

15  A.  Inspector Schwarz, he was already out on the street getting

16  out of his vehicle.  He didn't respond with us.  He just happened

17  to come up as we were talking to the suspect.

18  Q.  Did each of those people take part in eventually restraining

19  Mr. Everett?

20  A.  Inspector Schwarz took part in restraining him.

21  Q.  Okay.  So I want to talk about the initial encounter that you

22  had outside the building that day.  I think you've testified that

23  Mr. Everett walked essentially from this vehicle to where you

24  were standing outside the main entrance, correct?

25  A.  Correct.

Q.  Isn't it true that when he walked up -- or let me ask it this

way.  When he walked up to you, he mentioned that he was

muttering things essentially, right?

A.  Yes, sir.

Q.  Was he saying these things directly to you or was he just

saying internally, to himself perhaps?

A.  It was to us.

Q.  Okay.  When he walked towards you, isn't true that at some

point after he made that initial contact with you, he turned

around and walked the other direction, didn't he?  And he made it

a few steps?

A.  I believe so, yes.

Q.  Okay.  So let's -- let me just ask you to tell us about that.

So, he walks up towards you and then he just turned around and

walked away?  What happened?

A.  I mean if he would have continued to walk, we would have

allowed him to walk away.  We had nothing to do with him at this

point.  I mean, he had made no threats to us other than some

vague threats.  If he would have continued to walk, we would have

allowed him to walk away.

Q.  Okay.  So what ended up happening that caused him to turn

around and come back?

A.  I couldn't tell you what his thought process on that.

Q.  Okay.

A.  We didn't say anything to make him come back.

1  Q.  That's what my question was going to be.  So it's your

2  testimony then that he wasn't responding to a command to come

3  back, he turned around of his own volition to come back?

4  A.  Correct.

5  Q.  When he came back the second time, did he make any threats at

6  that point?

7  A.  Yes, he did.

8  Q.  Okay.  Was he placed in -- so at that point we he turns

9  around and comes back the second time, at that point he's under

10 arrest, correct?

11 A.  No, he was not under arrest.

12 Q.  Okay.  Isn't true, though, at that point that's when you

13 moved to go around behind him to restrain him?

14 A.  He was being detained.

15 Q.  Okay.

16 A.  He wasn't necessarily under arrest at that point.

17 Q.  Okay.  So, what would -- what would he be -- well, let me ask

18 this first.  As you walked around behind him at this point, isn't

19 it true that Officer Wright pulled -- put his hand on his Tazer?

20 A.  Yes.

21 Q.  Okay.  And once you got around behind Mr. Everett, you

22 immediately began grabbing his hands, right?

23 A.  Correct.

24 Q.  And his arms?

25 A.  Yes.

1  Q.  And you're essentially forcing them behind his back to put

2  him in handcuffs, correct?

3  A.  Correct.

4  Q.  So, is he arrested at that point?

5  A.  He's being detained at that point.

6  Q.  And then he's ultimately taken to the ground, right?

7  A.  Correct.

8  Q.  By yourself and two other officers?

9  A.  Correct.

10 Q.  And then additional KCMOPD officers, two of them show up and

11 then another Inspector gets -- comes as well, right?

12 A.  Correct.

13 Q.  So a total of six?

14 A.  Correct.

15 Q.  Is he arrested at that point?

16 A.  At that point he's still being detained for his safety and

17 our safety.

18 Q.  Okay.  So, he's handcuffed and he's laying -- is he laying

19 face down on the ground?

20 A.  He is.

21 Q.  And then he's -- his pockets are searched, right?

22 A.  Yes.

23 Q.  Okay.  So, is he arrested at that point?

24 A.  At that point, we make sure that there -- there is nothing on

25 him that can cause harm to the EMS that's going to going to be

1  responding to take him for evaluation.

2  Q.  Okay.  But that's when the heroin -- the Judge just mentioned

3  that -- that's when that heroin was found in his pocket, correct?

4  A.  Correct.

5  Q.  So, as you're waiting for EMS and he's on the ground, he's

6  never read his *Miranda* rights, is he, at this point?

7  A.  No.

8  Q.  Okay.  But you did testify that you did ask him a question.

9  You asked him -- your testimony was that you asked him at this

10 point did he drive here?

11 A.  Correct.

12 Q.  Do you know how long it was from when you asked him that to

13 when they ultimately ended up searching the car and finding the

14 Ruger that you testified about?

15 A.  No, I was -- I didn't have any part with searching the

16 vehicle.

17 Q.  Okay.  Who is Senior Special Agent Vas?

18 A.  Travis Vas.  He's a special agent with the Federal Protective

19 Service.

20 Q.  And at the time of this incident in March was he some sort of

21 commander at the place where you work?

22 A.  He's a -- just like you have a -- he's an agent.  He's on a

23 different side than us.  He works with us but he doesn't work for

24 us.

25 Q.  Okay.  He's been transferred to St. Louis now I understand?

1  A.  He has.

2  Q.  But you're familiar with him, right?

3  A.  I am.

4  Q.  And you're generally familiar with this case, right?

5  A.  Correct.

6  Q.  Is it fair to say that he was kind of in charge of getting

7  the reports and things ready for this case and turning them over

8  to the prosecution?

9  A.  As far as I'm aware, yes.

10 Q.  Okay.  So, he was basically the case agent, right?

11 A.  Correct.

12 Q.  Are you aware that he has provided a synopsis of the details

13 of the investigation in this case?

14 A.  I am.

15 Q.  Okay.  I'm going to show you what I've previously marked as

16 Defense Exhibit #1 and I provided a copy to the Government

17 already.

18         MR. ERMINE:  May I approach the bench, Your Honor?

19         THE COURT:  Yeah, you don't need to ask.  Just go on up

20 there.

21 BY MR. ERMINE:

22 Q.  Inspector, let me just have you look at Exhibit #1 there and

23 let me know when you've had a good opportunity to review it.

24 A.  (Witness reviewing Exhibit #1).  Okay.

25 Q.  Okay.  Now, does this document -- well, I'll ask you this

1  way.  What does this document appear to be?

2  A.  Which part there?  The details, investigation, or synopsis?

3  Q.  Yeah.  Is this basically a synopsis of everything written

4  down by Agent Vas?

5  A.  Yeah.  It looks like he's taken stuff from multiple reports.

6  Q.  Okay.  And do you have any reason to believe that this not

7  Agent Vas's report?

8          THE COURT:  Can we stipulate to that?  I mean --

9          MR. McCARTHER:  Stipulate that this Agent Vas's report?

10         THE COURT:  Yeah.  Yeah.

11         MR. McCARTHER:  Sure.  Yes.

12         MR. ERMINE:  So, on that basis, we'd move for admission

13  Defense Exhibit #1.

14         THE COURT:  Any problem with Exhibit #1 to be admitted?

15         MR. McCARTHER:  I'd object as to hearsay, Your Honor.

16         THE COURT:  Okay.  That's overruled.

17         MR. ERMINE:  I want to ask you to -- and I have a copy

18  for the Court.

19         THE COURT:  Yeah, sure.  Yeah.  I just -- you need to

20  give me a heads up on what we're going to do here with -- have

21  you ever seen this report before?

22         THE WITNESS:  I have not read this report.

23         THE COURT:  Okay.  So, I guess I'm trying to figure out

24  what we're trying to do.

25         MR. ERMINE:  I really am just trying to admit this

1  report since Agent Vas isn't here.

2          THE COURT:  I'm not trying to stop you from doing

3  anything.  I'm just trying to figure out where you're going with

4  it.

5          MR. ERMINE:  Right.  Yeah.

6          THE COURT:  If he's not ever seen it before.

7          MR. ERMINE:  Right.  Yeah.

8          THE COURT:  Is there parts here that you want to

9  emphasize or what?

10          MR. ERMINE:  Yes.

11          THE COURT:  Okay.

12          MR. ERMINE:  Essentially.

13          THE COURT:  All right.  Go ahead.

14  BY MR. ERMINE:

15  Q.  So, I'm going to ask you to turn to page -- the third page

16  and the first full paragraph on the third page and just ask you

17  to read that paragraph.

18  A.  The part that starts with "Everett"?

19  Q.  Yes, sir.

20  A.  "Everett also had a Kansas Drivers License K02057251

21  identifying Everett.  A cellular phone, lighter, two dice, a

22  packet of Newport cigarettes, a tube of Carmex lip balm.  FPS

23  Officer Yadon asked Everett if he drove to the FPS Officer

24  Yadon's location and if Everett had any weapons on his person.

25  Everett responded 'Yes' and further stated 'I have a gun in the

1  car.'  FPS Officer Yadon spoke with Protective Security Officer

2  Fernando and confirmed that Everett was parked on 12th Street in

3  an emergency vehicle only parking space with the driver's side

4  door open.  During the search incident to the arrest of Everett's

5  person, Everett was not notified of his *Miranda* rights."

6  Q.  Okay.  Thank you.

7        MR. ERMINE:  I'm going to skip Exhibit #2 for a second

8  and I'll just ask if the Government would stipulate to the

9  Affidavit.  I think the Court could take judicial notice of it

10  anyway since it's a court document.

11        THE COURT:  Yeah.  I don't know that we need to have him

12  read it.

13        MR. ERMINE:  Right.

14        THE COURT:  I mean, if you point it out to me, I'll --

15  I'll emphasize the parts that you're interested in me having to

16  focus on.

17        MR. ERMINE:  Yes, sir.  Then just move for admission for

18  Exhibit #3 as being self-authenticating.

19        THE COURT:  Do we -- Exhibit #3?

20        MR. ERMINE:  Yes, sir.

21        THE COURT:  Do we have a #2?

22        MR. ERMINE:  I'm going to get to #2 in a second.

23        THE COURT:  Okay.  So what is Exhibit #3?

24        MR. ERMINE:  Exhibit #3 is Special Agent Vas's Affidavit

25  in Support of the Criminal Complaint.  I think the Court can just

1  take notice at the time.  It's already been admitted at a

2  previous hearing.

3          THE COURT:  Or we can have it marked.  Well, if it's

4  marked as Exhibit #3, we'll go ahead and admit Exhibit #3 as part

5  of the record here.

6          MR. ERMINE:  All right.

7          THE COURT:  Any problem from the Government?

8          MR. McCARTHER:  Objection as to hearsay, Your Honor.

9          THE COURT:  Again, I think it's clear that this stuff

10 can come in.

11         MR. ERMINE:  All right.  And I would just ask the Court

12 to --

13         THE COURT:  I'm not trying to lecture you over there.  I

14 just -- I think the rule is pretty clear though that it comes in,

15 so.

16         MR. McCARTHER:  Sure.

17         MR. ERMINE:  And I'll just point the Court specifically

18 to Paragraph 5 on that document.

19         THE COURT:  Paragraph 5 of that, right?

20         MR. ERMINE:  Yes.

21         THE COURT:  Okay.  Let me just kind of mark what we're

22 doing here.  So, I got #1 and I've got #3 and we're looking at --

23 we're looking at Paragraph 5?

24         MR. ERMINE:  Yes, sir.

25         THE COURT:  Okay.  Okay.

BY MR. ERMINE:

Q.  Inspector, was -- Inspector, you mentioned that Inspector
Patterson was there as well during Mr. Everett's arrest?

A.  Yes.

Q.  Okay.  Have you seen the report written by Inspector
Patterson?

A.  I have seen that one.

Q.  I'm going to show you -- sorry.  I'm going to show you what's
previously marked as Defense Exhibit #2.  After taking a look at
that, I'll ask you if that appears to be Inspector Patterson's
report?

A.  I believe so, yes.

Q.  Okay.

        MR. ERMINE:  We'll move for admission of Defense Exhibit
#2.

        THE COURT:  Any problem?

        MR. McCARTHER:  Same objection, Your Honor.

        THE COURT:  Okay.  Same ruling.  Again, have you seen
this report?

        THE WITNESS:  I have seen this one.

        THE COURT:  Okay.  All right.

BY MR. ERMINE:

Q.  I want to direct your attention especially to the second page
of this and I will provide a copy to the Court as well.

        THE COURT:  Yeah.  Thank you.

BY MR. ERMINE:

Q.   And I'm going to just be rather specific here.  In the first
paragraph there, just from the top of the page looking one, two,
three, four, five, six, seven lines down, isn't it true that in
this report, Inspector Patterson says quote, "I heard someone ask
the subject a question and he replied, 'I have a gun in the
car.'"

A.   Yes, sir.  I see it.

Q.   Okay.  Now, you mentioned that during this incident with Mr.
Everett, really from the first instant you saw him -- or I guess
I should say even when you were called to come down there, you
were called to come down because of a report of a disorderly
person, right?

A.   Correct.

Q.   And you testified on direct that it appeared to you based on
your training and experience that it was quote, "obvious that he
was on a narcotic, maybe had some mental problem," right?

A.   Correct.

Q.   And you mentioned that you came to that conclusion because of
how strangely he was acting, right?

A.   Correct.

Q.   And I think maybe in your report you even mentioned that he's
making incoherent statements about his son.  Do you remember
that?

A.   Yes.  Something when he first came into the Federal Building,

1  yes.

2  Q.  Okay.  And I don't know if you mentioned this on direct, I

3  think maybe you did, that you testified he was out in the street

4  slapping himself about the head, right?

5  A.  I believe that his slapping was in the face and it was while

6  he was in the Federal Building.

7  Q.  Okay.

8  A.  When he was in the street, he was just yelling and waiving

9  his arms.

10  Q.  And then when he was taken down to the ground, he was banging

11  his head on the concrete, right?

12  A.  Correct.

13  Q.  In fact, he was ultimately transported to Truman by EMS,

14  right?

15  A.  Correct.

16  Q.  And they were monitoring him for drug usage or mental health

17  problems, right?

18  A.  Correct.

19  Q.  And are you aware that he actually ended up testing positive

20  for PCP when he was at Truman?

21  A.  I am aware of that.

22          MR. ERMINE:  If I just have one moment, Your Honor?

23          THE COURT:  Uh-huh.

24          MR. ERMINE:  Nothing further for this witness, Your

25  Honor.  Thank you.

1              THE COURT:  Okay.

2                        REDIRECT EXAMINATION

3   BY MR. McCARTHER:

4   Q.  I want to first discuss Special Agent Vas.  Was he present at

5   the time in which you asked the defendant about his car keys?

6   A.  I don't believe so, no.

7   Q.  And so this report, what's marked as Defendant's Exhibit #1,

8   this is a compilation of multiple people's reports, right?

9   A.  Correct.

10  Q.  This line where he notes "FPS Officer Yadon asked Everett if

11  he drove to FPS Officer Yadon's location and if Everett had any

12  weapons on his person."  Whether you asked Everett if he had any

13  weapons on his person, would he have gotten that from you or your

14  report?

15  A.  No.

16  Q.  But you're the person who actually did ask the defendant a

17  question, right?

18  A.  Correct.

19  Q.  And did you at any time during this entire ordeal ask the

20  defendant about any weapons on his person or in his car or

21  anywhere else?

22  A.  No, I did not.

23  Q.  I want to talk about your decision to detain the defendant.

24  You testified on cross and some on direct about how you circled

25  behind the defendant, is that correct?

1  A.  That's correct.

2  Q.  Was the defendant acting in an aggressive manner towards you

3  and your fellow officers?

4  A.  Yes, he was.

5  Q.  Describe how he was doing that?

6  A.  His actions, clenching of the fists, the pre-assault

7  indicators that we learned through the Police Academy were all

8  being exhibited as he was speaking to us.

9  Q.  Was he speaking in a calm and docile manner?

10 A.  No, he was not.

11 Q.  How was he speaking?

12 A.  A lot of screaming.  A lot of yelling.

13 Q.  And some of these yells were threats, is that correct?

14 A.  That's correct.

15 Q.  And so was it after these aggression indicators and after the

16 threats he made that you determined that the defendant needed to

17 be detained?

18 A.  Correct.

19         MR. McCARTHER:  No further questions, Your Honor.

20         THE COURT:  Okay.  Anything else?

21         MR. ERMINE:  Just one question.

22         THE COURT:  Don't ever say one question, Mr. Ermine,

23 because it never turns out to be one question.

24         MR. ERMINE:  One of these -- one of these days it will

25 just be one.  This could be the day.

1          THE COURT:  All right.  I'll start counting.

2                    RECROSS EXAMINATION

3   BY MR. ERMINE:

4   Q.  Do you -- throughout this whole process was there ever a

5   point where you ordered Mr. Everett to come toward you or where

6   one of the other FPS officers ordered Mr. Everett to come toward

7   you?

8   A.  No, we never ordered him.  We hollered at him and asked what

9   was going on.

10          MR. ERMINE:  Thank you.

11          THE COURT:  Well, that was really a compound question.

12          MR. McCARTHER:  It was a trick.

13          THE COURT:  Anything else?

14          MR. McCARTHER:  No, Your Honor.

15          THE COURT:  Okay.  Let me just before you move -- let me

16   just -- is that all the evidence the Government has?

17          MR. McCARTHER:  No, Your Honor, one additional witness.

18          THE COURT:  Okay.  And I want to just get on this

19   Exhibit #1, that's the report of an Officer Vas?  V-O-S-S?

20          MR. McCARTHER:  V-A-S, Your Honor.

21          THE COURT:  V-A-S?

22          MR. McCARTHER:  Special Agent Vas who was -- who is the

23   case agent on this case.

24          THE COURT:  Okay.  Is there two S's, Vas, or one?

25          MR. McCARTHER:  One S.

1        THE COURT:  One S.  Okay.  And just before we excuse the

2   -- this Inspector, although it is a Fifth Amendment issue and I

3   understand that, we have to also factor in the fruits issue here.

4   Are you going to have somebody present whatever else we had

5   seized?  The gun -- we've got the gun, we've got -- now I think

6   we've got the -- the drugs, the heroin, right?

7        MR. McCARTHER:  Right.

8        THE COURT:  Anything else of an evidentiary value that

9   we haven't already put in or that you intend to put in?

10        MR. McCARTHER:  Your Honor -- well, two things.  My

11   understanding from the Defendant's Motion to Suppress is it was

12   specific to the statement.  But regarding fruits, the gun was

13   found as an inventory search pursuant to a lawful tow.  And so

14   there's no issue as it relates to that statement.

15        THE COURT:  Okay.  All right.  Now, I'm going to ask

16   him.  Who are you going to have next?

17        MR. McCARTHER:  KCPD Detective Bradley Bailey, who was

18   also present at the scene and helped detain the defendant.

19        THE COURT:  Okay.  All right.  Well, let me ask him, I

20   think I understand your testimony here on direct but was there

21   ever a time during the period of time -- if I've got this right,

22   this guy was -- this man was in the Federal Building.  You get a

23   call -- a service call to respond because there's a disturbance.

24        THE WITNESS:  Uh-huh.

25        THE COURT:  You go to that area.  He's not there, he's

1  outside.  You then approach him to try to speak to him and then

2  you get this event that you've described here.  At some point you

3  become concerned about his well-being, his health and you call

4  for the emergency people to take a look at him, the EMT people,

5  is that correct?

6              THE WITNESS:  Correct.  Correct, Judge.

7              THE COURT:  And is that the truck that comes or who is

8  that?  Who is the EMT guy?

9              THE WITNESS:  The EMS -- it's -- I know that KCPD called

10 for it and then FPS called for it.  We have two different

11 dispatch centers.  So, who or what -- whether is it MAST

12 Emergency Medical Services --

13             THE COURT:  Yeah, but somebody comes from -- the EMT

14 people come?

15             THE WITNESS:  Correct.

16             THE COURT:  And they come and they begin to provide some

17 help to --

18             THE WITNESS:  Correct.

19             THE COURT:  -- the gentleman, right?

20             THE WITNESS:  Correct.

21             THE COURT:  Right.  Now, at any time -- and then he's

22 taken to the hospital then?

23             THE WITNESS:  Correct.

24             THE COURT:  At any time -- at that point on that date at

25 any time while you were there, did you ever place him under

1   arrest?

2          THE WITNESS:  I never did.  I never -- I never told Mr.

3   Everett that he was under arrest.  I did not.

4          THE COURT:  Okay.  In your mind at the time, did you

5   ever think he was -- I understand detention -- I'm talking about

6   arrest for a crime.  Did you ever arrest him for a crime and, if

7   so, what crime?

8          THE WITNESS:  I never arrested him for a crime, sir.

9          THE COURT:  Okay.  All right.  Now, so then he goes,

10  right, he gets taken away.  Do you ever see him again?

11         THE WITNESS:  I did.  We were at the hospital where he

12  was at.

13         THE COURT:  Okay.  So you followed them there to the

14  hospital, right?  And what was happening there at the hospital?

15         THE WITNESS:  He was fighting with security staff at the

16  hospital.  I believe at one point he broke free of his

17  restraints.  I think he peed all over his hospital room and they

18  were sedating him at that point to keep him calm.

19         THE COURT:  So, were you then -- were you then there for

20  security at the hospital or what were you --

21         THE WITNESS:  After that point, I believe they had found

22  the gun and they were finding out what procedures we needed to do

23  for the arrest warrant.

24         THE COURT:  Okay.

25         THE WITNESS:  I couldn't tell you.  I was just told by

1  supervisor to stand by --

2              THE COURT:  Okay.

3              THE WITNESS:  -- at the hospital.

4              THE COURT:  Now, I've asked a far number of questions

5  here, so I'm going to let you follow up.  Anything else from the

6  United States?

7              MR. McCARTHER:  No, Your Honor.

8              THE COURT:  Anything else for the defense?

9              MR. ERMINE:  No further questions, Your Honor.

10             THE COURT:  Okay.  So this officer is excused -- or you

11 can get off the stand now.  And you've got another witness,

12 correct?

13             MR. McCARTHER:  Yes, Your Honor.  The United States

14 calls Detective Bradley Bailey to the stand.

15             THE COURT:  Okay.

16             MR. McCARTHER:  I'll grab him.

17             THE COURT:  All right.  Just come on up here and I'll

18 place you under oath.  Just come right up here.  Raise your right

19 hand, please.

20               BRADLEY BAILEY, GOVERNMENT'S WITNESS, SWORN

21             THE COURT:  Take the stand over here on your left,

22 please.

23                          DIRECT EXAMINATION

24 BY MR. McCARTHER:

25 Q.  Could you state your name for the record, sir?

1  A.  Bradley Bailey.

2  Q.  What's your occupation?

3  A.  I'm a detective with Kansas City, Missouri Police Department.

4  Q.  How long have you been in law enforcement, sir?

5  A.  Seven years.

6  Q.  And how long have you been with KCPD?

7  A.  Seven years.

8  Q.  And as a detective with KCPD, what's your current assignment

9  area?

10 A.  Currently I'm assigned to our Violent Crimes Intelligence

11 Squad as part of our Violent Crimes Enforcement Division.

12 Q.  And as part of that squad, what are your duties and

13 responsibilities?

14 A.  Primarily to identify and apprehend individuals involved in

15 firearms, narcotics and other violent crimes, particularly those

16 involving gang activity.

17 Q.  Do you remember the date of March 10th, 2016?

18 A.  Yes, I do.

19 Q.  Were you working on that date?

20 A.  I was.

21 Q.  Specifically around 8:30 a.m. where were you?

22 A.  I was walking out of the Jackson County Courthouse at the

23 Intersection of 12th and Locust.

24 Q.  And is that in Kansas City?

25 A.  Yes, it is.

Q.  Is that in the Western District of Missouri?

A.  Yes, it is.

Q.  When you walked out of the courthouse, did you see anything

unusual?

A.  Yes, I did.

Q.  What did you see?

A.  My partner and I were walking to our patrol vehicle that was

parked on Locust Street.  My attention was directed up at the

intersection of 12th and Locust to a black male wearing all blue.

He was shouting profanities and other inaudible statements and

running around in the street.

Q.  And upon seeing that, what was your response?

A.  My partner and I entered our patrol vehicle and started to

drive towards the male's location.  We were probably about half a

block away at that point.

Q.  The man you saw in the street, is he present in the courtroom

here today?

A.  Yes, he is.

Q.  And could you describe what he's wearing and where he's

seated?

A.  In the orange jumpsuit at the table to your back right.

        MR. McCARTHER:  Your Honor, could the record reflect the

witness has identified the defendant?

        THE COURT:  Yes.

BY MR. McCARTHER:

1  Q.  After you pulled up to the location where you saw the

2  defendant, what did you do?

3  A.  As we turned onto 12th Street, I observed the defendant

4  walking aggressively towards front doors of the Federal Building

5  which is on the south side of 12th Street.  As he started walking

6  towards the doors, we pulled our patrol vehicle up and parked it

7  on 12th Street directly in front of the building.

8  Q.  And what did you see happen?

9  A.  As we were getting out of our vehicle, I observed four

10  uniformed Department of Homeland Security Officers make contact

11  with the male.  The defendant was continuing to -- acting in an

12  aggressive and erratic manner, was shouting profanity and

13  appeared to not be following the verbal requests or commands of

14  the officers.

15  Q.  Did you go over to help?

16  A.  I did.

17  Q.  At what point did you go over to help?

18  A.  I observed the officers attempt to place the defendant's

19  hands behind his back to place him in handcuffs.  A struggle

20  started to ensue, at which point we continued to walk over and

21  physically assisted in controlling the defendant.

22  Q.  Was it difficult to restrain him?

23  A.  Yes, it was.  Our training teaches us various control

24  techniques to take control of an individual with physical

25  resistance.  Those techniques were failing and we, in turn,

1  escorted the defendant to the ground to maintain further control.

2  Q.  Was the defendant finally restrained?

3  A.  After a struggle, yes.  The defendant was restrained and

4  placed in handcuffs.

5  Q.  And approximately where was this?

6  A.  We were just outside of the Federal Building's entrance along

7  12th Street.

8  Q.  Would that be the Richard Bolling Federal Building?

9  A.  Correct.

10 Q.  During the struggle, did the defendant appear to injure

11 himself?  Or immediately after the struggle?

12 A.  Not that I observed, no.

13 Q.  Did he do anything that gave you some concern over his

14 physical well-being after he was restrained?

15 A.  Yes, while were attempting to -- after we had placed the

16 defendant in handcuffs and were continuing our attempts to

17 physically restrain him on the ground, he continued to resist our

18 techniques, was still shouting, spitting, and the defendant

19 started to attempt to bang his head on the concrete ground.

20 Q.  And when you saw that, what measure were taken to prevent

21 that?

22 A.  I was positioned up near the defendant's upper portion of his

23 body near his head.  We maintained physical control of his head

24 to keep him from raising it off the ground and continuing to

25 attempt to strike it on the ground.

1  Q.  How would you describe the defendant's behavior at this time?

2  A.  The defendant continued to act in an irrational, erratic

3  manner.

4  Q.  And what was your -- what did you do in response to seeing

5  the defendant act in this manner?

6  A.  Based on not only his verbal and physical actions but the

7  behavior we observed prior to taking him into custody, that

8  behavior, in and of itself, contributed to the decision to order

9  an ambulance to the scene.

10  Q.  And why would you order an EMT in that situation?

11  A.  Based on my experiences as a police officer, both as a patrol

12  officer and a detective, I've had contact with numerous

13  individuals that were under the influence of alcohol, unknown

14  substances or drugs or also mental disorders that act -- were

15  acting in -- previously acted in a similar way that the defendant

16  was.  Based on those behaviors and the possibility of the

17  defendant being under an unknown substance, we ordered an

18  ambulance to the scene to evaluate his condition.

19  Q.  So you've called an ambulance.  How long did it take for the

20  ambulance to get there?

21  A.  I don't recall specifically.  Maybe a couple minutes.

22  Q.  In between the time you called the ambulance and the

23  ambulance arriving, did the defendant say anything?  Was he

24  talking?

25  A.  Yes.

1  Q.  What was he saying?

2  A.  I heard the defendant state that he was over at his nigga's

3  house smoking kush and heard another spontaneous statement

4  stating that the gray car over there was his and there was a gun

5  under the seat.

6  Q.  Did anyone ask him about a gun?

7  A.  Not that I heard.

8  Q.  Now, you noted in your report that this was a spontaneous

9  utterance, is that correct?

10 A.  Yes.

11 Q.  Why did you think it was a spontaneous utterance?

12 A.  While I was in the physical position of restraining and

13 making sure that the defendant didn't continue to injure himself

14 or other officers, my attention was focused on his upper body,

15 his head, and those statements I heard come from him and I didn't

16 hear any other statements or questions being asked by any officer

17 at the scene.

18 Q.  So, from your estimation, this appeared just completely

19 voluntary.  Is that fair to say?

20 A.  Yes.

21 Q.  Would his statement about having the gun in the car have been

22 reasonably prompted by anything that was going on around you?

23 A.  No.

24 Q.  Did anyone ask any questions regarding any weapons on his

25 person or in his car or anywhere else?

1  A.  Not that I recall.

2  Q.  Did you hear anyone interrogating the defendant during this

3  time?

4  A.  I did not.

5  Q.  Ultimately it's your understanding that a gun was located in

6  the gray car that the defendant had referenced?

7  A.  Yes.

8  Q.  And would that have been a Ruger Model P95 9mm handgun,

9  Serial Number 316-67472?

10  A.  Yes.

11  Q.  And is that the same gun for which the defendant is charged

12  in Count Two of the Superseding Indictment with being a felon in

13  possession of a firearm?

14  A.  Yes.

15          MR. McCARTHER:  I have no further questions at this

16  time, Your Honor.

17          THE COURT:  Cross.

18                      CROSS-EXAMINATION

19  BY MR. ERMINE:

20  Q.  Detective, you testified that as you were pulling up with

21  your partner you saw Mr. Everett walking aggressively toward the

22  doors of the Federal Building?

23  A.  Yes, sir.

24  Q.  And you mentioned that there were four FPS officers that were

25  making contact with him?

1  A.  Yes.

2  Q.  Could you hear what was being said at that point?

3  A.  Only by the defendant.

4  Q.  Okay.  You mentioned that in your direct that he was not

5  following verbal requests.  What sorts of verbal requests were

6  being given that he wasn't following?

7  A.  From the distance that I was at, I could only hear voices

8  from the officers.  I couldn't make out anything that was being

9  said.

10 Q.  Okay.  When you got to where all of these people were, was

11 Mr. Everett already on the ground at that point?

12 A.  No.

13 Q.  Okay.  So, did you assist in helping to take him to the

14 ground?

15 A.  I believe I did, yes.

16 Q.  Okay.  At that point, were you aware of what he was being

17 arrested for?

18 A.  I was not.

19 Q.  You mentioned that you had seen him acting aggressively,

20 right?

21 A.  Yes.

22 Q.  He's act -- was he acting erratically?

23 A.  Yes.

24 Q.  And you testified that based on your training and experience,

25 he appeared to be under the influence of some sort of narcotic,

1  correct?

2  A.   Either alcohol, narcotic or suffering from some sort of

3  mental disorder, yes.

4  Q.   Okay.  And that was based on his demeanor?

5  A.   Yes.

6  Q.   And based on his behavior?

7  A.   Uh-huh.  Yes.

8  Q.   Were you the one who actually issued the citation for the car

9  that was parked?

10  A.   I can't recall if it was me personally or my partner, but

11  either my partner and I did, yes.

12  Q.   You weren't the person that searched the car, though, were

13  you?

14  A.   I don't recall if I was or not.

15  Q.   Do you know if it was searched before or after the citation

16  was issued?

17  A.   I believe it was during.

18  Q.   Okay.  Did you ever attempt to contact the owner of that car?

19  A.   I don't recall.

20  Q.   You mentioned that you are a detective, you work with a

21  Violent Crimes Intelligence Squad, correct?

22  A.   Yes.

23  Q.   Are you aware of any rules or policies that detail when the

24  Kansas City, Missouri Police Department can go to assist with

25  something that's going on at the Federal Building?

1   A.  I'm not aware.

2   Q.  Are you aware of any limitation on your ability to go help

3   them out?

4   A.  I'm not.

5   Q.  Okay.

6           MR. ERMINE:  If I could have one moment, Your Honor?

7   Nothing further.  Thank you.

8           THE COURT:  Okay.  Anything else?

9           MR. McCARTHER:  Yes, briefly, Your Honor.

10                      REDIRECT EXAMINATION

11  BY MR. McCARTHER:

12  Q.  At some point was a safety protective hood placed on the

13  defendant?

14  A.  Yes.

15  Q.  And why was this done?

16  A.  The defendant had previously spat at officers and was

17  continuing to spit toward officers and also the paramedics once

18  they arrived on scene.

19  Q.  Was there also a concern about potential biting by the

20  defendant?

21  A.  I believe there was, yes.

22  Q.  Now, describe this hood for me.  Does it cover the entire

23  face of an individual?

24  A.  Yes, it does.

25  Q.  And while the defendant was on the ground restrained, was

1  anyone trying to interrogate him or ask him questions about any
2  criminal activity --
3  A.  No.
4  Q.  -- that was taking place?
5  A.  No.
6  Q.  Have you been -- have you been a part of any interrogations
7  in your career as a law enforcement officer?
8  A.  Yes, I have.
9  Q.  Did the circumstances of those interrogations that you have
10  done, did those at all match the circumstances of the defendant
11  being restraining in this case?
12  A.  No, they do not.
13  Q.  Okay.
14          MR. McCARTHER:  Nothing further, Your Honor.
15          THE COURT:  Anything else?
16          MR. ERMINE:  No follow up.  Thank you.
17          THE COURT:  Okay.  You can step down.  Thank you.
18  Additional evidence?
19          MR. McCARTHER:  Nothing further, Your Honor.
20          THE COURT:  Any evidence by the defense?
21          MR. ERMINE:  No, sir.  I think I admitted the three
22  exhibits, so.
23          THE COURT:  Yeah.  Okay.  All right.  Then does that
24  conclude the -- all the evidence we're going the hear?  Nothing
25  else, right?

1          MR. McCARTHER:  Yes, Your Honor.

2          MR. ERMINE:  That's correct.

3          THE COURT:  Okay.  All right.  Thank you.

4                    (Court Adjourned at 3:13 p.m.)

1

2                              **INDEX**

3

**WITNESSES FOR**
4  **THE PLAINTIFF:**      **DIRECT**    **CROSS**      **REDIRECT**    **RECROSS**

5  David Yadon            6            14            28            30
   Bradley Bailey         34           41            44

6

7  **EXHIBITS:**           **MARKED**    **ADMITTED**

8  D#1                    20           21
   D#3                    23           24
9  D#2                    25           25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.


/s/ Lissa C. Whittaker                January 9, 2017
Signature of transcriber                    Date