**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) Case No. 16-00110-01-CR-W-DGK |
| | ) |
| **Plaintiff,** | ) **Kansas City, Missouri** |
| | ) **February 8, 2017** |
| **v.** | ) |
| | ) |
| **JAMES E. EVERETT, JR.,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**TRANSCRIPT OF HEARING ON SUPPLEMENTAL MOTION TO SUPPRESS
BEFORE THE HONORABLE ROBERT E. LARSEN
UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

For the Plaintiff:          Mr. Jeffrey Q. McCarther
                            Ms. Courtney Pratten
                            Assistant United States Attorney
                            400 E. Ninth St., Ste. 5510
                            Kansas City, MO  64106
                            (816) 426-3122

For the Defendant:          Mr. W. Marc Ermine
                            Federal Public Defender's Off.
                            818 Grand Blvd., Ste. 300
                            Kansas City, MO  64106
                            (816) 471-8282

Court Audio Operator:       Ms. Christy Anderson

Transcribed by:             Rapid Transcript
                            Lissa C. Whittaker
                            1001 West 65th Street
                            Kansas City, MO  64113
                            (816) 914-3613

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                 (Court in Session at 9:36 a.m.)

2        THE COURT:  I have a follow-up on a suppression hearing

3 we conducted recently.  This is the case of *United States of*

4 *America vs. James E. Everett, Jr.*  The number of the case is 16-

5 110-01-CR-W-DGK.  Let me have the AUSA's appearance, please.

6        MR. McCARTHER:  Jeff McCarther on behalf of the United

7 States.  I'm joined at counsel table by Special Assistant

8 Courtney Pratten who will be second chairing me at trial.  Also

9 seated at counsel table is Special Agent Travis Vas who is the

10 case agent on this case, Your Honor.

11        THE COURT:  Okay.  Thank you.  And counsel for Mr.

12 Everett.

13        MR. ERMINE:  Marc Ermine on behalf of Mr. Everett.

14        THE COURT:  And we have Mr. Bush here along with Mr.

15 Everett.

16        MR. ERMINE:  Yes, sir.

17        THE COURT:  We've got a Supplemental Motion to Suppress

18 that was filed by defense counsel.  And as I read that, it raised

19 a new legal issue, or potentially two new legal issues in

20 connection with the issue of whether or not the information --

21 whether the evidence should be suppressed here.  The first issue

22 deals with the Fifth Amendment preclusion and whether or not the

23 statement that the defendant made was coerced and should,

24 therefore, the derivative evidence be suppressed.  And then the

25 second issue was whether or not the Government is arguing an

1  inevitable discovery theory here based on the representations

2  made at the first hearing as to an inventory search made of the

3  car.  So, those are at least what I think we're here to cover.

4  Is that accurate or not?

5           MR. ERMINE:  Yes, sir.  I think the simple way to put it

6  is we're moving to suppress not only the statement, but also all

7  the evidence to include the firearm that was discovered within

8  the car --

9           THE COURT:  Right.

10          MR. ERMINE:  -- and the heroin that was reportedly taken

11 from Mr. Everett's pockets.

12          THE COURT:  And the legal argument is not *Miranda* -- I

13 mean, we're not waiving *Miranda*, but it's a coercive argument

14 that the actions of the law enforcement people coerced him into

15 making that statement, right?

16          MR. ERMINE:  That's correct, Your Honor.

17          THE COURT:  And so -- and then the second piece is if

18 they are raising the other issue on inevitable discovery -- well,

19 let's get that on the table, too.

20          MR. ERMINE:  Yes, sir.

21          THE COURT:  Okay.  All right.  I would want to point out

22 to the parties that as we take evidence in here, it would be

23 helpful if we would make it clear whether or not in each instance

24 on direct examination or cross-examination, whether or not the

25 witness is talking about as a percipient witness to things he or

1   she saw, observed, tasted, felt, et cetera, or whether he or she

2   is reporting something that someone else said.  As we all, I

3   think, know under the Federal Rules of Evidence, hearsay may be

4   admissible here, but let's make it clear when we have hearsay

5   coming in and when we don't on both sides.  Okay.  All right.

6   So, are you ready to proceed?

7           MR. McCARTHER:  Yes, Your Honor.

8           THE COURT:  Okay.  The United States would first call

9   Special Agent Travis Vas to the stand.

10          THE COURT:  Okay.  Agent, just come on up here and I'll

11  place you under oath.  Good morning.  Raise your right hand,

12  please.

13              TRAVIS VAS, GOVERNMENT'S WITNESS, SWORN

14          THE COURT:  Take the stand over here on your left,

15  Agent.  And when you get up there, it sometimes makes a noise to

16  adjust for weight, but don't get concerned about it.

17                      DIRECT EXAMINATION

18  BY MR. McCARTHER:

19  Q.  Could you please state your name for the record, sir?

20  A.  Travis Stephen Vas.

21  Q.  How do you spell your last name?

22  A.  It's V as in Victor, A as in apple, S as in Sam.

23  Q.  What is your occupation, sir?

24  A.  I'm a special agent with the Federal Protective Service.

25  Q.  And what is your total length of service in law enforcement?

1   A.  I have about eight years, sir.

2   Q.  And how long have you been employed by the Department of

3   Homeland Security?

4   A.  About eight years, sir.

5   Q.  So, as part of the, I believe you said FPS, what are your

6   duties and responsibilities in that role?

7   A.  Our mission is to safeguard federal tenants, people that

8   visit federal buildings and then federal property, safeguarding

9   that as well.

10  Q.  What is your current assignment area?

11  A.  Right now I'm in St. Louis, Missouri, sir.

12  Q.  What was your assignment area on the date of March 10, 2016?

13  A.  Kansas City, Missouri.

14  Q.  And how long had you been assigned to the Kansas City,

15  Missouri area?

16  A.  About three years, sir.

17  Q.  What type of crimes in your role as a special agent do you

18  investigate?

19  A.  We deal with threats, assaults, unauthorized weapons, things

20  of that nature, sir.

21  Q.  Are you the case agent on this case, *The United States vs.*

22  *James Everett, Jr.*?

23  A.  I am.

24  Q.  As a case agent what are your responsibilities?

25  A.  Basically to take all the evidence, all the supplemental

1  reports, everything like that and essentially summarize that and

2  bring it to the AUSA for review.

3  Q.  Do you recall being the affiant on a complaint filed against

4  the defendant on March 11, 2016?

5  A.  I do.

6  Q.  Do you recall drafting that affidavit that was filed in

7  conjunction to that complaint?

8  A.  I do.

9  Q.  I'm going to show you what's been already marked and admitted

10  as Defense Exhibit #3.  Can you identify that document?

11  A.  I can.

12  Q.  What is it?

13  A.  It's the affidavit in support of a criminal complaint.

14  Q.  This was the one that would have been filed on March 11,

15  2016?

16  A.  That is correct.

17  Q.  I want to take you to Paragraph 5 of that document.  And I'm

18  going to read it and I want you to make sure that I read this

19  correctly.  Paragraph 5 reads, "During a search incident to the

20  arrest, Everett was asked if he had any weapons or contraband in

21  his possession.  Everett stated he had a weapon in his vehicle

22  which was unlocked with the driver's door open on 12th Street."

23  Did I read that correctly?

24  A.  You did, sir.

25  Q.  I now want to show you what's been marked and admitted as

1  Defense Exhibit #1.  Can you identify that document?

2  A.  I can.

3  Q.  What is that document?

4  A.  That's my Report of Investigation, sir.

5  Q.  I want to take you to page 3 of that document.  First full

6  paragraph on page 3, third line down that begins with, "Of Carmex

7  lip balm . . .."  And I want you to read along with me to make

8  sure I get this right.  "FPS Officer Yadon asked Everett if he

9  drove to FPS Officer Yadon's location and if Everett had any

10  weapons on his person.  Everett responded 'Yes' and further

11  stated, 'I have a gun in the car.'"  Did I read that accurately?

12  A.  You did.

13  Q.  On March 10, 2016, did you report to the Richard Bolling

14  Federal Building on a reported disturbance?

15  A.  I did.

16  Q.  When you reported was the defendant still present at the

17  scene at that time?

18  A.  He was.

19  Q.  And what actions did you take after you arrived on the scene?

20  A.  At that point the defendant was already in custody, prone in

21  a handcuff position.  One of the first things I did is I noticed

22  one of the uniform officer's hands was bleeding.  So, I went to

23  him, asked him what was going on, and I took him to the Richard

24  Bolling Federal Building nurse's station and got him medical

25  treatment.

1  Q.  After he was given medical assistance, did you go back down

2  to the scene of the incident?

3  A.  I did.

4  Q.  Was the defendant still present?

5  A.  I do not believe he was.  There was only just a lot of law

6  enforcement around.  I do not believe there was any ambulance or

7  anything like that around.

8  Q.  Would it be fair to say that you have no personal knowledge

9  of any of the events that took place prior to your arrival of at

10 the Richard Bolling Federal Building?

11 A.  That would be fair to say.  I personally was not a witness to

12 anything between our law enforcement officers and the defendant.

13 Q.  So, how did you figure out what had happened?

14 A.  Through the supplemental reports and speaking to law

15 enforcement officers on the ground.

16 Q.  Do you have any direct knowledge of any statements that the

17 defendant made at the scene?

18 A.  I was not present during any statements that the defendant

19 may have made.

20 Q.  So, these exhibits, Exhibits #1 and #3 that I've presented to

21 you, would it be fair to categorize these are summary documents?

22 A.  That would be fair to say, yes, sir.

23 Q.  Do you have any direct knowledge of the details contained in

24 these summary documents of which you were not -- during instances

25 where you were not present at the scene?

1  A.  I have no knowledge of what the defendant said versus --

2  Q.  So, I want --

3  A.  Just because of the fact I was not there.

4  Q.  So, I want to reference the statements that I read to you

5  from Exhibits #1 and Exhibits #3.  Why is there a reference in

6  these documents that defendant was asked whether he had any

7  weapons on him?

8  A.  At the time of -- when I came back down, sir, and started

9  taking the information, when I had heard that he had made that

10  statement, it was just such a spontaneous statement and the fact

11  that we're always taught in training to ask if a person has

12  weapons or contraband on their person, I had just assumed that

13  that was asked of the defendant prior to him making that

14  statement.

15  Q.  So, it would be fair to say that those statements in Exhibits

16  #1 and #3 were based on your belief of what happened at the time

17  rather than your personal knowledge.  Is that fair to say?

18  A.  Yes, sir.  I truly believe that's what he said.

19  Q.  I have a different question as it relates to the scene.  Do

20  you have any knowledge of what happened to Mr. Everett's keys

21  after he was taken into custody?

22  A.  During the investigation we did look at video that was taken

23  from the Richard Bolling Federal Building.  There's perimeter

24  cameras on the rooftops.  And there was a time where Mr. Everett

25  was taken to the ground by our officers where it looked like

1  something that matches the description of keys was almost I would

2  say tossed or flung from his hands as he was coming down to the

3  ground.

4  Q.  But you have no knowledge of where those keys were taken

5  after they had been flung to the ground?

6  A.  I do not.  I was not around, sir.

7           MR. McCARTHER:  I have no further questions at this

8  time, Your Honor.

9           THE COURT:  Cross.

10                       CROSS-EXAMINATION

11  BY MR. ERMINE:

12  Q.  Good morning.

13  A.  Hey, good morning.

14  Q.  You testify that you're the case agent in this case, right?

15  A.  Yes, sir.

16  Q.  So, you are familiar with all the supplemental reports that

17  were written in this case?

18  A.  I am, sir.

19  Q.  Are you familiar with a supplemental report that was written

20  by FPS Inspector Wright?

21  A.  I am, sir.

22  Q.  Okay.  Are you also familiar with the supplemental report

23  that was written by Inspector Patterson?

24  A.  I am.

25  Q.  I'm going to show you what I have previously marked as

1  Defense Exhibits #4 and #5.

2  A.  Thank you.

3  Q.  After taking a look at those, can you tell the Court what

4  Defense Exhibit #4 is?

5  A.  It appears this is a supplemental report written by Inspector

6  David Wright.

7  Q.  And is that the report that I just asked you about that

8  you're familiar with?

9  A.  That is correct, sir.

10          MR. ERMINE:  Okay.  I'd move for admission of Defense

11 Exhibit #4.

12          THE COURT:  Any objection?

13          MR. McCARTHER:  Your Honor, my understanding was this

14 was already marked and admitted though it may have been missing

15 some pages from the prior suppression hearing.

16          THE COURT:  Is this a complete report?

17          MR. ERMINE:  That's correct, Your Honor.  And I was

18 going to mention that after I did the next one.  I can tell you

19 now I agree with the Government.  The reason why I'm introducing

20 these two reports now is there were some pages missing from the

21 previous report.

22          THE COURT:  I welcome that.

23          MR. ERMINE:  Yes.

24          THE COURT:  So, I'm not -- I just want to make sure this

25 is a complete report.

1          MR. ERMINE:  This is the complete report.  And --

2          THE COURT:  Other than -- let me just see if -- is there

3   any other objection you've got, Mr. McCarther?

4          MR. McCARTHER:  My previous objection had been to

5   hearsay.  And to the extent that's relevant now, I would again

6   reiterate that objection.

7          THE COURT:  Okay.  Well, I think the rules allow hearsay

8   in these types of proceedings.  So, that objection is overruled.

9   #4 is in.  Move on to #5 then.

10  BY MR. ERMINE:

11  Q.  And, Agent Vas, taking a look at Defense Exhibit #5, what

12  does this appear to be?

13  A.  It also looks like a supplemental report, sir.  And this one

14  looks like it's authored by Wesley Patterson at the end.

15  Q.  Okay.  And are you familiar with this report in your role as

16  case agent?

17  A.  Yes, sir.

18  Q.  Okay.  This appears to be the complete report by Officer

19  Patterson, correct?

20  A.  Yes.

21          MR. ERMINE:  Okay.  Move for admission of Defense

22  Exhibit #5.

23          THE COURT:  Objection?

24          MR. McCARTHER:  Hearsay, Your Honor.

25          THE COURT:  Okay.  Overruled.  It's in.

1          MR. ERMINE:  And again, just so you're aware, Your

2    Honor, these exhibits will substitute for the previously admitted

3    exhibits at the prior hearing.  These are more accurate versions,

4    so we'll just ask the Court --

5          THE COURT:  Well, they're all in evidence.

6          MR. ERMINE:  Yes, sir.

7          THE COURT:  They're all in evidence.  Which ones were

8    these full copies of?  Do you know off-hand?

9          MR. ERMINE:  If I could have just one second.

10          THE COURT:  No, you don't need to do that now.  Just at

11    some point.  I mean, do you know, Jeff?

12          MR. McCARTHER:  I think I can clarify.

13          THE COURT:  Sure.

14          MR. McCARTHER:  I believe the prior admitted Exhibit #4

15    was one page from Officer Wright's report and a page from Officer

16    Patterson's report.  And so Exhibit #4 just admitted is the full

17    Officer Wright's report, whereas Exhibit #5 is the full Officer

18    Patterson's report.

19          MR. ERMINE:  Right.

20          THE COURT:  Do you know which ones they were

21    representing out of the earlier exhibits?  I can figure this out,

22    so.

23          MR. McCARTHER:  I believe Exhibit #4 had been offered as

24    Officer Wright's full report, even though it was one page from

25    Officer Wright's report and one page from Officer Patterson's

1  report.

2          THE COURT:  Okay.  All right.  Thank you.

3          MR. ERMINE:  Thank you.

4          MR. McCARTHER:  Thanks.

5  BY MR. ERMINE:

6  Q.  Now, Agent Vas, you testified that -- well, let me back up.

7  To become an FPS officer you undergo training, correct?

8  A.  Yes.

9  Q.  And part of that training is, I think as you mentioned, has

10  to do with how to make arrests, correct?

11  A.  Yes.

12  Q.  So, part of that training then involves being trained to ask

13  particular questions when someone is taken into custody, correct?

14  A.  Yes.

15  Q.  And you testified that as part of your training as an FPS

16  officer to ask these particular questions, those questions being

17  whether the person who is being detained has any weapons on their

18  person, correct?

19  A.  Yes.

20  Q.  And so it was based on your training and your experience then

21  that you expected that those questions would have been asked of

22  Mr. Everett here, correct?

23  A.  Yes.

24          MR. ERMINE:  Okay.  Might I have one moment, Your Honor?

25          THE COURT:  Yeah.  You bet.

1  BY MR. ERMINE:

2  Q.  A few more questions, Agent Vas.  When you were including

3  your summary, you actually talked to the officers as well as

4  reviewing their supplemental reports, didn't you?

5  A.  Yes, sir, on the same day.

6  Q.  Okay.  And isn't it true that there were more officers there

7  than just Wright and Patterson and Yadon, correct?

8  A.  Yes, sir.

9  Q.  I think it ended up being there were about six people who

10  ultimately arrested Mr. Everett, correct?

11  A.  I don't know the final number off the top of my head, sir, --

12  Q.  Okay.

13  A.  -- but it's more than those, yes.

14  Q.  Okay.  Did you talk to the other people besides Yadon, Wright

15  and Patterson?

16  A.  I cannot recall if I did, sir.

17  Q.  Okay.  Would you agree with me that the other people that

18  were there, the other FPS officers that were there, they didn't

19  write reports, did they?

20  A.  The ones that did not engage with the defendant with going

21  hands on, no, I don't believe I talked to any of them, sir.

22  Q.  Okay.

23  A.  I believe they arrived after the fact.

24  Q.  Do you know who Inspector C. Schwarz is?

25  A.  Yes, I do.

1  Q.  Okay.  Was that somebody who was there that day?

2  A.  Yes, sir.

3  Q.  He's an FPS officer?

4  A.  Yes.

5  Q.  And looking at --

6          THE COURT:  Is that Defendant's #5?

7          MR. ERMINE:  Yes, sir.  So, looking at Defense Exhibit

8  #5.

9          THE COURT:  Marc, is your -- Marc, would you move the

10  mic over so we're picking you up?

11  BY MR. ERMINE:

12  Q.  So, looking here at Defense Exhibit #5 and this report that

13  you've previously talked about, this is written by Officer

14  Patterson, you can see here -- would you agree with me that he

15  says that Inspector Schwarz was one of the folks who responded

16  immediately to Mr. Everett?

17  A.  Yes, sir.

18  Q.  Okay.  You haven't seen any reports from Inspector Schwarz

19  though?

20  A.  Not to my recollection, sir, at all.

21  Q.  Do you recall speaking to Inspector Schwarz before you wrote

22  your reports?

23  A.  I did, sir.

24  Q.  Okay.  And then there were also a couple of other inspectors

25  who showed up, or I should say area commanders.  There was a

1  Burnetta?

2  A.  Yes, sir.

3  Q.  Did you talk to Area Commander Burnetta before generating

4  your summaries of the reports?

5  A.  I don't believe I did, sir.

6  Q.  Okay.  Were you at the scene when the vehicle in this case

7  was searched?

8  A.  I don't believe I was, sir.

9  Q.  Okay.

10  A.  I believe that was all after the fact.

11  Q.  Okay.  So, you don't have any knowledge then of how the

12  vehicle came to be searched or any personal knowledge of how the

13  vehicle came to be searched?

14  A.  Any direct knowledge, no, sir.  I wasn't involved with

15  calling a tow truck or anything like that.

16          MR. ERMINE:  Okay.  All right.  One more moment, Your

17  Honor.

18          THE COURT:  You bet.

19                  (Off Record Talking)

20  BY MR. ERMINE:

21  Q.  Do you remember the substance of your conversation with

22  Inspector Schwarz?

23  A.  Vaguely, yes, sir.

24  Q.  Okay.  In that conversation did you learn that Inspector

25  Schwarz, was he close by Mr. Everett when Mr. Everett was on the

1   ground?

2           MR. McCARTHER:  Objection, hearsay.

3           THE COURT:  Overruled.  What was the question?  I --

4           MR. ERMINE:  The question is when he spoke to Inspector

5   Schwarz, did Inspector Schwarz tell him that basically he was

6   close by -- "he" being Inspector Schwarz was close by Mr. Everett

7   when Mr. Everett was taken to the ground.

8           THE COURT:  You may answer.

9           THE WITNESS:  A hundred percent I couldn't tell you what

10  he said, sir.  I just know you said he had been in an altercation

11  with the defendant.  So, as far as how close he was or anything

12  like that, I don't know directly how close he was --

13          MR. ERMINE:  Okay.

14          THE WITNESS:  -- or anything like that.

15  BY MR. ERMINE:

16  Q.  So, you're saying then that you don't recall really any of

17  the specifics of your conversation with Inspector Schwarz?

18  A.  It's mainly just getting him medical treatment at that time,

19  sir.  I believe one of the things we talked about is when I

20  arrived on scene before I took him to medical treatment, hey,

21  what's going on, you know, what's the situation, since I had no

22  really idea what was going on.  And one of those things I believe

23  he told me was that the defendant had drove here and demanded to

24  speak to a federal judge.  And far as specifically how everything

25  went down, I can't recall specifically what he said, sir, I'm

1   sorry.

2          MR. ERMINE:  Okay.  All right.  Nothing further, Your

3   Honor.

4          THE COURT:  Redirect?

5          MR. McCARTHER:  No redirect, Your Honor.

6   EXAMINATION BY THE COURT:

7   Q.  Okay.  I've got a couple of follow-up questions to ask you.

8   And some of this you may not know the answer to, Agent, and

9   that's fine.  If you don't, just tell me you don't know the

10  answer to it.

11  A.  Yes, Your Honor.

12  Q.  Let's go back to the examination about the criminal

13  complaint, which was marked as Defendant's #3 and your affidavit

14  there.  And counsel referred to Paragraph Number 5 in that

15  affidavit which said that "Everett was asked if he had any

16  weapons or contraband in his possession.  Everett stated he had a

17  weapon in his vehicle which was unlocked with the driver's door

18  open at 12th Street."  Where did you -- from whom did you get

19  that information?

20  A.  Sir, honestly, when I wrote that I believe that that question

21  had been asked since it was such a spontaneous statement to have

22  been made.  And with the training that goes with, and all our law

23  enforcement officers receive, they'll always ask before you go

24  hands-on with searching anybody, I had just essentially assumed

25  that that question had to have been asked for him to make that

1  statement.

2  Q.  So, just to make it precise.  No one -- you can't recall

3  today if anyone gave you that information, you just -- your

4  testimony is that you assumed that given the fact that this is a

5  standard procedure that that's what happened?

6  A.  Yes, sir.  I can't recall any specific -- where that was

7  specifically said to me.  That's correct, Your Honor.

8  Q.  Okay.  All right.  So, do you -- I guess I'm trying to think

9  if -- I'm trying to get it clear.  Do you just not remember today

10  or at the time did you did you just kind of think, well, this is

11  probably what happened?

12  A.  Well, sir, it was such a fluid situation.  Everything had --

13  all the reports had come in that day.  And with me talking to the

14  different individuals, piecing everything together and then

15  drafting the criminal complaint the next day, it just --

16  Q.  I'm just trying to -- I'm not trying to criticize anybody

17  here.

18  A.  Oh, no.  I understand, sir.

19  Q.  I'm just trying to figure out do you remember at the time you

20  executed the affidavit, do you remember at that time where you

21  got this information from?  Was it -- do you remember somebody

22  told you that, but you can't remember who had told you that?  Do

23  you think that, no, that's not what happened.  You just assumed

24  that that's, you know, somebody may have said this to you or you

25  just kind of made it up or what?

1  A.  I truly believe when I was talking to every -- all the

2  different parties involved, Your Honor, that somehow something

3  had to have been said where it clicked, that that question had to

4  have been asked and maybe I was placing the next logical step in

5  the sequence.

6  Q.  Okay.

7  A.  But at the time when I wrote it, I truly believed that's how

8  the circumstance went down, sir.

9  Q.  Yeah.  I'm not trying to -- I'm not trying to discredit you.

10 A.  Right.

11 Q.  I'm just trying to figure out what was going on when you

12 wrote this.  So, if I've got this right, and let me restate it,

13 and if I'm wrong, correct me.  At the time you had -- it was a

14 fluid situation.  You had talked to a number of people.  You

15 believe that somebody told you that Everett was asked if he had

16 any weapons and that he said that he had weapons.  You reported

17 what he's alleged to have said.  Is that much true?

18 A.  Yes, sir.

19 Q.  Okay.  And what would you have added here to that, do you

20 think, that was just based on experience or protocol?

21 A.  Experience and protocol, yes, Your Honor.  Just --

22 Q.  Yeah.  But what part of it?  Was that just supported by --

23 was that just kind of what you interpreted it to mean at the

24 time?

25 A.  As far as asking that question --

1  Q.  Right.

2  A.  -- when they went hands-on with the search, Your Honor?  Yes.

3  Based on my training and everything like that, --

4  Q.  Okay.

5  A.  -- that to me was just a logical step.  And with him making

6  that statement, Your Honor, I figured there had to have been some

7  type of question asked for him to just go straight from keys to a

8  car on the ground to gun in the car.

9  Q.  Okay.  Now, let's move to the other exhibit that was referred

10 to here.  And that's the -- oh, I must have screwed up.  I was

11 reading from the -- wait a minute.  Let me make sure I got this

12 right.  Yeah.  This is -- what I was covering was the affidavit

13 in support of the criminal complaint.  And then I've got -- oh,

14 that's a duplicate.  I've got too many papers up here is what my

15 problem is.

16         THE COURT:  Has somebody got the other Exhibit #5?  Let

17 me see if I can find it.  Okay.  #5.  This is -- and what page

18 were you reading from #5 here, Marc, or --

19         MR. ERMINE:  I'm sorry?

20         THE COURT:  -- Jeff, which page were -- Jeff, which part

21 of this were you reading on #5?

22         MR. McCARTHER:  I was reading from Exhibit #1, Your

23 Honor, which is the synopsis that Special Agent Vas put together.

24 Exhibit #5 should be Officer Patterson's report.

25         THE COURT:  Which Exhibit, #1?

1        MR. McCARTHER:  Yes.

2        THE COURT:  Let me see what you've got.

3        MR. McCARTHER:  It says "Synopsis" at the top.

4        THE COURT:  Was this in from the last one?

5        MR. McCARTHER:  Yes.

6        THE COURT:  And what page were you reading from --

7        MR. McCARTHER:  Page 3, first full paragraph, third line

8  down.

9        THE COURT:  Okay.  Thank you.  First full paragraph,

10  third line down.  Okay.  And I think -- let's see if I've got

11  this right.  It's the part, "FPS Officer Yadon asked Everett,"

12  right?

13        MR. McCARTHER:  Yes, Your Honor.

14        THE COURT:  Yeah.

15  BY THE COURT:

16  Q.  So, I want to direct your attention to that.  "FPS Officer

17  Yadon asked Everett if he drove to FPS Officer Yadon's location

18  and if Everett had any weapons on his person.  Everett responded

19  'Yes' and further stated, 'I have a gun in the car.'  FPS Officer

20  Yadon spoke to Protective Service Security Officer Foderaro and

21  confirmed that Everett was parked on 12th Street in an emergency

22  vehicle only parking space with the driver's side door open."

23  Now, where did you get that from?

24  A.  I believe that was from talking to Inspector Yadon, sir, with

25  the PSO, or Protective Security Officer Foderaro's comment of

1  where he actually first learned about the -- because I believe
2  PSO Foderaro was the one that contacted FPS in the first place.
3  Q.  Was Foderaro there?  Did you get this from Foderaro too?
4  A.  I did not speak to him directly, sir, because one of the
5  other uniformed officers was getting the supplemental statement,
6  or --
7  Q.  So, you got this -- you got this from Yadon?
8  A.  I believe so, sir.
9  Q.  Okay.
10 A.  But as far as, again, with the statement about the defendant
11 being asked if he had any weapons or contraband, essentially when
12 I wrote that, it was essentially at the same time I was starting
13 to write the criminal complaint draft.
14 Q.  Right.
15 A.  And those meshed.  The only time I even actually knew that
16 that was in contention was when I was working the Inauguration a
17 few weeks back and AUSA McCarther had let me know that there was
18 some inconsistencies with that.
19 Q.  Right.
20 A.  I truly believe that that's -- that that's the situation as
21 it went down.  So, with the affidavit in support of the
22 complaint, Your Honor, and that those were essentially written at
23 the same time with my same belief process.
24 Q.  Okay.  All right.  Now, I've got some other questions and
25 this is going to -- I'm just kind of curious.  You're the case

1  agent, so I -- you know, you may know answers to this and you may

2  not.  And if you don't, that's fine.

3  A.  Yes, Your Honor.

4  Q.  Just tell me that.  With regard to the keys that were -- that

5  at least one witness says fell out of the defendant's pocket at

6  the time, do you know why those aren't listed as being seized

7  from the defendant?

8  A.  To be honest, Your Honor, I don't know.  I don't think we

9  came across -- when I say "we," I say -- I mean FPS.  I don't

10 think it was anything that we had personally collected --

11 Q.  Okay.

12 A.  -- as far as personal property.  So, as far as the

13 whereabouts of the keys, Your Honor, I'm not 100 percent sure.

14 Q.  Okay.  What about -- there's a reference in some of the

15 testimony that we've had already about a video of the event being

16 gathered.

17 A.  Yes, Your Honor.

18 Q.  Do you know anything about that?

19 A.  Yes, Your Honor.  We had a Special Agent Kathy Glover, who

20 has since transferred to Denver, and a uniformed officer who

21 deals with gathering CCTV evidence.  And what they did is from, I

22 believe, like about an hour before and an hour after the time

23 frame we have multiple camera angles on the rooftop of the

24 Bolling Federal Building.  And I ordered them to grab all the

25 video for those time frames.  It's on two DVR units, Your Honor,

1    and provide those to me.

2           THE COURT:  So, do we have anything relevant to this

3    proceeding?  Anybody?  Have you seen them?

4           MR. ERMINE:  I have.

5           MR. McCARTHER:  I've also seen them, Your Honor.  The

6    videos are consistent with the reports.  And so, --

7           THE COURT:  Okay.

8           MR. McCARTHER:  -- rather than play through lengthy

9    video, I offered the testimony.

10   BY THE COURT:

11   Q.  Okay.  Do you know -- did you arrest him or did somebody else

12   arrest him?  Now, I'm not talking about detaining him.  Did you

13   arrest him or did someone --

14   A.  I physically was not there whenever the defendant was

15   handcuffed.

16   Q.  So, you don't know anything about that?

17   A.  No.  Sir, I was honestly after the fact of everything going

18   down and just trying to gather everything.

19   Q.  What about the issue of the car tow?  Were you involved in

20   that at all?  Or do you know who towed the car?

21   A.  To my best knowledge, sir, that was the Kansas City Police

22   Department since we, personally as an agency, the Federal

23   Protective Service, Your Honor, we don't have a -- I don't think

24   we have a -- I'll step back from that.  We don't have a way to

25   tow, I think, if it's on a city street.

Q.  So, if anybody had done that, it would have been the PD?

A.  Yes, Your Honor.  That would have been the Kansas City Police

Department.

        MR. McCARTHER:  Your Honor?

        THE COURT:  Yeah.

        MR. McCARTHER:  The United States will also be calling

Detective Bradley Bailey to speak to that.

        THE COURT:  Okay.  Good.  Thank you.  All right.  That's

all.  Now, I've asked a lot of questions here.  And I want to

give everybody an opportunity to follow-up.  First, Mr.

McCarther, additional questions here?

        MR. McCARTHER:  One -- well, actually I have a couple

follow-ups.

                    REDIRECT EXAMINATION

BY MR. McCARTHER:

Q.  Special Agent Vas, have you reviewed the surveillance video

in this case?

A.  I have.

Q.  And is what's depicted in that surveillance video consistent

with the reports of the officers who were on scene?

A.  I believe it is.

        MR. McCARTHER:  Nothing further, Your Honor.

                    RECROSS EXAMINATION

BY MR. ERMINE:

Q.  I want to direct your attention based on some of the

1  questions the Judge asked you to Defense Exhibit #3, page 2,

2  Paragraph 6.  This is the affidavit in support of the criminal

3  complaint.  So, in this paragraph you filed in your sworn

4  affidavit and you wrote, quote, "A KCPD officer approached the

5  open driver's side door and discovered a pistol underneath the

6  driver's seat."  Is that what you wrote?

7  A.  I did.

8  Q.  Okay.  Is that based on your observations or based on your

9  discussions with folks who were at the scene?

10 A.  I believe it was from discussions with folks at the scene.

11 Q.  Okay.  And then subsequent to that you describe how KCPD went

12 on to impound the vehicle and do an inventory search, correct?

13 A.  Yes.

14 Q.  And is that also based on your discussions with folks at the

15 scene?

16 A.  Correct.

17 Q.  So, your chronology of these events is then based on your

18 discussion with people from that day, correct?

19 A.  Correct.  I wasn't directly there, I believe, when anything

20 was towed.  And just there is very little footage of the vehicle

21 being towed away or anything like that.

22 Q.  Right.  Okay.  Do you recall that prior to the vehicle being

23 towed, there were officers from Homeland Security who brought a

24 dog essentially and did a dog sniff around the vehicle?  Does

25 that sound familiar to you?

1  A.  If they did, I don't recall.  I wasn't there.  I would say

2  it's probably something they do just around federal buildings.

3  The dogs we have are explosive trained.  So, I would assume

4  that's just something they did out of precaution.

5  Q.  So, then the FPS has -- all right.  Let me ask this.  Is that

6  unit who does that, are part of the FPS or is that some other

7  division of Homeland Security?

8  A.  Again, I don't know if it was a Kansas City Police detective

9  or a K-9 dog or if it was an FPS dog.  If it was an FPS dog, then

10 that is something they typically do when they're attached to us.

11 Q.  Okay.

12 A.  I believe we have two right now currently in Kansas City.

13 Q.  But FPS then has the ability to conduct certain searches of

14 vehicles when those vehicles are on federal property.  By

15 ability, I mean you have dogs on hand that can be brought in to

16 do this sort of bomb sniffing, correct?

17 A.  Yes.  They do routine searches.

18         MR. ERMINE:  Okay.  If I could have one moment, Your

19 Honor?  Nothing further.  Thank you.

20         THE COURT:  Okay.  Anything else?

21         MR. McCARTHER:  Nothing, Your Honor.

22         THE COURT:  All right.  Thank you.  You may step down.

23 Call your next witness.

24         MR. McCARTHER:  The United States calls Detective

25 Bradley Bailey of the Kansas City, Police Department.

1        THE COURT:  Just come up here, Detective, I'll place you

2  under oath.  Guys, you can retrieve your exhibits here if, Marc,

3  you and Jeff want to do that, get them back.  Thank you.  Raise

4  your right hand.

5              BRADLEY BAILEY, GOVERNMENT'S WITNESS, SWORN

6        THE COURT:  Take the stand over here on your left.  Now,

7  Officer, when you get up there it may make a noise.  It just

8  adjusts for weight, so don't get concerned about it.  Go ahead.

9                          DIRECT EXAMINATION

10 BY MS. PRATTEN:

11 Q.  Good morning.

12 A.  Good morning.

13 Q.  Your name is Detective Bradley Bailey, right?

14 A.  Yes, it is.

15 Q.  Okay.  And you've previously testified at a prior suppression

16 hearing?

17 A.  I did.

18 Q.  Regarding your involvement with this incident on March 10,

19 2016?

20 A.  I did.

21 Q.  Okay.  We're going to narrow down specifically and talk about

22 your participation in a tow that went on that day.

23 A.  Okay.

24 Q.  Were you personally and directly the individual who ordered

25 the tow?

1  A.  I believe I was, yes.

2  Q.  Okay.  And this tow, this was of a gray vehicle?

3  A.  Yes.

4  Q.  Okay.  Did you have any indicators prior to ordering this tow

5  that this vehicle was associated with the defendant?

6  A.  Yes, I did.

7  Q.  What kind of indicators did you have?

8  A.  During the previous incident, I had heard the defendant make

9  a spontaneous statement that the gray car over there was his and

10  that there was a gun under the seat.

11  Q.  Okay.  "Over there," when he indicated the gray car over

12  there, can you describe that "over there" looked like?  Where was

13  this car?

14  A.  The defendant had looked over towards 12th Street which was

15  directly in front of where we -- our location.  And at that point

16  I observed a silver car or gray car parked on 12th Street facing

17  east on the south curb in a lane that was exclusively marked with

18  signs for emergency vehicles only.

19  Q.  Okay.  So, there is more than one sign?

20  A.  Yes.

21  Q.  Okay.  And so indicating only cars parked there should be

22  what?

23  A.  Emergency vehicles of any sort.  Whether it be police

24  vehicle, ambulances, Federal Protective Service, based on the

25  location of the federal building.

1   Q.  Okay.  So, if a car that doesn't fit that description, such

2   as this gray car is there, then you would order a tow?

3   A.  It's subject to ticket and tow, yes.

4   Q.  Okay.  So, even if -- you said there were indicators this

5   vehicle was associated with him.  If this vehicle, even if it was

6   not associated with him, if it was like anybody's vehicle and it

7   was in that location, would you have ordered a tow?

8   A.  Yes.  The vehicle would have been ticketed and towed.

9   Q.  Okay.  And that's specifically because of the area that it

10  was in?

11  A.  Yes.

12  Q.  Okay.  When you -- after you order a tow, can you walk us

13  through the procedures that you generally do after you order a

14  tow?  Not specific to this situation, but just in general.

15  A.  Generally depending on the circumstances of an incident,

16  whether it be a criminal offense, a car accident, anything of

17  that nature, our procedures are to order a tow through our Police

18  Department dispatcher who then contacts various tow companies

19  depending on -- I'm not sure how their system works.  But it's a

20  designated system that will then have a tow truck respond to our

21  location.  As for any specific procedures as far as whether a

22  vehicle would be ticketed and towed, if it would be towed in

23  regard to a criminal offense with a hold for processing or

24  evidence, or if it would be in relation to a car accident that

25  would depend on each specific incident.

Q.   Okay.  After you order a tow, do you generally -- do you

conduct an inventory?

A.   We do.

Q.   Okay.  And how does that proceed?

A.   Based on our department policy, we have policies and

procedures that designate an inventory search of the vehicle's

property be conducted prior to towing a vehicle to our city tow

lot.  An exception to that would be if the vehicle is determined

to be a crime scene or be waiting a search warrant to have our

crime scene investigators process it.  But any vehicle that we

tow to our city tow lot, our policy indicates that an inventory

search of the contents should be conducted.  And whatever

contents are inside that vehicle are listed on our department

tow-in report.

Q.   Okay.  So, when you're actually conducting it, you open the

door and then -- to the vehicle and then what do you do?

A.   Essentially we go through the entire interior of the vehicle

to include the passenger compartments, anywhere where a person

could be, check the glove box, console, trunk, any part of the

vehicle where there could be personal belongings or other content

or evidence inside the vehicle.

Q.   Okay.  And then you write down everything that you find in

there?

A.   Any personal property or other items we do document on our

tow-in report.

Q.  All right.

        MS. PRATTEN:  Your Honor, I'm going to go ahead and
previously hand him what's been marked as Government Exhibit #6.

        THE COURT:  Okay.

BY MS. PRATTEN:

Q.  Do you recognize what this is?

A.  Yes, I do.

Q.  And what is it?

A.  It's a Kansas City, Missouri Police Department's Procedural
Instruction for Towing and Protective Custody of Vehicles and Its
Contents.

Q.  Okay.  Can you go ahead and flip through all the pages --

A.  Yes.

Q.  -- just make sure everything is there, there's not a missing
page.

A.  To my knowledge everything looks to be complete with no
missing pages.

Q.  Okay.  Are you familiar with this policy?

A.  Yes, I am.

Q.  Okay.  And how are you familiar with it?

A.  Each individual or person on our department is required to
read, understand and acknowledge new policies or updated policies
and procedures when they're disseminated throughout the
department.

Q.  Okay.

1    MS. PRATTEN:  Your Honor, I'd move to admit into

2  evidence what's been previously marked as Government Exhibit #6,

3  which is the --

4        THE COURT:  Any objection?

5        MR. ERMINE:  No objection.

6        THE COURT:  It's in.  Go ahead.

7        MS. PRATTEN:  -- Kansas City Police Department Tow

8  Policy.

9        THE COURT:  Officer, is this the policy that was in

10  effect on March 10th of 2016?

11        THE WITNESS:  Yes, it was, Your Honor.

12        THE COURT:  Go ahead.

13  BY MS. PRATTEN:

14  Q.  Okay.  So, you've stated you have read this policy then in

15  your employment with the Kansas City Police Department?

16  A.  I have.

17  Q.  Okay.  More than once?

18  A.  Yes, I have.

19  Q.  Did you read it prior to March 10th, 2016?

20  A.  Yes, I did.

21  Q.  Prior to ordering the tow in this case?

22  A.  Yes, I did.

23  Q.  Okay.  To the best of your knowledge is the tow that you

24  ordered and conducted and executed consistent with the policies

25  in this policy?

1   A.   Yes.

2   Q.   Consistent with the words in this policy?

3   A.   Yes, it is.

4   Q.   Okay.  All right.  Now, we talked generally about tow.

5   Specifically, can you walk us through the tow -- through the tow,

6   the inventory, the whole process that you conducted on this

7   vehicle?

8   A.   Yes.  Based on our observations of the vehicle being

9   illegally parked in an emergency vehicle parking only lane, and

10  on-scene investigation having determined that the defendant had

11  arrived or had been inside that vehicle prior to his arrest, we

12  ordered a tow for the vehicle and completed a parking citation

13  for the vehicle as well.

14  Q.   Okay.  And after that, what happened?

15  A.   I can't remember if it was during or after the citation was

16  issued, but the inventory search, as I mentioned, was completed

17  on the vehicle.  As we were going through the vehicle documenting

18  his property, the internal contents that were inside the vehicle,

19  we located a handgun underneath the driver's seat.

20  Q.   Okay.  Looking underneath the driver's seat, is this

21  consistent with a normal inventory search?

22  A.   Yes, it is.

23  Q.   Okay.  And again, how long have you been with the Kansas City

24  Police Department?

25  A.   Approximately a little over seven years.

1  Q.  Okay.  And is it fair to say you've conducted more than one

2  inventory prior to towing a vehicle?

3  A.  Yes, it is.

4  Q.  Okay.  In your experience was -- I know you say that it was

5  consistent with the policy.  Was this tow and inventory

6  consistent with all the other tow and inventories that you've

7  conducted?

8  A.  Yes, it was.

9  Q.  In form?

10  A.  Yes.

11  Q.  Okay.  And you stated that you found a firearm.  Did you

12  personally find the firearm?

13  A.  I can't recall if it was me personally or my partner that

14  actually discovered the firearm.  But the firearm was located

15  underneath the driver's side.

16  Q.  Okay.  And you saw it?

17  A.  Yes, I did.

18       MS. PRATTEN:  Okay.  Your Honor, can I have a moment,

19  please?

20       THE COURT:  Yes.

21  BY MS. PRATTEN:

22  Q.  Okay.  I just have a few brief questions before we're done

23  with regard to the policy -- generally the tow policy.  You said

24  you inventory, you write everything down, personal property

25  that's found in the car prior to towing.

1  A.  Yes.

2  Q.  Do you -- would you think it's fair to say that is

3  specifically to protect the owner of the property so that there

4  is a record of it?

5  A.  Yes.  That's one of the reasons why we do document all the

6  vehicle's content.  On our tow-in report it's to document at the

7  time of the tow what was inside the vehicle.  That way in case

8  there is later any items that may be claimed to have been in the

9  vehicle when it was towed, whether it be the tow lot or released

10 to the owner, if there is items that are missing, they're able to

11 determine what was inside the vehicle at that time of the tow.

12 Q.  The inventory itself isn't specifically to search and find

13 things for the purposes of anything other than recording what's

14 there for the protection of whose property it is?

15 A.  Correct.

16       MS. PRATTEN:  Okay.  Your Honor, I don't have any

17 further questions right now.

18       THE COURT:  Are we going to offer the inventory here?

19 Do we have that?

20       MS. PRATTEN:  Yeah.

21       THE COURT:  Do we have the actual inventory that was

22 conducted?  While they're looking for that, why don't you go

23 ahead and ask -- are you done with your direct examination?

24       MS. PRATTEN:  Yes, Your Honor.  Thank you.

25       THE COURT:  We'll cover that when we come back.  But

1  have you seen the inventory yet?

2          MR. ERMINE:  Yes, sir.

3          THE COURT:  Okay.  So, can we get an agreement that at

4  some point that'll be offered into evidence?  Is that all right

5  with everybody?

6          MR. ERMINE:  Yes, sir.

7          THE COURT:  Good.  Okay.  Let's cross-examine then.

8                          CROSS-EXAMINATION

9  BY MR. ERMINE:

10 Q.  Detective, you testified that you're familiar with the Kansas

11 City tow policy, correct?

12 A.  Yes.

13 Q.  And you're familiar then with Annex A of the tow policy,

14 correct?

15 A.  Yes.

16 Q.  What does that annex describe?

17 A.  Without looking at the policy right now, I -- given that

18 there is multiple annexes, I'd have to see which specific annex

19 it's referring to and its content.

20 Q.  I'll just put it up here.

21          THE COURT:  Is this from an exhibit?

22          MR. ERMINE:  Yes, sir.

23          THE COURT:  What exhibit are we looking at?

24          MR. ERMINE:  We're looking at --

25          THE COURT:  Why don't you mark that?

1          MR. ERMINE:  This is --

2          THE COURT:  Move it over so you can get picked up.  No,

3  no.  Just move the mic over, Marc.

4          MR. ERMINE:  Oh.

5          THE COURT:  There you go.  Okay.

6          MR. ERMINE:  This is Exhibit #6.

7          THE COURT:  Okay.  Good.  Move --

8  BY MR. ERMINE:

9  Q.  This is the tow policy, correct?

10  A.  Yes, it is.

11  Q.  And this is Annex A of the tow policy?

12  A.  Yes.

13  Q.  So, you're familiar then with this policy?

14  A.  I am.

15  Q.  So, which part of this policy were you acting under in this

16  case?

17  A.  Section 2 regarding vehicles and personal property being

18  illegally parked, I believe.  Let me look here.  Yes.  And that a

19  traffic summons had been either affixed to the vehicle or

20  presented to the owner-operator.

21  Q.  I think you testified that you don't remember whether you

22  actually wrote the traffic summons in this case, or do you

23  remember?

24  A.  I can't remember specifically if it was me or my partner.

25  Q.  Okay.  And your partner, just for the sake of the record, was

1  Detective Watt?

2  A.  Yes, it was.

3  Q.  The traffic summons, though, you would agree is something

4  that you fill out basically electronically?

5  A.  Yes, it's an electronic citation.

6  Q.  Okay.  Okay.  And then it's left, according to the policy,

7  either on the vehicle or given to the operator of the vehicle?

8  A.  Correct.

9  Q.  So, in this case do you remember where the traffic summons

10  was left?

11  A.  I believe it was left with the vehicle.

12  Q.  Okay.  Now, you had determined in your investigation here

13  that Mr. Everett wasn't the owner of the vehicle, correct?

14  A.  It was not registered to him.

15  Q.  Okay.  And you determined that the vehicle was actually

16  registered to someone named Tiara Gray, correct?

17  A.  Yes.

18  Q.  I guess you did that by searching police databases that you

19  use regularly matching up registrations with the registrant?

20  A.  Running the temporary tag on the vehicle, it responded back

21  to Ms. Gray.

22  Q.  Okay.  Did you contact Ms. Gray?

23  A.  I don't recall contacting her from the scene.

24  Q.  Okay.  Did you ever contact her?

25  A.  Yes, I did.

1  Q.  Okay.  And when was that, do you remember?

2  A.  After this incident had been completed.

3  Q.  Okay.

4  A.  I can't give you a time frame as far -- I know I had contact

5  with her the following day.

6  Q.  Okay.  And when you made contact with her, what was the

7  purpose of that?

8  A.  It was to inform her of -- to actually check with her about

9  the vehicle, to inform her that it had been towed, and

10  subsequently to seek the whereabouts of Mr. Everett the following

11  day.

12  Q.  So, you contacted her by telephone, right?

13  A.  I believe so, yes.

14  Q.  Did you make arrangements with her to get her some of the

15  property that was in the vehicle?

16  A.  I don't remember.

17  Q.  Do you remember whether there was, for example, like a

18  child's safety seat in the vehicle?

19  A.  I don't remember anything that would have been in the

20  vehicle.  It would have been listed on the inventory.

21  Q.  Okay.  Did you ever meet with her in person?

22  A.  Yes, I did.

23  Q.  Okay.  And when you met with her, did you all discuss the

24  property that was in the vehicle?

25  A.  I don't remember.

1  Q.  Okay.  You don't -- your testimony then is you don't remember

2  ever giving her any of the property from the vehicle?

3  A.  I don't remember if I did or didn't.

4  Q.  Okay.  Would that be normal that you would do that for

5  somebody?

6  A.  It's not uncommon.

7  Q.  Okay.

8  A.  That's the officer's discretion.

9  Q.  Would that property that you gave to her though be listed in

10 the tow report, in the inventory?

11 A.  Possibly.

12 Q.  Okay.  You testified that you're not certain when the

13 citation was written in this case relative to when the car was

14 actually searched, correct?

15 A.  I can't give you specifics as far as whether it was being

16 written while the search was being conducted or shortly before.

17 Q.  You were actually part of the search, weren't you?

18 A.  I believe I was, yes.

19 Q.  But you didn't find the handgun?

20 A.  I don't remember if it was my partner or I.

21 Q.  Okay.  One of the KCMO folks found the handgun, though, that

22 you're testifying?

23 A.  Yes.

24 Q.  Do you know if anybody had entered the car prior to the two

25 of you searching the car?

1  A.  I don't remember.  I don't believe so.

2  Q.  By the time you went to the car was the driver's side door

3  open?

4  A.  I don't remember.

5  Q.  Did you ever hear any of the FPS officers that day say that

6  they had found a handgun under the seat and point you in that

7  direction during your search?

8  A.  No.

9  Q.  No?  Or you don't remember?

10  A.  I didn't hear anyone saying that.

11  Q.  Okay.  I want to ask you -- I want to go back and ask you a

12  question about this tow policy.  So, we've already talked about

13  Annex A, Section B(2) and you've testified that that's the

14  section that you were operating under here.  I want to direct

15  your attention though to Annex B, subsection A.

16  Q.  Okay.  So, we're looking here at Annex B, subsection A,

17  correct?

18  A.  Yes.

19  Q.  And this is still Government's Exhibit #6.

20  A.  Yes.

21  Q.  Now, would you agree with me that this subsection seems to

22  cover essentially the same ground as the subsection that we were

23  just talking about that's in Annex A?

24  A.  Generally, yes.

25  Q.  So, do you know how these -- or do you have any training or

1  experience even as to how these two subsections work with each

2  other?

3  A.  I think there's always a possibility depending upon the

4  incident that they could work in accordance with a different

5  subsection of this policy as well as be independent.

6  Q.  Okay.  This policy in Annex B essentially mandates that you

7  contact -- that you make every reasonable effort to contact the

8  owner of the vehicle, correct?  I mean, it says, "Officers will

9  make every reasonable effort . . .."

10  A.  Yes.

11  Q.  So, then are you trained basically in a situation where a

12  vehicle is illegally parked to make every effort to contact the

13  owner prior to the tow?

14  A.  Yes.

15  Q.  Okay.  Is that what happened here?

16  A.  In this case, we were unable to locate or have any knowledge

17  of Ms. Gray, the registered owner of the vehicle, being present

18  at the scene.  And based on the registration of the vehicle,

19  there was no -- there's no phone number or anything that's ever

20  attached to registration information, so we had no on-scene means

21  of contacting the owner.

22  Q.  Okay.  Now I want to flip back to the other section real

23  quick.

24  A.  Okay.

25  Q.  So, you would agree with me that this policy gives you as an

1  officer or detective out in the world some discretion about when

2  to tow vehicles, correct?

3  A.  Yes.

4  Q.  So, how long does a car have to be parked illegally before

5  it's towed in your experience?

6  A.  Well, it depend on if the vehicle is abandoned, where it's

7  illegally parked, anything like that.  It generally depends on a

8  lot of different factors.

9  Q.  Okay.  Now, is there anything in the policy that, based on

10  your understanding of the policy, gives you latitude to

11  essentially leave the car parked and try to contact the owner to

12  just come move the car?

13  A.  I believe that's included in the discretionary remarks, yes.

14  Q.  Okay.  So, you would agree with me that you could have taken

15  that option in this case, correct?

16  A.  In this case it was a possibility.  But based on the fact

17  that the vehicle was parked within a marked emergency parking

18  only and the defendant had been operating the vehicle or had been

19  in the vehicle and was in custody at the time, our decision was

20  to tow the vehicle after ticketing.

21  Q.  But you would agree with me that there is nothing in this

22  particular section of the policy that we're talking about that

23  makes any reference to whether the person who was driving the

24  vehicle was arrested or not, correct?

25  A.  If you go down to, I believe it's Section 4, if we can move

1  that down, it references if the driver of any vehicle is taken

2  into custody and such vehicle would be left unattended on a

3  street or highway, that section also applied to this incident.

4          MR. ERMINE:  Okay.  All right.  If I could have one

5  moment, Your Honor?

6          THE COURT:  You bet.

7  BY MR. ERMINE:

8  Q.  Do you remember searching the glove compartment on the

9  vehicle here?

10  A.  I don't specifically remember.

11  Q.  Do you remember finding registration information in some

12  place in the vehicle that led you to -- or gave you additional

13  information that Ms. Gray -- that the car was registered to Ms.

14  Gray?

15  A.  I don't remember.

16  Q.  Okay.  Do you do a lot of parking enforcement in your role as

17  a detective?

18  A.  Currently, no.

19  Q.  Okay.  So, it would be out of the ordinary then for you to

20  write traffic summons and tow vehicles, wouldn't it?

21  A.  It depends on the day, it depends on the situation.  In my

22  current position I have no enforcement activity.  But in my

23  previous position at the time of this incident, to say it would

24  be uncommon or out of my daily duties, I would have to disagree

25  with that.

1  Q.  Okay.  All right.  Fair enough.  Thank you.

2          THE COURT:  Additional questions?

3          MS. PRATTEN:  Yes, Your Honor.

4          THE COURT:  Uh-huh.

5          MS. PRATTEN:  Okay.  Your Honor, this isn't marked, but

6  I --

7          THE COURT:  That's all right.  We'll put a sticker on

8  it.

9          MS. PRATTEN:  -- put it in --

10         THE COURT:  What are we calling it?

11         MS. PRATTEN:  This is a tow report as #6.

12         THE COURT:  What is it called?

13         MS. PRATTEN:  The tow report, which I'll mark as

14  Government's Exhibit #7.

15         THE COURT:  Okay.  Any problem with #7?

16         MR. ERMINE:  Yes, sir.

17         THE COURT:  There is a problem with #7?

18         MR. ERMINE:  Oh, sorry.  No objection.

19         THE COURT:  Okay.

20         MR. ERMINE:  No problem with that.

21         THE COURT:  #7 it is.  It's offered and admitted into

22  evidence.  Do you need to show it to him at all?  Why don't we --

23                    REDIRECT EXAMINATION

24  BY MS. PRATTEN:

25  Q.  I'm going to show you what's been marked as Exhibit #7.  Do

1   you recognize it?

2   A.  Yes, I do.

3   Q.  And what is it?

4   A.  That's our Kansas City, Missouri Police Department Tow-In

5   Report, Form Number 36, specifically in regard to this incident.

6   Q.  Okay.  So, how can you recognize it?  Tell me what this is.

7   A.  Based on the case number, location, date and the vehicle

8   involved.

9   Q.  Okay.  Now, you didn't personally fill this out though?

10  A.  I did not.

11  Q.  I just want that on the record.  Okay.  And who filled this

12  out?

13  A.  My partner, Detective Watt.

14  Q.  Okay.  And he's the one who was working this with you?

15  A.  Yes, he was.

16       MS. PRATTEN:  Okay.  Move to place this into evidence as

17  Exhibit #7.

18       THE COURT:  It's in.

19       MS. PRATTEN:  Oh, okay.  My mistake, Your Honor.

20  BY MS. PRATTEN:

21  Q.  And then I am going to hand you what's being marked as

22  Government's Exhibit #8.  Do you recognize this?

23  A.  Yes, I do.

24  Q.  Just look at all the pages.  Okay.  And what is it?

25  A.  It's the Kansas City, Missouri Police Department incident

report, which I completed following this incident.

        MS. PRATTEN:  Okay.  Your Honor, I'd move to admit

what's been marked as Government's Exhibit #8.

        THE COURT:  Any problem with that?

        MR. ERMINE:  No objection.

        THE COURT:  It's in.

BY MS. PRATTEN:

Q.  And now I'm going to hand you what I'm marking as

Government's Exhibit #9.  And what is this?

A.  This is the Kansas City, Missouri Police Department Uniform

Parking Citation that was issued on this date to the vehicle at

the location.

        MS. PRATTEN:  I'd move to admit that as Government's

Exhibit #9, Your Honor.

        THE COURT:  Any problem with #9?

        MR. ERMINE:  No, sir.

        THE COURT:  It's in.

BY MS. PRATTEN:

Q.  Okay.  And now I'm just going to hand you what was admitted

as Exhibit #7, and it references the tow-in report.  And can you

look and see if there's anything inventoried on there that was

collected from the car?

A.  As far as collection or recovery.

Q.  What was recovered and collected from the car?

A.  There's items listed as the content from within the vehicle,

1  but I don't believe that they were retrieved or recovered by us.

2  Q.  Okay.  Is it fair to say in the box that says "Other

3  Contents," it lists miscellaneous paper, car chargers, coat,

4  glass -- coat, glass window and baby bottles?

5  A.  Yes.

6  Q.  Okay.  And at the bottom of the exhibit it -- is it fair to

7  say it indicates disposition of the property was those were left

8  in the vehicle?

9  A.  If I can see the report?

10 Q.  Yeah.

11 A.  Yes, they were.

12 Q.  So, there's no firearm listed on that actual paper, right?

13 A.  No, there was not.

14 Q.  Okay.  So, I'm going to hand you your report, which was

15 Exhibit #8.  And on that report, do you actually have the firearm

16 listed as recovered from the vehicle?

17 A.  Yes, I do.

18 Q.  In the property section?

19 A.  Yes.

20        MS. PRATTEN:  Okay.  I have no further questions, Your

21 Honor.

22        THE COURT:  Why is it that you don't put that in the

23 inventory?

24        THE WITNESS:  Based on the inventory of the vehicle, if

25 it -- as it pertains to firearms or other things of evidentiary

1    value, we would then recover those and list them on a separate

2    report as I did in this incident.

3        THE COURT:  You're not going to return it to the people

4    that own it if there's some question of whether or not it's

5    legal?

6        THE WITNESS:  Now, if it pertains to a firearm or

7    another object or whatever, if we're unable to determine an owner

8    that's specifically with firearms within our tow policy, it

9    advises that firearms within a vehicle being towed will be

10   recovered for safekeeping.

11       THE COURT:  Okay.  All right.  Go ahead.

12                      RECROSS EXAMINATION

13   BY MR. ERMINE:

14   Q.  I want to talk to you about Government's Exhibit #9.  You

15   testified this is the citation and it does have your signature on

16   it, correct?

17   A.  An electronic signature, yes.

18   Q.  Right.  So, you fill this out electronically, right?

19   A.  Yes.

20   Q.  Now, is any information on this generated automatically as a

21   result of it being an electronic system?

22   A.  The citation number, court address, court information, and

23   any verbiage that's assigned to the specific charge code that we

24   entered in.

25   Q.  Okay.  Is the date and time of the incident automatically

1  generated through this ticket writing system?

2  A.  Automatically, no.

3  Q.  Okay.  So, you have to enter that time in?

4  A.  Yes.

5  Q.  And in this instance, is that -- that information is here?

6  That's the date of the incident, 3/10/2016?

7  A.  On or about the date or time that the vehicle was illegally

8  parked, yes.

9  Q.  Okay.  And then 8:33 a.m.?

10  A.  Yes.

11  Q.  Okay.  Now, this is Government's Exhibit #7.  This is the tow

12  report, correct?

13  A.  Yes.

14  Q.  And did you fill this out or did your partner fill this out?

15  A.  My partner did.

16  Q.  Okay.  So, this though has information about when the tow

17  truck was ordered and when the tow truck actually arrived at the

18  scene, correct?

19  A.  Yes.

20  Q.  And so it says on here that the tow truck was ordered in this

21  case at 9:12 a.m., correct?

22  A.  Yes.

23  Q.  And then the tow truck actually arrived at 9:28 a.m.?

24  A.  Yes.

25  Q.  Okay.  Do you know what time Mr. Everett was arrested?

1  A.  I don't remember.  I'd have to look at my report.

2  Q.  I want to ask you one more question about Government's #9.

3  That's the ticket.  Why is the section that has the registrant's

4  name not filled out here?  It just says "Registered owner."  Do

5  you know?

6  A.  In this case the citation was issued to the vehicle for being

7  illegally parked.

8  Q.  Okay.  So, is that something you're trained to put -- you

9  wouldn't put Ms. Gray's name on it, you would just put

10 "Registered owner"?

11 A.  Yes.  That -- yes.

12        MR. ERMINE:  Okay.  One moment, Your Honor.  Nothing

13 further.

14        THE COURT:  Okay.

15        MR. ERMINE:  Thank you, Detective.

16        MS. PRATTEN:  Nothing further, Your Honor.

17 EXAMINATION BY THE COURT:

18 Q.  Let me just follow up on a couple of issues here.  Can you

19 tell me when you learned that the car was actually owned by

20 another person and how you learned that?  I think you ran it

21 through the computer, but tell me when that occurred in

22 relationship to doing the search and having to deal with the

23 incident with the defendant.  When exactly did that happen?

24 A.  Yes.  Following our contact with the defendant, after he was

25 taken into custody and the ambulance was ordered, the defendant

1  was transported to the hospital in the ambulance.  At that time

2  we proceeded towards the vehicle.  Prior to completion of the

3  tow-in, ordering the tow, citation, anything like that, I

4  remember we ran the license plate with our dispatcher over our

5  radio.  It was the Missouri temporary tag on the vehicle, to find

6  out whether it matched the vehicle and who the registered owner

7  was.

8  Q.  Okay.  And so once you found that out that it was registered

9  to another person, you did the inventory.  But then you contacted

10 the other person later?

11 A.  Yes, later on.

12 Q.  Okay.  And with regard to the arrest here of the defendant,

13 did you place the defendant under arrest or did somebody else do

14 that?

15 A.  I don't remember specifically who told him he was under

16 arrest.

17 Q.  Do you have a -- you mentioned that there was a report that

18 you did though that would have that information.

19 A.  Yes.

20 Q.  And where is that report?  Do we have it?  Is there some

21 report that you can --

22 A.  Yes.

23 Q.  Okay.  And I'm just --

24         MS. PRATTEN:  It's right here, Your Honor.

25         THE COURT:  Yeah.  Sure.  Do you have -- can you show

1  him what report it is we're talking about here?  Make sure it's

2  the one he wants.

3  BY THE COURT:

4  Q.  Tell us what the number is.

5  A.  I believe it's Exhibit #8.

6  Q.  Okay.

7  A.  And the case number is 16-17036.

8  Q.  Does it reflect in -- why don't you read it to yourself and

9  see if that refreshes your memory about when, if you did, place

10 the defendant under arrest?

11 A.  My partner and I assisted the Federal Protective Officers in

12 gaining physical control of the defendant.

13 Q.  Right.  But I'm talking about --

14 A.  -- escorting him to the ground.

15 Q.  Right.

16 A.  And assisted them in controlling the male while they placed

17 him in handcuffs.

18 Q.  Okay.  But I'm interested, did you arrest him for anything?

19 A.  At that point --

20 Q.  For any city violation or anything like that?

21 A.  At that point based on our contact and observations, we did

22 not have any municipal charges regarding -- that we were there

23 in --

24 Q.  So, you never placed him under arrest?

25 A.  No.  We were in an assisting capacity.

1  Q.  Right.

2  A.  Yes.

3  Q.  Okay.  All right.  I got it.  Just bear with me for a second,

4  please.

5  A.  Yes, sir.

6  Q.  When you arrived and the officers were trying to get the

7  defendant under control, were you there when that was going on

8  when he was on the ground?

9  A.  We were approaching, yes.

10  Q.  Okay.

11  A.  And assisted them in escorting him to the ground.

12  Q.  Did you hear anything exchanged between any of the officers

13  that were involved and the defendant about the car and about the

14  gun?

15  A.  I did not.

16        THE COURT:  Okay.  Okay.  Now, I've asked a fair number

17  of questions.  Any additional follow-up by the United States?

18        MS. PRATTEN:  No, Your Honor.  Thank you.

19        THE COURT:  Additional follow-up by the defense?

20        MR. ERMINE:  No, sir.  Thank you.

21        THE COURT:  Okay.  Thank you.  You may step down,

22  Officer.

23        THE WITNESS:  Thank you.

24        THE COURT:  Additional evidence by the Government?

25        MR. McCARTHER:  No, Your Honor.

1          THE COURT:  May I ask the parties before -- and any

2     evidence you want to present?

3          MR. ERMINE:  No, sir.

4          THE COURT:  May I ask the parties if I can get a copy of

5     that video?  I would like to see the video.

6          MR. McCARTHER:  Yes, Your Honor.

7          THE COURT:  Okay.  Any problem with that?

8          MR. ERMINE:  There's a lot of different videos.  So,

9     maybe if you could tell us which one you want to see and figure

10    out which one shows what you want --

11         THE COURT:  Tell me -- well, help me understand what

12    videos we have.

13         MR. ERMINE:  There are a lot.  I think there are videos

14    that kind of show the street where the car is parked.  There's a

15    video that shows Mr. Everett being arrested.  None of the videos

16    have audio.

17         THE COURT:  I want to see that one.

18         MR. ERMINE:  Okay.

19         THE COURT:  I want to see that one.

20         MR. ERMINE:  There is a video that shows officers

21    milling about outside the vehicle and then ultimately shows the

22    tow truck come.  I think the reason why we're saying what we are

23    about the videos is that the whole time -- the videos are panning

24    back and forth.  So, you get like a few seconds here and then it

25    continues to pan and so it is difficult to see.  But so we

1  definitely could get the arrest video.

2        THE COURT:  Can you agree on what would be relevant to

3  the issues here?  I'm not interested in watching the camera span

4  back and forth, but I would be interested if there's footage that

5  would be relevant to the questions that are before me.

6        MR. McCARTHER:  Your Honor, I do have a typed guide

7  which should show at what time frame on which camera which would

8  be relevant to different events that are taking place.

9        THE COURT:  Can we do this?  Then can you get together

10 with Marc and kind of figure out what part of this would be

11 really relevant to the issues here and then submit that?  Is that

12 possible?

13       MR. McCARTHER:  Yes.

14       THE COURT:  Okay.  You're looking at me like, you know,

15 this is an incredible burden or something.

16       MR. McCARTHER:  No.  I'm --

17       THE COURT:  I'm just trying to figure out why you're

18 hesitant.

19       MR. McCARTHER:  But the answer can't be we don't feel

20 any of it's relevant, right?  Do you know what I mean?

21       THE COURT:  And I just don't know that though.  I mean,

22 you may not believe any of it's relevant, but I would like to see

23 it if we have -- I mean, what -- to me, what could be more -- if

24 we have actual video of the event, that's not -- that's the

25 event.

1          MR. McCARTHER:  That --

2          THE COURT:  And it seems like that would be important.

3    Now, you may be perfectly right that it's not going to be

4    helpful.  But I wouldn't --

5          MR. McCARTHER:  Your Honor, just -- and just to be

6    clear, the reason that video wasn't brought in was for a number

7    of reasons.  One, the video is very choppy.  The camera does pan

8    back and forth.  I did not find it helpful any more -- well, I

9    found it less helpful than the direct testimony of the witnesses

10   that I presented.  And as Agent Vas stated on the record, the

11   video is consistent to the testimony that you've heard.  And so

12   I'll certainly get it together for you.

13         THE COURT:  Why don't you -- why don't you see if you

14   can at least get it edited that you both can agree what would

15   conceivably be helpful.  I'm not interested in watching a bunch

16   of scanning back and forth.  But if there is something there

17   about the actual event, it might be helpful for me or it might

18   not be.  I'm not -- you know it better than I do having reviewed

19   it, so.  Why don't you see if you can get something and submit

20   it.  And if you think -- both of you think otherwise, you know,

21   I'm not going to require anybody to do it.  But at least let me

22   see what it is that we've got.  Okay.  So, does that then

23   conclude everything here?  Is that it?

24         MR. McCARTHER:  On behalf of the United States, yes,

25   Your Honor.

1          THE COURT:  All right.

2          MR. ERMINE:  Yes, sir.

3          THE COURT:  Okay.  You're not anticipating any more

4    supplemental motions here?

5          MR. ERMINE:  Not anticipating them, no, sir.

6          THE COURT:  Okay.  All right.  Well, thank you both very

7    much.  We covered a fair amount of material in a relatively short

8    amount of time.  So, thank you.

9                    (Court Adjourned at 11:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Travis Vas | 4 | 10 | 27 | 28 |
| Bradley Bailey | 37 | 39 | 48 | |

| EXHIBITS: | MARKED | ADMITTED |
|---|---|---|
| D#4 | 11 | 12 |
| D#5 | 11 | 13 |
| G#6 | 34 | 35 |
| G#7 | 48 | 48 |
| G#8 | 49 | 50 |
| G#9 | 50 | 50 |

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.


/s/ Lissa C. Whittaker                    February 15, 2017
Signature of transcriber                        Date