1            IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI

2                WESTERN DIVISION

3  UNITED STATES OF AMERICA,     )
                        )

4         PLAINTIFF,      ) NO.  4:16-CR-00110-BCW-1
                        )       MARCH 29, 2017

5         V.            )       KANSAS CITY, MISSOURI
                        )       CRIMINAL

6  JAMES EVERETT,           )
                        )

7         DEFENDANT.      )

8

9       PARTIAL JURY TRIAL TRANSCRIPT - DAY 1
        BEFORE THE HONORABLE BRIAN C. WIMES

10         UNITED STATES DISTRICT JUDGE

11   PROCEEDINGS RECORDED BY ELECTRONIC VOICE WRITING
         TRANSCRIPT PRODUCED BY COMPUTER

12

13

14                 APPEARANCES

15  FOR PLAINTIFF:      MR. JEFFREY QUINN MCCARTHER
                  UNITED STATES ATTORNEY'S OFFICE - KCMO

16               400 E. 9TH STREET, 5TH FLOOR
                  KANSAS CITY, MISSOURI 64106

17
                  MS. COURTNEY R. PRATTEN

18               UNITED STATES ATTORNEY'S OFFICE - KCMO
                  400 E. 9TH STREET, 5TH FLOOR

19               KANSAS CITY, MISSOURI 64106

20

21  FOR DEFENDANT:      MR. WILLIAM ERMINE
                  FEDERAL PUBLIC DEFENDER'S OFFICE - KCMO

22               818 GRAND AVENUE
                  KANSAS CITY, MISSOURI  64106

23

24

25

1                        I N D E X

2    DESCRIPTION:                                    PAGE:

3    PLAINTIFF'S EVIDENCE:

4    JOSEPH FODERARO
     DIRECT EXAMINATION BY MS. PRATTEN:              4
5    CROSS-EXAMINATION BY MR. ERMINE:                25
     REDIRECT EXAMINATION BY MS. PRATTEN:            27
6    RECROSS-EXAMINATION BY MR. ERMINE:              29

7    CHARLES SCHWARZ
     DIRECT EXAMINATION BY MS. PRATTEN:              30
8    CROSS-EXAMINATION BY MR. ERMINE:                41

9    DAVID WRIGHT
     DIRECT EXAMINATION BY MR. MCCARTHER:            46
10   CROSS-EXAMINATION BY MR. ERMINE:                61

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         E X H I B I T S

2    DESCRIPTION                           OFF'D      ADM'D

3    GOVERNMENT'S EXHIBIT NO. 4            8          8
     GOVERNMENT'S EXHIBIT NO. 10           22         22
4    GOVERNMENT'S EXHIBIT NO. 11           58         58

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MARCH 29, 2017

2          THE COURT:  GOVERNMENT, CALL YOU FIRST WITNESS.

3          MS. PRATTEN:  THANK YOU, YOUR HONOR.  THE GOVERNMENT

4  CALLS OFFICER JOSEPH FODERARO.

5               JOSEPH FODERARO

6          CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

7  DULY SWORN, AND TESTIFIED AS FOLLOWS:

8          THE COURT:  THANK YOU, OFFICER.  YOU CAN COME UP

9  HERE, AND WATCH YOUR STEP AS YOU COME UP.  COUNSEL.

10              DIRECT EXAMINATION

11 BY MS. PRATTEN:

12  Q    GOOD AFTERNOON.  CAN YOU GO AHEAD AND STATE YOUR NAME

13 FOR THE COURT, PLEASE?

14  A    JOSEPH MICHAEL FODERARO THE 3RD.

15  Q    OKAY.  AND YOU ARE A PROTECTIVE SERVICE OFFICER?

16  A    YES, MA'AM.

17  Q    OKAY.  AND WHO DO YOU WORK FOR?

18  A    A COMPANY CALLED VTSGI?

19  Q    WHAT KIND OF COMPANY -- DID YOU SAY FTSGI?

20  A    VTSGI.  IT IS A CONTRACTED SECURITY COMPANY.

21  Q    OKAY.  SO YOU ARE A PROTECTIVE SERVICE OFFICER WITH

22 VTSGI?

23  A    THAT'S CORRECT.

24  Q    OKAY.  AND WHO DOES VTSGI CONTACT WITH?

25  A    WE CONTRACT WITH THE FEDERAL GOVERNMENT.

1  Q    VARIOUS FEDERAL BUILDINGS?

2  A    YES, MA'AM.

3  Q    JUST IN KANSAS CITY?

4  A    NO, WE ALSO DO ST. LOUIS I BELIEVE.  AND THEN WE ALSO DO

5  SOME OUTLYING AREAS IN DES MOINES AND IN WICHITA, KANSAS.

6  Q    OKAY.  SO IS ONE OF THE BUILDINGS THEY CONTRACT WITH THE

7  RICHARD BOLLING FEDERAL BUILDING?

8  A    THAT'S CORRECT.

9  Q    AND WHERE IS THIS LOCATED?

10 A    IT IS LOCATED AT 601 EAST 12th STREET.

11 Q    DOWNTOWN KANSAS CITY, MISSOURI?

12 A    YES, MA'AM.

13 Q    AND APPROXIMATELY WHERE IS THAT BUILDING IN RELATION TO

14 THIS BUILDING?

15 A    I WOULD SAY A COUPLE BLOCKS SOUTH.

16 Q    IS THIS WHERE YOU ARE ASSIGNED SPECIFICALLY TO WORK

17 SECURITY?

18 A    YES, MA'AM?

19 Q    HOW LONG HAVE YOU BEEN PROVIDING SECURITY FOR THE

20 BOLLING BUILDING?

21 A    I'VE BEEN PROVIDING SECURITY FOR THAT BUILDING FOR ABOUT

22 18 MONTHS NOW.

23 Q    NOW, LET'S TALK A LITTLE BIT ABOUT YOUR JOB AS A

24 PROTECTIVE SERVICE OFFICER.  WHAT KIND OF TRAINING DID YOU

25 UNDERGO TO BECOME A PROTECTIVE SERVICE OFFICER?

1    A    THIS IS DIFFERENT TYPES OF TRAINING THAT WE UNDER GO.

2   WE DO O.C. BATON TRAINING, WE DO SELF AID TRAINING, WE DO

3   HEART START, ADT TRAINING, WE DO X-RAY AND WALK-THROUGH

4   MAGNETOMETER TRAINING FOR VISITOR SCREENING.

5    Q    OKAY.  AND DID YOU HAVE INITIAL TRAINING PERIOD BEFORE

6   YOU STARTED?

7    A    YES, I DID.  IT WAS ABOUT THREE AND HALF WEEKS.

8    Q    OKAY.  AND THEN DO YOU HAVE PERIODIC REFRESHERS AS WELL?

9    A    YES, MA'AM.

10    Q    OKAY.  DO YOU TRAIN ON A WEAPON OR HAVE YOU TRAINED ON A

11   WEAPON?

12    A    YES, WE DO.  I AM TRAINED ON A 40 CALIBER SMITH & WESSON

13   AND WE HAD INITIAL TRAINING WITH THAT FIREARM AT THE VERY

14   BEGINNING IN OUR TRAINING PERIOD.  AND THE EVERY FIVE MONTHS I

15   DO A REFRESHER TRAINING WITH THE FIREARM AND THEN EVERY YEAR I

16   AM TRAINED WITH KCPD AS WELL.

17    Q    OKAY.  AND WHAT IS THAT KIND OF TRAINING WITH KCPD?

18    A    IT IS A FOUR HOUR CLASS.  FOR THE FIRST THREE HOURS OR

19   SO IT IS MORE OF LIKE A CLASSROOM, FIREARM SAFETY.  AND THEN

20   THE LAST HALF OF THE CLASS IS WHERE YOU ACTUALLY GO OUT AND

21   YOU FIRE THE COURSE, COURSE OF FIRE TO SEE IF YOU CAN QUALIFY

22   WITH THE WEAPON.

23    Q    AND JUST TO KIND OF SPELL EVERYTHING OUT.  KCPD, KANSAS

24   CITY POLICE DEPARTMENT, IS THAT CORRECT?

25    A    THAT'S CORRECT.

1   Q    OKAY.  LET'S TALK A LITTLE BIT ABOUT THE BOLLING

2   BUILDING WHERE YOU WORK.

3           MS. PRATTEN:  PERMISSION TO APPROACH, YOUR HONOR?

4           THE COURT:  YES.

5   BY MS. PRATTEN:

6   Q    I'M GOING TO GO AHEAD AND HAND YOU WHAT HAS BEEN

7   PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 4.  WHAT IS THAT

8   THAT I JUST HANDED YOU?

9   A    THIS ONE RIGHT HERE?

10  Q    WELL FOR THE MOMENT YOU CAN TALK IN THE MIC?

11  A    THIS IS A PHOTO OF THE RICHARD BOLLING FEDERAL BUILDING.

12  Q    FROM OVERHEAD?

13  A    YES, MA'AM.

14  Q    OKAY.  DOES THAT PICTURE FAIRLY AND ACCURATELY REPRESENT

15  THE RICHARD BOLLING FEDERAL BUILDING AND IMMEDIATE

16  SURROUNDINGS AS YOU RECALL THEM ON MARCH 10TH, 2016?

17  A    YES, IT DOES.

18  Q    AND TO BE CLEAR WAS THIS PHOTO, THIS PHOTO WASN'T

19  NECESSARILY TAKEN ON THAT DAY, RIGHT?

20  A    YES, THAT'S CORRECT.  IT WASN'T TAKEN ON THAT DATE

21  SPECIFICALLY.

22  Q    OKAY.  BUT IT REPRESENTS THE SCENE AS YOU RECALL IT THAT

23  DAY?

24  A    YES.

25  Q    WOULD THIS DEMONSTRATIVE AID ASSIST YOU AND YOUR

1  TESTIMONY AS YOU TALK TO US TODAY?

2   A    YES.

3           MS. PRATTEN:  YOUR HONOR, I MOVE TO ADMIT INTO

4  EVIDENCE WHAT HAS BEEN PREVIOUSLY MARKED AS GOVERNMENT'S

5  EXHIBIT 4.

6           MR. ERMINE:  NO OBJECTION.

7           THE COURT:  GOVERNMENT'S EXHIBIT 4 SHALL BE

8  ADMITTED.

9           (THEREUPON; GOVERNMENT'S EXHIBIT NO. 4 WAS THEN

10 ADMITTED INTO EVIDENCE BY THE COURT.)

11          MS. PRATTEN:  MAY I HAVE PERMISSION TO PUBLISH THAT,

12 YOUR HONOR?

13          THE COURT:  YOU MAY.

14 BY MS. PRATTEN:

15  Q    AND WHAT I WILL ASK YOU TO DO IS IF YOU CAN STEP AROUND

16 FROM THE STAND AND TAKE THE MICROPHONE WITH YOU AND THE

17 POINTER THAT I HANDED YOU.  AND I'M GOING TO ASK YOU TO

18 IDENTIFY A FEW OF THE LOCATIONS THAT WE TALK ABOUT BY PUTTING

19 THE POINTER ON THAT LOCATION.

20          THE COURT:  LET ME ASK YOU, CAN THE JURY SEE?  CAN

21 YOU SEE THAT FIND?  IF YOU GUYS ARE FINE THEN I'M OKAY.  IS

22 THAT'S PROBABLY THE BEST IN LIGHT OF EVERYTHING.

23          THE WITNESS:  IS THIS BETTER?

24          THE COURT:  YES, THANK YOU.

25 BY MS. PRATTEN:

1    Q    OKAY.  ON THIS PHOTOGRAPH CAN YOU GO AHEAD AND POINT OUT

2   WHERE THE RICHARD BOLLING FEDERAL BUILDING IS?  DRAW A CIRCLE

3   AROUND IT WITH THE LASER?

4    A    THE BUILDING IS -- IT WOULD BE RIGHT HERE.  THIS IS THE

5   MAIN BUILDING.

6    Q    OKAY?

7    A    YEAH, THAT'S THE MAIN BUILDING RIGHT THERE.  THAT'S 12TH

8   STREET, THERE'S THE LOBBY AND THEN THERE IS THE OTHER LOBBY

9   RIGHT THERE.

10   Q    SO YOU SAID 12th STREET IS A STREET RIGHT ABOVE IT

11  NEAR THE TOP OF THE DRAWING?

12   A    THAT'S CORRECT.  THIS IS 12TH STREET RIGHT HERE.

13   Q    OKAY.  AND YOU SAID THE LOBBY IS RIGHT IN FRONT OF KIND

14  OF THAT LARGE WHITE OBJECT WHICH IS THE FEDERAL BUILDING?

15   A    YES, MA'AM.

16   Q    AND THERE ARE A NUMBER OF VEHICLES THAT SEEM TO BE

17  PARKED ON 12TH STREET IMMEDIATELY TO THE LEFT OF THE BOLLING

18  BUILDING, IS THAT CORRECT?

19   A    YES, MA'AM.  RIGHT HERE?

20   Q    YES?

21   A    YES.

22   Q    IS THAT A PARKING LOT IN THAT AREA?

23   A    NOW, MA'AM.  THAT IS NOT A PARKING LOT.  IT IS A MARKED

24  EMERGENCY VEHICLES ONLY.

25   Q    OKAY.  THANK YOU.  YOU CAN GO AHEAD AND RETURN TO YOUR

1    SEAT NOW, THANKS.

2         SO LET'S FOCUS A LITTLE MORE IN ON THE MORNING OF

3    MARCH 10TH, 2016.  WHAT IS YOUR NORMAL SHIFT?

4    A    MY NORMAL SHIFT IS I WORK THURSDAYS AND FRIDAYS, 0530 TO

5    1830.  AND THEN ON SATURDAYS 0530 TO 1800.

6    Q    OKAY.  AND WERE YOU WORKING THE MORNING OF MARCH 10TH,

7    2016?

8    A    YES, I WAS.

9    Q    SPECIFICALLY AROUND THE HOUR OF 8:30 TO 9:30 A.M.?

10   A    YES, MA'AM.

11   Q    AND WHAT DUTIES WERE YOU PERFORMING AT APPROXIMATELY

12   THAT TIME?

13   A    I WAS THE HEAD ENTRY SECURITY GUARD.  I WAS WORKING THE

14   LOBBY AT THE TIME AND GREETING VISITORS AS THEY CAME INTO THE

15   BUILDING.

16   Q    OKAY.  SO YOU WERE WORKING AT THE 12TH STREET ENTRANCE

17   TO THAT BUILDING?

18   A    THAT'S CORRECT.

19   Q    OKAY.  IN THE LOBBY?  AND YOU SAID YOU WERE THE HEAD

20   INDIVIDUAL AT THAT TIME?

21   A    YES, MA'AM.  THE POINT PSO.

22   Q    SO HOW MANY OTHER INDIVIDUALS WERE WORKING THERE THAT

23   MORNING?

24   A    THERE WAS MYSELF AND THREE OTHER SECURITY GUARDS WORKING

25   AT THAT TIME.

1    Q    OKAY.  AND WHAT SPECIFICALLY WERE YOU DOING.

2    A    I WAS GREETING VISITORS AS THEY CAME INTO THE BUILDING.

3    AND I WAS DIRECTING INDIVIDUALS TO EITHER BE SCREENED IF THEY

4    WERE A VISITOR OR TO COME ON INTO THE BUILDING IF THEY HAD A

5    FEDERAL ID.

6    Q    OKAY.  SO DOES EVERYONE WHO ENTERS THAT BUILDING AT THAT

7    ENTRANCE NEED TO SHOW AN ID?

8    A    THAT'S CORRECT.

9    Q    OKAY.  AND MY UNDERSTANDING FROM YOUR TESTIMONY IS THAT

10   THERE IS ONE OF TWO WAYS THAT THEY CAN ENTER, RIGHT?

11   A    YES, MA'AM.

12   Q    SO THE SCREEN YOU TALKED ABOUT, WHAT IS THAT?

13   A    THE VISITOR SCREENING IT IS VERY SIMILAR TO WHAT PEOPLE

14   COME THROUGH IF THEY ARE COMING TO THIS BUILDING.  THERE IS AN

15   X-RAY MACHINE, WE ASK THEM TO EMPTY THEIR POCKETS OF ANY METAL

16   ITEMS, AND THEY PUT THEIR OBJECTS ONTO THE BELT OF THE X-RAY

17   MACHINE, WE SCAN THE ITEMS, AND THEN THE INDIVIDUAL ALSO WALKS

18   THROUGH A WALK THROUGH A WALK THROUGH METAL DETECTOR TO MAKE

19   SURE THAT THERE ARE NO ITEMS ON THEM THAT ALARMS.  IF THEY DO

20   ALARM ME, THEY DO A SECONDARY SCREENING WITH THE HAND WAND.

21   Q    OKAY.  AND THIS IS THE ENTRANCE OF SOMEONE I THINK YOU

22   SAID DOES NOT HAVE A FEDERAL ID, RIGHT?

23   A    THAT'S CORRECT.

24   Q    SO THIS WOULD BE INDIVIDUALS WHO PERHAPS ARE NOT WORKING

25   IN THAT BUILDING?

1    A     POSSIBLY. YES.

2    Q     OKAY.  OR MAYBE SOMEBODY WHO WORKS THERE WHO FORGOT

3    THEIR ID?

4    A     YES.

5    Q     OKAY.  AND THEN THERE IS THE SEPARATE ENTRANCE FOR

6    PEOPLE WHO HAVE GOVERNMENT ID?

7    A     YES, MA'AM.

8    Q     AND WHAT ARE THE PROCEDURES TO GET IN THERE?

9    A     IF THEY HAVE A VALID FEDERAL ID THEY SHOW THEIR ID TO

10   US, AND THEN ONCE WE MAKE SURE THAT IS A VALID GOVERNMENT,

11   FEDERAL ID, WE LET THEM PASS.

12   Q     OKAY.  SO THAT MORNING ON THE 10TH, BETWEEN 8:30 AND

13   9:00 APPROXIMATELY, DO YOU RECALL ENCOUNTERING AN INDIVIDUAL

14   WHO YOU LATER DISCOVERED WAS JAMES EVERETT AT THE ENTRY POINT

15   THERE?

16   A     YES, I DO RECALL.

17   Q     OKAY.  YOU INTERACT WITH A LOT OF INDIVIDUALS, IS THAT

18   TRUE?  DO YOU INTERACT WITH A LOT OF INDIVIDUALS?

19   A     YES, I DO.

20   Q     IN THAT PART OF YOUR JOB?

21   A     YES.

22   Q     OKAY.  IN THAT PARTICULAR TIME IN THE MORNING, IS THAT A

23   COMMON TIME FOR THERE TO BE A HIGHER POPULATION?

24   A     IT IS ONE OF OUR BUSIER MOMENTS.  WE HAVE PEOPLE COMING

25   AROUND FROM OTHER BUILDINGS UTILIZING THE CAFETERIA FOR

1  BREAKFAST.  WE ALSO HAVE INDIVIDUALS DROPPING OFF THEIR

2  CHILDREN AT THE DAYCARE THAT WE HAVE AT THAT FACILITY.

3  Q   OKAY.  SO YOU INTERACT WITH A LOT OF INDIVIDUALS, BUT

4  THIS WHO YOU LATER DISCOVERED AS JAMES EVERETT, THAT STICKS

5  OUT IN YOUR MIND AS SOMEONE YOU INTERACTED WITH?

6  A   THAT'S CORRECT.

7  Q   OKAY.  WHY, WHY WOULD THIS INDIVIDUAL STICK OUT?  WHY

8  DOES THIS INDIVIDUAL STICK OUT AS SOMEONE YOU INTERACTED WITH?

9  A   THE INDIVIDUAL CAME INTO THE BUILDING, AND NORMALLY WHEN

10 WE GET VISITORS TO COME INTO THE BUILDING, YOU KNOW, THEIR

11 DEMEANOR IS VERY CALM.  THEY ARE JUST -- I DON'T REALLY WANT

12 TO SAY NORMAL, BUT YOU KNOW, THEY ARE -- I WOULD SAY WITH THAT

13 INDIVIDUAL HE WAS ANGRY.  HE SEEMED THAT HE WAS ANGRY.  IT

14 WASN'T A NORMAL -- FOR WHAT THE VISITORS THAT WE HAVE THAT

15 COMES INTO THE BUILDING.

16 Q   SO IT WASN'T YOUR TYPICAL ENCOUNTER?

17 A   IT WASN'T A TYPICAL ENCOUNTER, NO.

18 Q   OKAY.  HAD YOU EVER SEEN THIS INDIVIDUAL BEFORE?

19 A   I HAD NOT.

20 Q   DID ANY OF THE OTHER PSOS THAT WERE WITH YOU INDICATE

21 THAT THEY HAD EVER SEEN THIS INDIVIDUAL?

22 A   NO.

23 Q   OKAY.  TO SEE THIS INDIVIDUAL THAT YOU ENCOUNTERED THAT

24 DAY SITTING HERE IN THE COURTROOM?

25 A   I DO.

1    Q    OKAY.  CAN YOU TAKE A LOOK AROUND AND CAN YOU IDENTIFY

2   HIM BY AN ARTICLE OF CLOTHING THAT HE IS WEARING?

3    A    HE IS WEARING A BLUE SHIRT.  HE IS SITTING DOWN RIGHT

4   THERE AT THE DESK.

5    Q    OKAY.

6         MS. PRATTEN:  LET THE RECORD REFLECT THAT THE

7   WITNESS HAS IDENTIFIED THE DEFENDANT AS THE INDIVIDUAL THAT HE

8   INTERACTED WITH AT THE BOLLING FEDERAL BUILDING ON THE MORNING

9   OF MARCH 10TH, 2016?

10        THE COURT:  THE RECORD WILL SO REFLECT.

11  BY MS. PRATTEN:

12   Q    SO WHEN YOU AND THE OTHER PSOS INITIALLY ENCOUNTER THE

13  DEFENDANT THAT MORNING, DID HE INDICATE WHY HE WAS THERE?

14   A    WHEN HE ENTERED THE BUILDING HE DIDN'T FIRST STATE WHAT

15  HE WAS DOING THERE AT THE BUILDING.  HE MENTIONED THAT HE WAS

16  LOOKING FOR A FEDERAL JUDGE, BUT HE SEEMED CONFUSED ON WHY HE

17  WAS THERE IN THE FIRST PLACE.

18   Q    OKAY.  AND I THINK A LITTLE EARLIER YOU SAID HE APPEARED

19  ANGRY, WHAT GAVE YOU THIS IMPRESSION?

20   A    WHEN HE WALKED INTO THE BUILDING HIS FISTS WERE

21  CLENCHED, HE HAD A JUST AN ANGRY DEMEANOR ON HIS FACE, YOU

22  COULD TELL BY THE WAY HE WAS WALKING THAT -- JUST FROM MY

23  POINT OF VIEW THAT HE SEEMED LIKE HE WAS JUST ENRAGED BY

24  SOMETHING.

25   Q    OKAY.  FIST CLENCHED, WHAT ELSE DID YOU OBSERVE THAT

1   INDICATED THAT?

2   A    WHEN HE WALKED INTO THE BUILDING HE FIRST SAW ME.  WE

3   KIND OF LOCKED EYES AND HE LOOKED RIGHT AT ME AND SAID,

4   "THERE'S THAT MOTHER FUCKER RIGHT THERE."

5   Q    OKAY.  HE SAID THAT TO YOU?

6   A    YES.

7   Q    WHAT KIND OF -- HOW DID HE SAY THAT TO YOU?  LOUD,

8   QUIET, COULD YOU DESCRIBE THAT?

9   A    HE DIDN'T SAY IT LOUDLY.  HE WAS FROM ME TO YOU AND

10  MAYBE LIKE HE SAID IT TO HIMSELF, BUT LOUD ENOUGH FOR EVERYONE

11  TO HEAR HIM.

12  Q    OKAY.  AND THEN WHAT HAPPENED AFTER HE SAID THAT?

13  A    HE APPROACHED ME AND WITH HIS FISTS CLENCHED AND HIS

14  DEMEANOR, IT SEEMED LIKE A VISIBLE THREAT.  AT THAT TIME --

15  Q    A THREAT TO YOU?

16  A    YES.

17  Q    OKAY.

18  A    AT THE TIME THAT HE WAS APPROACHING ME ANOTHER PSO

19  PROTECTIVE SECURITY OFFICER CAME UP BEHIND ME ON MY RIGHT AND

20  SHOUTED AT HIM TO STOP, AND HE STOPPED AT THAT TIME.  HE THEN

21  PROCEEDED TO TALK TO THE PSO MARCUS WILLIAMS.  AND I RADIOED

22  FOR FPS ASSISTANCE AT THAT TIME.

23  Q    OKAY.  SO PROCEEDING TO TALK.  COULD YOU HEAR WHAT THE

24  DEFENDANT WAS SAYING?

25  A    I DID HEAR HIM MENTION THE FEDERAL JUDGE WHICH MADE US

1   THINK THAT HE WAS LOOKING FOR THIS BUILDING AND NOT THE

2   FEDERAL BUILDING AT 601 BECAUSE WE DON'T HAVE ANY -- THERE IS

3   NO COURTS DOWN THERE I DON'T BELIEVE SO.

4   Q    SO INITIALLY HE SAID HE APPEARED ANGRY AND WHEN HE IS

5   TALKING DID YOU STILL OBSERVE HIM TO APPEAR ANGRY?

6   A    YES, YES, THROUGHOUT THE ENTIRE TIME HE WAS -- HIS FISTS

7   WERE STILL CLENCHED, HE WAS JUST HIS BODY LANGUAGE WAS, JUST

8   GAVE OFF -- HE WAS TENSE, VERY TENSE.

9   Q    OKAY.  AND WAS HE ACTUALLY PERMITTED TO ACCESS THE

10  BUILDING?

11  A    NO, HE NOT.

12  Q    OKAY.  WHY NOT?

13  A    WELL, JUST BECAUSE OF HIS BEHAVIOR RIGHT OFF THE BAT.

14  WE WEREN'T GOING TO ALLOW THAT INDIVIDUAL TO ENTER THE

15  BUILDING WITHOUT FURTHER INVESTIGATION.

16  Q    OKAY.  WHAT DID HE DO WHEN HE WAS NOT PERMITTED TO ENTER

17  THE BUILDING?

18  A    WHEN I RADIOED FOR FPS, MARCUS WILLIAMS TOLD HIM THAT

19  THERE WASN'T ANY FEDERAL JUDGES AT THAT LOCATION.  HE TURNED

20  AROUND AND EXITED THE LOBBY.

21  Q    OKAY.  WERE YOU ABLE TO SEE HIM WHEN HE LEFT THE LOBBY?

22  A    I'M SORRY?

23  Q    WERE YOU ABLE TO SEE HIM WHEN HE LEFT THE LOBBY?

24  A    YES, I WAS ABLE TO SEE HIM.

25  Q    OKAY.  AND IF WE ARE LOOKING AT THAT PHOTOGRAPH AGAIN OF

1     THE BOLLING BUILDING AND THE PIECE OF THE BUILDING THAT STICKS

2     OUT THAT YOU HAVE INDICATED IS THE LOBBY, THERE IS THE BOTTOM

3     HALF OF THE LOBBY WHICH BACKS AGAINST THE FEDERAL BUILDING,

4     THAT LEADS INTO THE FEDERAL BUILDING, RIGHT?

5      A     THAT'S CORRECT.

6      Q     AND THEN THERE ARE THREE OTHER WALLS.  ARE THOSE WALLS,

7     WALLS OR CAN YOU SEE THROUGH THEM, ARE THEY GLASS?

8      A     THEY ARE ALL MADE OF GLASS.

9      Q     OKAY.  SO YOU CAN SEE CLEARLY SEE THROUGH THEM?

10     A     YES.

11     Q     OKAY.  AND THAT WAS HOW YOU WERE ABLE TO VIEW THE

12    DEFENDANT WHEN HE LEFT THE BUILDING?

13     A     THAT'S CORRECT.

14     Q     OKAY.  WHAT DID YOU SEE HIM DO WHEN HE LEFT THE

15    BUILDING?

16     A     I SAW HIM PROCEED TO A VEHICLE THAT I BELIEVED WAS HIS.

17     Q     CAN YOU DESCRIBE THE VEHICLE?

18     A     THE VEHICLE WAS A FOUR-DOOR, GRAY SEDAN.

19     Q     OKAY.  AND WHERE WAS THIS VEHICLE?

20     A     THE VEHICLE WAS PARKED ON THE STREET RIGHT AROUND THIS

21    AREA IN THE EMERGENCY VEHICLE ONLY PARKING LOT OR PARKING

22    RIGHT ALONG SIDE THE CURVE.

23     Q     OKAY.  AND WHAT DID HE DO WHEN HE APPROACHED THE

24    VEHICLE?

25     A     HE OPENED UP THE DRIVER'S SIDE DOOR.  AT THAT POINT WHEN

1   -- IT LOOKED LIKE HE WAS GETTING SOMETHING OUT OF HIS CAR, BUT

2   I COULDN'T TELL BECAUSE HE LOWERED HIMSELF AFTER HE OPENED THE

3   DOOR.  I LOST SIGHT OF HIM SO.

4   Q    OKAY.  NOW, YOU INDICATED THAT YOU CALLED FPS, WOULD

5   THIS BE FEDERAL PROTECTIVE SERVICE?

6   A    YES, MA'AM.

7   Q    OKAY.  AND WHY DID YOU CALL THEM?

8   A    FEDERAL PROTECTIVE SERVICE, WE HAVE A PROTOCOL WHERE IF

9   THERE IS ANY INDIVIDUAL THAT IS THREATENING THAT WE WOULD

10  OBSERVE TO HAVE ANY TYPE OF LIKE MAYBE AN ANGRY BODY LANGUAGE,

11  THEY WANT US TO CALL THEM TO HANDLE THE SITUATION.

12  Q    OKAY.  SO IT IS JUST A, A -- IS IT FAIR TO SAY THAT IT

13  IS A DIFFERENT, DIFFERENT RESPONSIBILITIES?

14  A    YES.

15  Q    SO YOUR RESPONSIBILITY IS THE ENTRY POINT, IS THAT FAIR

16  TO SAY?

17  A    YES, MA'AM.

18  Q    AND THEIR RESPONSIBILITIES ARE TO RESPOND WHEN YOU HAVE

19  PROBLEMS?

20  A    THAT'S CORRECT.

21  Q    OKAY.  WERE YOU THEIR WHEN THEY ARRIVED?

22  A    I WAS.

23  Q    DO YOU KNOW APPROXIMATELY HOW MANY PEOPLE ARRIVED?  HOW

24  MANY FPS OFFICERS?

25  A    I BELIEVE THERE FOUR OF THEM THAT ARRIVED?

1    Q    AND WHAT INFORMATION WERE YOU ABLE TO CONVEY TO THEM

2    ABOUT THE SITUATION?

3    A    I TOLD THEM THAT THE INDIVIDUAL CAME IN.  HE WAS, HE WAS

4    ACTING SPORADIC, HE -- HIS BODY LANGUAGE INDICATED THAT HE WAS

5    ANGRY ABOUT SOMETHING, BUT WE HAD A HARD TIME UNDERSTANDING

6    HIM, AND BEFORE THEY WERE ABLE TO COME DOWN HE HAD EXITED THE

7    LOBBY AND HE WAS AT A VEHICLE, AND THE VEHICLE WAS ON THE

8    SIDEWALK IN THE EMERGENCY VEHICLE ONLY PARKING SPOTS.

9    Q    AND YOU WERE ACTUALLY ABLE TO POINT HIM OUT THEM?

10   A    I WAS ABLE TO POINT WHERE THE VEHICLE WAS, BUT I DON'T

11   RECALL IF HE WAS STANDING UP OR IN THE VEHICLE AT THE TIME.

12   Q    OKAY.  DID YOU ACTUALLY SEE FPS ENCOUNTER HIM?

13   A    I DID.

14   Q    OKAY.  CAN YOU GO AHEAD AND DESCRIBE THE INTERACTIONS

15   THAT YOU SAW?

16   A    FROM WHAT I SAW THE FPS OFFICERS, FEDERAL PROTECTIVE

17   SERVICES OFFICERS EXITED THE LOBBY, AND THEY STARTED TO WALK

18   IN THE DIRECTION OF MR. EVERETT.  I WITNESSED MR. EVERETT

19   LEAVE HIS CAR OR LEAVE THE CAR, AND HE STARTED WALKING TOWARDS

20   THE FPS OFFICERS.  IT WASN'T A NORMAL WALK, IT WAS -- HE WAS

21   MOVING QUICKLY.  IT WASN'T A SPRINT OR A RUN, BUT HE WAS

22   MOVING QUICKLY TOWARDS THE FPS OFFICERS.

23   Q    OKAY.  AND DID YOU SEE ANYTHING AFTER THAT?

24   A    I SAW THEM WHEN MR. EVERETT GOT CLOSER TO THE FPS

25   OFFICERS, I COULD HEAR YELLING, BUT I COULDN'T REALLY MAKE OUT

1   WHAT WAS BEING SAID, IT WAS MUFFLED.

2   Q    IS THAT BECAUSE HE WERE INSIDE STILL?

3   A    YES, MA'AM.  BUT I DID HERE, I HEARD SOME MUFFLED

4   YELLING, I COULDN'T MAKE OUT WAS BEING SAID.  I OBSERVED ONE

5   OF THE FEDERAL PROTECTIVE OFFICERS DEPLOY HIS TASER AND

6   POINTED IT AT MR. EVERETT.

7   Q    OKAY.  SO YOU DIDN'T ACTUALLY -- DID YOU ACTUALLY SEE

8   HIM DEPLOY IT ON THE DEFENDANT OR DID YOU JUST SEE HIM PULL IT

9   OUT?

10  A    JUST PULLED IT OUT.

11  Q    OKAY.  WHAT DID YOU SEE AFTER THAT?

12  A    I SAW ANOTHER ONE OF THE FEDERAL PROTECTIVE OFFICERS

13  MOVE BEHIND MR. EVERETT.  AND IT LOOKED LIKE HE GRABBED BOTH

14  OF THE INDIVIDUALS HANDS, AND THEN THEY TOOK HIM DOWN TO THE

15  GROUND.

16  Q    OKAY.  AND WHAT ABOUT AFTER THAT?

17  A    AFTER THAT YOU COULD TELL THAT THERE WAS A STRUGGLE.  IT

18  LOOKS LIKE THEY WERE STRUGGLING TO KEEP HIM DOWN ON THE

19  GROUND.  I ALSO WITNESSED OTHER KCPD, KANSAS CITY POLICE

20  OFFICER CROSSING THE STREET AND HELPING THE FEDERAL PROTECTIVE

21  OFFICERS SUBDUE THE INDIVIDUAL.

22  Q    OKAY.  AND WHILE THIS IS ALL GOING ON YOU ARE STILL

23  DOING YOUR REGULAR DUTIES AS WELL OF THE ENTRY POINT?

24  A    THAT'S CORRECT.

25  Q    OKAY.  EVENTUALLY DID YOU SEE THE DEFENDANT LEAVE THE

1   SCENE?

2    A    THE DEFENDANT LEAVE THE SCENE?  I SAW HIM BEING PUT IN

3   THE BACK OF AN AMBULANCE.

4    Q    OKAY.  AND EVENTUALLY -- THE VEHICLE THAT YOU OBSERVED

5   EARLIER, DID YOU ALSO SEE THAT LEAVE THE SCENE?

6    A    YES, THAT VEHICLE WAS TOWED AWAY.

7    Q    OKAY.  ARE YOU AWARE THAT THERE ARE SURVEILLANCE CAMERAS

8   THAT ARE LOCATED ON TOP OF THE RICHARD BOLLING FEDERAL

9   BUILDING IN VARIOUS LOCATIONS?

10   A    I AM.

11   Q    OKAY.  AND TO YOUR KNOWLEDGE ARE THEY FULLY FUNCTIONAL

12  AND CAPABLE OF RECORDING EVENTS THAT HAPPEN AT VARIOUS

13  PORTIONS AROUND THE VICINITY OF THE BUILDING?

14   A    YES, MA'AM.

15   Q    ARE YOU AWARE WHETHER THEY WERE FULLY FUNCTIONAL AND

16  CAPABLE THAT MORNING?

17   A    YES, I AM AWARE OF THAT.

18   Q    AND ARE YOU FURTHER AWARE THAT THEY WERE ACTUALLY ABLE

19  TO CAPTURE FOOTAGE OF EVERYTHING THAT YOU TESTIFIED HERE

20  TODAY?

21   A    YES.

22   Q    UM, HAVE YOU HAD A CHANCE TO REVIEW THIS FOOTAGE PRIOR

23  TO TRIAL?

24   A    I HAVE.

25   Q    OKAY.  IS THE FOOTAGE THAT YOU REVIEWED A COMPLETE AND

1    ACCURATE REPRESENTATION OF THE EVENTS AS YOU RECALL THEM

2    HAPPENING THAT DAY?

3     A    YES, MA'AM.

4     Q    ALL RIGHT.  I'M GOING TO HAND YOU NOW WHAT HAS BEEN

5    PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 10 AND ASK YOU TO

6    TAKE A LOOK AT THIS, AND DO YOU RECOGNIZE THAT?

7     A    YES, MA'AM.

8     Q    AND WHAT DO YOU RECOGNIZE THAT TO BE?

9     A    IT IS THE SURVEILLANCE FOOTAGE OF THE EVENTS THAT DAY.

10          MS. PRATTEN:  OKAY.  YOUR HONOR, I MOVE NOW TO ADMIT

11   WHAT HAS BEEN PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 10

12   INTO EVIDENCE.

13          MR. ERMINE:  NO OBJECTION.

14          THE COURT:  GOVERNMENT'S EXHIBIT 10 SHALL BE

15   ADMITTED.

16          (THEREUPON; GOVERNMENT'S EXHIBIT NO. 10 WAS THEN

17   ADMITTED INTO EVIDENCE BY THE COURT.)

18          MS. PRATTEN:  AND PERMISSION TO PLAY AND PUBLISH

19   THIS TO THE JURY NOW?

20          THE COURT:  YOU MAY.

21   BY MS. PRATTEN:

22    Q    OKAY.  AND BEFORE WE START THIS FOOTAGE, WE'RE ALMOST

23   THERE, I JUST WANT TO NOTE, YOU HAVE VIEWED THIS BEFORE,

24   RIGHT?

25    A    I HAVE, YES.

1    Q    SO THESE CLIPS THAT WE ARE VIEWING, IT IS NOT A SMOOTH,

2    NICE VIDEO THAT WE ARE ALL GOING TO WATCH, CORRECT?

3    A    THAT'S CORRECT.

4    Q    OKAY.  IT'S A BUNCH OF CLIPS THAT ARE ESSENTIALLY PUT

5    TOGETHER?

6    A    YES, MA'AM.

7    Q    OKAY.  AND THE TIMESTAMPS THAT WE ARE GOING TO SEE -- IS

8    THERE A TIMESTAMP ON THIS?

9    A    I THINK IT MIGHT BE ON THE UPPER LEFT CORNER, BUT I'M

10   NOT SURE.

11   Q    OKAY.  AND THE TIMESTAMPS, DO YOU HAVE ANY KNOWLEDGE AS

12   TO WHETHER THESE TIMESTAMPS ARE GENERALLY ACCURATE?

13   A    THAT TIMESTAMPS ARE -- THERE'S AN ISSUE WITH THE

14   TIMESTAMPS WHERE THERE IS ABOUT 20 TO 25 MINUTE DISCREPANCY.

15   Q    OKAY.  WHAT IS ACTUALLY GOING TO SHOW HERE IS NOT

16   NECESSARILY CORRECT?

17   A    WITH THE TIME, NO.  IT COULD BE OFF.

18   Q    OKAY.  AND ONE MORE QUESTION, DO YOU KNOW REMEMBER WHAT

19   THE DEFENDANT WAS WEARING THAT MORNING?

20   A    BLUEJEANS, AND I DON'T KNOW, I THINK HE MIGHT HAVE HAD A

21   COAT ON, I'M NOT SURE.

22   Q    WHEN YOU REVIEWED THIS VIDEO AND WE'RE ABOUT TO PLAY IT

23   RIGHT NOW, CAN YOU GO AHEAD AND POINT OUT WHEN YOU SEE THE

24   DEFENDANT ENTER THE SCENE?

25            (THEREUPON, GOVERNMENT'S EXHIBIT 10 WAS PUBLISHED TO

```
 1    THE JURY IN OPEN COURT.)

 2    BY THE WITNESS:

 3     A    YES.

 4     Q    AND THIS VIDEO IS THIS KIND OF PANNING THE FRONT OF THE

 5    BUILDING?

 6     A    YES, MA'AM.

 7     Q    GOING BACK AND FORTH?

 8     A    YES.

 9     Q    IS THAT 12TH STREET RIGHT THERE?

10     A    THAT IS 12TH STREET.

11     Q    ARE THOSE THE VEHICLES THAT YOU WERE TALKING ABOUT?

12     A    YES, MA'AM.

13          I WASN'T SURE OF THAT INDIVIDUAL --

14     Q    OKAY.  THAT INDIVIDUAL THAT WE JUST SAW IN THE CORNER OF

15    THE SCENE RIGHT THERE?

16     A    CORRECT.  THAT'S THE INDIVIDUAL RIGHT THERE.

17     Q    OKAY.  NOW, WE SAW HIM COMING TOWARDS THE BUILDING A

18    COUPLE MINUTES AGO, AND RIGHT NOW WE ARE CLEARLY SEE HIM GOING

19    AWAY.  I'M GOING TO ASK YOU, THESE ARE TWO ACTUALLY SEPARATE

20    CLIPS, CORRECT?

21     A    YES.

22     Q    SO HIS ENCOUNTER WASN'T THE FIVE SECONDS WE JUST SEEN

23    REFLECTED IN THE VIDEO?

24     A    NO.

25     Q    AND WHAT IS HE DOING RIGHT NOW?
```

1   A    HE IS BACK AT THE VEHICLE I DESCRIBED AND HE WAS -- WE

2   COULD HEAR YELLING OUTSIDE, BUT IT WASN'T REALLY CLEAR SINCE

3   WE WERE INSIDE THE LOBBY.

4   Q    OKAY.  AND THAT IS HIM ON 12TH STREET RIGHT NOW?

5   A    THAT'S CORRECT.

6   Q    OKAY.  NOW, HE IS GOING BACK TOWARDS THE FEDERAL

7   BUILDING?

8   A    YES, MA'AM.

9   Q    OKAY.  SO THIS WOULD HAVE BEEN PRIOR TO WHEN YOU SAW HIM

10  INTERACT WITH FPS OFFICERS?

11  A    YES, THAT WAS PRIOR.

12       MS. PRATTEN:  YOUR HONOR, I DON'T HAVE ANY FURTHER

13  QUESTIONS RIGHT NOW.

14       THE COURT:  THANK YOU.  MR. ERMINE, CROSS?

15                  CROSS-EXAMINATION

16  BY MR. ERMINE:

17  Q    WHEN MR. EVERETT CAME INTO THE LOBBY OF THE FEDERAL

18  BUILDING YOU TESTIFIED HE SEEMED CONFUSED?

19  A    YES, I DID.

20  Q    AND YOU MENTIONED THAT HE SEEMED ANGRY?

21  A    YES.

22  Q    AND YOU MENTIONED THAT HE HAD A BIT OF A -- KIND OF A

23  THREATENING DEMEANOR ABOUT HIM?

24  A    YES.

25  Q    WAS HE YELLING IN THE LOBBY?

1    A    HE WASN'T SCREAMING IN THE LOBBY, BUT HE HAD HIS VOICE

2    RAISED.

3    Q    AND HE WAS CURSING TOO, WASN'T HER?

4    A    YES.

5    Q    WOULD YOU SAY THAT HE WAS JUST GENERALLY ACTING

6    BELLIGERENT?

7    A    YES, I WOULD.

8    Q    AND WHILE HE WAS IN THE LOBBY, HE ACTUALLY SLAPPED

9    HIMSELF IN THE FACE, DIDN'T HER?

10   A    YES.

11   Q    BASED ON YOU SEEING ALL THIS HAPPEN, IT WAS YOUR OPINION

12   THAT HE WAS UNDER THE INFLUENCE OF DRUGS, WASN'T IT?

13   A    UNDER -- IN MY OPINION, NO NORMAL PERSON WOULD ACT LIKE

14   THAT SO I WOULD ASSUME THAT HE WAS UNDER THE INFLUENCE OF

15   SOMETHING.

16   Q    OKAY.  AND THAT IS BECAUSE HE APPEARED TO BE YELLING FOR

17   NO REASON, RIGHT?

18   A    YES.

19   Q    AND HE WASN'T COMPLYING WITH THE COMMANDS THAT YOU ALL

20   WERE GIVING HIM, RIGHT?

21   A    THAT'S CORRECT.

22   Q    AND WHEN YOU SAW HIM AT THE VEHICLE EVEN YOU SAW HIM

23   THROWING THINGS OUT OF THE VEHICLE INTO THE STREET, RIGHT?

24   A    YES.

25   Q    AND YOU ACTUALLY SAW HIM SHOUTING CURSE WORDS AT

1   PASSERSBY IN THE STREET, DIDN'T YOU?

2    A    I'M NOT SURE IF THEY WERE CURSE WORDS, BUT HE WAS

3   YELLING.

4    Q    YELLING AT PASSERSBY?

5    A    YES.

6    Q    AND HE WAS JUST GENERALLY UNCOOPERATIVE WITH ANY

7   COMMANDS THAT YOU WERE GIVING HIM THAT DAY, WASN'T HE?

8    A    THAT IS CORRECT.

9    Q    YOU NEVER ACTUALLY SAW HIM WITH A FIREARM THAT DID, DID

10  YOU?

11   A    NO.

12          MR. ERMINE:  NO FURTHER QUESTIONS.

13          THE COURT:  MS. PRATTEN, ANY REDIRECT?

14          MS. PRATTEN:  YES, YOUR HONOR.

15          YOUR HONOR, MAY I HAVE ONE MOMENT, PLEASE.

16          THE COURT:  YES.

17                  REDIRECT EXAMINATION

18  BY MS. PRATTEN:

19   Q    ALL RIGHT.  IF WE COULD, MS. BEYER, REBOOT THAT CLIP ONE

20  MORE TIME, PLEASE.  THANK YOU.

21          AND AGAIN, I'M GOING TO WALK YOU THROUGH AGAIN REAL

22  QUICK WHAT THIS CLIP ENTAILS, BECAUSE IT'S A LITTLE QUICK AND

23  MINUS AUDIO, OF COURSE.

24          OKAY.  SO IS THIS THE POINT AT WHICH THE

25  DEFENDANT -- A FEW MINUTES.  OKAY.  IS THAT THE POINT IN WHICH

1   HE ARRIVED AT THE BUILDING?

2   A    YES.

3   Q    OKAY.  AND HOW LONG IN REALTIME -- I SEE -- THAT IS THE

4   DEFENDANT EXITING RIGHT NOW, RIGHT?

5   A    THAT'S CORRECT.

6   Q    APPROXIATELY HOW LONG IN REALTIME WOULD YOU SAY THAT

7   ENCOUNTER IN THE LOBBY WAS?

8   A    I WOULD SAY IT IS WAS LESS THAN FIVE MINUTES.

9   Q    OKAY.  AND THEN AT THIS POINT THAT IS WHERE YOU SAW HIM

10  ENTER THAT VEHICLE?

11  A    THAT'S CORRECT.

12  Q    AND IN REALTIME, HOW LONG DO YOU THINK HE WAS THERE?

13  A    AT THE VEHICLE HE MIGHT HAVE BEEN THERE FOR ABOUT A

14  MINUTE OR TWO.

15  Q    OKAY.  AND THIS IS THE SCENE THAT YOU HAVE DESCRIBED ON

16  THE STREET?

17  A    YES.

18  Q    AND CAN YOU APPROXIMATE WHAT THE TIMEFRAME FOR THIS IS

19  ABOUT?

20  A    MAYBE 30 SECONDS OR SO.

21  Q    OKAY.  AND THEN AGAIN AT THIS POINT JUST TO CLARIFY, IS

22  THE POINT WHICH HE RE-APPROACHES THE FEDERAL BUILDING,

23  CORRECT?

24  A    THAT'S CORRECT.

25  Q    OKAY.

1          MS. PRATTEN:  I HAVE NOTHING FURTHER, YOUR HONOR.

2    THANK YOU.

3          THE COURT:  ANY RECROSS?

4                    RECROSS-EXAMINATION

5    BY MR. ERMINE:

6    Q    I WOULD LIKE TO CLARIFY SOMETHING WITH YOU.  YOU JUST

7    TESTIFIED THAT HE WAS AT THAT VEHICLE IN THIS VIDEO FOR A

8    MINUTE AND A HALF?

9    A    AT THE VEHICLE FOR ABOUT A MINUTE OR SO.

10   Q    DURING THIS CLIP THAT WE ARE SEEING HERE?  IS THAT WHAT

11   YOUR TESTIMONY IS?

12   A    YES.

13   Q    NOW, ISN'T THIS JUST SHOWING -- THIS IS JUST SPEEDING

14   FORWARD ONE SECOND AT A TIME, THIS VIDEO, CORRECT?

15   A    I'M NOT SURE WHAT THE GAP IS.

16   Q    AND YOU HAVE WATCHED THIS VIDEO BEFORE, RIGHT?

17   A    I HAVE.

18   Q    AND YOU HAVE PAID ATTENTION TO IT ENOUGH TO NOTICE THAT

19   THE TIMESTAMP IS OFF, CORRECT?

20   A    THAT'S CORRECT.

21   Q    BUT THE TIMESTAMP IS JUST OFF IN TERMS OF -- IT'S NOT

22   CONNECTED WITH REALTIME.  FOR INSTANCE, IF THE VIDEO SAID 8:30

23   IN THE MORNING, IT DOESN'T NECESSARILY MEAN THE VIDEO WAS

24   TAKEN AT 8:30 IN THE MORNING, CORRECT?

25   A    THAT'S CORRECT.

1   Q    BUT THE TIMESTAMP AT THE TOP LEFT IS CORRECT INSOFAR AS

2   IT IS MEASURING THE PASSAGE OF TIME, RIGHT?

3   A    YES.

4   Q    SO IF THE VIDEO SHOWS THAT HE AT THE CAR AND IS JUMPING

5   ONE SECOND AT A TIME, AND HE IS ONLY THERE FOR ABOUT TEN STILL

6   IMAGES, THAT WOULD BE A PASSAGE OF ABOUT 10 SECONDS, WOULD IT

7   NOT?

8   A    I BELIEVE SO.

9           MR. ERMINE:  OKAY.  NOTHING FURTHER.

10          THE COURT:  THANK YOU, OFFICER.  YOU CAN STEP DOWN.

11          GOVERNMENT CALL THEIR NEXT WITNESS.

12          MR. ERMINE:  YES, YOUR HONOR.  THE GOVERNMENT WILL

13  CALL OFFICER CHARLES SCHWARZ.

14          THE COURT:  OFFICER, IF YOU CAN COME FORWARD AND

15  RAISE YOUR RIGHT HAND TO BE SWORN.  THANK YOU.

16                  CHARLES SCHWARZ

17          CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

18  DULY SWORN, AND TESTIFIED AS FOLLOWS:

19          THE COURT:  YOU CAN HAVE A SEAT RIGHT HERE.  WATCH

20  YOUR STEP AS YOU GO UP.  COUNSEL.

21                  DIRECT EXAMINATION

22  BY MS. PRATTEN:

23  Q    GOOD MORNING.

24  A    GOOD MORNING.

25  Q    I'M SORRY.  GOOD AFTERNOON.

1    A    GOOD AFTERNOON.

2    Q    UM, CAN YOU GO AHEAD AND STATE YOUR NAME FOR THE COURT?

3    A    CHARLES SCHWARZ.

4    Q    AND WHO IS YOUR EMPLOYER?

5    A    DEPARTMENT OF HOMELAND SECURITY, FEDERAL PROTECTIVE

6    SERVICE.

7    Q    OKAY.  FEDERAL PROTECTIVE SERVICE, THAT'S A COMPONENT OF

8    HOMELAND SECURITY?

9    A    SUB-COMPONENT, YES, MA'AM.

10   Q    OKAY.  SUB-COMPONENT.  AND HOW LONG HAVE YOU WORKED FOR

11   FPS?

12   A    THREE AND HALF YEARS.

13   Q    AND WHAT IS YOUR JOB TITLE?

14   A    MY JOB TITLE IS INSPECTOR.

15   Q    OKAY.  AS AN INSPECTOR FOR FPS, WHAT KIND OF TRAINING

16   DID YOU HAVE TO GO THROUGH TO BECOME AN INSPECTOR OF FPS?

17   A    THE INITIAL TRAINING IS SIX MONTHS IN TOTAL DOWN IN

18   GLYNCO, GEORGIA, AT THE FEDERAL LAW ENFORCEMENT TRAINING

19   CENTER.  THE FIRST THREE MONTHS IS THE UNIFORM AND POLICE

20   TRAINING PROGRAM, WHICH INCLUDES FEDERAL LAW, USE OF FORCE,

21   UM, WEAPONS TRAINING, PHYSICAL TECHNIQUES AND WRITTEN AND

22   PRACTICAL EXERCISES.

23   Q    OKAY.  SO YOU SAID INITIAL.  SO DO YOU ALSO HAVE

24   ADDITIONAL TRAINING?

25   A    YES, MA'AM.

1    Q    OKAY.  WHAT KIND OF ADDITIONAL TRAINING DO YOU HAVE?

2    A    ADD-ON IS THREE WEEKS OF IT'S CALLED ADVANCED -- EXCUSE

3    ME.  ADVANCED INDIVIDUALIZED TRAINING PROGRAM.  THAT IS

4    ROUGHLY THREE WEEKS WHERE WE COVER POLICIES.  AND THEN REST IS

5    AN ADDITIONAL MONTH AND WEEK OF PHYSICAL SECURITY TRAINING

6    PROGRAM.  ONCE WE LEAVE GLYNCO, WE COME BACK AND WE GO THROUGH

7    A 12 WEEK -- EXCUSE ME.  12 WEEK, -- SORRY, I CAN'T THINK OF

8    THE WORD.

9    Q    MORE TRAINING?

10    A    YES, IT IS KIND OF LIKE A RIDE ALONG.  I JUST CAN'T

11    THINK OF THE NAME RIGHT NOW.

12    Q    SO IT'S LIKE A PRACTICAL LIKE TRAINING?

13    A    YES, MA'AM.

14    Q    OKAY.  THANK YOU.  AND WHAT ARE YOUR ACTUAL DUTIES OF

15    YOUR JOB?

16    A    IT'S A TWO PART.  FIRST PART IS LAW ENFORCEMENT.  WE

17    COVER ANY GOVERNMENT LEASED OR OWNED FACILITY BY GENERAL

18    SERVICES ADMINISTRATION.  AND THEN THE SECOND PART IS PHYSICAL

19    SECURITY.  WE CONDUCT ASSESSMENTS ON THOSE FACILITIES, LOOKING

20    AT FENCES, BARRIERS, CAMERAS, IDS SYSTEMS, AND THINGS LIKE

21    THAT.

22    Q    SO WHEN YOU SAY YOU COVER GOVERNMENT BUILDINGS OR

23    GOVERNMENT LEASED BUILDINGS, WHAT DO YOU MEAN BY COVER.

24    A    WE CONDUCT PATROLS, WE RESPOND TO CALLS, WE -- IF THERE

25    IS A COUNTER MEASURE, I.E, CAMERAS, WE COME AND TAKE A LOOK,

1    AND WE GET TECHNICIANS TO COME OUT AND REPAIR THOSE COUNTER

2    MEASURES.  WE'RE ABLE TO WRITE TICKETS, AND WE JUST PATROL.

3     Q    OKAY.  SO ANY KIND OF EMERGENCY AT ANY FEDERAL BUILDING

4    AROUND KANSAS CITY, THAT YOUR JOB?

5     A    YES, MA'AM.

6     Q    OKAY.  NOW, YOUR PHYSICAL OFFICE, WHERE'S THAT LOCATED?

7     A    IT'S LOCATED 601 EAST 12TH STREET, KANSAS CITY,

8    MISSOURI.

9     Q    IS THAT AT THE RICHARD BOLLING FEDERAL BUILDING?

10    A    YES, MA'AM.

11    Q    ABOUT TWO OR THREE BLOCKS FROM HERE?

12    A    YES, MA'AM.

13    Q    GIVE OR TAKE?

14    A    YES, MA'AM.

15    Q    OKAY.  BUT YOUR DUTIES, IF I UNDERSTAND YOU RIGHT, WHEN

16   YOU RESPOND TO THESE CALLS, YOU GO TO ANY OF THE FEDERAL

17   BUILDINGS?

18    A    YES, MA'AM.  I HAVE A BUILDING AS FAR AS INDEPENDENCE,

19   KANSAS.

20    Q    OKAY.  LET'S TALK A LITTLE BIT ABOUT THE BOLLING IN

21   PARTICULAR.  ABOUT HOW MANY FLOORS WOULD YOU SAY ARE IN THIS

22   BUILDING?

23    A    18 FLOORS.

24    Q    18 FLOORS?  OKAY.  WE KIND OF POPULATION IS HOUSED IN

25   THIS FACILITY?

1    A    ROUGHLY 3500.

2    Q    OKAY.  ROUGHLY 3500.  OF THOSE 3500 PEOPLE, WHO ARE

3    THESE PEOPLE?

4    A    YOU HAVE SOCIAL SECURITY ADMINISTRATION, NATIONAL

5    OCEANIC ATMOSPHERIC AGENCY, THERE IS ARMY CORPS OF ENGINEERS,

6    YOU HAVE A DAYCARE ON THE FIRST FLOOR, TWO CREDIT UNIONS, A

7    CAFETERIA, A SNACK SHOP, FEDERAL PROTECTIVE SERVICE AND OTHER

8    GOVERNMENT REGULATION.

9    Q    AND WHEN YOU ARE NAMING THESE DIFFERENT FEDERAL

10   AGENCIES, DO SOME OF THEM, LIKE THE SOCIAL SECURITY

11   ADMINISTRATION, DO THEY OCCUPY MORE THAN ONE FLOOR?

12   A    YES, MA'AM.

13   Q    AND YOU SAID THERE WAS A DAY CARE ON THE FIRST FLOOR?

14   A    YES, MA'AM.

15   Q    AND YOU SAID THERE IS A CREDIT UNION ON THE FIRST FLOOR?

16   A    THERE IS A CREDIT UNION ON THE FIRST FLOOR AND ON THE

17   GROUND FLOOR?

18   Q    OKAY.  SO SOME OF THESE FLOORS, ARE THEY OPEN TO THE

19   PUBLIC?

20   A    YES, GROUND AND FIRST FLOOR.

21   Q    ALL RIGHT.  AND WHICH FLOOR ARE YOU LOCATED ON?

22   A    WE ARE LOCATED ON THE SECOND FLOOR.

23   Q    OKAY.  AND A ROUGH GUESS, AND I KNOW ALREADY SAID THIS,

24   BUT HOW MANY PEOPLE DO YOU THINK ON AN AVERAGE WORKDAY, UM,

25   AROUND 8:30 OR 9:00 IN THE MORNING, ABOUT HOW MANY PEOPLE DO

1   YOU THINK OCCUPY THAT BUILDING?

2   A   ROUGHLY ABOUT 3500.

3   Q   OKAY.  AND I'M GONNA SHOW YOU WHAT HAS BEEN PREVIOUSLY

4   ADMITTED AS GOVERNMENT'S EXHIBIT 4 WHICH IS AN ARIEL VIEW OF

5   THE FEDERAL BUILDING.  WELL, I WANT TO SHOW YOU GOVERNMENT'S

6   EXHIBIT 4.  JUST GIVE ME ONE SECOND.

7        WHILE WE ARE GETTING THAT FIGURED OUT, CAN YOU GO

8   AHEAD AND TELL ME HOW MANY ENTRANCES ARE ACTUALLY ENTRANCES

9   THAT THE PUBLIC CAN ENTER THROUGH IN THE FEDERAL BUILDING?

10   A   TWO ENTRANCES.

11   Q   TWO ENTRANCES?

12   A   ONE OFF OF 12TH STREET AND ONE OFF OF 13TH STREET.

13   Q   OKAY.  ONE OFF OF 12TH STREET AND ONE OFF OF 13TH

14   STREET?

15   A   YES, MA'AM.

16   Q   AND THESE ENTRANCES ARE THEY BOTH MONITORED BY PSOS?

17   A   YES, MA'AM.

18   Q   AND WE HEARD EARLIER THESE ARE CONTRACTED INDIVIDUALS

19   THAT PROVIDE ENTRY CHECK?

20   A   YES, MA'AM.

21   Q   OKAY.  SO LET'S FOCUS ON -- DO YOU RECALL THE MORNING OF

22   MARCH 10TH, 2016?

23   A   YES, MA'AM.

24   Q   OKAY.  WE'RE GOING TO FOCUS IN ON THAT RIGHT NOW.  AND

25   I'VE GOT UP THERE NOW, IF YOU WANT TO TAKE A LOOK AT IT, THAT

1   IS THE EXHIBIT NO. 4 THAT I WAS TALKING ABOUT.  UM, THERE IS A

2   LITTLE POINTER RIGHT IN FRONT OF YOU.  AND IF YOU WANT TO LEAN

3   FORWARD A LITTLE BIT.  CAN YOU SHOW THE JURY WHERE THE 12TH

4   STREET ENTRANCE THAT YOU ARE JUST TALKING ABOUT IS LOCATED?

5    A    RIGHT THERE.

6    Q    OKAY.  AND WHERE IS THE OTHER ENTRANCE THAT THE PUBLIC

7   CAN ACCESS THE BUILDING FROM?

8    A    RIGHT HERE.

9    Q    OKAY.  AND WHAT STREET WOULD THAT BE DOWN THERE?

10    A    THAT WOULD BE 13TH STREET.

11    Q    OKAY.  THANK YOU.  SO BACK TO THE MORNING OF

12   MARCH 10th, 2016, do you recall what hours you worked that

13   day?

14    A    At the time I was working 8:00 AM to 4:00 PM.

15    Q    All right.  Around the 8:30, 9:00 o'clock window, did

16   you respond to a call service at the Richard Bolling Federal

17   Building?

18    A    Yes, ma'am.

19    Q    Okay.  Go ahead and tell the Jury how that call came in?

20    A    At around 8:30 in the morning the PSOs in the 12th

21   Street lobby got on the radio and radioed to Battle Creek Mega

22   Center, which is located in Battle Creek, Michigan.  That is

23   our dispatch center.  They radioed in that they had a

24   disruptive individual in the lobby.  At that time, myself,

25   Inspector Yaden, Inspector Wright, and Inspector Patterson all

1    RADIO THAT THEY WOULD BE RESPONDING TO HELP THEM.  SO WE

2    RESPONDED TO THE LOBBY.

3     Q    OKAY.  AND YOU SAID AT LEAST TWO OR THREE OTHER PEOPLE

4    WERE WITH YOU?

5     A    YES, MA'AM, THREE.

6     Q    AND YOU SAID YOU RESPONDED TO THE 12TH STREET LOBBY?

7     A    YES, MA'AM.

8     Q    OKAY.  DID YOU EVENTUALLY WHEN YOU RESPONDED COME INTO

9    CONTACT WITH AN INDIVIDUAL YOU LATER FOUND OUT TO JAMES

10   EVERETT?

11    A    YES, MA'AM.

12    Q    OKAY.  IS THAT INDIVIDUAL IN THIS COURTROOM?

13    A    YES, MA'AM.

14    Q    CAN YOU GO AHEAD AND IDENTIFY HIM WITH AN ARTICLE OF

15   CLOTHING THAT HE IS WEARING?

16    A    YES, MA'AM.  HE IS SITTING DOWN WITH THE BLUE TOP.

17          MS. PRATTEN:  OKAY.  LET THE RECORD REFLECT THE

18   WITNESS HAS IDENTIFIED THE DEFENDANT AS THE INDIVIDUAL HE CAME

19   INTO CONTACT WITH THAT MORNING?

20          THE COURT:  THE RECORD WILL SO REFLECT.

21   BY MS. PRATTEN:

22    Q    OKAY.  HAD YOU SEEN THE DEFENDANT PRIOR TO THAT MORNING?

23    A    NO, MA'AM.

24    Q    OKAY.  IS THE FIRST PLACE IN WHICH YOU ENCOUNTERED HIM

25   THE LOBBY?

1    A    NO, MA'AM.  HE WAS ACTUALLY -- WHEN WE ARRIVED IN THE

2   LOBBY, HE WAS NOT IN THE LOBBY.  THE PSOS IN THE LOBBY POINTED

3   OUT TOWARDS THE STREET AND SAID THE INDIVIDUAL AT THE TIME WAS

4   OUT BY HIS VEHICLE.

5    Q    OKAY.  AND CAN YOU DESCRIBE HIS DEMEANOR WHEN YOU FIRST

6   ENCOUNTERED HIM?

7    A    WHEN WE FIRST ENCOUNTERED HIM I WILL EXPLAIN IT AS A

8   LITTLE FASTER THAN A WALK, SLOWER THAN A RUN.  ALMOST KIND OF

9   LIKE A SKIP WITH HIS HANDS DOWN BY HIS SIDE WITH HIS FISTS

10  CLENCHED COMING TOWARD US.  HE WAS YELLING SOMETHING AND WE

11  COULDN'T REALLY MAKE IT OUT AT THE TIME.  HE GOT TO US AND HE

12  STARTED TO CURSE.  HE WAS VERY, VERY UPSET AT AN UNKNOWN

13  REASON.

14   Q    OKAY.  SO WHEN YOU RESPONDED TO THE LOBBY, YOU AND THE

15  OTHER OFFICERS GET THE INFORMATION YOU NEED FROM THE OTHER

16  OFFICERS, YOU EXIT THE LOBBY, AND THEN THE DEFENDANT

17  APPROACHED YOU?

18   A    YES, MA'AM.

19   Q    IN THE MANNER YOU DESCRIBED?

20   A    YES, MA'AM.

21   Q    OKAY.  DID YOU HEAR HIM SAY ANYTHING?

22   A    HE SAID THAT -- AS WE WALKED OUTSIDE HE SAID, I'LL BEAT

23  YOUR ASS.  SOMETHING TO THE EFFECT OF THAT.  SOMETHING ELSE IN

24  THE EFFECT OF, I'LL KNOCK YOUR FUCKING HEAD OFF.  WE TRIED TO

25  TALK TO HIM AND IT JUST DIDN'T WORK.

1    Q    UM, AND HE IS SAYING THIS AS HE IS COMING TOWARDS YOU?

2    A    YES, MA'AM.  HE WAS STANDING AROUND THREE FEET AWAY FROM

3    US AT THIS TIME COMING UP TO US.

4    Q    OKAY.  HOW HE APPROACHED YOU, CAN YOU DESCRIBE THE SPEED

5    WITH WHICH HE APPROACHED YOU?

6    A    NOT A RUN, IN BETWEEN A RUN AND A WALK.  ALMOST AS A

7    SKIPPING.

8    Q    OKAY.  WHAT DID THE -- WHAT DID YOU AND THE OFFICERS DO

9    IN RESPONSE TO THIS?

10   A    AT THIS TIME INSPECTOR WRIGHT TRIED TO CALM HIM DOWN.

11   IT DIDN'T HAPPEN.  INSPECTOR WRIGHT THEN PULLED HIS TASER AND

12   POINTED IT AS MR. EVERETT.  AS INSPECTOR WRIGHT HAD THE TASER

13   POINTED AT MR. EVERETT, MR. EVERETT, SAID, OH, YOU'RE GOING TO

14   SHOOT ME NOW.  I'LL FUCKING KILL YOU.  INSPECTOR YADEN MOVED

15   TO THE BACK SIDE OF MR. EVERETT BECAUSE MR. EVERETT WAS

16   POINTING ALL OF HIS ATTENTION OF INSPECTOR WRIGHT.  INSPECTOR

17   YADEN GRABBED BOTH OF MR. EVERETT'S ARMS AND TRIED TO HOLD

18   THEM BEHIND HIM TO PLACE CUFFS ON HIM.  AT THAT TIME, MR.

19   EVERETT TIGHTENED HIS MUSCLES AT THE SHOULDERS AND TRIED TO

20   SEPARATE HIS ARMS.  AT THAT TIME I GRABBED MR. EVERETT BY THE

21   FRONT COLLARBONE AREA OF THE SWEATSHIRT, INSPECTOR WRIGHT

22   HOLSTERED HIS TASER AND GRABBED MR. EVERETT'S ARM AND TRIED TO

23   TRIP MR. EVERETT TO GET HIM TO THE GROUND.  MR. EVERETT

24   STEPPED OVER, HE DID NOT FALL THE FIRST TIME, IT TOOK A SECOND

25   ATTEMPT, AND FOR ME TO PULL FORWARD TO GET MR. EVERETT TO THE

1 GROUND. ONCE MR. EVERETT WAS TO THE GROUND, INSPECTOR WRIGHT

2 WAS ABLE TO GAIN CONTROL OF MR. EVERETT'S ARM. EXCEPT FOR HE

3 WAS GRABBING AT HIS FRONT WAISTBAND AND HOLDING ONTO IT. SO I

4 TRIED TO HELP INSPECTOR WRIGHT PRY HIS HAND OFF OF HIS FRONT

5 WAISTBAND. FINALLY, WE WERE ABLE TO GET HIS HAND FROM HIS

6 FRONT WAISTBAND AND ABLE TO GET HIM HANDCUFFED. AT THIS TIME

7 I STOOD UP AND LOOKED UP AND THE KANSAS CITY POLICE DEPARTMENT

8 WAS ALREADY ON SCENE HELPING US KEEP HIS LEGS UNDER CONTROL.

9 ONCE WE GOT UP, I STOOD UP, I NOTICED THAT THERE WAS BLOOD ON

10 MY HAND SO I TRIED TO STAY BACK AWAY FROM MR. EVERETT.

11 Q    AND THAT WAS YOUR BLOOD?

12 A    YES, MA'AM.

13 Q    OKAY. I THINK YOU MENTIONED HE WAS GRABBING HIS

14 WAISTBAND?

15 A    YES, MA'AM.

16 Q    OKAY. AND YOU SPECIFICALLY TOOK OTHER ACTIONS, YOU AND

17 THE OTHER OFFICERS, IN RESPONSE TO THIS PARTICULAR ACTION?

18 A    YES, MA'AM.

19 Q    AND WHY IS THAT?

20 A    WE ARE TAUGHT IN OUR INITIAL TRAINING YOUNG VIOLATORS OR

21 WEAPON VIOLATORS WILL HIDE WEAPONS IN THE FRONT WAISTBAND.

22 THAT IS A COMMON PLACE WHERE THAT IS HELD. SO WE TRY TO KEEP

23 HANDS AWAY FROM THOSE AREAS.

24 Q    AND THEN YOU MENTIONED KCPD OFFICERS RESPONDED TO THE

25 SCENE?

1   A    YES, MA'AM.

2   Q    DO YOU KNOW HOW MANY?  MORE THAN ONE?

3   A    MORE THAN ONE.  I BELIEVE THERE WERE TWO.

4   Q    OKAY.  AND YOU SAID YOU DID -- SORRY.  DID YOU RECEIVE

5   INJURIES?  WAS THAT WHAT THAT BLOOD WAS?

6   A    YES, MA'AM.  I HAD A CUT ON MY FINGER.

7   Q    OKAY.  YOU SOUGHT MEDICAL ATTENTION FOR THOSE?

8   A    YES, MA'AM.

9   Q    OKAY.  DURING THIS ENTIRE ENCOUNTER WITH HIM, I BELIEVE

10  YOU SAID YOU CAME ON DUTY AT 8:00, RIGHT?

11  A    YES, MA'AM.

12  Q    AND SO WHEN IT HAPPENED YOU WERE IN YOUR OFFICIAL

13  CAPACITY PERFORMING YOUR OFFICIAL DUTIES?

14  A    YES, MA'AM?

15  Q    AND YOU DIDN'T GET OFF DUTY, DID YOU, DURING THE ENTIRE

16  ENCOUNTER?

17  A    NO, MA'AM.

18  Q    OKAY.

19          MS. PRATTEN:  YOUR HONOR, CAN I HAVE A MOMENT,

20  PLEASE?

21          THE COURT:  YES.

22          MS. PRATTEN:  I DON'T HAVE ANY FURTHER QUESTIONS AT

23  THIS TIME.

24          THE COURT:  MR. ERMINE, CROSS?

25                  CROSS-EXAMINATION

1  BY MR. ERMINE:

2  Q    INSPECTOR OR OFFICER?

3  A    INSPECTOR, SIR.

4  Q    INSPECTOR SCHWARZ, WHEN YOU FIRST ENCOUNTERED MR.

5  EVERETT, YOU TESTIFIED HE SEEMED UPSET, CORRECT?

6  A    YES, SIR.

7  Q    AND HE WAS YELLING?

8  A    YES, SIR.

9  Q    AND AS FAR YOU COULD TELL THERE WAS NO REASON FOR HIM TO

10 BE ACTING THAT WAY, CORRECT?

11 A    YES, SIR.

12 Q    SO AS YOU TESTIFIED ULTIMATELY MR. EVERETT IS TAKEN TO

13 THE GROUND, AT THAT POINT AN AMBULANCE IS CALLED AN EMT SHOWS

14 UP, CORRECT?

15 A    YES, SIR.

16 Q    AND MR. EVERETT ACTUALLY ENDED UP GOING TO TRUMAN

17 MEDICAL CENTER, CORRECT?

18 A    YES, SIR.

19 Q    AND IN CASE WE HAVE SOME JURORS THAT ARE NOT FAMILIAR

20 WITH KANSAS CITY, THAT IS A FAIRLY BIG HOSPITAL JUST A FEW

21 BLOCKS SOUTH, SOUTH OF HERE, CORRECT?

22 A    YES, SIR.

23 Q    AND YOU KNOW THAT MR. EVERETT WENT TO TRUMAN MEDICAL

24 CENTER BECAUSE YOU ACTUALLY WENT TO TRUMAN MEDICAL CENTER, NOT

25 WITH HIM, BUT YOU FOLLOWED ALONG AFTERWARD, CORRECT?

1   A   YES, SIR.

2   Q   AND YOU HAD ANOTHER INSPECTOR GO WITH YOU TO TRUMAN

3   MEDICAL CENTER, CORRECT?

4   A   YES, SIR.

5   Q   TO BE WITH MR. EVERETT THERE?

6   A   YES, SIR.

7   Q   AND WHEN YOU GOT TO TRUMAN MEDICAL CENTER YOU WENT TO

8   MR. EVERETT'S ROOM, CORRECT?

9   A   I WAS JUST OUTSIDE OF MR. EVERETT'S ROOM.

10  Q   OKAY.  AND SO YOU ACTUALLY SAW MR. EVERETT STRAPPED TO

11  THE BED THERE AT TRUMAN?

12  A   YES, SIR.

13  Q   AND THEY -- YOUR UNDERSTANDING WAS THEY HAD DONE THAT

14  BECAUSE HE WAS ACTING AGGRESSIVELY WITH THE STAFF, RIGHT?

15  A   YES, SIR.

16  Q   AND HE WAS EVEN THREATENING THE STAFF THERE, WASN'T HE?

17  A   YES, SIR.

18  Q   AND HE HAD THREATENED THE HOSPITAL SECURITY THERE,

19  DIDN'T HE?

20  A   YES, SIR.

21  Q   HE EVEN THREATENED THE DOCTOR?

22  A   YES, SIR.

23  Q   NOW, WHILE YOU ARE THERE, YOU SAW MR. EVERETT BE

24  SEDATED, DIDN'T YOU?

25  A   I DIDN'T SEE HIM GET SEDATED.  I KNEW THEY WENT IN TO

1    SEDATE HIM.  BUT I DID NOT PHYSICALLY SEE HIM GET SEDATED.

2     Q    AND SO THEN YOU KNOW -- DO YOU KNOW WHY THEY SEDATED

3    HIM?

4              MS. PRATTEN:  OBJECTION, SPECULATION, YOUR HONOR.

5              THE COURT:  OVERRULED.

6    BY MR. ERMINE:

7     Q    I'M JUST ASKING DO YOU HAVE PERSONAL KNOWLEDGE AS TO WHY

8    THEY WERE SEDATING HIM?

9     A    I DON'T.

10    Q    OKAY.  DID YOU HEAR ANY DOCTORS COMMENT ABOUT WHY THEY

11   WERE SEDATING HIM?

12             MS. PRATTEN:  OBJECTION, YOUR HONOR.  HEARSAY.

13             MR. ERMINE:  PRESENT SENSE.

14             THE COURT:  WHAT IS YOUR QUESTION AGAIN?

15             MR. ERMINE:  I'M ASKING HIM IF HE HEARD ANY DOCTORS

16   COMMENT ABOUT WHY THEY WERE SEDATING HIM.

17   BY THE WITNESS:

18    A    I BELIEVE IT WAS TO CALM HIM DOWN.

19    Q    OKAY.  DID THEY, FOR EXAMPLE, SAY WHY THEY WERE CALMING

20   HIM DOWN?

21             MR. ERMINE:  OBJECTION, YOUR HONOR.

22             THE COURT:  I'M GOING TO SUSTAIN THAT AS TO HEARSAY,

23   I'M PRESUMING?

24             MS. PRATTEN:  YES, YOUR HONOR.

25             MR. ERMINE:  IT IS PRESENT SENSE, YOUR HONOR.  HE IS

Case 4:16-cr-00110-BCW   Document 105   Filed 05/11/17   Page 44 of 66

1  HEARING THESE STATEMENTS BE MADE, IT IS A CONTEMPORANEOUS

2  STATEMENT.

3          THE COURT:  I'LL OVERRULE THE OBJECTION.  I'LL ALLOW

4  HIM TO ANSWER.

5  BY THE WITNESS:

6   A   MY UNDERSTANDING WAS THEY THOUGHT HE WAS IN SOME TYPE OF

7  DRUGS?

8   Q   THAT'S CORRECT.

9          MR. ERMINE:  NOTHING FURTHER, YOUR HONOR.

10         THE COURT:  MS. PRATTEN?

11         MS. PRATTEN:  NO, YOUR HONOR.  THANK YOU.

12         THE COURT:  OKAY.  THANK YOU, INSPECTOR.  YOU CAN

13  STAND DOWN.

14         UNITED STATES CALL THEIR NEXT WITNESS.

15         MR. MCCARTHER:  YES, YOUR HONOR.  THE UNITED STATES

16  CALLS FPS INSPECTOR -- WELL, FORMER FPS INSTRUCTOR, DAVID

17  WRIGHT.

18         THE COURT:  SIR, IF YOU WANT TO COME AND YOU CAN

19  COME ROUND THIS WAY HERE, AND I'LL HAVE MY COURTROOM DEPUTY

20  SWEAR YOU IN.

21                    DAVID WRIGHT

22         CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

23  DULY SWORN, AND TESTIFIED AS FOLLOWS:

24         THE COURT:  THANK YOU, SIR.  YOU CAN HAVE A SEAT

25  HERE.  WATCH YOUR STEP AS YOU GO UP.  COUNSEL.

1                    DIRECT EXAMINATION

2    BY MR. MCCARTHER:

3    Q    SIR, COULD YOU PLEASE STATE YOUR NAME FOR THE JURY?

4    A    DAVID WRIGHT.

5    Q    COULD YOU SPELL YOUR LAST NAME, PLEASE?

6    A    W-R-I-G-H-T.

7    Q    AND IS YOU CURRENT OCCUPATION, SIR?

8    A    I AM A SECURITY SPECIALIST AT USDA DEPARTMENT OF

9    AGRICULTURE.

10   Q    HOW LONG HAVE YOU BEEN IN THAT POSITION?

11   A    APPROXIMATELY EIGHT OR NINE MONTHS.

12   Q    WHAT WERE YOU DOING BEFORE YOU WORKED IN THAT FIELD?

13   A    I WAS AN FPS INSPECTOR?

14   Q    AND HOW LONG HAD YOU BEEN IN THAT ROLE AS AN FPS

15   INSPECTOR?

16   A    A LITTLE OVER THREE YEARS, SIR.

17   Q    WERE YOU AN FPS INSPECTOR AS OF MARCH 10, 2016?

18   A    YES, I WAS, SIR.

19   Q    AS PART OF THE FPS, WHAT WE'RE YOUR DUTIES AND

20   RESPONSIBILITIES IN THAT ROLE?

21   A    PROTECTION OF FEDERAL PROPERTY, FEDERAL BUILDINGS,

22   FEDERAL EMPLOYEES, LAW ENFORCEMENT INVESTIGATIONS, PATROL,

23   STUFF LIKE THAT, SIR.

24   Q    WHAT TYPE OF CRIMES DID YOU INVESTIGATE IN THAT ROLE?

25   A    THEFTS, ASSAULTS, VEHICLE DAMAGE, PROPERTY DAMAGE.

1    Q    AND THIS WOULD ALL HAVE TO DO WITH FEDERAL FACILITIES,

2    IS THAT FAIR TO SAY?

3    A    YES, SIR.

4    Q    DURING YOUR TIME WITH FPS, WOULD INVESTIGATING SPECIFIC

5    INDIVIDUALS AROUND THE FEDERAL BUILDING BE PART OF YOUR

6    OFFICIAL DUTIES WITH FPS?

7    A    YES, IT WOULD, SIR.

8    Q    WOULD INVESTIGATING HOSTILE INDIVIDUALS AT THE FEDERAL

9    BUILDING BE PART OF YOUR OFFICIAL DUTIES AT THE FPS?

10    A    YES.

11    Q    AND WOULD INVESTIGATING HOSTILE INDIVIDUALS DEMANDING TO

12    SEE FEDERAL JUDGES BE PART OF YOUR OFFICIAL DUTIES?

13    A    YES, SIR.

14    Q    WHERE IS THE HEADQUARTERS FOR THE FPS, WHERE YOU WORKED?

15    A    IT IS AT 601 EAST 12th STREET.  APPROXIMATELY THREE

16    BLOCKS DOWN FROM HERE.

17    Q    AND IS THAT IN THE WESTERN DISTRICT OF MISSOURI?

18    A    YES, THAT IS, SIR.

19    Q    NOW, WE HAVE HEARD SOME TESTIMONY ABOUT THAT BUILDING,

20    THERE ARE ABOUT A DOZEN FEDERAL AGENCIES IN THAT BUILDING, IS

21    THAT CORRECT?

22    A    I BELIEVE IT IS OVER A DOZEN.

23    Q    THERE'S A POST OFFICE IN THERE?

24    A    YES.  THERE IS A COUPLE CIVILIAN BUSINESSES, A COUPLE OF

25    BANKS, A DAY CARE, BUT MOSTLY FEDERAL AGENCIES AND FEDERAL

1    TENANTS.

2    Q    IS YOUR ROLE IN CONJUNCTION WITH THOSE AGENCIES AND THE

3    PEOPLE WHO FREQUENT THAT BUILDING, IS YOUR ROLE TO SAFEGUARD

4    THOSE PEOPLE THAT GO IN AND OUT OF THE BUILDING?

5    A    YES, SIR, ON A DAILY BASIS.

6    Q    AND TO SAFEGUARD THE PEOPLE WHO ACTUALLY WORK IN THAT

7    BUILDING, IS THAT CORRECT?

8    A    YES, SIR, EMPLOYEES AND VISITORS.

9    Q    I WANT TO GO TO MARCH 10th, OF 2016, DO YOU REMEMBER

10   THAT DATE, SIR?

11   A    YES, I DO.

12   Q    WERE YOU WORKING ON THAT DATE?

13   A    YES, I WAS.

14   Q    AT APPROXIMATELY 8:30 A.M. DID ANYTHING UNUSUAL HAPPEN?

15   A    I WAS SITTING AT MY DESK JUST NORMAL EVERY DAY AT TIMES,

16   AND THEN GET A CALL OVER THE RADIO, THE PROTECTIVE SECURITY

17   OFFICER REQUESTING FPS RESPONSE AT THE 12th STREET LOBBY.

18   Q    AND WHAT DID YOU DO IN RESPONSE?

19   A    MYSELF, INSPECTOR DAVE YADEN, INSPECTOR CHARLES SCHWARZ,

20   AND WESLEY PATTERSON, WE ALL WENT DOWNSTAIRS, WE ARE LOCATED

21   ON THE SECOND FLOOR, WE ALL GO DOWNSTAIRS AND PROCEED TO THE

22   LOBBY.

23   Q    NOW, WHEN YOU GET TO THE LOBBY WHAT DID YOU OBSERVE?

24   A    THE PROTECTION SECURITY OFFICERS POINTING OUTSIDE

25   TOWARDS THE KCPD HEADQUARTERS SAYING, THAT'S THE GUY, THAT'S

1   THE GUY.

2   Q    AND WHAT DID YOU KNOW ABOUT THAT GUY AT THAT POINT?

3   A    NOTHING AT THAT TIME.

4   Q    AND SO WHAT DID YOU PROCEED AT THAT POINT?

5   A    WE GO -- I CAN'T REMEMBER WHO WAS FIRST WHO WAS SECOND,

6   I WAS THIRD, AND INSPECTOR WES PATTERSON WAS FOURTH.  WE GO

7   OUT THE DOOR AND WE START WALKING TOWARDS THE STREET.

8   Q    AND AS YOU BEGAN WALKING TOWARDS THE STREET DID YOU SEE

9   ANYTHING UNUSUAL?

10  A    YES, SIR.

11  Q    WHAT DID YOU SEE?

12  A    I SAW AN INDIVIDUAL ACTING VERY ERRATIC.

13  Q    THAT INDIVIDUAL, DID YOU WIND UP HAVING A CONFRONTATION

14  WITH HIM?

15  A    YES, I DID, SIR.

16  Q    THAT INDIVIDUAL, IS HE SITTING IN THIS COURTROOM TODAY?

17  A    YES, HE IS, SIR.

18  Q    COULD YOU DESCRIBE WHAT HE IS WEARING AND WHERE HE IS

19  SEATED?

20  A    LONG SLEEVE BUTTON UP, I BELIEVE IT IS STRIPES.

21  Q    AND IS HE SITTING AT DEFENSE COUNSEL TABLE?

22  A    YES, HE IS.

23       MR. MCCARTHER:  YOUR HONOR, MAY THE RECORD REFLECT

24  THAT THE WITNESS HAS IDENTIFIED THE DEFENDANT, JAMES EVERETT?

25       THE COURT:  THE RECORD WILL SO REFLECT.

1    BY MR. MCCARTHER:

2    Q    OKAY.  SO AS YOU SEE THIS INDIVIDUAL IN THE STREET, WHAT

3    IS YOU AND YOUR FELLOW OFFICERS RESPONSE?

4    A    INSPECTOR DAVE YADEN GOES TO MY RIGHT, INSPECTOR CHARLES

5    SCHWARZ GOES TO MY LEFT, AND I CONTINUE TO WALK STRAIGHT.

6    Q    WERE YOU SAYING ANYTHING TO THE DEFENDANT?

7    A    I HADN'T MADE CONTACT AT THAT TIME.

8    Q    HAD ANYONE MADE CONTACT AT THAT TIME?

9    A    INSPECTOR DAVE YADEN, HE WAS HE TRYING TO ESTABLISH

10   CONTACT?

11   Q    AND WHAT WAS HE SAYING TO TRY AND ESTABLISH CONTACT?

12   A    SIR, HEY SIR, SIR, CALM DOWN.  THINGS LIKE THAT.

13   Q    AND IN RESPONSE TO INSPECTOR DAVE YADEN ATTEMPTING TO

14   CONTACT MR. EVERETT, WHAT DID MR. EVERETT DO IN RESPONSE?

15   A    HE WALKED VERY FAST TOWARDS US, THROWING UP HIS HANDS

16   AND ARMS, JUST HOLLERING, NOT -- COULDN'T REALLY UNDERSTAND

17   HIM.

18   Q    WAS THERE A POINT WHERE YOU COULD UNDERSTAND WHAT HE WAS

19   SAYING?

20   A    HE WAS PRETTY CLOSE.

21   Q    FOR INSTANCE, DID HE MADE ANY SPECIFIC STATEMENTS TO YOU

22   AND YOUR OFFICERS?

23   A    MOST OF IT WAS UNCLEAR BUT I DID HEAR I'M GOING TO KNOCK

24   YOUR FUCKING HEAD OFF, I'M GOING TO FUCK YOU UP.

25   Q    AND IN FACT, DID HE ALSO TELL YOU THAT HE WAS GOING TO

1    KILL YOU?

2     A    DON'T KNOW WHY, HE CAME STRAIGHT TOWARDS ME AND I WAS

3    TRYING TO KEEP A -- THERE'S A CONCRETE POST RIGHT BESIDE THAT

4    HOLD UP THE FIVE POLLS IN FRONT OF THE BUILDING.  I WAS TRYING

5    TO KEEP THAT CONCRETE POST BETWEEN ME AND MR. EVERETT.  AND HE

6    KIND OF JUMPED, LOUNGED CLOSING THE DISTANCE, AND THAT IS WHEN

7    I PULLED OUT MY TASER.

8     Q    AND WHY DID YOU PULL OUT YOUR TASER?

9     A    BECAUSE I THOUGHT -- I DIDN'T KNOW WHAT HE WAS DOING,

10    BUT HE WAS CLOSING THE DISTANCE, AND I THOUGHT THAT HE WAS

11    GOING TO DO SOMETHING TO ME, ASSAULT ME.

12     Q    SO AFTER YOU PULLED OUT YOUR TASER DID THE DEFENDANT SAY

13    ANYTHING TO YOU SPECIFICALLY?

14     A    HE DROPPED HIS HANDS, EVERYTHING JUST CALMED DOWN FOR A

15    SECOND, AND HE SAID, I'M GOING TO FUCKING KILL YOU.

16     Q    DID YOU THINK HE WAS TRYING TO INTIMIDATE YOU?

17     A    YES.

18     Q    WHY DO YOU THINK THAT?

19     A    JUST HIS ENTIRE DEMEANOR THAT MORNING.

20     Q    LET ME ASK YOU THIS, DID YOU THINK HE WAS SERIOUS WHEN

21    HE TOLD YOU THAT?

22     A    YES.

23     Q    WHY DID YOU THINK HE WAS SERIOUS?

24     A    HE WAS JUST DISPLAYING SYMPTOMS OF EMOTIONAL, UH,

25    EMOTIONAL DISTRESSED PERSONS.

1    Q    DID HE LOOK LIKE MAYBE HE WAS ON DRUGS TOO?

2    A    I -- HE WAS COMPLETELY --

3    Q    I DON'T WANT YOU TO SPECULATE, BUT HE WASN'T ACTING

4    NORMALLY, RIGHT?

5    A    NO, IT WAS NOT NORMAL BEHAVIOR.

6    Q    AND JUST TO BE CLEAR WHEN YOU -- WHEN HE SAID THESE

7    THINGS TO YOU AND YOUR FELLOW OFFICERS, WERE YOU ON DUTY?

8    A    YES, I WAS.

9    Q    WERE YOU ENGAGED IN THE PERFORMANCE OF YOUR OFFICIAL

10   DUTIES?

11   A    YES, I WAS.

12   Q    WOULD PROTECTING YOURSELF THROUGH THE USE OF A TASER BE

13   A PART OF YOUR OFFICIAL DUTIES OF AN FPS OFFICER?

14   A    YES, IT IS, SIR.

15   Q    SO LET'S TALK ABOUT THE TAKEDOWN.  NOW, THERE CAME A

16   POINT WHERE YOU HAD TO TAKE THE DEFENDANT TO THE GROUND, IS

17   THAT FAIR TO SAY?

18   A    YES, SIR.

19   Q    WHERE YOU BELIEVED YOUR SAFETY WAS AT RISK, IS THAT

20   RIGHT?

21   A    YES, SIR.

22   Q    AND WHEN DID THAT POINT COME?

23   A    AFTER MR. EVERETT DROPPED HIS HANDS AND SAID HE WAS

24   GOING TO, YOU KNOW, MADE THAT COMMENT.  INSPECTOR DAVE YADEN

25   TACKLED HIM FROM BEHIND, HELD HIM BY HIS, PRETTY MUCH UPPER

1    TORSO.  THAT IS WHEN I HOLSTERED MY TASER, NEVER FIRED IT,

2    INSPECTOR DAVE YADEN SAID HANDCUFF HIM.  I GRAB MY HANDCUFFS.

3    I GO TO PUT THE FIRST CUFF ON HIS LEFT WRIST AND THAT IS WHEN

4    THE INDIVIDUAL STARTED VIOLENTLY RESISTING.

5    Q    WHY WAS THE DECISION MADE TO PLACE MR. EVERETT IN

6    HANDCUFFS?

7    A    HE THREATENED LAW ENFORCEMENT OFFICERS.

8    Q    DID YOU ATTEMPT TO TAKE MR. EVERETT DOWN?

9    A    YES, I DID.

10   Q    WAS IT EASY?

11   A    NO, IT WAS NOT.

12   Q    WHY WASN'T IT EASY?

13   A    IT TOOK TWO LEG SWEEPS FROM ME ON HIS SIDE.  INSPECTOR

14   DAVE YADEN TRYING TO PUSH HIM.  AND INSPECTOR CHARLES SCHWARZ

15   TRYING TO DRAG HIM DOWN.

16   Q    DID HE EVENTUALLY GO DOWN?

17   A    YES.

18   Q    NOW, WHILE HE IS DOWN DO YOU HAVE FULL CONTROL OF HIS

19   ARMS?

20   A    I HAD CONTROL OF HIS LEFT ARM.

21   Q    DID AT ANY POINT MR. EVERETT REACH TOWARDS ANY PART OF

22   HIS BODY THAT MADE YOU THINK YOUR SAFETY MIGHT BE AT RISK?

23   A    I HAD HIS LEFT ARM SPLAYED OUT PERPENDICULAR TO HIS

24   BODY.  I -- ONE OF THE FEW TIMES I LOOKED UP AND SAW INSPECTOR

25   DAVE YADEN, I HEARD HIM SAY WAISTBAND, WAISTBAND.  THAT IS A

1    BIG INDICATOR OF POSSIBLE WEAPON.  AND THEN I SAW -- I WAS SO

2    FOCUSED ON JUST HOLDING MR. EVERETT'S LEFT ARM DOWN TO KEEP

3    HIM PINNED TO THE GROUND.  AND ALL I HEARD, YOU KNOW, I HEARD

4    WAISTBAND, AND THEN I SAW DETECTIVE DAVE YADEN STRUGGLING

5    TRYING TO GET HIS ARM AWAY FROM THE FRONT OF HIS BODY.

6    Q    NOW, YOU TESTIFIED YOU HEARD INSPECTOR YADEN YELL,

7    WAISTBAND, WAISTBAND, ARE YOU TRAINED TO TRY AND -- ARE YOU

8    TRAINED THAT A PERSON THAT YOU ARE INTERACTING WITH GOING TO

9    THE WAISTBAND IS A DANGER TO YOU?

10   A    YES.

11   Q    EXPLAIN THAT TRAINING?

12   A    INDIVIDUALS -- MOST OF THE TIME THEY WILL EITHER --

13   ACCORDING TO OUR TRAINING, THEY WILL EITHER CONCEAL WEAPONS IN

14   THEIR POCKETS OR THEIR WAISTBANDS.  SO WE HAVE TO CONTROL

15   THEIR HANDS TO LIMIT THE EXPOSURE TO THOSE AREAS.

16   Q    NOW, WAS THE DEFENDANT FINALLY RESTRAINED?

17   A    YES.

18   Q    AND I BELIEVE SOME ADDITIONAL OFFICERS CAME TO HELP YOU

19   OUT, IS THAT CORRECT?

20   A    IT WAS TWO KCPD OFFICERS.

21   Q    AND THAT WOULD BE KCPD DETECTIVES, BRADLEY BAILEY AND

22   ANTHONY WATT, IS THAT CORRECT?

23   A    YES.

24   Q    AFTER -- AND I'M SORRY.  WHEN I SAY RESTRAINED, HE WAS

25   PLACED IN THE HANDCUFFS, CORRECT?

1   A    YES.

2   Q    AFTER HE WAS PLACED IN HANDCUFFS, WAS HE STILL

3   STRUGGLING?

4   A    YES, HE WAS.

5   Q    HOW WAS HE STRUGGLING?

6   A    SO I TRANSFERRED HIS ARM, HIS LEFT-HAND AND WRIST TO HIS

7   BACK, WE WERE ABLE TO HANDCUFF HIM.  I STAND UP AND NOTICED I

8   HAD SOME BLOOD ON MY HAND.  I'M STANDING, YOU KNOW, I'M

9   STANDING OVERHEAD AND THEN I HEAR A THUMB SOUND.  AND I LOOK

10  AND IT IS THE SUSPECT HEADBUTTING THE CONCRETE, BRICK PATIO.

11  Q    SO AT THAT POINT YOU THINK, OKAY, THIS GUY IS NOT ACTING

12  NORMAL, RIGHT?

13  A    THAT IS CORRECT.

14  Q    AND PROBABLY BEFORE THAT YOU THOUGHT THAT?  YOU THOUGHT

15  HE MIGHT ACTUALLY BE ON A DRUG, RIGHT?

16  A    I --

17  Q    RIGHT.  AND I CERTAINLY DON'T WANT YOU TO SPECULATE.

18  DID HE ALSO TRY TO ATTACK YOU AND YOUR FELLOW OFFICERS WHILE

19  HE WAS RESTRAINED ON THE GROUND?

20  A    YES, AFTER HE HEADBUTTED THE GROUND THE FIRST TIME, I

21  TRIED TO PUT MY HAND ON HIS FOREHEAD SO HE WOULDN'T DO THAT

22  AND HE SNAPPED AT ME OR BIT AT MY HAND.

23  Q    WAS HE ABLE TO BITE YOUR HAND?

24  A    NO.

25  Q    DID HE TRY AND SPIT AT YOU OR ANY OF YOUR FELLOW

1  OFFICERS?

2   A    YES.  HE TRIED SPITTING ON MY HAND AND -- WE LATER ENDED

3  UP PUTTING A SPIT HOOD ON HIM.

4   Q    AND A SPIT HOOD, JUST BRIEFLY EXPLAIN THAT TO THE JURY.

5  WHAT IS THAT?

6   A    A SPIT HOOD IS A SEE THROUGH HOOD, IF AN INDIVIDUAL IS

7  SPITTING, YOU DON'T WANT TO LIMIT THE -- POSSIBLE -- DISEASES

8  TRANSFERRED THROUGH SALIVA.  EMS TYPICALLY HAS THEM IN THEIR

9  VEHICLES, AND THEY WILL PUT THEM ON THE HOOD -- OR AROUND THE

10  HEAD AND THEN THE NECK.

11   Q    WERE YOU INJURED IN THIS STRUGGLE?

12   A    YES.

13   Q    HOW WERE YOU INJURED?

14   A    CUT UP OR SKINNED MY HAND ON THE BRICK TAKING THE

15  INDIVIDUAL DOWN.  AND BRUISES AND SCRAPES ACROSS MY KNEECAPS

16  AND MY SHINS.

17   Q    NOW, AN AMBULANCE WAS CALLED FOR THE DEFENDANT, IS THAT

18  CORRECT?

19   A    YES, IT IS, SIR.

20   Q    WHY WAS AN AMBULANCE CALLED FOR THE DEFENDANT?

21   A    FOR HIS SAFETY.

22   Q    AND IS THAT BECAUSE IT IS STANDARD PROTOCOL WHEN YOU

23  THINK SOMEONE IS ON DRUGS?  THAT YOU TAKE THEM TO AN AMBULANCE

24  BEFORE YOU ACTUALLY TAKE THEM INTO LAW ENFORCEMENT CUSTODY?

25   A    YES, SIR.

1    Q    I WANT TO TALK ABOUT SURVEILLANCE FOOTAGE.  ARE THERE

2   SURVEILLANCE CAMERAS OUTSIDE OF THE RICHARD BOLLING FEDERAL

3   BUILDING?

4    A    YES, SIR.

5    Q    WERE THOSE CAMERAS FUNCTIONING THE MORNING OF MARCH

6   10TH, 2016?

7    A    YES, THEY WERE, SIR.

8    Q    IS ANYONE ACTIVELY MONITORING THESE CAMERAS AT ANY GIVEN

9   POINT?

10    A    YES, SIR.  THERE IS A PROTECTIVE SECURITY OFFICER, ONE

11   OF THE GUARDS ON THE GROUND LEVEL.

12    Q    AND SO AM I CORRECT, AND I BELIEVE I HEARD EARLIER,

13   TYPICALLY THE CAMERAS ARE ROTATING BACK AND FORTH, IS THAT

14   FAIR TO SAY?

15    A    THEY CAN BE PROGRAMMED TO LOOK AT CERTAIN AREAS OR

16   CERTAIN PATHS OR CERTAIN TIMES, TURN AND BASICALLY DO A BIG

17   LOOP.

18    Q    BUT IN ANY GIVEN POINT, A PROTECTIVE SERVICE OFFICER CAN

19   TAKE CONTROL OF THE CAMERA AND FOCUS IT ON ONE POINT, IS THAT

20   RIGHT?

21    A    YES, SIR.  YOU CAN MANUALLY OVERRIDE IT.

22    Q    AND WAS THERE SURVEILLANCE FOOTAGE FROM THIS INCIDENT IN

23   QUESTION FROM MARCH 10TH, 2016?

24    A    YES, SIR.

25    Q    HAVE YOU REVIEWED THE FOOTAGE FROM THAT MORNING?

1    A    YES, SIR.

2          MR. MCCARTHER:  YOUR HONOR, CAN I APPROACH THE

3    WITNESS?

4          THE COURT:  YOU MAY.

5    BY MR. MCCARTHER:

6    Q    I'M HANDING YOU WHAT HAS BEEN PREVIOUSLY MARKED AS

7    GOVERNMENT EXHIBIT 11.  DO YOU RECOGNIZE THAT?

8    A    YES, I DO, SIR.

9    Q    AND HOW DO YOU RECOGNIZE THAT?  THAT IS FOOTAGE YOU HAVE

10   REVIEWED, CORRECT?

11   A    YES, SIR.

12   Q    AND IS THE FOOTAGE ON EXHIBIT 11, DOES THAT FAIRLY AND

13   ACCURATELY PORTRAY THE EVENTS THAT TOOK PLACE ON MARCH 10TH,

14   2016, AT APPROXIMATELY 8:30 IN THE MORNING?

15   A    YES, SIR.

16          MR. MCCARTHER:  YOUR HONOR, AT THIS TIME I MOVE FOR

17   ADMISSION OF EXHIBIT 11 INTO EVIDENCE.

18          MR. ERMINE:  NO OBJECTION, BUT I WOULD REQUEST A

19   BREAK BEFORE WE PUBLISH IT.

20          THE COURT:  OKAY.

21          MR. ERMINE:  IT'S ABOUT 16 MINUTES OF VIDEO.

22          THE COURT:  COUNSEL, APPROACH.

23   (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

24   PROCEEDINGS WERE HELD.)

25          THE COURT:  DO YOU NEED A BATHROOM BREAK?

1    MR. ERMINE:  YES, SIR.

2    THE COURT:  OKAY.  WE'LL DO THAT.

3    MR. MCCARTHER:  LET'S JUST DO THAT.  I HAVE MORE

4  QUESTIONS AFTER THE SURVEILLANCE VIDEO IS PLAYED, SO WE SHOULD

5  JUST DO IT NOW AND THEN I CAN PLAY THE VIDEO AND THEN I CAN

6  ASK THE QUESTIONS.

7    THE COURT:  OKAY.  WE'LL TAKE ABOUT 15 MINUTES.

8  (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

9    THE COURT:  LADIES AND GENTLEMEN OF THE JURY, WE ARE

10  GOING TO OUR AFTERNOON RECESS AT THIS TIME.  WE WILL TAKE NO

11  LONGER THAN 15 MINUTES.  WHEN WE RETURN WE WILL HAVE A VIDEO

12  THAT WILL BE PLAYED.  SO WITH THAT SAID, WE WILL BREAK AT THIS

13  TIME.

14  (THEREUPON, THE FOLLOWING PROCEEDINGS WERE ADJOURNED.)

15    (PROCEEDINGS BEGAN AT 4:25 PM)

16    THE COURT:  OKAY.  MR. MCCARTHER.  AND I WILL REMIND

17  THE WITNESS THAT YOU ARE STILL UNDER OATH.

18    MR. MCCARTHER:  THANK YOU, JUDGE.

19  BY MR. MCCARTHER:

20  Q    THERE IS AN IMPORTANT QUESTION I NEED TO ASK.  WHAT WERE

21  YOU WEARING THAT DAY WHEN YOU CONFRONTED THE DEFENDANT?

22  A    MY FPS UNIFORM.

23  Q    NOW, DID YOU SEE INSPECTOR CHARLES SCHWARZ THIS MORNING?

24  A    YES, I DID.

25  Q    SO WHAT HE WAS WEARING WOULD THAT HAVE BEEN THE SAME

1   TYPE OF UNIFORM YOU WERE WEARING?

2    A    YES, SIR.

3    Q    AND IT SAYS POLICE ACROSS THE FRONT?

4    A    I BELIEVE, YES.  DHS POLICE.

5    Q    AND SO IS THERE ANYTHING ABOUT THAT UNIFORM THAT WOULD

6   LEAD ANY ONE TO BELIEVE YOU WERE ANYTHING BUT A POLICE OFFICER

7   OR A POLICE INSPECTOR?

8    A    THERE IS NO WAY THEY CAN CONFUSE THAT.

9            MR. MCCARTHER:  YOUR HONOR, WITH YOUR PERMISSION,

10  MAY I PUBLISH EXHIBIT 11 TO THE JURY?

11           THE COURT:  YOU MAY.

12           MR. MCCARTHER:  THANK YOU.

13           (THEREUPON; GOVERNMENT'S EXHIBIT NO. 11 WAS THEN

14  PUBLISHED TO THE JURY IN OPEN COURT.)

15  BY MR. MCCARTHER:

16   Q    ALLYSON, CAN YOU DO ME A FAVOR AND REWIND IT TO THE

17  BEGINNING AND THEN PAUSE.  I DON'T BELIEVE I BROUGHT THIS UP

18  DURING YOUR DIRECT EXAMINATION, BUT NOW THAT I SEE THE VIDEO,

19  THE DEFENDANT WAS HEADING TOWARDS YOU SUCH THE POINT THAT YOU

20  HAD TO BACK UP, IS THAT RIGHT?

21   A    YES, SIR.

22   Q    WHY DID YOU BACK UP?

23   A    I WANTED THE DISTANCE AWAY FROM THE INDIVIDUAL.

24   Q    AND DID YOU BACK UP BECAUSE IT LOOKED LIKE HE WAS COMING

25  TO ACTUALLY ATTACK YOU?

1   A    THAT'S WHAT I BELIEVED, SIR.

2   Q    I'D LIKE TO PLAY THIS AGAIN BUT JUST THE FIRST 30

3   SECONDS OR SO.  OKAY.  THANK YOU, ALLYSON.  YOU CAN PAUSE IT.

4        WERE YOU MADE AWAY OF THE VEHICLE THE DEFENDANT

5   DROVE TO THE LOCATION IN?

6   A    IT WAS DURING THE PART WHERE I WAS HOLDING HIS FEET

7   DOWN, THAT'S WHEN I FIRST HEARD ABOUT IT.

8   Q    WERE YOU SUBSEQUENTLY INFORMED THAT A FIREARM WAS

9   DISCOVERED UNDER THE FRONT SEAT OF THAT CAR?

10  A    I WAS HOLDING HIS FOOT DOWN AND I HEARD THAT.

11  Q    AND IN THIS CLIP WE HAVE RIGHT HERE, THE DEFENDANT SAID

12  HE WAS GOING TO KILL YOU, IS THAT RIGHT?

13  A    YES, SIR.

14  Q    AND DEFENDANT SAID SOMETHING LIKE, I'M GOING TO BLOW

15  YOUR HEAD OFF?

16  A    I WANT TO KNOCK YOUR HEAD OFF.

17  Q    AND WHILE HE WAS ON THE GROUND HE WAS REACHING TOWARDS

18  HIS WAISTBAND, IS THAT YOUR TESTIMONY?

19  A    YES, SIR.

20  Q    AND THERE WAS A GUN LOCATED IN THE CAR HE DROVE THERE IN

21  ABOUT 100 FEET AWAY, IS THAT RIGHT?

22  A    ABOUT 100 FEET.

23       MR. MCCARTHER:  YOUR HONOR, I HAVE NO FURTHER

24  QUESTIONS AT THIS TIME.

25       THE COURT:  THANK YOU.  MR. ERMINE, CROSS.

<u>CROSS-EXAMINATION</u>

BY MR. ERMINE:

Q    YOUR OFFICE IS LOCATED ON THE SECOND FLOOR OF THE

FEDERAL BUILDING OR WAS AT THAT TIME, WAS WHAT WAS AT THE TIME

CORRECT?

A    YES, SIR.

Q    AND YOU GOT A CALL TO COME DOWN TO THE LOBBY BECAUSE

THERE WAS A GUY ACTING VERY CRAZY DOWN THERE, RIGHT?

A    I CAN'T REMEMBER THE EXACT CALL.

Q    OKAY.  ULTIMATELY YOU WENT DOWN TO THE LOBBY AND YOU

WENT OUTSIDE, CORRECT?

A    YES, SIR.

Q    AND RIGHT WHEN HE SAW YOU, HE WAS YELLING, RIGHT?

A    YES, SIR.

Q    AND SCREAMING PROFANITY?

A    YES.

Q    AND AS SOON AS HE SAW YOU HE WAS MUTTERING AND YELLING

THREATS, WASN'T HER?

A    THROWING HIS ARMS UP, HOLLERING AND SCREAMING.

Q    OKAY.  TRY AS YOU MIGHT, HE JUST WOULD NOT BE CALMED

DOWN, WOULD HE?

A    THAT IS WHEN INSPECTOR DAVE YADEN WAS TRYING TO INITIATE

CONTACT.

Q    RIGHT.  AND AS WE SEE HERE, THAT IS WHEN HE WAS TAKEN TO

THE GROUND, RIGHT?

1    A    WHEN HE WENT AROUND THOSE BARRIERS KIND OF WENT FOR ME.

2    Q    RIGHT.  SO WHEN HE IS TAKEN TO THE GROUND -- AND WE SAW

3    ON THIS VIDEO AND I THINK YOU TESTIFIED AS WELL, HE ACTUALLY

4    SLAMMED HIS FOREHEAD AGAINST THE GROUND, DIDN'T HE?

5    A    YES, HE DID, SIR.

6    Q    HE DID THAT TWICE, DIDN'T HE?

7    A    I JUST RECALL THE FIRST ONE.

8    Q    I THINK THE GROUND THERE IS CONCRETE, RIGHT?

9    A    CONCRETE, BRICK.

10    Q    ULTIMATELY -- WELL, I SHOULD, NOW, WHEN HE WAS ON THE

11    GROUND AND YOU TESTIFIED THAT HE WAS REACHING FOR HIS

12    WAISTBAND, CORRECT?

13    A    YES, SIR.

14    Q    THERE WAS NO GUN FOUND IN HIS WAISTBAND, WAS THERE?

15    A    NO, SIR.

16    Q    WHEN THE PARAMEDICS ARRIVED AS WE SEE ON THIS VIDEO, YOU

17    WERE STILL IN CLOSE PROXIMITY TO THIS WHOLE THING, WEREN'T

18    YOU?

19    A    HOLDING HIS FEET, SIR.

20    Q    DID YOU HIM THREATEN THE PARAMEDICS THAT WERE ON THE

21    SCENE?

22    A    I DON'T RECALL THE PARAMEDICS.

23    Q    OKAY.  YOU WROTE A REPORT IN THIS CASE, DIDN'T YOU?

24    A    I'M SORRY?

25    Q    YOU WROTE A REPORT IN THIS CASE?

1   A   YES, I DID, SIR.

2   Q   AS PART OF YOUR TRAINING -- WE HEARD A LITTLE BIT ABOUT

3   THE TRAINING THAT THE FPS OFFICER GO THROUGH.  PART OF THE

4   TRAINING IS ABOUT REPORT WRITING, ISN'T IT?

5   A   YES, SIR.

6   Q   SO ONE OF THE REASONS THAT YOU WANT TO WRITE A REPORT IS

7   ESSENTIALLY WHAT WE ARE HERE FOR TODAY, RIGHT?

8   A   YES, SIR.

9   Q   WHEN YOU COME TESTIFY YOU WANT TO BE ABLE TO REMEMBER

10   SOMETHING THAT HAPPEN IN THIS CASE OVER A YEAR AGO, RIGHT?

11   A   YES, SIR.

12       MR. ERMINE:  I'M NOT GOING TO MARK THIS BECAUSE I

13   DON'T PLAN OF ADMITTING IT.  CAN I APPROACH THE WITNESS AND

14   SHOW HIM THIS?

15       THE COURT:  NOTWITHSTANDING THAT, AND I UNDERSTAND

16   THAT, WHY DON'T WE MARK IT FOR PURPOSES OF THE RECORD.

17       MR. ERMINE:  I HAVE A STICKER HANDY AND I WILL MARK

18   THIS AS DEFENDANT'S EXHIBIT NO. 1.

19       THE COURT:  AND IT'S TYPICALLY CONSECUTIVE.  SO WHY

20   DON'T YOU MARK THAT AS DEFENDANT'S EXHIBIT 100.

21       MR. ERMINE:  YES, YOUR HONOR.  I'LL MARK THIS

22   DEFENDANT'S EXHIBIT 100.

23   BY MR. ERMINE:

24   Q   YOU TESTIFIED JUST MOMENTS AGO, YOU DON'T REMEMBER

25   WHETHER HE WAS THREATENING THE PARAMEDICS THAT WERE THERE,

1  CORRECT?

2   A   I DO NOT RECALL IF HE DID OR DIDN'T.

3   Q   LET ME SHOW YOU WHAT I HAVE MARKED AS DEFENDANT'S

4  EXHIBIT 100.  LET ME ASK YOU FIRST, DOES THIS APPEAR TO BE THE

5  REPORT THAT YOU WROTE?

6   A   YES, IT IS.

7   Q   AND SO LOOKING AT THIS REPORT DOES THIS REPORT REFRESH

8  YOUR RECOLLECTION ABOUT WHETHER HE THREATENED AND EMS THAT

9  WERE AT THE SCENE?

10  A   YES, I WROTE, "I THEN SAW EMS ARRIVE ON SCENE.  THEN

11  WITH A STRETCHER EMS WAS TRYING TO TALK TO THE SUSPECT AND HE

12  TRIED TO SPIT ON EMS AND MAKING MORE VERBAL THREATS."

13          MR. ERMINE:  NOTHING FURTHER, YOUR HONOR.  THANK

14  YOU.

15          THE COURT:  ANY REDIRECT?

16          MR. MCCARTHER:  ONE MOMENT, YOUR HONOR.

17          THE COURT:  OKAY.

18          MR. MCCARTHER:  YOUR HONOR, I HAVE NO REDIRECT.

19          THE COURT:  OKAY.  THANK YOU, SIR.  YOU CAN STAND

20  DOWN.

21          LADIES AND GENTLEMEN OF THE JURY, IT IS ABOUT TEN

22  TILL FIVE AND THERE IS NO USE TO ATTEMPTING TO PUT ON ANOTHER

23  WITNESS.  WITH THAT SAID, WE ARE GOING TO ADJOURN FOR THE

24  EVENING.

25          I WILL TELL YOU WE WILL START BACK UP AT 9:00

Denise Carroll Halasey CCR, CVR-CM

1  TOMORROW.

2         WITH THAT SAID, THE COURT AGAIN REMINDS YOU OF WHAT

3  YOU WERE TOLD AT THE FIRST RECESS OF THE COURT.  UNTIL YOU

4  RETIRE TO CONSIDER YOUR VERDICT YOU MUST NOT DISCUSS THIS CASE

5  AMONG YOURSELVES OR WITH OTHERS OR PERMIT ANYONE TO DISCUSS IT

6  IN YOUR HEARING.  YOU SHOULD NOT FORM OR EXPRESS ANY OPINION

7  ABOUT THE CASE UNTIL IT IS FINALLY GIVEN TO YOU DECIDE.  DO

8  NOT DO ANY RESEARCH OR INVESTIGATION ON YOUR OWN ABOUT ANY

9  MATTER REGARDING THIS CASE OR ANYONE INVOLVED WITH THE TRIAL.

10  DO NOT COMMUNICATE WITH OTHERS ABOUT THE CASE BY ANY MEANS.

11  DO NOT READ, VIEW, OR LISTEN TO ANY NEWSPAPER, RADIO,

12  ELECTRONIC COMMUNICATION FROM THE INTERNET OR TELEVISION

13  REPORT OF THE TRIAL.

14         MS. BALDWIN:  ALL RISE.  COURT IS IN RECESS.

15  (THEREUPON, THE FOLLOWING PROCEEDINGS WERE ADJOURNED.)

16

17                       CERTIFICATE

18

19         I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

20  FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

21  MATTER.

22       MAY, 11, 2017

23

24                    /S/ DENISE C. HALASEY
                      DENISE C. HALASEY, CCR, CVR-CM
                      UNITED STATES COURT REPORTER

25