1          IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
2                    WESTERN DIVISION

3    UNITED STATES OF AMERICA,      )
                                    )
4            PLAINTIFF,             ) NO.  4:16-CR-00110-BCW-1
                                    )      MARCH 30, 2017
5            V.                     )      KANSAS CITY, MISSOURI
                                    )      CRIMINAL
6    JAMES EVERETT,                 )
                                    )
7            DEFENDANT.             )

8

9         PARTIAL JURY TRIAL TRANSCRIPT - DAY 2
            BEFORE THE HONORABLE BRIAN C. WIMES
10              UNITED STATES DISTRICT JUDGE

11    PROCEEDINGS RECORDED BY ELECTRONIC VOICE WRITING
                TRANSCRIPT PRODUCED BY COMPUTER
12

13

14                     APPEARANCES

15   FOR PLAINTIFF:     MR. JEFFREY QUINN MCCARTHER
                        UNITED STATES ATTORNEY'S OFFICE - KCMO
16                      400 E. 9TH STREET, 5TH FLOOR
                        KANSAS CITY, MISSOURI 64106
17
                        MS. COURTNEY R. PRATTEN
18                      UNITED STATES ATTORNEY'S OFFICE - KCMO
                        400 E. 9TH STREET, 5TH FLOOR
19                      KANSAS CITY, MISSOURI 64106

20

21   FOR DEFENDANT:     MR. WILLIAM ERMINE
                        FEDERAL PUBLIC DEFENDER'S OFFICE - KCMO
22                      818 GRAND AVENUE
                        KANSAS CITY, MISSOURI  64106
23

24

25

1                         I N D E X

2   DESCRIPTION:                                    PAGE:

3   PLAINTIFF'S EVIDENCE:

4   BRADLEY BAILEY
    DIRECT EXAMINATION BY MS. PRATTON:              4
5   CROSS-EXAMINATION BY MR. ERMINE:                28
    REDIRECT EXAMINATION BY MS. PRATTON:            40
6   RECROSS-EXAMINATION BY MR. ERMINE:              42

7   ANTHONY WATT
    DIRECT EXAMINATION BY MR. MCCARTHER:            44
8   CROSS-EXAMINATION BY MR. ERMINE:                58

9   MATTHEW WILSON
    DIRECT EXAMINATION BY MS. PRATTON:              60
10  CROSS-EXAMINATION BY MR. ERMINE:                67

11  FRANK RORABAUGH
    DIRECT EXAMINATION BY MR. MCCARTHER:            69
12  CROSS-EXAMINATION BY MR. ERMINE:                77
    REDIRECT EXAMINATION BY MR. MCCARTHER:          79

13

14  TRAVIS VAS
    DIRECT EXAMINATION BY MR. MCCARTHER:            79
15  CROSS-EXAMINATION BY MR. ERMINE:                89

16

17

18

19

20

21

22

23

24

25

| | OFF'D | ADM'D |
|---|---|---|

E X H I B I T S

| DESCRIPTION | OFF'D | ADM'D |
|---|---|---|
| PLAINTIFF'S EVIDENCE: | | |
| GOVERNMENT'S EXHIBIT 5 THROUGH 8 | 19 | 20 |
| GOVERNMENT'S EXHIBIT 1 | 23 | 23 |
| GOVERNMENT'S EXHIBIT 2 AND 3 | 27 | 27 |
| GOVERNMENT'S EXHIBIT 9 | 66 | 66 |
| GOVERNMENT'S EXHIBIT 15 | 82 | 82 |
| GOVERNMENT'S EXHIBIT 12, 13, AND 14 | 86 | 86 |

1          MARCH 30, 2017

2          THE COURT:  GOVERNMENT CALL THEIR NEXT WITNESS.

3          MS. PRATTEN:  YOUR HONOR, THE GOVERNMENT CALLS

4    KANSAS CITY POLICE DETECTIVE BRADLEY BAILEY TO THE STAND.

5          THE COURT:  DETECTIVE, IF YOU WANT TO COME AROUND

6    THIS WAY, SIR.  I'M GOING TO HAVE YOU STOP RIGHT THERE AND

7    TURN TO MY COURTROOM DEPUTY AND RAISE YOUR RIGHT-HAND AND BE

8    SWORN.

9                    BRADLEY BAILEY

10         CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

11   DULY SWORN, AND TESTIFIED AS FOLLOWS:

12         THE COURT:  THANK YOU, DETECTIVE, YOU COULD HAVE A

13   SEAT RIGHT HERE.  WATCH YOUR STEP.  COUNSEL.

14                  DIRECT EXAMINATION

15   BY MS. PRATTEN:

16   Q    GOOD MORNING.

17   A    GOOD MORNING.

18   Q    CAN YOU GO AHEAD AND STATE YOUR NAME FOR THE RECORD?

19   A    BRADLEY BAILEY.

20   Q    AND WHERE ARE YOU EMPLOYED?

21   A    KANSAS CITY POLICE DEPARTMENT.

22   Q    AND HOW LONG HAVE YOU BEEN WITH KANSAS CITY POLICE

23   DEPARTMENT?

24   A    A LITTLE OVER SEVEN YEARS.

25   Q    AND WHAT UNIT ARE YOU CURRENTLY IN?

1    A    CURRENTLY I'M ASSIGNED TO OUR VIOLENT CRIMES GANG SQUAD

2    WITHIN OUR VIOLENT CRIMES ENFORCEMENT DIVISION.

3    Q    HOW LONG HAVE YOU BEEN ASSIGNED TO THAT SQUAD?

4    A    ASSIGNED TO THE SQUAD APPROXIMATELY EIGHT MONTHS.

5    Q    OKAY.  IN THAT PARTICULAR UNIT?

6    A    A LITTLE -- ABOUT TWO AND A HALF YEARS.

7    Q    OKAY.  SO WHAT ARE YOUR DUTIES AS A MEMBER OF THAT UNIT?

8    A    PRIMARILY TO COLLECT, ANALYSIS, AND DISSEMINATE

9    INTELLIGENCE INFORMATION TO OUR POLICE DEPARTMENT AND OTHER

10   AGENCIES, AS WELL AS THE IDENTIFICATION APPREHENSION OF

11   SUBJECTS INVOLVED IN VIOLENT CRIMES.

12   Q    WHAT KIND OF INITIAL TRAINING DID YOU UNDERGO TO BECOME

13   A KANSAS CITY POLICE OFFICER?

14   A    ALL SWORN OFFICERS FOR OUR DEPARTMENT ARE REQUIRED TO

15   COMPLETE ABOUT SEVEN AND A HALF MONTHS OF ACADEMY TRAINING.

16   WHICH CONSISTS OF TRAINING IN VARIOUS FIELDS AND IN

17   DISCIPLINES SUCH AS LEGAL, AND LAW APPLICATION, DRIVING,

18   DEFENSIVE TACTICS, FIREARMS, AND OTHER CRIMINAL JUSTICE TOPICS

19   AND SUBJECTS.

20   Q    OKAY.  AND DO YOU UNDERGO ANNUAL TRAINING AS WELL?

21   A    YES, WE DO.

22   Q    CAN YOU GO AHEAD AND TELL US JUST A LITTLE BIT ABOUT

23   THAT?

24   A    ALL DEPARTMENT MEMBERS ARE REQUIRED TO COMPLETE ANNUAL

25   REFRESHER TRAINING WHICH LAST APPROXIMATELY TWO TO THREE DAYS

1    AND IT GIVES UPDATES ON VARIOUS TOPICS SUCH AS CHANGES IN LAWS

2    AS WELL AS REMEDIAL TRAINING ON FIREARMS, DEFENSIVE TACTICS,

3    AND OTHER TOPICS.  WE'RE ALSO REQUIRED TO QUALIFY ON OUR

4    FIREARMS, DEPENDING ON WHAT FIREARMS ARE CARRIED, AT LEAST TWO

5    TIMES A YEAR.

6    Q    AND WHAT IS THE TOPIC DEFENSIVE TACTICS?

7    A    ESSENTIALLY CONTROL TECHNIQUES FOR FISCAL

8    CONFRONTATIONS, HANDGUN RETENTION, GROUND FIGHTING, AND THINGS

9    OF THAT NATURE.

10   Q    OKAY.  ON MARCH 10, 2016, WERE YOU A MEMBER OF THAT

11   UNIT -- I'M SORRY.  YOU SAID THE VIOLENT CRIMES ENFORCEMENT?

12   A    YES, I WAS.

13   Q    AND WHAT WAS YOUR -- WHAT IS USUAL SHIFT RIGHT NOW?

14   A    CURRENTLY IS 7:30 TO 3:30 IN THE AFTERNOON.

15   Q    IS THAT WHAT IT WAS BACK ON MARCH 10, 2016?

16   A    YES, IT WAS.

17   Q    WERE ON DUTY THAT DAY?

18   A    YES, I WAS.

19   Q    OKAY.  BETWEEN THE HOURS OF 8:30 AND 9:00 A.M. OF MARCH

20   10, DID YOU FIND YOURSELF IN THE VICINITY OF THE RICHARD

21   BOLLING FEDERAL BUILDING?

22   A    I DID.

23   Q    WHERE WERE YOU?

24   A    I WAS NEXT DOOR AT THE JACKSON COUNTY COURTHOUSE AT 415

25   EAST 12th STREET.

1   Q   OKAY.  WERE YOU -- ABOUT THAT TIME WERE YOU OUTSIDE THE

2   COURTHOUSE?

3   A   YES.

4   Q   OKAY.  SO YOU COULD -- COULD YOU SEE THE BOLLING

5   BUILDING FROM WHERE YOU WERE STANDING?

6   A   YES.

7   Q   AND WERE YOU ALONE?

8   A   NO, I WAS NOT.

9   Q   WHO WAS WITH YOU?

10   A   MY PARTNER AT THE TIME, DETECTIVE ANTHONY WATT.

11   Q   WAS HE A MEMBER OF THE SAME UNIT?

12   A   YES, HE WAS.

13   Q   OKAY.  WHAT WERE YOU GUYS DOING AT THAT TIME?

14   A   WE WERE WALKING FROM THE COURTHOUSE WHERE OUR OFFICE WAS

15   AT THAT TIME TO OUR PATROL VEHICLE WHICH WAS PARKED ON LOCUST

16   STREET BETWEEN THE COURTHOUSE AND RICHARD BOLLING FEDERAL

17   BUILDING.

18   Q   OKAY.  AND DID YOU ENCOUNTER ANYTHING UNUSUAL AS YOU

19   WERE WALKING TOWARDS YOUR VEHICLE?

20   A   YES, WE DID.

21   Q   WHAT DID YOU ENCOUNTER?

22   A   AS WE APPROACHED OUR VEHICLE AS I SAID IT WAS IS PARKED

23   ON LOCUST, OUR ATTENTION WAS DIRECTED TO A BLACK MALE SUBJECT

24   THAT WE OVERHEARD SCREAMING AND YELLING AND OBSERVED RUNNING

25   AROUND IN THE STREET A LONG 12th STREET JUST EAST OF LOCUST.

1   Q    SO YOU HEARD HIM YELLING?

2   A    FIRST WE HEARD HIM YELLING, IT GOT OUR ATTENTION, IT WAS

3   LOUD YELLING AND SCREAMING TO MAKE OUT VARIOUS WORDS OF

4   PROFANITY.  AND ONCE WE OBSERVED THE SUBJECT WE OBSERVED HIM

5   TO BE ACTING ERRATICALLY, WAVING HIS ARMS AROUND, RUNNING

6   ABOUT IN THE STREET.

7   Q    IS THAT INDIVIDUAL THAT YOU ARE REFERRING TO, IS HE

8   SITTING HERE IN THE COURTROOM TODAY?

9   A    YES, HE IS.

10  Q    CAN YOU PLEASE POINT HIM OUT AND DESCRIBE HIM BY LISTING

11  AN ARTICLE OF CLOTHING HE IS WEARING?

12  A    AT THE TABLE BEHIND YOU, WEARING A LIGHT GREEN SHIRT,

13  BLACK MALE WITH A SHORT HAIRCUT.

14          MS. PRATTEN:  YOUR HONOR, CAN THE RECORD PLEASE

15  REFLECT THAT THE WITNESS IDENTIFIED THE DEFENDANT AS THE

16  INDIVIDUAL THAT HE OBSERVED THAT MORNING?

17          THE COURT:  THE RECORD WILL SO REFLECT.

18  BY MS. PRATTEN:

19  Q    SO YOU MENTIONED THAT HE WAS YELLING AND SCREAMING IN

20  THE MIDDLE OF THE STREET?

21  A    YES.

22  Q    DID HE APPEAR TO BE DIRECTING THESE COMMENTS TO ANY ONE

23  IN PARTICULAR?

24  A    FROM OUR VANTAGE POINT FROM WHERE WE WERE AT, WE WERE

25  UNABLE TO DETERMINE THAT AT THE TIME.

1    Q    OKAY.  AND WHAT DID YOU -- DID YOU SAY YOU AND DETECTIVE

2    WATT?

3    A    YES.

4    Q    OKAY.  WHAT DID YOU AND DETECTIVE WATT DO IN RESPONSE OF

5    YOUR OBSERVATIONS OF THE DEFENDANT?

6    A    BASED ON OUR OBSERVATIONS WE WEREN'T SURE IF THE SUBJECT

7    WAS INVOLVED IN SOME SORT OF A DISTURBANCE OR ANOTHER ISSUE

8    WAS GOING ON.  WE WERE A SHORT DISTANCE AWAY AND AS WE WERE

9    KIND OF MONITORING VISUALLY THE SUBJECT, WE OBSERVED HIM TO BE

10   WALKING EAST TOWARDS THE FRONT ENTRANCE OF THE FEDERAL

11   BUILDING.  AT THAT TIME WE GOT INSIDE OUR PATROL VEHICLE AND

12   DROVE NORTH ON LOCUST STREET AND TURNED RIGHT ON 12th STREET

13   TO SEE IF WE COULD AGAIN MAINTAIN OR OBTAIN VISUAL CONTACT OF

14   THE SUBJECT.

15   Q    SO YOU'RE WALKING FROM THE COURTHOUSE TO YOUR PATROL

16   VEHICLE AND YOU SEE HIM -- WOULD IT BE ACCURATE TO SAY A

17   LITTLE BIT NORTH OF WHERE YOU ARE SITTING?

18   A    YES, JUST TO THE NORTH AND TO THE EAST.

19   Q    OKAY.  AND THEN YOU SEE HIM START TO HEAD TOWARDS THE

20   ENTRANCE OF THE FEDERAL BUILDING ON 12TH STREET?

21   A    YES, TO THE EAST ON FOOT.

22   Q    SO BOTH OF YOU GET IN YOUR PATROL VEHICLE AND

23   ESSENTIALLY JUST TURN THE CORNER?

24   A    YES.  WE WERE PROBABLY ABOUT 40 TO 50 YARDS SOUTH OF THE

25   INTERSECTION OF 12TH STREET WHERE WE WERE PARKED.  WE DROVE TO

1 THE INTERSECTION IN THE EAST DIRECTION OF WHERE WE OBSERVED

2 THE SUBJECT WALKING.

3  Q    OKAY.  SO FROM THE TIME YOU INITIALLY SAW HIM AND

4 GETTING IN YOUR CAR, AND THEN DID YOU SEE HIM AGAIN AFTER

5 THAT?

6  A    YES, WE DID.

7  Q    DID YOU BRIEFLY LOSE SIGHT OF HIM WHILE YOU GUYS WERE

8 GETTING INTO YOUR PATROL VEHICLE AND TURNING THE CORNER?

9  A    YES, WE DID.

10  Q    OKAY.  SO WHAT DID YOU -- WHERE DID YOU PARK AT THAT

11 POINT?

12  A    AFTER WE TURNED ON TO 12TH STREET WE PROCEEDED EAST,

13 ROUGHLY ABOUT 7500 YARDS, DIRECTLY BETWEEN OUR POLICE

14 HEADQUARTERS AND THE RICHARD BOLLING FEDERAL BUILDING.  AS WE

15 ARE LOOKING AROUND FOR THE INDIVIDUAL I OBSERVED HIM WALKING

16 WESTS TOWARDS THE FRONT DOORS OF THE FEDERAL BUILDING.  WE

17 PARKED OUR CAR JUST WEST OF WHERE WE COULD BE PARALLEL WITH

18 THE FRONT DOOR OF THE FEDERAL BUILDING FACING EAST ON 12th

19 STREET.

20  Q    SO WERE YOU IN YOUR PATROL VEHICLE WHEN YOU OBSERVED HIM

21 WALKING AGGRESSIVELY?

22  A    YES.

23  Q    OKAY.  AND WHAT ABOUT HIS DEMEANOR GAVE YOU THE

24 INDICATION THAT HE WAS WALKING AGGRESSIVELY?

25  A    HE APPEARED TO BE SWINGING HIS ARMS IN A VERY ACTIVE

1   MANNER.  STILL WAVING HIS ARMS AND AS WE OPENED OUR WINDOW TO

2   CONFIRM THAT THAT WAS THE MALE BASED ON THE DESCRIPTION WE'D

3   SEEN, AGAIN, WE HEARD HIM YELLING AND SCREAMING.

4    Q    WERE YOU ABLE TO DISTINGUISH WHAT HE WAS YELLING AND

5   SCREAMING?

6    A    JUST LOUD INAUDIBLE COMMENTS AT THAT POINT.  VARIOUS

7   WORDS OF PROFANITY.  I DON'T RECALL SPECIFICALLY WHICH WORDS

8   WERE BEING SAID, BUT IT WAS VERY APPARENT THAT THE SUBJECT WAS

9   AGITATED FOR SOME REASON.

10   Q    OKAY.  WAS HE YELLING AND SCREAMING AT THAT POINT AT

11  ANYONE IN PARTICULAR?

12   A    WE OBSERVED HIM AS HE WAS WALKING TOWARDS THE FRONT DOOR

13  OF THE FEDERAL BUILDING, WE SAW HIM COME IN CONTACT WITH FOUR

14  UNIFORMED DEPARTMENT OF HOMELAND SECURITY FEDERAL PROTECTIVE

15  SERVICE OFFICERS WHO WERE STANDING JUST OUTSIDE THE ENTRANCE.

16   Q    OKAY.  YOU SAY UNIFORM.  SO CAN I TAKE YOU TO LITERALLY

17  MEAN THAT THEY WERE IN SOME SORT OF UNIFORM?

18   A    YES, THEY WERE.

19   Q    READILY IDENTIFIABLE AS LAW ENFORCEMENT OFFICERS?

20   A    YES, THEY WERE.

21   Q    DID YOU KNOW THESE GUYS?

22   A    NO.

23   Q    YOU JUST COULD TELL?

24   A    YES, THEY WERE WEARING DARK BLUE UNIFORMS WITH LAW

25  ENFORCEMENT STYLE BULLET RESISTANT VESTS WITH DEPARTMENT OF

1    HOMELAND SECURITY AND POLICE MARKINGS ON THEM.

2    Q    OKAY.  SO NOT MEMBERS OF KCPD, LIKE YOU?

3    A    CORRECT.

4    Q    OKAY.  GO AHEAD AND DESCRIBE THE INTERACTIONS THAT YOU

5    SAW HIM TAKE WITH REGARD TO THESE OFFICERS?

6    A    WHILE THE OFFICERS WERE SPEAKING WITH HIM, AT THAT POINT

7    WE HAD EXITED OUR PATROL VEHICLE TO AGAIN DETERMINE WHAT WAS

8    GOING ON WITH THE SUBJECT.  AS WE WERE WALKING TOWARDS THE

9    OFFICERS WE CONTINUED TO HEAR THE SUBJECT YELLING AND

10   SCREAMING.  THE OFFICERS WERE TELLING HIM TO CALM DOWN.  STILL

11   CONTINUED MORE INAUDIBLE COMMENTS MADE BY THE SUBJECT.  AT

12   THAT POINT AS WE WERE CONTINUING TO WALK TOWARDS HIM ON THE

13   SIDEWALK AREA, I OBSERVED AT LEAST ONE OF THE OFFICERS TELL

14   HIM TO PLACE HIS HANDS BEHIND HIS BACK AND MOVE BEHIND HIM TO

15   DO SUCH.  WHILE THEY ARE TRYING TO MAINTAIN PHYSICAL CONTROL

16   OF HIM AND PLACE HIM IN HANDCUFFS, THE MALE STARTED TO

17   PHYSICALLY RESIST THEIR MOVEMENTS AT WHICH TIME A PHYSICAL

18   STRUGGLE ENSUED, AND THEY ESCORTED HIM TO THE GROUND USING

19   DEFENSIVE TACTICS CONTROL TECHNIQUES.

20   Q    OKAY.  DID YOU EVER HAVE PHYSICAL CONTACT WITH HIM?

21   A    YES, I DID.

22   Q    OKAY.  DID DETECTIVE WATT EVER HAVE PHYSICAL CONTACT

23   WITH HIM?

24   A    YES, HE DID.

25   Q    CAN YOU TELL THE JURY ABOUT HOW YOU AND DETECTIVE WATT

1   ENDED UP BEING INVOLVED IN THIS?

2    A    YES.  AS I STATED AS WE WERE WALKING TOWARDS THE FPS

3   OFFICERS AND THE SUBJECT, WE OBSERVED THE PHYSICAL

4   CONFRONTATION --

5    Q    I'M SORRY, WERE YOU WALKING AT A NORMAL PACE?

6    A    YES, AT THAT POINT WE WERE WALKING.

7    Q    OKAY.  KIND OF GETTING A FEEL OF WHAT IS GOING ON BEFORE

8   YOU DECIDE TO JUMP IN?

9    A    YES.

10   Q    AND I'M SORRY.  PLEASE GO ON.

11   A    AND THEY ESCORTED THE SUBJECT TO THE GROUND.  WE RAN UP

12   TO ASSIST IN PHYSICALLY CONTROLLING THE MALE.  AS WE WERE

13   APPROACHING THE MALE WAS CONTINUING TO SCREAM.  REFUSING TO

14   PLACE HIS HANDS BEHIND HIS BACK.  HE WAS KICKING HIS FEET

15   AROUND.  HE CONTINUED TO REFUSE TO PLACE HIS HANDS BEHIND HIS

16   BACK.  AT THAT POINT DETECTIVE WATT AND I MAINTAINED CONTROL

17   OF THE SUBJECT'S FEET WHILE THE FPS OFFICER PLACED HIM IN

18   HANDCUFFS.

19   Q    OKAY.  AND WHY WERE YOU GUYS DOING THIS?

20   A    TO PHYSICALLY ASSIST THEM IN MAINTAINING CONTROL OF THE

21   SUSPECT AS THEY PLACED HIM IN HANDCUFFS BASED ON HIS PHYSICAL

22   AND RESISTED DEMEANOR.

23   Q    OKAY.  ARE YOU AWARE WHETHER ANY ONE WAS INJURED IN THIS

24   PHYSICAL ALTERCATION?

25   A    I WAS NOT AWARE OF ANY INJURIES.

1    Q    OKAY.  BUT YOU WERE ACTUALLY INVOLVED IN THIS STRUGGLE?

2    A    YES, I WAS.

3    Q    ACTIVELY INVOLVED IN A FLUID SITUATION?

4    A    YES.

5    Q    SO IT DOESN'T NECESSARILY MEAN THAT NO ONE WAS INJURED?

6    A    CORRECT.

7    Q    AND ULTIMATELY THE DEFENDANT ENDED UP BEING TRANSPORTED

8  AWAY FROM THE SCENE, CORRECT?

9    A    YES.

10   Q    DID YOU SEE THIS?

11   A    YES, I DID.

12   Q    OKAY.  UM, HOW DID HE LEAVE THE SCENE?

13   A    VIA KANSAS CITY FIRE DEPARTMENT AMBULANCE.

14   Q    OKAY.  SO SOMEONE CALLED THE AMBULANCE?

15   A    YES, I DID.

16   Q    YOU CALLED THE AMBULANCE?

17   A    YES.

18   Q    OKAY.  AND WHY DID YOU CALL FOR AN AMBULANCE?

19   A    BASED ON OUR PREVIOUS OBSERVATIONS OF THE SUBJECT, THE

20  DEMEANOR, STATE OF MIND, AS WELL AS HIS ACTIONS IN CONTACT

21  WITH HIM, BOTH PHYSICALLY AND AS I SAID AS HIS DEMEANOR.  THEY

22  RESEMBLED BEHAVIORS CONSISTENT WITH SOMEONE UNDER THE

23  INFLUENCE OF EITHER ALCOHOL OR AN UNKNOWN SUBSTANCE, POSSIBLY

24  NARCOTICS OR TO BE HAVING SIMILAR BEHAVIORS OF SOMEONE UNDER

25  MENTAL DISTRESS.

1    Q    AND YOU DIDN'T ACTUALLY SEE HIM INGEST ANY NARCOTICS?

2    A    NO, I DID NOT?

3    Q    WERE YOU ABLE TO OBSERVE -- I GUESS, SINCE YOU SAW HIM

4    TAKEN AWAY BY AN AMBULANCE, WERE YOU ABLE TO OBSERVE HIS

5    INTERACTIONS WITH THE EMERGENCY MEDICAL PERSONNEL?

6    A    YES, I WAS.

7    Q    OKAY.  CAN YOU DESCRIBE WHAT YOU SAW IN REGARD TO HIS

8    INTERACTIONS?

9    A    YES.  BASED ON HIS BEHAVIOR AT THE SCENE HE WAS

10   CONTINUING TO SCREAM AND SHOUT.  HE WAS ALSO SPITTING SALIVA

11   AT THE SCENE.  A CLOTH PROTECTIVE SPIT MASK, IF YOU CALL IT,

12   WAS PLACED ON HIM FOR PROTECTIVE REASONS FOR ALL THE PARTIES

13   INVOLVED.  AFTER HE HAD BEEN PLACED ON THE STRETCHER TO BE

14   TRANSPORTED FOR AN EVALUATION HE HAD TO BE PHYSICALLY

15   RESTRAINED ON THE STRETCHER.  HE CONTINUED TO SHOUT AND SCREAM

16   AND MAKE ATTEMPTS TO SPIT WHICH WERE PROHIBITED BY THE MASK,

17   HE WAS STILL SHOUTING AND CURSING AND YELLING ALL THE WAY TO

18   AND INSIDE THE AMBULANCE.

19   Q    OKAY.  AND AFTER HE LEFT THE SCENE YOU ACTUALLY REMAINED

20   THERE, RIGHT?

21   A    I DID.

22   Q    OKAY.  AND YOU WERE INVOLVED WITH THE TOWING OF THE

23   VEHICLE, RIGHT?

24   A    YES, I WAS.

25   Q    DID YOU ACTUALLY CALL IN THE TOW?

1    A    YES.

2    Q    AND WHERE WAS THIS VEHICLE?

3    A    THE VEHICLE WAS PARKED ON 12TH STREET ON THE SOUTH CURB

4    JUST TO THE WEST OF WHERE THE FRONT DOOR OF THE FEDERAL

5    BUILDING IS.  THIS AREA IS DIRECTLY BETWEEN THE FEDERAL

6    BUILDING AND KANSAS CITY MISSOURI POLICE HEADQUARTERS, AND HAS

7    CLEAR POSTED SIGNS STATING THAT IT IS EMERGENCY VEHICLE

8    PARKING ONLY?

9    Q    OKAY.  AND WHAT VEHICLE WAS THIS?

10   A    A SILVER DODGE CALIBER SEDAN.

11   Q    UM, WHY DID YOU END UP TOWING THIS VEHICLE FROM THE

12   SCENE OR CALLING A TOW I SHOULD SAY?

13   A    THE VEHICLE WAS ILLEGALLY PARKED IN A CLEARLY POSTED

14   AREA, AND BELIEVED TO BE AN ABANDONED.

15   Q    DID YOU HAVE REASON TO BELIEVE THAT IT WAS ASSOCIATED

16   WITH THE DEFENDANT.

17   A    YES, I DID.

18   Q    AND SINCE HE WAS GONE, YOU DIDN'T SEE ANY ONE ELSE THAT

19   WAS GOING TO TAKE THIS VEHICLE?

20   A    NO.

21   Q    WAS THIS DONE PRETTY MUCH IMMEDIATELY AFTER HE LEFT THE

22   SCENE?

23   A    SHORTLY THEREAFTER, YES.

24   Q    WHY THE SPEED?

25   A    BASED ON WHERE THE VEHICLE WAS PARKED, IT WAS

1    PROHIBITING ACCESS TO OTHER EMERGENCY VEHICLES WHO MAY NEED TO

2    ARRIVE OR PARK IN THE AREA BEING AT EITHER BUILDING OR OTHER

3    EMERGENCY RESPONDED VEHICLES.

4    Q    OKAY.  WERE YOU ABLE -- SORRY.  PRIOR TO IT TOWING, WHAT

5    IS THE NEXT -- YOU CALL AND YOU TOW, WHAT IS THE NEXT STEP YOU

6    DO WHEN YOU ARE TRYING TO REMOVE A VEHICLE?

7    A    WE COMPLETE A PARKING VIOLATION CITATION FOR THE

8    VEHICLE, AS I SAID, DUE TO IT BEING ILLEGALLY PARKED, AT THAT

9    POINT WE HAD TO ORDER THE TOW FOR THE VEHICLE, AND CONDUCT AN

10   INVENTORY SEARCH OF THE VEHICLES CONTENTS IN ACCORDANCE WITH

11   OUR DEPARTMENT TOWING POLICY.

12   Q    AND WHY DO YOU DO AN INVENTORY?

13   A    ESSENTIALLY TO DETERMINE IF THERE IS ANY CONTRABAND OR

14   ITEMS OF INVESTIGATED NATURE WITHIN THE VEHICLE.  AS WELL AS

15   TO DOCUMENT ANY PERSONAL PROPERTY OF THE OWNER OR THE DRIVER

16   OR THE OCCUPANTS THAT IS INSIDE THE VEHICLE.  THAT INFORMATION

17   IS RECORDED ON OUR TOWING SHEET WHICH IS A DEPARTMENT REPORT

18   THAT IS ON FILE AT THE TOW LOT AS WELL.  ESSENTIALLY, ALL

19   CONTENTS ARE RECORDED ON THAT FORM TO VERIFY ANY FOLLOW UP

20   WITH THE OWNER OCCUPANTS CLAIMING THAT ITEMS MAY OR MAY NOT BE

21   INSIDE THE VEHICLE WHEN IT WAS TOWED.  IT IS A WRITTEN RECORD.

22   Q    OKAY.  AND WERE YOU ABLE TO DETERMINE AT ANY POINT WHO

23   THE VEHICLE WAS REGISTERED TO?

24   A    YES, WE WERE.

25   Q    WHO DID YOU DETERMINE IT WAS REGISTERED TO.

1    A    THE MISSOURI TEMPORARY TAG THAT WAS ON THE VEHICLE WAS

2    REGISTERED TO A TIARA GRAY WITH AN ADDRESS OF KANSAS CITY,

3    MISSOURI, OF 2063 EAST 37th STREET.

4    Q    YOU DIDN'T SEE MS. GRAY IN THE FACILITY?

5    A    NO.  FROM THE TIME WE ARRIVED ON SCENE UNTIL THE TIME

6    THE VEHICLE WAS TOWED, NO OTHER PERSONS ARRIVED AT THE VEHICLE

7    OR IN THE AREA CLAIMING TO MENTION TO OF OWNERSHIP OR NO

8    CONTACT AT THE SCENE WAS MADE WITH MS. GRAY.

9    Q    OKAY.  SO LET'S GO BACK TO THIS INVENTORY OF THE

10   CONTENTS.  DID YOU FIND ANYTHING OF AS YOU SAID INVESTIGATIVE

11   INTEREST AS YOU WERE CONDUCTING THE INVENTORY?

12   A    YES, WE DID.

13   Q    WHAT DID YOU FIND?

14   A    AS WE STARTED THE INVENTORY SEARCH OF THE INTERIOR OF

15   THE VEHICLE WE DISCOVERED A SILVER AND BLACK HANDGUN

16   UNDERNEATH THE DRIVER'S SEAT OF THE VEHICLE.

17   Q    OKAY.  WHAT DID YOU DO WITH IT ONCE YOU FOUND IT?

18   A    THE HANDGUN WAS REMOVED FROM THE VEHICLE AND SECURED FOR

19   SAFETY PURPOSES.  IT WAS FOUND TO HAVE ONE ROUND IN THE

20   CHAMBER AS WELL AS ADDITIONAL ROUNDS IN THE MAGAZINE OF THE

21   WEAPON.

22   Q    OKAY.  AND WHAT DID YOU DO WITH IT AFTER YOU SECURED IT?

23   A    AT THAT POINT WE PLACED IT IN A BROWN PAPER PROPERTY BAG

24   AND SECURED IT IN THE TRUNK OF OUR PATROL VEHICLE.

25   Q    OKAY.  AND IS THAT TO PRESERVE FOR EVIDENTIARY PURPOSES?

1    A    IT COULD BE, YES.

2    Q    I'M GOING TO ASK YOU, THERE IS A STACK OF PAPERS RIGHT

3    NEXT TO YOU AND I'M GOING TO ASK YOU TO PICK THAT UP.  CAN YOU

4    FLIP THROUGH AND PLEASE FIND WHAT IS MARKED ON THE BOTTOM ON A

5    LITTLE LABEL AS GOVERNMENT'S EXHIBIT 5 THROUGH 8?  CAN YOU

6    TAKE A LOOK AT THOSE AND TELL ME WHAT THEY ARE?

7              FIRST OF ALL, ARE THOSE PHOTOGRAPHS?

8    A    YES, THEY ARE.

9    Q    DID YOU TAKE THEM?

10   A    YES, I DID.

11   Q    SO YOU ARE FAMILIAR WITH THE OBJECTS THAT ARE DETAILED

12   THEREIN?

13   A    YES, I AM.

14   Q    AND ARE THOSE PHOTOGRAPHS A FAIR AND ACCURATE

15   DEPICTION -- WHAT ARE THEY A DEPICTION OF?

16   A    THE PHOTOGRAPHS ARE OF THE RUGER FIREARM THAT WE

17   RECOVERED FROM INSIDE THE VEHICLE.

18   Q    OKAY.  IS IT A FAIR AND ACCURATE DEPICTION OF THAT

19   RUGER?

20   A    YES.

21   Q    THAT WAS RECOVERED FROM THE VEHICLE THAT YOU ULTIMATELY

22   TOWED THAT DAY?

23   A    YES.

24         MS. PRATTEN:  I MOVE TO ADMIT INTO EVIDENCE WHAT HAS

25   BEEN MARKED AS GOVERNMENT'S EXHIBIT 5 THROUGH 8, YOUR HONOR.

1          MR. ERMINE:  YOUR HONOR, CAN WE APPROACH?

2          THE COURT:  YES.

3    (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

4    PROCEEDINGS WERE HELD.)

5          THE COURT:

6          MR. ERMINE:  I'M GOING TO OBJECT TO THE PHOTOS JUST

7    FOR PURPOSES OF THE RECORD BASED ON OUR MOTION TO SUPPRESS.

8          THE COURT:  OKAY.

9          MR. ERMINE:  JUST FOR PURPOSES OF THE RECORD.  I'M

10   OBJECTING TO THE ADMISSION OF THE PHOTOS.

11         THE COURT:  THANK YOU.

12   (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

13         THE COURT:  GOVERNMENT'S EXHIBIT 5, 6, 7, AND 8

14   SHALL BE ADMITTED.

15         MS. PRATTEN:  PERMISSION TO PUBLISH, YOUR HONOR?

16         THE COURT:  YOU MAY.

17         (THEREUPON; GOVERNMENT'S EXHIBIT NOS. 5, 6, 7, AND 8

18   WERE THEN ADMITTED INTO EVIDENCE BY THE COURT.)

19   BY MS. PRATTEN:

20   Q    OKAY.  I'M GOING TO PLACE ON HERE WHAT HAS BEEN MARKED

21   AS GOVERNMENT'S EXHIBIT 5 FIRST?

22   A    OKAY.

23   Q    MARKED AND ADMITTED.  CAN YOU GO AHEAD AND DESCRIBE WHAT

24   IS IN THIS PHOTOGRAPH?

25   A    YES, IT IS THE RUGER SEMI-AUTOMATIC HANDGUN, AN EMPTY

1    MAGAZINE FROM THE WEAPON, AS WELL AS EIGHT LIVE ROUNDS OF

2    AMMUNITION.

3    Q    OKAY.  AND NOW I'M GOING TO PUT UP WHAT HAS BEEN

4    PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 6.  CAN YOU GO AHEAD

5    AND JUST TELL US QUICKLY WHAT IS IN THAT ONE AS WELL?

6    A    YES, THIS IS THE SAME FIREARM MAGAZINE, AS WELL AS EIGHT

7    ROUNDS OF LIVE AMMUNITION.

8    Q    OKAY.  WOULD YOU SAY IT'S JUST A LITTLE MORE ZOOMED IN

9    ON THE RUGER WORD THERE WHICH IS ON THE HANDLE?

10    A    YES, CORRECT.

11    Q    OKAY.  ALL RIGHT.  AND THIS IS GOVERNMENT'S EXHIBIT

12    NO. 7.  CAN YOU GO AHEAD AND TELL US WHAT THAT IS A PHOTOGRAPH

13    OF?

14    A    YES.  THIS IS A CLOSE-UP PHOTOGRAPH OF THE SERIAL NUMBER

15    OF THE FIREARM.

16    Q    OKAY.  CAN YOU ACTUALLY -- I KNOW IT MAY BE A LITTLE BIT

17    DIFFICULT, BUT CAN YOU READ THAT?

18    A    YES.  316-67472.

19    Q    OKAY.  AND IS THIS THE SAME SERIAL NUMBER THAT YOU

20    WOULD'VE NOTED ON YOUR REPORTS?

21    A    YES.

22    Q    OKAY.  AND JUST ONE MORE TIME CAN YOU GO AHEAD AND

23    EXPLAIN TO US WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 8?

24    A    YES.  THIS IS THE OPPOSITE SIDE OF THE HANDLE AND SLIDE

25    OF THE RUGER SEMI-AUTOMATIC HANDGUN.

1   Q    OKAY.  THANK YOU.  ALL RIGHT.  I'M NOW GOING TO HAND YOU

2   WHAT HAS BEEN PREVIOUSLY MARKED AS GOVERNMENTS EXHIBIT NO. 1.

3   A    OKAY.

4   Q    ALL I WANT YOU TO DO IS TAKE A LOOK AT IT YOURSELF AND

5   THEN JUST PAUSE.  DO YOU RECOGNIZE WHAT IS IN THAT BOX?

6   A    YES, I DO.

7   Q    HOW DO RECOGNIZE IT?

8   A    THIS IS THE FIREARM THAT WAS RECOVERED FROM THE VEHICLE

9   AND THE SAME FIREARM FROM THE PHOTOS THAT WERE JUST REVIEWED.

10   Q    OKAY.  SO DOES THAT HAVE THE SAME MAKE, MODEL, SERIAL

11   NUMBER, THAT IS LISTED IN YOUR REPORT, AND AT THE SAME ONE

12   THAT WE JUST SPOKE ABOUT IT?

13   A    YES, IT IS.  RUGER P95, SEMI-AUTOMATIC HANDGUN.  SERIAL

14   NUMBER, 316-67472.

15   Q    OKAY.  AND DID YOU ALTER IT OR DO ANYTHING WITH IT THE

16   DAY THAT YOU COLLECTED IT?

17   A    NO, I DID NOT.

18   Q    OKAY.  ONCE SEIZED YOU SAID I BELIEVE YOUR EARLIER

19   TESTIMONY WAS THAT YOU PLACED IT IN A PROPERTY BAG?

20   A    CORRECT.

21   Q    OKAY.  AND PRESERVED IT FOR EVIDENTIARY VALUE?

22   A    YES, I DID.

23   Q    OKAY.  AND TODAY DOES IT LOOK TO BE IN SUBSTANTIALLY THE

24   SAME CONDITION THAT IT WAS THE DAY THAT YOU COLLECTED IT?

25   A    YES, IT DOES.

1          MS. PRATTEN:  OKAY.  YOUR HONOR, I MOVE TO ADMIT

2    INTO EVIDENCE WHAT HAS BEEN PREVIOUSLY MARKED AS GOVERNMENT'S

3    EXHIBIT NO. 1.

4          MR. ERMINE:  CAN WE APPROACH?

5          THE COURT:  YES.

6    (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

7    PROCEEDINGS WERE HELD.)

8          THE COURT:  I'M ASSUMING SAME OBJECTION RELATED TO

9    THE SUPPRESSION ISSUES?

10         MR. ERMINE:  YES, SIR.  JUST RENEWING THAT

11   OBJECTION.

12         THE COURT:  THE OBJECTION IS NOTED AND OVERRULED,

13   AND IT WILL BE ADMITTED.

14   (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

15         THE COURT:  GOVERNMENT'S NO. 1 SHALL BE ADMITTED.

16         (THEREUPON; GOVERNMENT'S EXHIBIT NO. 1 WAS THEN

17   ADMITTED INTO EVIDENCE BY THE COURT.)

18         MS. PRATTEN:  PERMISSION TO PUBLISH TO THE JURY,

19   YOUR HONOR?

20         THE COURT:  YOU MAY.

21   BY MS. PRATTEN:

22   Q    OKAY.  CAN YOU GO AHEAD AND HOLD THAT BOX UP AND DISPLAY

23   IT FOR THE JURY, PLEASE?

24   A    YES.

25   Q    OKAY.  AND I SEE -- I NOTE THAT THERE THE FIREARM AND

1   THE MAGAZINE, AND THEN THERE IS A YELLOWISH ENVELOPE IN THERE.

2   WHAT IS IN THERE?

3   A    CORRECT.  THE LIVE ROUNDS OF AMMUNITION THAT WERE

4   RECOVERED FROM THE FIREARM.

5   Q    OKAY.  THANK YOU.  I'M GONNA TAKE THAT FROM YOU RIGHT

6   NOW.  ALL RIGHT.

7           MOVING ON.  WERE YOU ALSO INVOLVED IN THE SUBSEQUENT

8   APPREHENSIVE AND ARREST OF THE DEFENDANT WHICH TOOK PLACE THE

9   FOLLOWING DAY?

10  A    YES, I WAS.

11  Q    OKAY.  WAS ANYONE WITH YOU WHEN YOU WERE INVOLVED IN

12  THAT?

13  A    DETECTIVE WATT.

14  Q    OKAY.  SAME DETECTIVE WATT THAT WAS WITH YOU THE DAY

15  BEFORE?

16  A    YES.

17  Q    WERE YOU GUYS ACTUALLY PARTNERS AT THE TIME?

18  A    YES, WE WERE.

19  Q    AND WHAT ADDRESS DID YOU GUYS REPORT TO EXECUTE THE

20  APPREHENSION AND ARREST OF THE DEFENDANT?

21  A    2063 EAST 37TH STREET.

22  Q    IS THIS THE SAME ADDRESS THAT THE VEHICLE THAT YOU TOWED

23  THE DAY BEFORE WAS REGISTERED TO, IS THAT CORRECT?

24  A    YES.

25  Q    OKAY.  AND WAS THE DEFENDANT THERE?

1  A    HE WAS NOT PRESENT AT THE ADDRESS.

2  Q    OKAY.  WHEN YOU GOT THERE, WHAT DID YOU GUYS DO?

3  A    WE MADE CONTACT WITH TIARA GRAY WHO WAS THE RESIDENT AT

4  THE ADDRESS AS WELL AS THE OWNER OF THE VEHICLE THAT WE HAD

5  TOWED THE DAY PRIOR.  SHE ADVISED THAT THE DEFENDANT WAS NOT

6  PRESENT AT THE ADDRESS AND PROCEEDED TO CALL HIM ON HER

7  CELLULAR PHONE TO TRY AND DETERMINE HIS LOCATION.

8  Q    AND WERE YOU ABLE TO DETERMINE WHAT TIARA GRAY'S

9  RELATIONSHIP WAS TO THE DEFENDANT?

10  A    I BELIEVE SHE SAID THEY WERE BOYFRIEND AND GIRLFRIEND

11  INVOLVED IN SOME SORT OF RELATIONSHIP.

12  Q    BASED ON THE INFORMATION THAT SHE GAVE YOU WERE YOU ABLE

13  TO ULTIMATELY APPREHEND HIM?

14  A    YES, WE WERE.

15  Q    ALL RIGHT.

16         MS. PRATTEN:  YOUR HONOR, MAY I HAVE A MOMENT,

17  PLEASE?

18         THE COURT:  YOU MAY.

19  BY MS. PRATTEN:

20  Q    I JUMPED A LITTLE TOO FAST INTO ADMITTING THIS ENTIRE

21  BOX.  I'M GONNA BRING YOU BACK A LITTLE BIT MORE TO THE

22  CONTENTS OF THIS BOX, OKAY?

23  A    YES.

24  Q    ALL RIGHT.  WE DID BRIEFLY TOUCH ON THIS BUT I JUST WANT

25  TO CLARIFY SOME THINGS.  OTHER THAN THE FIREARM, THAT WE HAVE

1  ALREADY ADMITTED, YOU SAID THERE WERE TWO OTHER ELEMENTS THAT

2  WERE IN THAT BOX, RIGHT?

3   A    YES.

4   Q    OKAY.  AND THAT WOULD BE THE MAGAZINE AND THE

5  AMMUNITION?

6   A    YES.

7   Q    AND IN SUBSTANTIALLY THE SAME CONDITION AS WHEN YOU

8  RETRIEVED IT THAT DAY?

9   A    YES, TO MY KNOWLEDGE.

10   Q    AS TO THE AMMUNITION AND AS TO THE MAGAZINE?

11   A    YES.

12   Q    OKAY.  AND YOU DIDN'T ALTER IT IN ANYWAY WHEN YOU

13  COLLECTED EITHER ITEM?

14   A    I HAVE NOT, NO.

15   Q    OKAY.  AND TODAY DO BOTH ITEMS LOOK TO BE THE SAME?

16   A    YES, THEY DO.

17   Q    OKAY.  AND I KNOW THAT THIS IS LITTLE BIT IN THE WEEDS,

18  BUT CAN YOU JUST ACTUALLY PICK UP THE ENVELOPE AND PEEK INSIDE

19  TO OVER COVER OUR BASIS?

20        OKAY.  ARE ALL YOUR PREVIOUS CONCLUSION ACCURATE AS

21  TO THAT'S THE AMMUNITION AND HOW MUCH YOU REMEMBER COLLECTING?

22   A    YES.  THERE ARE EIGHT LIVE ROUNDS OF AMMUNITION IN THIS

23  ENVELOPE.  SAME ROUNDS THAT WERE PHOTOED.

24   Q    OKAY.

25        MS. PRATTEN:  YOUR HONOR, AT THIS TIME I'M GOING TO

1    MOVE TO ADMIT WHAT HAS BEEN PREVIOUSLY MARKED AS EXHIBIT 2 AND

2    3 PERTAINING TO THE MAGAZINE AND THE AMMUNITION INTO EVIDENCE?

3            THE COURT:  AND THE COURT WILL RECOGNIZE THAT THERE

4    IS STANDING OBJECTION WITH RESPECT TO EXHIBITS 1, 2, AND 3, AS

5    WELL AS 5 THROUGH 8.  SAME OBJECTION APPLIES SO IT WILL BE

6    ONGOING.

7            MR. ERMINE:  THANK YOU.

8            THE COURT:  THANK YOU.  GOVERNMENT'S EXHIBITS 2 AND

9    3 SHALL BE ADMITTED.

10           (THEREUPON; GOVERNMENT'S EXHIBIT NOS 2 AND 3 WERE

11   THEN ADMITTED INTO EVIDENCE BY THE COURT.)

12   BY MS. PRATTEN:

13    Q    AND I JUST HAVE ONE MORE QUESTION REMAINING FOR YOU AT

14   THIS POINT IN TIME.  WERE YOU ABLE TO GET A PHONE NUMBER, A

15   CONTACT NUMBER FOR MS. TIARA GRAY?

16    A    YES, WE WERE.

17    Q    AND DO YOU REMEMBER WHAT THAT WAS?

18    A    I DON'T RECALL THE SPECIFIC PHONE NUMBER.

19           MS. PRATTEN:  YOUR HONOR, MAY I APPROACH THE

20   WITNESS?

21           THE COURT:  YES.

22   BY MS. PRATTEN:

23    Q    DID YOU MAKE A REPORT ON THIS CASE?

24    A    YES.

25           MS. PRATTEN:  MAY I HAND HIM HIS REPORT, YOUR HONOR?

1          THE COURT:  TYPICALLY I LIKE TO MARK IT AND APPROACH

2     HIM WITH ANOTHER EXHIBIT NUMBER.  I THINK 20 IS OUR NEXT

3     NUMBER I THINK.

4     BY MS. PRATTEN:

5      Q    ALL RIGHT.  I'M GOING TO GO AHEAD AND HAND YOU WHAT HAS

6     NOT BEEN ADMITTED, BUT IT HAS BEEN MARKED AS GOVERNMENT'S

7     EXHIBIT 20, AND I'D LIKE FOR YOU TO TAKE A LOOK AT THIS?

8      A    OKAY.

9      Q    OKAY.  IN LOOKING BACK OVER THAT EXHIBIT, I'M GOING TO

10     TAKE THAT FROM YOU RIGHT NOW, CAN YOU AT THIS POINT GO AHEAD

11     AND RECALL WHAT MS. TIARA GRAY'S PHONE NUMBER IS?

12     A    YES, AREA CODE, 816-210-2996.

13     Q    OKAY.

14          MS. PRATTEN:  YOUR HONOR, I DON'T HAVE ANY FURTHER

15     QUESTIONS.

16          THE COURT:  OKAY.  THANK YOU.  MR. ERMINE, CROSS.

17                    CROSS-EXAMINATION

18     BY MR. ERMINE:

19     Q    GOOD MORNING, DETECTIVE.

20     A    GOOD MORNING.

21     Q    ON MARCH 10, 2016, THE FIRST TIME YOU SAW MR. EVERETT,

22     YOU TESTIFIED HE WAS RUNNING TOWARD PEOPLE IN THE AREA OF

23     12th STREET, CORRECT?

24     A    YES.

25     Q    AND YOU HEARD HIM SHOUTING PROFANITY AT PEOPLE TOO,

1 RIGHT?

2    A    YES.

3    Q    AND THOSE PEOPLE WEREN'T ALL SPF OFFICERS, HE WAS

4  GENERALLY SHOUTING AND SHOUTING AT FOLKS ON THE STREET, WASN'T

5  HE?

6    A    FROM MY OBSERVATIONS HE WAS SHOUTING AT UNKNOWN PERSONS

7  WHO WERE IN THE AREA.

8    Q    OKAY.  AND I KNOW THAT YOU WERE PART OF THE GROUP OF --

9  IT WAS SIX PEOPLE WHO ULTIMATELY TOOK MR. EVERETT TO THE

10  GROUND, CORRECT, AND KEPT HIM ON THE GROUND?

11   A    YES.

12   Q    YOURSELF AND FIVE OTHER LAW ENFORCEMENT OFFICERS, RIGHT?

13   A    YES.

14   Q    AND SO YOU WERE HOLDING ONE OF HIS FEET DOWN, CORRECT?

15   A    YES.

16   Q    AND WHEN HE WAS ON THE GROUND DID YOU HEAR HIM SAY

17  SOMETHING THAT HE WAS OVER AT A FRIEND'S HOUSE SMOKING KUSH?

18   A    YES.

19   Q    NOW, YOU HAVE BEEN INVOLVED IN LAW ENFORCEMENT FOR

20  SEVERAL YEARS, CORRECT?

21   A    YES.

22   Q    AND YOU WORK ON THE VIOLENT CRIMES SQUAD, RIGHT?

23   A    YES.

24   Q    AND AS PART OF YOUR JOB DUTIES YOU DEAL REGULARLY WITH

25  PEOPLE WHO ARE INVOLVED OR SUSPECTED WITH BEING INVOLVED IN

1  NARCOTIC ACTIVITY, CORRECT?

2  A    YES.

3  Q    IN YOUR TRAINING AND EXPERIENCE, WHAT IS KUSH, WHAT DOES

4  THAT MEAN?

5  A    KUSH IS ANOTHER TERM FOR A CERTAIN GRADE OF MARIJUANA.

6  Q    AND IT IS SLANG FOR A HIGH GRADE OF MARIJUANA, ISN'T IT?

7  A    IN MANY CASES, YES.

8  Q    NOW, KEEPING ON YOUR TRAINING AND EXPERIENCE, YOU

9  TESTIFIED THAT BASED ON YOUR TRAINING YOU BELIEVED THAT

10 MR. EVERETT WAS UNDER THE INFLUENCE OF SOME DRUG THAT DAY,

11 RIGHT, OR HE WAS HAVING A MENTAL LAPSE?

12 A    SOME ALCOHOL, DRUGS, AN UNKNOWN SUBSTANCE, OR SOME SORT

13 OF A MENTAL LAPSE.

14 Q    OKAY.  AND AGAIN, THAT IS BASED ON YOUR TRAINING?

15 A    CORRECT.

16 Q    AND YOUR SEVEN YEARS OF EXPERIENCE IN LAW ENFORCEMENT?

17 A    YES.

18 Q    AND BASED ON THE WAY THAT YOU SAW HIM ACTING THAT DAY,

19 RIGHT?

20 A    YES.

21 Q    HIS DEMEANOR?

22 A    YES.

23 Q    HIS BEHAVIOR?

24 A    CORRECT.

25 Q    WOULD YOU ALSO SAY IN YOUR TRAINING AND EXPERIENCE THAT

1    PERHAPS THE FACT THAT IT TOOK SIX LAW ENFORCEMENT OFFICERS TO

2    HOLD HIM ON THE GROUND MIGHT BE INDICATIVE OF HIS BEING UNDER

3    THE INFLUENCE OF SOME DRUG?

4    A    THAT WOULD BE CORRECT.

5    Q    AND IN FACT, YOU WHERE I GUESS I WOULD SAY SO SURE THAT

6    HE WAS HAVING SOME SORT OF SPELL IF YOU WILL THAT YOU CALLED

7    AN AMBULANCE FOR HIM TO BE TAKEN FROM THE SCENE VIA AMBULANCE

8    INSTEAD OF TAKING HIM TO JAIL, RIGHT?

9    A    WE WERE UNSURE AS TO WHAT SUBSTANCE IF ANY HE WAS UNDER,

10   BUT FOR PRECAUTIONARY REASONS WE REQUESTED AN AMBULANCE TO

11   RESPOND AND EVALUATE HIS CONDITION.

12   Q    OKAY.  SO THE AMBULANCE FOLKS, THE EMT SHOW UP, RIGHT?

13   A    YES.

14   Q    AND WE SAW THE VIDEO YESTERDAY, THERE ARE MANY PEOPLE ON

15   THE SCENE WHO ARE ATTEMPTING TO RESTRAIN MR. EVERETT, CORRECT?

16   A    YES.

17   Q    SO THERE IS LAW ENFORCEMENT OF VARIOUS STRIPES, RIGHT?

18   A    CORRECT.

19   Q    KCMOPD, FPS, MAYBE EVEN SOME JACKSON COUNTY FOLKS, LOTS

20   OF PEOPLE ON THE SCENE, RIGHT?

21   A    YES, THERE WERE.

22   Q    AND NOW THERE'S SEVERAL EMTS ON THE SCENE AS WELL,

23   CORRECT?

24   A    YES.

25   Q    AND SO EVEN AFTER AS WE SAW ON THE VIDEO, EVEN AFTER

1    MR. EVERETT IS RESTRAINED, HE IS STILL SHOUTING AT EVERYONE,

2    CORRECT?

3     A    CORRECT.

4     Q    HE IS SHOUTING AT THE EMTS, CORRECT?

5     A    YES.

6     Q    AND HE WAS EVEN SPITTING ON FOLKS, RIGHT?

7     A    CORRECT.

8     Q    HE'S SPITTING AT THE EMTS?

9     A    YES.

10    Q    TO THE POINT WHERE HE ACTUALLY HAD TO HAVE A SPLIT HOOD

11   PUT ON HIM, RIGHT?

12    A    YES.

13    Q    IN THE MIDST OF ALL OF THIS WHILE HE WAS ON THE GROUND,

14   DID YOU SEE HIM BANG HIS HEAD ON THE CONCRETE?

15    A    I DON'T RECALL.

16    Q    OKAY.  DO YOU RECALL WHETHER HE HAD TO BE RESTRAINED TO

17   PREVENT HIM FROM BANGING HIS HEAD ON THE GROUND?

18    A    I DON'T REMEMBER.

19    Q    OKAY.  SHIFTING GEARS AND MOVING A LITTLE BIT FORWARD OF

20   THE EVENTS THAT DAY.  YOU TESTIFIED I THINK THAT YOU WERE THE

21   PERSON THAT ACTUALLY FOUND AND TOOK CUSTODY OF THE FIREARM,

22   CORRECT?

23    A    YES.

24    Q    AND JUST TO MAKE SURE THAT EVERYONE IS ON THE SAME PAGE

25   HERE, THAT FIREARM WAS FOUND UNDERNEATH THE SEAT IN A CAR,

1    RIGHT?

2    A    YES, UNDERNEATH THE DRIVER'S SEAT.

3    Q    AND THE CAR IS REGISTERED YOU FIND THROUGH OFFICIAL

4    RECORDS TO TIARA GRAY, CORRECT?

5    A    YES.

6    Q    NOW, WHEN YOU TOOK CUSTODY OF THE FIREARM, DID YOU PUT

7    GLOVES ON?

8    A    YES.

9    Q    WHY DID YOU PUT GLOVES ON BEFORE YOU PICKED UP THE

10   FIREARM?

11   A    TYPICALLY BASED ON SOME UNFORTUNATE EXPERIENCES THAT I

12   HAVE HAD SEARCHING CARS AND SEARCHING PEOPLE I ALWAYS WEAR

13   PROTECTIVE GLOVES JUST FOR UNKNOWN REASONS THAT COULD COME IN

14   CONTACT WHETHER THERE BE FLUIDS OR ANYTHING, AND ALSO TO

15   PRESERVE ANY EVIDENTIARY VALUE OF ANYTHING THAT IS DISCOVERED

16   DURING THE SEARCH.

17   Q    THAT IS EXACTLY RIGHT.  YOU WANT TO WEAR GLOVES SO THAT

18   YOUR FINGERPRINTS DON'T GET PLACED ON THAT FIREARM, CORRECT?

19   A    YES.

20   Q    AND YOU WANT TO WEAR GLOVES SO THAT YOUR DNA DOESN'T GET

21   PLACED ON THAT FIREARM, CORRECT?

22   A    YES.

23   Q    NOW, IN YOUR ASSIGNMENT IN YOUR SEVEN YEARS OF

24   EXPERIENCE IN LAW ENFORCEMENT, WE TALKED ABOUT HOW YOU DEAL

25   WITH NARCOTIC CASES, YOU ALSO DEAL WITH FIREARM CASES

1  ROUTINELY, CORRECT?

2   A    YES, I DO.

3   Q    AND YOU HAVE THROUGHOUT YOUR CAREER, RIGHT?

4   A    YES.

5   Q    I WOULD IMAGINE THAT YOU TRAINING AND EXPERIENCE IN

6  DEALING WITH FIREARM CASES, CORRECT?

7   A    YES, I DO.

8   Q    LOADS OF IT I AM SURE.  AND SO YOU HAVE TRAINING ABOUT

9  HOW TO ESSENTIALLY GATHER EVIDENCE, RIGHT, AND PART OF THE

10 TRAINING INVOLVES PUTTING ON GLOVES, AND AS YOU SAID, YOUR

11 EXPERIENCE INVOLVES THE NECESSITY OF PUTTING ON GLOVES,

12 CORRECT?

13  A    YES.

14  Q    SO YOU'RE AWARE THEN IN YOUR EXPERIENCE HERE AS A

15 DETECTIVE IN THE VIOLENT CRIMES SQUAD, THAT DNA TESTING CAN BE

16 DONE ON FIREARMS, CORRECT?

17  A    YES.

18  Q    AND THIS IS NOT SOMETHING RIGHT -- LET ME ASK IT THIS

19 WAY.  THE KANSAS CITY POLICE DEPARTMENT HAS THE CAPACITY TO

20 ORDER DNA TESTING ON FIREARMS, CORRECT?

21  A    YES.

22  Q    AND YOU ALL HAVE A CRIME LAB WHERE THAT TESTING IS DONE,

23 YOU DON'T ACTUALLY DO THE TESTING, BUT A CRIME LAB DOES THAT

24 TESTING, CORRECT?

25  A    CORRECT.  WE ALSO HAVE CERTIFIED OFFICERS THAT ARE

1    TRAINED IN DNA COLLECTION WHETHER IT BE VARIOUS FORMS OF

2    EVIDENCE OR CRIME SCENES AS WELL.

3    Q    OKAY.  ARE YOU TRAINED IN DNA COLLECTION?

4    A    I AM NOT.

5    Q    HAVE YOU EVER COLLECTED DNA FROM A FIREARM?

6    A    I HAVE NOT.

7    Q    ARE YOU GENERALLY AWARE OF THE PROCESS THAT HAPPENS WHEN

8    DNA IS COLLECTED FROM A FIREARM?

9    A    GENERAL PROCESS, YES.

10    Q    OKAY.  SO LET'S TALK ABOUT THE GENERAL PROCESS.

11    GENERALLY SPEAKING, THERE IS A SWAB, CORRECT, IT LOOKS LIKE A

12    Q-TIP?

13    A    YES.

14    Q    AND THAT SWAB IS -- SOME SOLUTION IS ATTACHED TO THE END

15    OF THAT SWAB, CORRECT?

16    A    TO MY KNOWLEDGE, YES.

17    Q    AND THEN THE SWAB IS JUST GRAZED OVER WHATEVER SURFACE

18    IS BEING TESTED, CORRECT?

19    A    YES.

20    Q    SO THAT GATHERS THE DNA AND THAN IT IS PLACED INTO A

21    LITTLE TUBE FOR 0SAFEKEEPING, CORRECT?

22    A    TO MY KNOWLEDGE, YES.

23    Q    AND THEN THAT TUBE IS JUST KIND OF STORED, RIGHT, UNTIL

24    LATER IT IS TESTED, RIGHT?

25    A    YES.

1   Q    NOW, HAVE YOU EVER HAD OCCASION TO COLLECT DNA FROM A

2   SUSPECT?

3   A    I HAVE NOT PERSONALLY, NO.

4   Q    HAVE YOU SEE IT DONE?

5   A    YES, I HAVE.

6   Q    OKAY.  SO THE PROCESS TO COLLECT DNA FROM A SUSPECT IS

7   VERY SIMILAR TO THE PROCESS TO COLLECT DNA FROM A FIREARM,

8   CORRECT?

9   A    YES.

10  Q    AGAIN, THERE IS A SWAB, RIGHT?

11  A    YES.

12  Q    AND THE SWAB IS, GENERALLY SPEAKING, PLACED IN THE

13  SUSPECT'S MOUTH, CORRECT?

14  A    IN MANY CASES, YES.

15  Q    AND IT IS LIKE A TWO SECOND PROCESS AND IT IS TAKEN OUT,

16  RIGHT?

17  A    YES.

18  Q    PLACED IN A TUBE?

19  A    YES.

20  Q    STORE IT AWAY, RIGHT, AND THOSE TWO THINGS CAN BE SENT

21  TO THE CRIME LAB AND THE CRIME LAB DOES THEIR MAGIC AND

22  FIGURES OUT WHETHER THERE IS DNA ON THE GUN, COMPARES AGAINST

23  THE DNA FROM THE SUSPECT, CORRECT?

24  A    YES.

25  Q    AND THAT SORT OF THING HAPPENS WITH SOME FREQUENCY IN

```
1    KANSAS CITY, DOESN'T IT, IN FIREARM CASES?

2     A    CORRECT.

3              MR. ERMINE:  NOTHING FURTHER, THANK YOU.

4              MR. MCCARTHER:  MAY WE APPROACH?

5              THE COURT:  YES.

6    (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

7    PROCEEDINGS WERE HELD.)

8              MR. MCCARTHER:  YOUR HONOR --

9              THE COURT:  -- HOLD ON.  IF THIS IS ABOUT THIS

10   WITNESS THEN MS. PRATTEN -- WHAT IS THIS RELATED TO?

11             MR. MCCARTHER:  I THINK IT'S GENERALLY ABOUT THIS

12   COURT'S ORDER.  THIS COURT ORDERED IN CONJECTURE WITH JUDGE

13   LARSON'S R&R, THAT ALL STATEMENTS THAT THE SUSPECT MADE ON THE

14   GROUND WERE TO BE SUPPRESSED WHICH IS WHY WE DIDN'T BRING IT

15   UP.  MR. ERMINE, I BELIEVE, JUST OPENED THE DOOR TO

16   DISCUSSIONS ABOUT STATEMENTS MADE WHILE THE DEFENDANT WAS ON

17   THE GROUND BY HAVING THIS WITNESS TESTIFY THAT THE DEFENDANT

18   HAD BEEN SMOKING KUSH.

19             NOW, WE WERE UNDER AN ORDER THAT WE COULD NOT GO

20   INTO THAT STATEMENT, AND I THINK NOW THAT THAT DOOR HAS BEEN

21   OPENED, WE CAN NOW TALK ABOUT OTHER STATEMENTS THE DEFENDANT

22   MADE.

23             MR. ERMINE:  I THINK THERE IS AN IMPORTANT THING

24   THAT THE GOVERNMENT'S COUNSEL IS MISSING HERE.

25             THE COURT:  AND MS. PRATTEN SHOULD BE ARGUING.  IT'S
```

1    HER WITNESS.

2             MR. MCCARTHER:  RIGHT.

3             MR. ERMINE:  I THINK THERE SOMETHING IMPORTANT THAT

4    HAS BEEN MISSED, THE STATEMENT THAT JUDGE LARSON AND THAT YOU

5    ORDERED TO BE SUPPRESSED IS A STATEMENT DEALING WITH THE

6    FIREARM.  THIS IS NOT THAT STATEMENT, IT IS A MUCH DIFFERENT

7    STATEMENT.  ASKING ABOUT THE STATEMENT DOESN'T EVEN BEGIN TO

8    APPROACH THE DOOR TO OPEN.

9             THE COURT:  WHAT ARE YOU TRYING TO GET IN?

10            MS. PRATTEN:  THE STATEMENT THAT HE MADE ON THE

11   GROUND.

12            THE COURT:  ABOUT WHAT?

13            MS. PRATTEN:  THE FIREARM.  THAT'S MY CAR, I HAVE A

14   FIREARM.

15            THE COURT:  NO, NO, NO.  I AGREE WITH MR. ERMINE.

16   HE HAS NOT OPENED THAT DOOR.  I DON'T BELIEVE LARSON'S ORDER,

17   WHICH I ADOPTED, SUGGESTS THAT.  SO ANYTHING ELSE?

18            MS. PRATTEN:  I WOULD LIKE TO HAVE HIM CLARIFY THE

19   STATEMENT THAT MR. ERMINE HAD HIM SAY.

20            THE COURT:  CLARIFY?

21            MS. PRATTEN:  SAY THE WHOLE -- I WAS AT MY FRIEND'S

22   HOUSE SMOKING KUSH.  THE REFERENCE HE REFERENCED.  THE ENTIRE

23   STATEMENT.

24            THE COURT:  OKAY.  WHAT'S THE ENTIRE STATEMENT?  I

25   DON'T KNOW.

```
 1              MR. ERMINE:  NO ONE WANTS TO SAY IT, YOUR HONOR,
 2    BECAUSE IT INCLUDES A RACIAL SLUR.  THAT'S WHY I ASKED THE
 3    QUESTION I DID BECAUSE I DIDN'T WANT TO USE A RACIAL SLUR.
 4              THE COURT:  SAY THE N-WORD.
 5              MR. MCCARTHER:  I WAS --
 6              THE COURT:  NO, THIS IS MS. PRATTEN'S WITNESS.
 7              MS. PRATTEN:  YOUR HONOR, I CAN'T RECALL EXACTLY.
 8              THE COURT:  THEN I'M NOT -- IF YOU CAN'T REMEMBER
 9    EXACTLY WHAT YOU WANT HIM TO SAY, I'M NOT GOING TO LET YOU SAY
10    IT.
11              MS. PRATTEN:  I WAS AT MY NIGGER'S HOUSE SMOKING
12    KUSH IS WHAT HE SAID.  AND THAT'S WHAT I WANT HIM TO SAY.
13              THE COURT:  WHY?
14              MS. PRATTEN:  HE DIDN'T SAY THE FULL -- MR. ERMINE
15    SAID -- IT'S A LITTLE BIT OF A DIFFERENT CHARACTERIZATION.  I
16    WAS AT MY FRIEND'S HOUSE SMOKING KUSH, AND WHAT HE ACTUALLY
17    SAID WHICH IS A -- IT'S NOT WHAT HE ACTUALLY SAID.  WHAT MR.
18    ERMINE SAID IS NOT WHAT HE ACTUALLY SAID.
19              THE COURT:  I DO WANT TO SPEAK FOR MR. ERMINE, I
20    THINK HE WAS TRYING -- YOU KNOW, YOU COULD SAY THE N-WORD,
21    THAT'S FINE.  BUT YOU BETTER INSTRUCT HIM BECAUSE I THINK MR.
22    ERMINE DID IT FOR THE SAKE OF NOT SAYING THE N-WORD HERE IN
23    COURT.
24              MR. ERMINE:  THAT'S EXACTLY RIGHT.
25              THE COURT:  AND THE CLOSEST WORD HE CAN GATHER FROM
```

1    THAT IS MY FRIEND.  WHICH I WOULD INTEND TO ASSOCIATE MY

2    N-WORD WITH MY FRIEND'S HOUSE.  I DON'T KNOW HOW IT MOVES US

3    ONE WAY OR THE OTHER OR WHAT IT MEANS AT ALL.

4              MS. PRATTEN:  OKAY.

5              THE COURT:  I MEAN, YES, IF YOU WANT TO SAY -- YOU

6    BETTER MAKE SURE HE SAYS IT.

7              MS. PRATTEN:  YES, YOUR HONOR.

8              THE COURT:  OKAY.  OBJECTION OVERRULED.  I'M NOT

9    GOING TO ALLOW YOU TO GET INTO ANYTHING THAT RELATES TO WHAT

10   WAS SUPPRESSED.  IF YOU WANT TO BRING THE ENTIRETY OF WHAT HE

11   SAID, YOU KNOW, I THINK THAT'S FINE BUT -- OKAY.

12   (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

13              REDIRECT EXAMINATION

14   BY MS. PRATTEN:

15   Q    DETECTIVE BAILEY, I JUST HAVE TWO GENERAL AREAS THAT I

16   WANT TO TOUCH ON.  WHEN YOU SAW HIM INTERACTING INITIALLY WHEN

17   YOU AND DETECTIVE WATT SAW HIM INTERACTING INITIALLY ON 12TH

18   STREET, I BELIEVE THE DEFENSE COUNSEL BROUGHT UP HE WAS

19   YELLING GENERAL THINGS AT PEOPLE PASSING BY, IS THAT CORRECT?

20   A    IT APPEARED THAT WAY, YES.

21   Q    OKAY.  WERE ANY OF THESE -- WHEN HE WAS YELLING AT

22   INDIVIDUALS WERE THESE LIKE THE PROLONGED INTERACTIONS LIKE

23   YOU SAW WITH THE FPS OFFICERS?

24   A    NO, THEY WERE NOT.

25   Q    OKAY.  SO THEY WERE NOT FOCUSED AND TAILORED ON ANY

1  INDIVIDUALS?

2   A    THEY DID NOT APPEAR TO BE, NO.

3   Q    OKAY.  AND THEN WHEN YOU SAW HIM INTERACTING WITH THE

4  FPS OFFICERS, THIS WAS ACTUALLY A PROLONGED FOCUS INTERACTION?

5   A    YES, IT WAS A DIRECT VERBAL CONVERSATION OR CONTACT,

6  YES.

7   Q    AND ONE MORE FURTHER THING, I BELIEVE MR. IRVINE BROUGHT

8  UP A STATEMENT THAT THE DEFENDANT MADE WHEN HE WAS ON THE

9  GROUND?

10  A    YES.

11  Q    DO YOU RECALL THAT?

12        THE COURT:  COUNSEL, I'LL LET YOU LEAD HIM THROUGH

13 IT SO IT WOULD BE SAID PROPERLY.  AND I MEANT TO CLARIFY.  DO

14 YOU WANT TO APPROACH?  COUNSEL APPROACH.

15 (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

16 PROCEEDINGS WERE HELD.)

17        THE COURT:  IF YOU WANT TO MAKE THE STATEMENT THAT

18 HE SAID, RACIAL SLUR, AT MY FRIEND'S HOUSE.  JUST SAY IT SO HE

19 WON'T JUST OUT THERE SAY IT BECAUSE HE DOESN'T KNOW -- ISN'T

20 IT TRUE HE ACTUALLY SAID -- THAT'S ALL I WANT.

21        MS. PRATTEN:  OKAY.

22 (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

23 BY MS. PRATTEN:

24  Q    ALL RIGHT.  THANK YOU FOR YOUR PATIENTS THROUGH THIS?

25  A    YOU'RE WELCOME.

1   Q   I BELIEVE MR. ERMINE SOMETHING TO THE EFFECT OF, THE

2   DEFENDANT SAID I WAS AT MY FRIEND'S HOUSE SMOKING KUSH?

3   A   YES.

4   Q   BUT IS IT TRUE THAT WHAT THE DEFENDANT ACTUALLY SAID

5   WAS, I WAS AT MY NIGGERS HOUSE SMOKING KUSH?

6   A   YES.

7         MS. PRATTEN:  OKAY.  I DON'T HAVE ANY FURTHER

8   QUESTIONS.  THANK YOU.

9         THE COURT:  MR. ERMINE.

10        MR. ERMINE:  BRIEF FOLLOW-UP, YOUR HONOR.

11             RECROSS-EXAMINATION

12   BY MR. ERMINE:

13   Q   I NEGLECTED TO ASK YOU DETECTIVE BAILEY, JUST TO

14   REITERATE, YOU ARE THE ONE THAT COLLECTED THE GUN IN THIS

15   CASE, CORRECT?

16   A   YES.

17   Q   DID YOU REQUEST THAT DNA SWABS BE TAKEN OFF THE GUN?

18   A   I DON'T REMEMBER.

19        MR. ERMINE:  NOTHING FURTHER, YOUR HONOR.

20        THE COURT:  COUNSEL, APPROACH FOR A MOMENT.

21   (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

22   PROCEEDINGS WERE HELD.)

23        THE COURT:  MAYBE I WASN'T CLEAR, MY SUGGESTION WAS

24   NOT TO THAT YOU SAY IT BECAUSE THAT WAS MY WHOLE POINT.  MY

25   SUGGESTION THAT YOU SAY, DIDN'T HE SAY THE N-WORD AS A RACIAL

1    SLUR.

2              MS. PRATTEN:  I DIDN'T UNDERSTAND.  I DIDN'T

3    UNDERSTAND.

4              THE COURT:  I DON'T KNOW.  THAT'S WHAT YOU GUYS -- I

5    DON'T SEE THE POINT, I DON'T SEE THE RELEVANCE OF IT, I DON'T

6    SEE THE NEED, BUT IF YOU WANT TO SAY THE WHOLE THING THEN BE

7    VERY ONE IS A GOING WORK THING, BUT I'D BE VERY CLEAR, AND I

8    THINK I WAS VERY CLEAR --

9              MS. PRATTEN:  I DIDN'T UNDERSTAND BECAUSE --

10             THE COURT:  NO, I'M NOT DONE YET.

11             MR. ERMINE WASN'T DOING IT FOR THE PURPOSE TO SAY

12   THAT WORD, AND HE SAID THE FRIEND WORD, WHICH IS NEXT OF KIN

13   TO THE CONDONATION OF WHAT IT MEANT.  SO I MEAN, YOU JUST NEED

14   TO BE VERY CAREFUL AND MAKE SURE YOU LISTEN TO WHAT THE COURT

15   SAYS IN TERMS OF THAT.  ALL RIGHT.  WE CAN MOVE ON.

16   (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

17             THE COURT:  THANK YOU, DETECTIVE.  YOU CAN STAND

18   DOWN.

19             GOVERNMENT CALL THEIR WITNESS.

20             MR. MCCARTHER:  THANK YOU.  UNITED STATES CALLS

21   DETECTIVE ANTHONY WATT TO THE STAND, JUDGE.

22             THE COURT:  SIR, IF YOU WANT TO STOP RIGHT THERE AND

23   I'LL HAVE YOU TURN TO MY COURTROOM DEPUTY TO BE SWORN.

24                          ANTHONY WATT

25             CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

```
1   DULY SWORN, AND TESTIFIED AS FOLLOWS:

2            THE COURT:  WATCH YOUR STEP AS YOU GO UP.  THANK

3   YOU.  COUNSEL.

4                    DIRECT EXAMINATION

5   BY MR. MCCARTHER:

6    Q    SIR, CAN YOU PLEASE STATE YOUR NAME FOR THE JURY?

7    A    DETECTIVE ANTHONY WATT.

8    Q    AND CAN YOU SPELL YOUR LAST NAME, SIR?

9    A    W-A-T-T.

10   Q    WHAT IS YOUR OCCUPATION?

11   A    KANSAS CITY POLICE DEPARTMENT OFFICER.

12   Q    WHAT IS YOUR ENTIRE LENGTH OF SERVICE IN LAW

13  ENFORCEMENT, SIR?

14   A    IN MAY OF THIS YEAR IT WILL BE 13 YEARS.

15   Q    AND WHAT IS YOUR CURRENT ROLE WITH THE KCPD RIGHT NOW?

16   A    RIGHT NOW I'M ASSIGNED TO AN INVESTIGATION UNIT, KANSAS

17  CITY VIOLENT CRIMES ENFORCEMENT DIVISION.

18   Q    AND HOW LONG HAVE YOU BEEN ON THAT UNIT?

19   A    SINCE NOVEMBER OF 2012.

20   Q    AND SO THAT WOULD'VE BEEN THE UNIT YOU WOULD'VE BEEN A

21  PART OF ON MARCH 10, 2016, IS THAT CORRECT?

22   A    YES.

23   Q    I WANT TO JUMP TO MARCH 10TH, 2016, DO YOU REMEMBER THAT

24  DAY?

25   A    YES.
```

1    Q    WERE YOU WORKING ON THAT DATE?

2    A    YES.

3    Q    AT APPROXIMATELY 8:30 IN THE MORNING DID ANYTHING

4    UNUSUAL HAPPEN TO YOU?

5    A    YES.

6    Q    WHAT DID YOU SEE?  WHAT HAPPENED?

7    A    DETECTIVE BAILEY AND I WERE JUST LEAVING OUR OFFICE AND

8    WE WERE GOING TO OUR PATROL CAR.  WE OBSERVED A BLACK MALE IN

9    THE MIDDLE OF THE STREET YELLING AND SCREAMING.

10   Q    DID YOU INVESTIGATE?

11   A    YES.

12   Q    AND WHAT -- HOW DID YOU PROCEED?

13   A    WE WENT ON AND GOT INTO OUR PATROL VEHICLE, MADE THE

14   CORNER RIGHT THERE AT 12TH AND LOCUST.  WE WERE PRETTY MUCH

15   FACING EAST BOUND WHEN WE OBSERVED AN UNKNOWN BLACK MALE

16   STANDING AGGRESSIVELY, YELLING AND SCREAMING AT -- FOR

17   OFFICERS IN FRONT OF THE FEDERAL BUILDING.

18   Q    AND WOULD THAT BE THE RICHARD BOLLING FEDERAL BUILDING?

19   A    YES.

20   Q    AND TO YOUR KNOWLEDGE IS THAT AT 601 EAST 12TH STREET,

21   KANSAS CITY, MISSOURI?

22   A    YES.

23   Q    IS THAT IN THE WESTERN DISTRICT OF MISSOURI?

24   A    YES.

25   Q    LET ME ASK THIS, THAT MAN THAT YOU OBSERVED THAT MORNING

1  IS HE PRESENT IN THE COURTROOM TODAY?

2  A    YES.

3  Q    CAN YOU DESCRIBE WHERE HE IS SITTING, AT WHAT HE IS

4  WEARING?

5  A    HE IS SITTING TO THE LEFT OF ME.  IT LOOKS LIKE HE MAY

6  HAVE A TIE AND A GREEN BUTTONED UP SHIRT.

7       MR. MCCARTHER:  YOUR HONOR, LET THE RECORD REFLECT

8  THAT THE WITNESS HAS IDENTIFIED THE DEFENDANT, JAMES EVERETT

9  JUNIOR?

10      THE COURT:  NOTWITHSTANDING THE FACT THAT I DON'T

11  THINK HE HAS A TIE, I THINK HE HAS SUFFICIENTLY IDENTIFIED

12  HIM.  NEVER THE LESS, THE RECORD WILL REFLECT THAT THE WITNESS

13  HAS MADE THE IN COURT IDENTIFICATION OF THE DEFENDANT,

14  MR. EVERETT.

15      MR. MCCARTHER:  THANK YOU, YOUR HONOR.

16  BY MR. MCCARTHER:

17  Q    THE RICHARD BOLLING FEDERAL BUILDING, WHERE IS THAT IN

18  RELATION TO THE JACKSON COUNTY COURTHOUSE?

19  A    IT SITS JUST EAST OF THE JACKSON COUNTY COURTHOUSE.

20  Q    SO WHERE YOU ARE DESCRIBING YOU CAN SEE AS YOU LEFT THE

21  JACKSON COUNTY COURTHOUSE, IS THAT FAIR TO SAY?

22  A    YES.

23  Q    I WANT TO TALK ABOUT WHAT HAPPENED AFTER YOU VIEWED THIS

24  CONFRONTATION BETWEEN THE DEFENDANT AND FPS INSPECTORS.  WHAT

25  DID YOU OBSERVE THE DEFENDANT DO WHEN HE WAS FRONT OF THE FPS

1    INSPECTORS?

2    A    HE WAS STANDING, HE HAD BOTH HIS HANDS CLENCHED.  THERE

3    WERE FOUR OFFICERS SURROUNDING HIM, THEY WERE GIVING HIM

4    VERBAL COMMANDS.  AT THIS POINT IN TIME WHEN I EXITED THE

5    PASSENGER SIDE OF THE VEHICLE OF OUR VEHICLE IS WHERE WE

6    STARTED MAKING AN APPROACH TOWARDS MR. EVERETT AND THE FOUR

7    OFFICERS IS WHEN THEY WERE TRYING TO GET HIM IN CUSTODY.

8    Q    AND AS YOU SAW THEM TRYING TO GET HIM IN CUSTODY, WHAT

9    DID YOU SAY IN RESPONSE?

10   A    DETECTIVE BAILEY AND I PROCEEDED TO JOIN BECAUSE THEY

11   DID HAVE HIM ON THE GROUND.  THEY WERE STILL TRYING TO GET HIM

12   INTO CUSTODY AND INTO HANDCUFFS.  AT THIS TIME MR. EVERETT WAS

13   PHYSICALLY RESISTING.  HE BEGAN TO SPIT.  HE BEGAN TO SCREAM,

14   CURSE, AND HE WAS TRYING TO GET BACK UP, STAND BACK UP.

15   Q    WAS IT HARD TO RESTRAIN THE DEFENDANT?

16   A    YES.

17   Q    WHY WAS IT HARD TO RESTRAIN THE DEFENDANT?

18   A    I DON'T KNOW IF IT WAS JUST SO MANY HANDS INVOLVED THAT

19   WAS TRYING TO CONTROL, BUT AT THAT PARTICULAR TIME HE WAS

20   PRETTY MUCH TRYING TO GET BACK IN THIS STANCE.  THAT WAS WHEN

21   I TOOK HIS RIGHT LEG FROM UNDERNEATH HIM AND TRIED TO GET HIM

22   BACK ON THE GROUND.

23   Q    WAS THE DEFENDANT FINALLY RESTRAINED?

24   A    I'M SORRY?

25   Q    WAS THE DEFENDANT FINALLY RESTRAINED?  WAS HE PLACED IN

1  HANDCUFFS?

2   A   APPROXIMATELY ABOUT TWO OR THREE MINUTES LATER.

3   Q   NOW, WHILE HE WAS ON THE GROUND IN HANDCUFFS, DID HE

4  ATTEMPT TO ASSAULT YOU OR THE OTHER OFFICERS THAT WERE ON THE

5  SCENE?

6   A   YES, SIR.

7   Q   HOW SO?

8   A   HE BEGAN SPITTING.  HE WAS SPITTING BLOOD.  HE ACTUALLY

9  SPIT ON I BELIEVE TWO OFFICERS.  THERE WAS OTHER OFFICERS THAT

10  ARRIVED, KCPD OFFICER THAT ARRIVED AT THE SCENE.  I CAN

11  REMEMBER ONE PARTICULAR KCPD OFFICER, A FEMALE, THAT HE WAS

12  ACTUALLY TRYING TO BITE HER.

13   Q   SO HE WAS TRYING TO SPIT ON AND BITE AT YOU AND YOUR

14  FELLOW OFFICERS, IS THAT FAIR TO SAY?

15   A   YES.

16   Q   AND IN FACT, BECAUSE OF THAT, HE HAD TO HAVE A SPIT MASK

17  PUT ON HIM, RIGHT?

18   A   YES.  THAT IS WHEN THE KANSAS CITY FIRE DEPARTMENT, EMS

19  TEAM ARRIVED AT THE SCENE.

20   Q   OKAY.  SO EMS ARRIVES ON THE SCENE, AND THEN MR. EVERETT

21  IS LOADED ON AN AMBULANCE AND HE IS TAKEN FROM THE SCENE TO

22  THE HOSPITAL, IS THAT CORRECT?

23   A   YES.

24   Q   ALL RIGHT.  SO I WANT TO TALK ABOUT THE CAR LEFT AT THE

25  SCENE.  WAS THERE A SILVER DODGE CALIBER FOUND PARKED ALONG

1  12th STREET THAT DAY?

2  A    YES.

3  Q    AND WHAT BROUGHT THAT CAR TO YOUR ATTENTION?

4  A    THE DOOR WAS OPEN.

5  Q    AND WHAT ELSE?

6  A    THERE WAS -- THE OFFICERS THAT WERE THERE AT THE SCENE

7  EXPLAINED TO US THAT ON VIDEO THEY OBSERVED MR. EVERETT

8  EXITING THAT VEHICLE.

9  Q    AND IN FACT THEY OBSERVED HIM PULL UP IN THAT VEHICLE,

10  ISN'T THAT CORRECT?

11  A    YES.

12  Q    WAS THAT VEHICLE PARKED LEGALLY?

13  A    NO, SIR, IT WASN'T.

14  Q    WHY WASN'T THE CAR PARKED LEGALLY?

15  A    IT WAS PARKED WHERE POLICE MARKED VEHICLES ARE SUPPOSED

16  TO PARK AT.  KANSAS CITY POLICE DEPARTMENT VEHICLES WERE

17  SUPPOSED TO PARK.

18  Q    DID YOU DETERMINE THAT CAR NEEDED TO BE TOWED?

19  A    YES.

20  Q    WHY DID YOU DETERMINE THAT CAR NEEDED TO BE TOWED?

21  A    BECAUSE OF THE LOCATION OF WHERE IT WAS PARKED AT.

22  Q    PRIOR TO ANY TOW THAT IS ORDERED BY THE KCPD, DO YOU

23  TAKE AN ACCOUNTING OF WHAT IS ACTUALLY IN THE VEHICLE?

24  A    YES, BY POLICY WE HAVE TO DO AN INVENTORY.

25  Q    AND WHY DO YOU DO AN INVENTORY?

1    A    THE INVENTORY IS PRETTY MUCH FOR US AND ALSO FOR THE

2    PERSON THAT WE ARE TOWING THE VEHICLE FROM SO WE CAN GET AN

3    ACCOUNTABILITY OF THE THINGS LEFT IN THE VEHICLE WHEN IT GOES

4    TO THE TOW LOT.

5    Q    SO THIS IS KIND OF A LIABILITY POLICY, RIGHT?

6    A    YES.

7    Q    YOU DON'T WANT OWNERS OF VEHICLES COMING BACK TO YOU AND

8    SAYING, YOU KNOW, MY $10,000 NECKLACE IS GONE FROM THE

9    VEHICLE, RIGHT?

10   A    CORRECT.

11   Q    DID YOU FIND ANYTHING OF INTEREST UNDER THE FRONT SEAT

12   OF THAT CAR?

13   A    YES, UNDERNEATH THE FRONT SEAT OF THE DRIVER'S SEAT OF

14   THE VEHICLE WAS A SEMI-AUTOMATIC HANDGUN.

15   Q    AND YOUR RECOLLECTION, WOULD THAT HAVE BEEN A RUGER

16   MODEL P95, 9-MILLIMETER PISTOL, SERIAL NUMBER 316-67472?

17   A    YES.

18   Q    IN YOUR TRAINING AND EXPERIENCE HAVE YOU INVENTORIED

19   VEHICLES BEFORE?

20   A    YES.

21   Q    HAVE YOU FOUND FIREARMS IN VEHICLES THAT YOU HAVE

22   INVENTORIED?

23   A    YES.

24   Q    IN YOUR TRAINING AND EXPERIENCE UNDER THE FRONT OF THE

25   DRIVER'S SEAT, IS THAT A TYPICAL PLACE THAT YOU WILL FIND A

1    FIREARM?

2    A    YES.

3    Q    AND IN YOUR TRAINING AND EXPERIENCE, IS UNDER THE FRONT

4    SEAT OF A CAR A TYPICAL PLACE PEOPLE WHO HAVE FIREARMS PUT

5    THEIR GUNS?

6    A    YES.

7    Q    WHY DO YOU THINK THAT IS?

8    A    FROM MY UNDERSTANDING I BELIEVE THAT IT MAKES IT EASIER

9    FOR THAT PERSON TO GET TO THAT HANDGUN.

10   Q    I WANT YOU TO REFERENCE EXHIBITS 5 THROUGH 8.  THEY

11   SHOULD BE UP THERE ON THE STAND WITH YOU.  IT SHOULD BE IN

12   THAT STACK OF PAPERS.

13            DO YOU RECOGNIZE WHAT IS SHOWN IN EXHIBITS 5 THROUGH

14   8?

15   A    YES.

16   Q    I AM NOW SHOWING EXHIBIT 5.  IS THIS THE FIREARM THAT

17   YOU RECOVERED UNDER THE SEAT OF THE 2007 DODGE CALIBER.

18   A    YES.

19   Q    IS THAT ALSO THE SAME FOR WHAT IS DEPICTED IN EXHIBIT

20   NO. 6?

21   A    YES.

22   Q    AND EXHIBIT 7?

23   A    YES.

24   Q    AND EXHIBIT 8, IS THAT THE SAME FIREARM?

25   A    YES.

1    Q    I'M GOING TO ZOOM IN ON SOMETHING HERE.  WHAT DOES IT

2  SAY ON THE SIDE OF THAT GUN?

3    A    RUGER, PRESCOTT, ARIZONA, USA.

4    Q    PRESCOTT, ARIZONA.  WHY WOULD IT SAY PRESCOTT, ARIZONA

5  ON THE SIDE OF THAT GUN?

6    A    THAT IS WHERE THE GUN WAS MANUFACTURED AT.

7    Q    SO AT SOME POINT IF THE LIFE OF THAT GUN, IT WOULD HAVE

8  COME FROM ARIZONA TO MISSOURI, IS THAT RIGHT?

9    A    YES.

10         MR. MCCARTHER:  YOUR HONOR, MAY I APPROACH THE

11  WITNESS?

12         THE COURT:  YOU MAY.

13  BY MR. MCCARTHER:

14    Q    I'M HANDING YOU NOW WHAT IS BEEN MARKED AS GOVERNMENT'S

15  EXHIBIT 1 THROUGH 3.  CAN YOU TAKE A LOOK AT THOSE EXHIBITS,

16  PLEASE.  IN THE BOX, SIR.

17         ARE EXHIBITS 1 THROUGH 3 THE FIREARM MAGAZINE AND

18  AMMUNITION THAT YOU RECOVERED ON MARCH 10, 2016?

19    A    YES.

20    Q    ALL RIGHT.  I WANT TO GO BACK TO TALKING ABOUT THE CAR.

21  NOW, WHO IS THE VEHICLE ULTIMATELY REGISTER TO?

22    A    THE VEHICLE CAME BACK TO A MS. GRAY.

23    Q    AND WHAT IS YOUR UNDERSTANDING OF THE RELATIONSHIP TO

24  THE DEFENDANT?

25    A    BOYFRIEND, GIRLFRIEND.

1    Q    DID YOU WIND UP CONTACTING HER ON MARCH 10TH, 2016?

2    A    YES.

3    Q    WHY DID YOU CONTACT HER?

4    A    THE REASON FOR IT BECAUSE DOING THE INVENTORY WE

5    OBSERVED A CAR SEAT.

6    Q    I'M SORRY.  WHAT ABOUT THE CAR SEAT WOULD MAKE YOU WANT

7    TO CONTACT THE OWNER?

8    A    WE WANTED TO KNOW WHAT CHILD WAS INVOLVED, AND IF THAT

9    CHILD -- JUST OUT OF COURTESY TO GIVE THAT CAR SEAT BACK TO

10   MS. GRAY IN CASE SHE NEEDED TO TRANSPORT THE CHILD ANYWHERE.

11   Q    AND HOW DID YOU CONTACT HER?

12   A    DOING THE INVENTORY WE FOUND SOME REGISTRATION PAPERWORK

13   AND SO WHEN WE RAN THE TEMPORARY TAG THAT WAS ON THE VEHICLE

14   IT CAME BACK TO HER.  WE HAD ACCESS TO A COMPUTER INSIDE THE

15   VEHICLE, THAT ACCESS TO THE COMPUTER ALLOWED US TO RUN HER

16   NAME TO SEE IF SHE WAS INVOLVED IN ANY REPORTS AND WE WERE

17   ABLE TO RETRIEVE A PHONE NUMBER.

18   Q    AND DID YOU WIND UP PLACING A PHONE CALL TO MS. GRAY?

19   A    YES, SIR.

20   Q    AND DURING THAT CALL DID SHE ACKNOWLEDGE IN ANYWAY THAT

21   MR. EVERETT HAD HAD HER CAR?

22           MR. ERMINE:  OBJECTION.  CALLS FOR HEARSAY.  CAN WE

23   APPROACH?

24           THE COURT:  OKAY.

25           MR. MCCARTHER:  THERE IS A STATEMENT THAT IS GOING

1    TO COME LATER THAT I BELIEVE MR. ERMINE IS REFERENCING HERE.

2    THIS IS NOT THAT POINT.  THIS IS JUST THE POINT WHERE

3    DETECTIVE WATT IS ASKING MS. GRAY WHETHER -- WHERE TO TAKE THE

4    CAR SEAT TO WHICH IS THE SAME ADDRESS THAT COMES BACK AS THE

5    LOCATION --

6          THE COURT:  I THOUGHT THE QUESTION ELICITED WHAT DID

7    SHE TELL.  NOTWITHSTANDING A STATEMENT I THINK IN AND OF WHAT

8    THE QUESTION SOLICITED IS OBJECTIONABLE AS HEARSAY.  UNLESS

9    THERE IS SOME EXCEPTION.

10          MR. MCCARTHER:  AS TO THIS POINT OF THE INTERACTION,

11   I CAN LEAD HIM THROUGH THIS.  BUT AS TO THE NEXT POINT WHERE

12   HE ACTUALLY APPROACHES MS. GRAY AT HER HOUSE, SHE MAKES A

13   STATEMENT TO THE EFFECT OF SO JAMES DID IT AGAIN.  WHICH I AM

14   NOT TRYING TO GET IN FOR THE TRUTH OF THE MATTER ASSERTED.  I

15   AM TRYING TO GET IT IN FOR ACKNOWLEDGMENT THAT MS. GRAY HAD

16   LET MR. EVERETT BORROW HER CAR.  I'M NOT HAVING HER SAY -- I'M

17   NOT HAVING HIM TALK ABOUT THAT.

18          THE COURT:  HE'S GOING TO SAY THAT SHE SAID HE DID

19   IT AGAIN?

20          MR. MCCARTHER:  DURING THE NEXT INTERACTION, YES.

21          THE COURT:  HE'S GOING TO SAY THAT?

22          MR. MCCARTHER:  YES.

23          THE COURT:  AND YOU'RE SAYING IT'S NOT FOR THE TRUTH

24   OF THE MATTER ASSERTED, IT'S BECAUSE THERE IS A HEARSAY

25   EXCEPTION THAT ALLOWS THAT WHICH IS WHAT?  WHAT IS THE

1   EXCEPTION?

2          MR. MCCARTHER:  THE EXCEPTION IS I'M NOT ELICITING

3   THAT STATEMENT FOR THE TRUTH OF IT.  I'M NOT ELICITING IT TO

4   SHOW THAT MR. EVERETT HAD DONE SOMETHING AGAIN.  I'M ELICITING

5   IT FOR HER ACKNOWLEDGMENT THAT JAMES HAD HER CAR.

6          THE COURT:  WHAT DO YOU SAY TO THAT?

7          MR. ERMINE:  WELL, I THINK I HAVE TWO ARGUMENTS TO

8   THAT.  FIRST OF ALL IT DOESN'T PROVE THAT.  IT IS NOT A

9   STATEMENT, HE HAD MY CAR AGAIN.  ONE CAN DRAW ANY INFERENCE

10  THAT THEY WANTED TO FROM IT.  IF SHE HAD SO SOMETHING -- I

11  DON'T KNOW.  I CAN IMAGINE STATEMENTS THAT WOULD POSSIBLY BE

12  ADMISSIBLE, BUT I DON'T THINK THIS IS ACTUALLY IS A STATEMENT

13  THAT SHOWS WHAT THE GOVERNMENT SAYS IT SHOWS.  SO THAT'S THE

14  FIRST THING FIRST.

15         THE COURT:  WITH RESPECT TO ITS GOING TO SHOW?

16         MR. ERMINE:  I MEAN, I UNDERSTAND WHY THE GOVERNMENT

17  IS ARGUING, HER SAYING HE DID IT AGAIN IS NOT OFFERED TO SHOW

18  THAT HE DID IT AGAIN.  THERE IS NO MENTION OF THE CAR IN THAT

19  STATEMENT.  SO I THINK FIRST OF ALL, IT IS HEARSAY, BECAUSE IT

20  IS GONNA BE TAKEN AS A STATEMENT TENDING TO SHOW THAT HE DID

21  IT AGAIN.

22         BUT SECONDLY, IT DEFINITELY DOES NOT SHOW THAT HE

23  BORROWED THE CAR AGAIN, BECAUSE THERE'S NOTHING ABOUT THE CAR

24  IN THAT STATEMENT.

25         THE COURT:  I DON'T EVEN KNOW WHY HE SAID IT.  I

```
1   MEAN, SHE SAYS HE DID IT AGAIN, I DON'T EVEN KNOW THE CONTEXT.

2         MR. MCCARTHER:  HE RETURNS THE CAR SEAT TO HER AT

3   HER HOME BECAUSE HER CAR HAS BEEN TOWED.

4         THE COURT:  I KNOW THAT.

5         MR. MCCARTHER:  SO LIKE IT IS DIRECTLY ABOUT THE

6   CAR.

7         THE COURT:  NO, I'M GOING TO SUSTAIN THE OBJECTION.

8         MR. MCCARTHER:  THANK YOU.

9   (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

10  BY MR. MCCARTHER:

11  Q    SO AGAIN WE WERE TALKING, YOU MADE CONTACT WITH MS. GRAY

12  IN ORDER TO RETURN HER CAR SEAT, IS THAT CORRECT?

13  A    YES.

14  Q    DID YOU SUBSEQUENTLY GO TO HER HOME TO RETURN THAT CAR

15  SEAT?

16  A    YES.

17  Q    AND WHERE DID YOU GO TO RETURN THAT CAR SEAT?  WAS IT

18  THE SAME ADDRESS LISTED IN YOUR REPORT?

19  A    YES.  IT WAS THE APARTMENTS.  I WANT TO SAY 2036 EAST

20  37th STREET.

21  Q    SO I WANT TO TALK ABOUT WHAT HAPPENED LATER THAT NIGHT.

22  NOW, IT IS YOUR UNDERSTANDING THAT MR. EVERETT WAS TAKEN TO

23  TRUMAN MEDICAL CENTER, IS THAT CORRECT?

24  A    YES.

25  Q    AND HE WAS RELEASED FROM TRUMAN MEDICAL CENTER LATER
```

1  THAT NIGHT, IS THAT RIGHT?

2   A    YES, I BELIEVE LATER ON THAT MORNING, PROBABLY THE NEXT

3  DAY ABOUT 2:00 OR 3:00 O'CLOCK IN THE MORNING.

4   Q    WAS THERE SUPPOSED TO BE A KCPD OFFICER SITTING ON HIM

5  READY TO TAKE HIM INTO CUSTODY?

6   A    IT WAS OUR UNDERSTANDING THAT NOT A KCPD OFFICER, BUT

7  MAYBE A JACKSON COUNTY OFFICER.

8   Q    AND WHAT HAPPENED?

9   A    THE HOSPITAL NOTIFIED DIFFERENT DISTRICTS TRYING TO

10  FIGURE WHAT IS GOING ON BECAUSE THEY WERE GETTING READY TO

11  RELEASE MR. EVERETT, AND THEY WANTED TO KNOW IF THERE WAS A

12  SIT WITH HIM.  AND THEY WASN'T ABLE TO MAKE CONTACT WITH

13  JACKSON COUNTY POLICE OFFICERS OR OFFICERS OR DEPUTIES,

14  THEREFORE, THE HOSPITAL SAID THEY HAD TO RELEASE HIM.

15   Q    BUT THE INTENTION WOULD'VE BEEN FOR MR. EVERETT TO GO

16  INTO A 24 HOUR HOLD, IS THAT CORRECT?

17   A    YES.

18   Q    AND THAT WOULD'VE BEEN TO INVESTIGATE THE CRIMES THAT WE

19  ARE INVESTIGATING HERE TODAY?

20   A    YES.

21   Q    NOW, THE NEXT DAY MR. EVERETT WAS CHARGED UP HERE BY THE

22  US ATTORNEY'S OFFICE, IS THAT RIGHT?

23   A    YES.

24   Q    AND ON THAT DAY, AN ARREST WARRANT IS ISSUED, CORRECT?

25   A    YES.

1  Q    AND ON THE NEXT DAY, MARCH 11, 2016, DID YOU SEEK TO GO

2  ARREST MR. EVERETT?

3  A    YES.

4  Q    AND WHERE DID YOU GO?

5  A    WE WENT TO 2036 EAST 37th STREET.

6  Q    DID YOU FIND MR. EVERETT THERE AT FIRST?

7  A    NO.

8  Q    WAS IT APPARENT THAT IS WHERE HE LIVED THOUGH?

9  A    YES.

10  Q    AND WAS IT APPARENT THAT HE SHARED A HOME WITH MS. GRAY?

11  A    YES.

12  Q    SO WHERE EVENTUALLY DID YOU ARREST THE DEFENDANT?

13  A    39TH AND GARFIELD.

14  Q    AND WHY WOULD YOU GO THERE TO ARREST THE DEFENDANT?

15  A    HE WAS THERE EXITING THE BP GAS STATION SMOKING A

16  CIGARETTE.

17  Q    AND IT WAS MS. GRAY THAT TOLD YOU WHERE HE WAS, IS THAT

18  CORRECT?

19  A    YES.

20        MR. MCCARTHER:  NO FURTHER QUESTIONS AT THIS TIME,

21  YOUR HONOR.

22        THE COURT:  THANK YOU.  MR. ERMINE, CROSS.

23                CROSS-EXAMINATION

24  BY MR. ERMINE:

25  Q    DETECTIVE, WHEN YOU FIRST SAW MR. EVERETT THAT DAY, YOU

1   TESTIFIED HE WAS IN THE MIDDLE OF THE STREET, RIGHT?

2   A    YES.

3   Q    WAS IT 12TH STREET?

4   A    YES, SIR.

5   Q    AND HE WAS YELLING?

6   A    YES, SIR.

7   Q    WAS HE SHOUTING PROFANITY AT FOLKS?

8   A    THERE WAS NO ONE AROUND HIM AT THAT TIME.  HE WAS JUST

9   YELLING.

10  Q    OKAY.

11          MR. ERMINE:  NOTHING FURTHER, THANK YOU.

12          THE COURT:  MR. MCCARTHER, DO YOU HAVE ANY REDIRECT?

13          MR. MCCARTHER:  NO, YOUR HONOR.

14          THE COURT:  CAN I HAVE COUNSEL, APPROACH?

15  (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

16  PROCEEDINGS WERE HELD.)

17          THE COURT:  WHO IS DOING THE NEXT WITNESS?

18          MS. PRATTEN:  I AM, YOUR HONOR.

19          THE COURT:  HOW LONG DO YOU THINK YOUR THAT WITNESS

20  WILL TAKE?

21          MS. PRATTEN:  I WOULD GUESS MY DIRECT MY BE 15

22  MINUTES.

23          THE COURT:  OKAY.  WE'LL LET'S SEE WHERE WE END UP.

24  MAYBE WE WILL BREAK BEFORE YOUR CROSS.

25  (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

```
 1            THE COURT:  GOVERNMENT CALL YOUR NEXT WITNESS.

 2            MS. PRATTEN:  GOVERNMENT WILL CALL MATT WILSON TO

 3   THE STAND.

 4            THE COURT:  OKAY.  MR. WILSON, IF YOU WANT TO COME

 5   AROUND THIS WAY, SIR, AND STOP RIGHT THERE AND RAISE YOUR

 6   RIGHT HAND TO BE SWORN BY MY COURTROOM DEPUTY.  THANK YOU.

 7                         MATTHEW WILSON

 8            CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

 9   DULY SWORN, AND TESTIFIED AS FOLLOWS:

10            THE COURT:  AND SIR, YOU CAN HAVE A SEAT RIGHT UP

11   HERE.  WATCH YOUR STEP AS YOU GO UP.  COUNSEL.

12                       DIRECT EXAMINATION

13   BY MS. PRATTEN:

14   Q    GOOD MORNING.

15   A    GOOD MORNING.

16   Q    CAN YOU STATE YOUR NAME FOR THE RECORD, PLEASE?

17   A    MATTHEW WILSON.

18   Q    WHERE ARE YOU EMPLOYED?

19   A    I'M A SPECIAL AGENT WITH THE FEDERAL BUREAU OF ALCOHOL,

20   TOBACCO, FIREARMS AND EXPLOSIVES.

21   Q    AND YOU SAID SPECIAL AGENT, IS THAT WITH THE ATF?

22   A    YES, MA'AM.

23   Q    HOW LONG HAVE YOU BEEN WITH ATF?

24   A    APPROXIATELY 15 AND A HALF YEARS.

25   Q    AND AS A SPECIAL AGENT WITH ATF, WHAT ARE YOUR DUTIES
```

1    AND RESPONSIBILITIES?

2    A    WE ARE TASKED WITH ENFORCING THE FEDERAL ARMS ARSON AND

3    EXPLOSIVE LAWS.

4    Q    ALL RIGHT.  HAVE YOU HELD ANY OTHER POSITIONS WITH THE

5    ATF?

6    A    I AM.  BESIDES JUST BEING A REGULAR STREET AGENT, I AM

7    ALSO A FIREARMS INTERSTATE NEXUS EXPERT.

8    Q    AND WHAT DOES A FIREARMS AND EXPLOSIVES NEXUS PERSON DO?

9    A    AN INTERSTATE NEXUS EXPERT MAKES DETERMINATIONS ON

10   FIREARMS AS TO WHERE THEY ARE MADE AND THERE -- WHERE THEY ARE

11   MADE, AND HOW THE TRAVELED INTERSTATE COMMERCE.  INTERSTATE

12   COMMERCE SIMPLY MEANS THAT A PARTICULAR PRODUCT WAS MADE IN

13   ONE PLACE AND TRAVELED TO ANOTHER.  NOT NECESSARILY CONCERNED

14   WITH HOW IT TRAVELED, BUT JUST THE FACT THAT IT WAS MADE IN

15   ONE PLACE AND MOVED TO ANOTHER.

16   Q    SO IN YOUR POSITION YOU TAKE ACTUALLY FIREARMS AND YOU

17   EXAMINE THEM TO ANSWER THAT QUESTION?

18   A    CORRECT.

19   Q    OKAY.  HAVE YOU EVER RECEIVED ANY SPECIAL TRAINING

20   REGARDING FIREARMS?

21   A    I HAVE.

22   Q    WHEN?

23   A    I HAVE RECEIVED -- ALL ATF AGENTS RECEIVE A TWO-WEEK

24   COURSE DURING OUR ATF ACADEMY ON FIREARM IDENTIFICATION AND

25   HOW TO IDENTIFY BASIC FIREARMS.  I RECEIVED A WEEKLONG BASIC

1    INTERSTATE NEXUS SCHOOL IN OUR FIREARMS TECHNOLOGY CENTER IN

2    MARTINSBURG, WEST VIRGINIA.  I HAVE BEEN TO ADVANCE NEXUS

3    SCHOOLS WHERE WE TOUR MANUFACTURING FACILITIES TO SEE THE

4    ACTUAL MANUFACTURING PROCESS.  AND I HAVE TOURED SEVERAL OF

5    THOSE TO INCLUDE SMITH & WESSON, RUGER, CHARTER ARMS, AND

6    NUMEROUS OTHERS.  AND THEN I HAVE ALSO BEEN TO A 10 DAY

7    ADVANCE FIREARMS SCHOOL ON HOW FIREARMS WORK AND FUNCTION AND

8    SO ON.

9    Q    OKAY.  AND SO I BELIEVE ONE OF THE MANUFACTURING

10   FACILITIES THAT YOU TOURED YOU SAID IS RUGER?

11   A    I HAVE BEEN TO RUGER FACILITY, YES.

12   Q    SO CLEARLY YOU ARE FAMILIAR WITH THIS MANUFACTURE?

13   A    I AM.

14   Q    HOW MANY RUGERS DO YOU THINK YOU HAVE SEEN DURING YOUR

15   TIME IN LAW ENFORCEMENT?

16   A    PROBABLY BETWEEN 100 AND 150 OR MORE.

17   Q    AND HOW MANY OF THOSE DO YOU THINK YOU HAVE EXAMINED IN

18   YOUR CAPACITY AS A NEXUS EXPERT?

19   A    THAT IS AS AN NEXUS EXPERT.  IN MY CAREER, IN ALMOST 20

20   YEARS OF LAW ENFORCEMENT I'VE SEE SEVERAL HUNDRED RUGER.  BUT

21   TO EXAMINE AS A NEXUS EXPERT BETWEEN 100 AND 150.

22   Q    OKAY.  SO HAVE YOU EVER PERSONALLY USED OF RUGER?

23   A    I BELIEVE THAT I SHOT ONE YEARS AGO.  AND I OWN A RUGER

24   RIFLE, YES.

25   Q    HAVE YOU EVER TESTIFIED IN FEDERAL OR STATE COURT AS AN

1    EXPERT REGARDING THE LOCATION OF WHERE A FIREARM HAS BEEN

2    MANUFACTURED?

3     A    I HAVE.  I HAVE TESTIFIED AS AN EXPERT BOTH HERE IN THE

4    WESTERN DISTRICT OF MISSOURI AND IN THE DISTRICT OF KANSAS.

5     Q    SO BOTH FEDERAL COURT?

6     A    YES.

7     Q    HOW MANY TIMES DO YOU THINK YOU HAVE DONE THAT?

8     A    APPROXIMATELY SEVEN.

9     Q    CAN YOU DESCRIBE THE PROCEDURES YOU FOLLOW WHEN YOU GET

10   A FIREARM IN AND WHEN YOU ARE TRYING TO DETERMINE WHERE IT IS

11   MANUFACTURED.

12    A    YES.  DOMESTIC MADE FIREARMS ARE REQUIRED TO HAVE

13   CERTAIN INFORMATION.  YOU HAVE TO HAVE THE NAME OF THE

14   MANUFACTURER, THE CITY AND STATE WHERE THE MANUFACTURER IS,

15   MODEL, CALIBER AND A SERIAL NUMBER.  ON FOREIGN-MADE FIREARMS

16   PLUS THE CITY AND STATE OF THE IMPORTER THAT BROUGHT IT INTO

17   THE UNITED STATES.  SO ONCE I GET A FIREARM I START LOOKING

18   FOR THAT INFORMATION.  I START LOOKING AT THE MARKINGS ON THE

19   FIREARMS.  BOTH -- IF THEY ARE WRITTEN WORDS, AND THEN I ALSO

20   LOOK FOR SYMBOLS OR DIFFERENT -- IF IT'S RUSSIAN I WILL LOOK

21   FOR THE CYRILLIC MANUFACTURER MARKS.  I WILL LOOK FOR THE --

22   IF IT IS A EUROPEAN MADE FIREARM, YOU HAVE TO HAVE EUROPEAN

23   PROOF MARKS TO SHOW IT HAS BEEN TESTED BY THE GOVERNMENT.  SO

24   I WILL LOOK FOR THOSE.  SO I'LL JUST LOOK FOR ANY MARKINGS

25   THAT MAYBE ON THE FIREARM.  I WILL MAKE NOTE OF THOSE MARKINGS

1    AND THEN USE THOSE MARKINGS TO DETERMINE WHERE THE FIREARM WAS

2    MADE OR WHO MADE IT AND WHERE.

3    Q    OKAY.  WHAT KIND OF RESEARCH -- SORRY.  WHAT KIND OF

4    RESOURCES DO YOU CONSULT WHEN YOU ARE CONDUCTING THIS TYPE OF

5    EXAMINATION?

6    A    I WILL CONDUCT -- ATF MAINTAINS A DATABASE OF FIREARM

7    MANUFACTURES, PLUS I HAVE DIFFERENT BOOKS THAT I WILL CONSULT.

8    BOTH BEING STANDARD CATALOG OF FIREARMS, THE BOOK OF GUN

9    VALUES.  IF THE COMPANY ITSELF HAS A FIREARM THAT IS MADE OR A

10   BOOK MADE ABOUT THEIR FIREARM, I WILL CONSULT THOSE.  RUGER

11   HAS GOT A BOOK, RUGER A MAN AND HIS GUNS, ABOUT BILL RUGER AND

12   HIS COMPANY.  I WILL LOOK AT THOSE.  I WILL CHECK WITH OPEN

13   SOURCES ON THE INTERNET.  THERE IS A LOT OF RESEARCH THAT CAN

14   BE DONE.

15   Q    OKAY.  AND RIGHT NEXT TO YOU SITTING ON THE WITNESS

16   STAND IS A BOX.  AND A PORTION OF THAT BOX HAS BEEN ADMITTED

17   AS GOVERNMENT'S EXHIBIT NO. 1.  DO YOU SEE THAT?

18   A    YES.

19   Q    AND WHAT IS IT?

20   A    IT IS RUGER P95 9-MILLIMETER PISTOL, SERIAL NUMBER

21   316-67472.

22   Q    HAVE YOU EVER EXAMINED THAT PARTICULAR WEAPON?

23   A    I HAVE.

24   Q    OKAY.  AND BASED ON YOUR EXAMINATION IT'S YOUR OPINION

25   THIS WEAPON MEETS THE DEFINITION OF A FIREARM?

1    A    IT DOES.

2    Q    OKAY.  AND IN THAT IT IS DESIGNED TO OR READILY BE

3    CONVERTED TO EXPEL A PROJECTILE BY ACTION AND EXPLOSIVE.  IS

4    THAT AN ACCURATE DEFINITION OF A FIREARM?

5    A    THAT IT.

6    Q    AND THAT'S WHAT THAT IS?

7    A    CORRECT.

8    Q    OKAY.  BASED ON YOUR EXAMINATION AND RESEARCH DO YOU

9    HAVE AN OPINION ABOUT WHERE THAT GUN WAS MANUFACTURED?

10   A    I DO.

11   Q    AND WHAT IS YOUR OPINION?

12   A    THIS FIREARM WAS MADE IN ARIZONA.

13   Q    OKAY.  AND SINCE IT IS NOW LOCATED IN THE STATE OF

14   MISSOURI WOULD THIS HAVE TRAVELED INTERSTATE COMMERCE?

15   A    IT HAS.

16   Q    OKAY.  ARE THERE, IN FACT, ANY RUGERS THAT ARE

17   MANUFACTURED IN THE STATE OF MISSOURI?

18   A    NO, THERE ARE NOT.

19   Q    OKAY.  DID YOU MEMORIALIZE YOUR OPINIONS AFTER YOUR

20   EXAMINATION IN A REPORT?

21   A    YES, MA'AM.

22   Q    OKAY.  AND YOU GENERALLY DO THAT?

23   A    YES.  WHENEVER I LOOK AT A FIREARM AND MADE A

24   DETERMINATION, I USUALLY WRITE A REPORT ON IT.

25          MS. PRATTEN:  YOUR HONOR, MAY I HAVE PERMISSION TO

Denise Carroll Halasey CCR, CVR-CM

1    APPROACH THE WITNESS?

2            THE COURT:  YOU MAY.

3    BY MS. PRATTEN:

4     Q    I JUST HANDED YOU WHAT IS PREVIOUSLY MARKED AS

5    GOVERNMENT'S EXHIBIT 9.  ARE YOU FAMILIAR WITH WHAT I JUST

6    HANDED YOU?

7     A    YES, MA'AM.

8     Q    AND WHAT IS THAT DOCUMENT?

9     A    THIS IS THE REPORT THAT I WROTE ABOUT MY EXAMINATION.

10    THIS IS MY INTERSTATE NEXUS REPORT ON THE FIREARM.

11     Q    OKAY.  IS THAT A DOCUMENT THAT YOU WOULD NORMALLY

12    PREPARE IN THE ORDINARY SCOPE OF YOUR DUTIES AS A NEXUS

13    EXAMINER?

14     A    YES, IT IS.

15     Q    AND IT IS A REGULAR PART OF YOUR DUTY TO MAINTAIN AND

16    KEEP RECORDS LIKE THAT?

17     A    IT IS.

18     Q    OKAY.  IS THAT DOCUMENT THE TYPE THAT WOULD BE KEPT

19    GENERALLY UNDER YOUR PERSONAL CUSTODY AND CONTROL?

20     A    YES, IT WAS IN THE CASE FILE, YES.

21            MS. PRATTEN:  YOUR HONOR, I MOVE AT THIS TIME TO

22    ADMIT GOVERNMENT'S EXHIBIT 9 INTO EVIDENCE.

23            MR. ERMINE:  NO OBJECTION.

24            THE COURT:  GOVERNMENT'S EXHIBIT NO. 9 SHALL BE

25    ADMITTED.

1          (THEREUPON; GOVERNMENT'S EXHIBIT NO. 9 WAS THEN

2    ADMITTED INTO EVIDENCE BY THE COURT.)

3          MS. PRATTEN:  YOUR HONOR, I DON'T HAVE ANY FURTHER

4    QUESTIONS AT THIS TIME.

5          THE COURT:  OKAY.  THANK YOU.  MR. IRVINE?

6                    CROSS-EXAMINATION

7    BY MR. ERMINE:

8     Q    RUGER IS A MAJOR MANUFACTURER OF FIREARMS IN THE UNITED

9    STATES, CORRECT?

10    A    I'M SORRY.  I DIDN'T HEAR YOU.

11    Q    RUGER IS A MAJOR MANUFACTURER OF FIREARMS IN THE UNITED

12   STATES, CORRECT?

13    A    YES, SIR.  THE LAST YEAR TOTALS CAME OUT THEY WERE THE

14   NUMBER ONE MANUFACTURER IN THE UNITED STATES.

15    Q    OKAY.  NOW, YOUR ROLE IN THIS CASE IS EXTREMELY LIMITED,

16   RIGHT?  ALL YOU DO IS LOOK AT RUGER P95S, GENERALLY -- WELL,

17   LET ME START OVER.  FIRST, YOU FIGURE OUT WHETHER THE GUN

18   INVOLVED IN THIS CASE IS A RUGER P95, CORRECT?

19    A    YES, I WILL LOOK AT IT AND DETERMINE WHAT IT IS.

20    Q    WHAT IT IS.  RIGHT.  AND THEN YOU -- ALL YOU DO IS TAKE

21   THAT INFORMATION WHETHER GENERALLY THAT FIREARM WAS

22   MANUFACTURED IN MISSOURI OR ELSEWHERE, CORRECT?

23    A    CORRECT.

24    Q    SO YOU BEING ON THIS CASE HAS NOTHING TO DO WITH

25   FIGURING OUT WHETHER MR. EVERETT POSSESSED THIS RUGER OR NOT,

1    DOES IT?

2     A    NO, IT DOES NOT.

3            MR. ERMINE:  THANK YOU, NOTHING FURTHER.

4            THE COURT:  MS. PRATTEN, DO YOU HAVE ANY REDIRECT?

5            MS. PRATTEN:  NO, YOUR HONOR, THANK YOU.

6            THE COURT:  SIR, YOU CAN STAND DOWN.

7            WHY DON'T WE DO THIS AND TAKE OUR MORNING RECESS.

8    WE WILL START BACK UP ABOUT 10:35.

9            WITH THAT SAID, THE COURT AGAIN REMINDS YOU OF WHAT

10   YOU WERE TOLD AT THE FIRST RECESS OF THE COURT.  UNTIL YOU

11   RETIRE TO CONSIDER YOUR VERDICT YOU MUST NOT DISCUSS THIS CASE

12   AMONG YOURSELVES OR WITH OTHERS OR PERMIT ANYONE TO DISCUSS IT

13   IN YOUR HEARING.  YOU SHOULD NOT FORM OR EXPRESS ANY OPINION

14   ABOUT THE CASE UNTIL IT IS FINALLY GIVEN TO YOU DECIDE.  DO

15   NOT DO ANY RESEARCH OR INVESTIGATION ON YOUR OWN ABOUT ANY

16   MATTER REGARDING THIS CASE OR ANYONE INVOLVED WITH THE TRIAL.

17   DO NOT COMMUNICATE WITH OTHERS ABOUT THE CASE BY ANY MEANS.

18   DO NOT READ, VIEW, OR LISTEN TO ANY NEWSPAPER, RADIO,

19   ELECTRONIC COMMUNICATION FROM THE INTERNET OR TELEVISION

20   REPORT OF THE TRIAL.

21           MS. BALDWIN:  ALL RISE.  COURT IS IN RECESS.

22   (THEREUPON, THE FOLLOWING PROCEEDINGS WERE ADJOURNED.)

23           THE COURT:  GOVERNMENT, CALL YOU NEXT WITNESS.

24           MR. MCCARTHER:  THANK YOU, YOUR HONOR.  WE CALL

25   DETECTIVE FRANK RORABAUGH TO THE STAND.

1          THE COURT:  DETECTIVE, IF YOU CAN COME FORWARD AND

2    RAISE YOUR RIGHT HAND SO MY COURTROOM DEPUTY CAN SWEAR YOU IN.

3    THANK YOU.

4                    FRANK RORABAUGH

5          CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

6    DULY SWORN, AND TESTIFIED AS FOLLOWS:

7          THE COURT:  SIR, YOU CAN TAKE A SEAT UP HERE.  WATCH

8    YOUR STEP.  THANK YOU.  COUNSEL.

9                    DIRECT EXAMINATION

10   BY MR. MCCARTHER:

11   Q    SIR, COULD YOU PLEASE STATE YOUR NAME FOR THE JURY?

12   A    MY NAME IS FRANK RORABAUGH.

13   Q    HOW DO YOU SPELL YOUR LAST NAME, SIR?

14   A    R-O-R-A-B-A-U-G-H.

15   Q    WHAT IS YOUR OCCUPATION?

16   A    I'M A DETECTIVE WITH THE KANSAS CITY MISSOURI POLICE

17   DEPARTMENT.

18   Q    WHAT IS YOUR ENTIRE LENGTH OF SERVICE IN LAW

19   ENFORCEMENT?

20   A    A LITTLE BIT OVER 15 YEARS.

21   Q    AND WHAT IS YOUR CURRENT ASSIGNMENT WITH KCPD?

22   A    I'M A DETECTIVE ASSIGNED TO THE ILLEGAL FIREARMS SQUAD.

23   Q    WHAT OF THE OTHER POSITIONS THAT YOU'VE HELD WITHIN

24   KCPD?

25   A    TO BEGIN, I WAS A PATROL OFFICER AND I WORKED NIGHTS.  I

1   THEN WENT TO THE HOMICIDE UNIT AS A DETECTIVE WITHIN THE

2   ASSAULT SQUAD.  I THEN WENT BACK TO PATROL FOR A COUPLE OF

3   MONTHS BEFORE TAKING A POSITION AS A PROACTIVE COMMUNITY

4   OFFICER FOR A COUPLE YEARS.  I THEN BECAME A DETECTIVE AGAIN

5   WORKING BASICALLY GUN CRIMES.

6    Q    THIS IS ILLEGAL FIREARM SQUAD, WAS IT KNOWN AS A

7   DIFFERENT NAME AT ANY POINT?

8    A    YES.

9    Q    WHAT WAS THAT?

10   A    THE SQUAD I WORK FOR HAS CHANGED NAME SEVERAL TIMES.

11  INITIALLY WE WERE THE AREA COMMAND UNIT.  WE THEN WERE THE

12  VIOLENT CRIMES ADMINISTRATIVE SQUAD, AND WE ARE NOW ILLEGAL

13  FIREARMS SQUAD.

14   Q    AND AS PART OF THE ILLEGAL FIREARMS SQUAD, WHAT TYPE OF

15  CRIMES DO YOU INVESTIGATE?

16   A    I HANDLE MOSTLY THE ILLEGAL POSSESSION OF FIREARM CASES

17  BOTH STATE AND FEDERAL LEVEL.

18   Q    AND HOW LONG HAVE YOU BEEN ASSOCIATED WITH -- DESPITE

19  THE CHANGE IN NAME, HOW LONG HAVE YOU BEEN ASSOCIATED WITH

20  THIS UNIT?

21   A    WE CREATED THE UNIT IN NOVEMBER OF 2012.

22   Q    SO APPROXIMATELY FOUR AND A THIRD YEARS, WOULD YOU SAY?

23   A    YES, SIR.

24   Q    HOW MANY TIMES HAVE YOU TESTIFIED IN COURT?

25   A    OVER A 100.

1    Q    I WANT TO TALK ABOUT FIREARMS BECAUSE YOU BROUGHT THAT

2   UP.  DURING YOUR SERVICE IN LAW ENFORCEMENT HOW MANY FIREARMS

3   INVOLVED OFFENSES HAVE YOU INVESTIGATED?

4    A    WELL, IF YOU INCLUDE MY TIME IN PATROL RESPONDING ON

5   DIFFERENT CALLS FOR SERVICE REGARDING FIREARMS AS WELL AS

6   WITHIN THE ASSAULT SQUAD, WELL OVER A 1,000.

7    Q    WHAT TYPE OF FIREARM OFFENSES HAVE YOU INVESTIGATED?

8    A    MURDER, AGGRAVATED ASSAULT, ROBBERIES, AND THEN

9   OBVIOUSLY THE POSSESSION OF FIREARMS REGARDING THE DIFFERENT

10  LAWS.

11   Q    AND THAT WOULD INCLUDE CONVICTED FELONS IN POSSESSION OF

12  FIREARMS, CORRECT?

13   A    YES, SIR.

14   Q    HAVE YOU BEEN TRAINED IN THE FIELD OF FIREARMS

15  INVESTIGATIONS?

16   A    YES.

17   Q    WHAT TYPE OF TRAINING HAVE YOU RECEIVED?

18   A    I WENT TO THE ORIGINAL POLICE ACADEMY BACK IN 2001 AND

19  2002.  I'VE BEEN TRAINED BY THE ATF IN WASHINGTON DC.  WE HAVE

20  YEARLY IN-SERVICE TRAINING AND REGULAR LEGAL UPDATES AS LAWS

21  CHANGE.

22   Q    HOW MANY FIREARMS BASE ARRESTS WOULD YOU SAY YOU HAVE

23  MADE IN YOUR CAREER?

24   A    I WOULD ESTIMATE BETWEEN 300 TO 400 ARRESTS THAT I'VE

25  ACTUALLY MADE THE ARREST ON THOSE CASES.

1    Q    I WANT TO TALK ABOUT THE KCPD CRIME LAB.  WHAT IS THE

2    KCPD REGIONAL CRIME LAB, WHAT IS THAT?

3    A    IT IS OUR DEPARTMENT'S CRIME LABORATORY WHERE WE HAVE

4    PEOPLE WHO INVESTIGATE ALL KINDS OF STUFF RELATED TO DIFFERENT

5    CRIMES.  SO WE HAVE EVERYTHING FROM FINGERPRINT AND DNA

6    ANALYSIS TO FIREARMS EXAMINERS, CRIME SCENE TECHNICIANS.  WE

7    HAVE IT ALL HOUSED IN ONE LOCATION.

8    Q    HAVE YOU EVER SUBMITTED ANY FIREARMS TO THE KCPD CRIME

9    LAB FOR DNA AND/OR FINGERPRINT ANALYSIS?

10   A    YES.

11   Q    APPROXIMATELY HOW MANY FIREARMS HAVE YOU SUBMITTED FOR

12   THOSE ANALYSIS?

13   A    I WOULD SAY 500 TO 600.

14   Q    500 TO 600 SEPARATE FIREARMS YOU HAVE SUBMITTED OVER THE

15   COURSE OF YOUR CAREER TO THE KCPD REGIONAL CRIME LAB?

16   A    YES.

17   Q    AND THIS IS FOR DNA AND/OR FINGERPRINT ANALYSIS?

18   A    YES.

19   Q    HOW MANY OF THOSE FIREARMS THAT YOU SUBMITTED TO THE

20   KCPD CRIME LAB WERE THEY ABLE TO GET A USABLE FINGERPRINT OFF

21   OF?

22   A    I HAVE NEVER RECEIVED A FINGERPRINT HIT ON A FIREARM IN

23   MY CAREER.

24   Q    SO ZERO OUT OF 500 TO 600?

25   A    THAT'S CORRECT?

1   Q   WHAT IS YOUR OPINION ON THE EFFECTIVENESS OF FINGERPRINT

2   ANALYSIS AND AS IT RELATES TO FIREARMS?

3   A   WE DON'T HAVE MUCH LUCK WITH FIREARMS BECAUSE OF THE

4   TEXTURE THAT IS OFTEN ON THE FIREARM.  LIKE I SAID, I DON'T

5   BELIEVE MUCH IN IT BECAUSE I HAVE NEVER ACTUALLY GOTTEN

6   FINGERPRINT ON A GUN.

7   Q   I BELIEVE YOU TESTIFIED APPROXIMATELY 500 TO 600 YOU

8   SUBMITTED FOR DNA ANALYSIS, IS THAT RIGHT?

9   A   YES.

10   Q   WHAT PERCENTAGE OF THOSE FIREARMS THAT YOU SUBMITTED TO

11   THE KCPD CRIME LAB, HAVE YOU BEEN ABLE TO GET ANY USABLE DNA

12   OFF OF?

13   A   OF THOSE FIREARMS, WE PUT IN A LAB REQUEST ON PRETTY

14   MUCH ALL OF THEM.  OFTEN TIMES THE TEST AREN'T DONE BECAUSE OF

15   OTHER EVIDENCE IN THE CASE.  BUT OF THE ONES THAT ARE DONE, I

16   WOULD SAY ONE IN EVERY TEN I GET A USABLE DNA HIT.

17   Q   SO WHAT IS YOUR OPINION OF THE EFFECTIVENESS OF DNA

18   ANALYSIS WHEN IT COMES TO FIREARMS INVESTIGATIONS?

19   A   IT CAN BE VERY VALUABLE, BUT IT IS NOT SOMETHING THAT I

20   CAN RELY ON IN MOST CASES.

21   Q   SO THIS NOTION THAT SOMEONE CAN'T POSSESS AN ITEM UNLESS

22   THEIR FINGERPRINT OR DNA IS ON THAT ITEM, WHAT IS YOUR OPINION

23   ON THAT NOTION?

24   A   MY EXPERIENCE, YOU KNOW, IT'S ALMOST A LAST RESORT

25   ORDERING THE DNA.  THE REST OF THE INVESTIGATION IS MUCH MORE

1    IMPORTANT IN DETERMINING WHETHER SOMEBODY POSSESSED OR OWNED A

2    FIREARM.  THERE IS A LOT THAT GOES INTO IT.  THERE ARE SOME

3    PEOPLE THAT THEY ARE CALL SECRETORS WHERE THEIR DNA IS MUCH

4    MORE READILY AVAILABLE AND IS TRANSFERRED TO ITEMS MUCH EASIER

5    THAN OTHER PEOPLE.  IN FACT, WE HAVE CERTAIN PEOPLE ON THE

6    POLICE DEPARTMENT THAT THEIR DNA SHOWS UP IN MANY CRIME

7    SCENES, JUST SIMPLY THE FACT THAT THEY SHOW UP ON THE CALL FOR

8    SERVICE, THEIR DNA IS TRANSFERRED TO ITEMS VERY EASILY.

9    Q    AND I WOULD SAY THERE IS PROBABLY PEOPLE ON THE OTHER

10   SIDE OF THE SPECTRUM TOO, IS THAT A FAIR ANALYSIS?

11   A    YES, ABSOLUTELY.

12   Q    SO PEOPLE ON THE OTHER SIDE, THEIR DNA WOULD NOT SHOW UP

13   ON ANYTHING, IS THAT FAIR?

14   A    I WOULDN'T SAY, WOULDN'T SHOW UP ON ANYTHING, BUT IT IS

15   MUCH -- IT IS NOT VERY COMMON THAT THEIR DNA IS TRANSFERRED.

16   Q    THE ITEMS THAT YOU DO SUBMIT FOR DNA TESTING, WHAT IS

17   THE TYPICAL TIMEFRAME THAT YOU WOULD GET FROM THE TIME YOU

18   SUBMIT IT TO THE TIME YOU ACTUALLY GET A DNA LAB REPORT BACK?

19   A    IF THERE IS NO EXIGENT CIRCUMSTANCES, IF I DON'T HAVE A

20   REASON THAT THE CASE NEEDS TO BE RUSHED THROUGH THE PROCESS,

21   IT TAKES IN EXCESS OF A YEAR?

22   Q    ON AVERAGE EXCESS OF AN ENTIRE CALENDAR YEAR?

23   A    YES, SIR.

24   Q    ARE ILLEGAL GUN POSSESSION CRIMES CONSIDERED A HIGH

25   PRIORITY FOR THE KCPD REGIONAL CRIME LAB?

1   A    THEY ARE NOT.

2   Q    WHY IS THAT?

3   A    OUR CRIME LAB IS GEARED TOWARDS WORKING VIOLENT CRIME SO

4   THEY ALWAYS TAKE PRIORITY OVER OUR CASES.  IF THERE ARE

5   EXIGENT CIRCUMSTANCES IN OUR CASES, THEN I CAN ON A

6   CASE-BY-CASE BASIS CONTACT OUR LAB AND REQUEST THAT IT BE

7   SPEED UP AND PRIORITIZED.  BUT IN GENERAL OUR CASES FALL AT

8   THE END OF THE CUE.

9   Q    NOW, WE TALKED ABOUT YOU SUBMITTED FIREARMS TO THE KCPD

10  REGIONAL CRIME LAB.  ARE THERE CASES WHERE -- I'LL ASK AT THIS

11  WAY.  DOES THE REGIONAL CRIME ACCEPT ALL THE FIREARMS YOU

12  SUBMIT TO IT FOR DNA AND FINGERPRINT ANALYSIS?

13  A    NO.

14  Q    WHY WOULDN'T THEY?

15  A    JUST BECAUSE OF RESOURCES AND TIME.

16  Q    DO THEY REVIEW THE EVIDENCE IN CASES?

17  A    YES, THEY DO.

18  Q    HAVE YOU REVIEWED THE EVIDENCE THAT HAS BEEN PRESENTED

19  TO THE JURY IN THIS CASE?

20  A    YES, I HAVE.

21  Q    IS THIS A CASE THAT THE KCPD CRIME LAB WOULD HAVE AS A

22  HIGH PRIORITY?

23  A    NO.

24  Q    WHY NOT?

25          MR. ERMINE:  YOUR HONOR, CAN WE APPROACH?

1          THE COURT:  YES.

2    (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

3    PROCEEDINGS WERE HELD.)

4          THE COURT:  WHAT IS YOUR OBJECTION?

5          MR. ERMINE:  YOUR HONOR, I THINK HE IS ESSENTIALLY

6    ELICITING LEGAL CONCLUSIONS FROM THE WITNESS.  SO I THINK HE'S

7    GONNA HAVE THE WITNESS ESSENTIAL TESTIFY ABOUT THE STRENGTH OF

8    THE GOVERNMENT'S EVIDENCE TO TRY AND SHOW WHY THEY DIDN'T RUN

9    SCIENTIFIC TESTING IN THIS CASE.

10         THE COURT:  MR. MCCARTHER?

11         MR. MCCARTHER:  IT'S THE PROCESS OF THE REGIONAL

12   CRIME LAB.  THAT'S WHY HE HAS BEEN ASKED TO TESTIFY.  HE'S

13   BEEN LISTED AS AN EXPERT.

14         THE COURT:  SEEMS LIKE HE IS GOING TO WHY THEY

15   WOULDN'T PRIORITIZE THIS.  I DON'T KNOW IF THAT GOES

16   NECESSARILY -- I KNOW ALL THE TIME THEY WOULDN'T -- IT'S

17   BECAUSE THEY ARE PRIORITIZE THE HIGHER CASES.

18         MR. ERMINE:  I AGREE WITH THAT, YOUR HONOR, I THINK

19   HE CAN TESTIFY GENERALLY SPEAKING WHERE THE CRITERIA -- WHICH

20   HE HAS ALREADY TESTIFIED TO.  BUT THE QUESTION THAT WAS JUST

21   ASKED WAS DID YOU REVIEW THE FILE IN THIS CASE, WHY WOULDN'T

22   THE CRIME LAB HAVE DONE, HAD ACCEPTED A REQUEST IN THIS CASE.

23   SO HE IS ESSENTIALLY CALLING AN OUTSIDE WITNESS THAT HAD

24   NOTHING TO DO WITH THE INVESTIGATION IN THIS CASE, TO COMMENT

25   ON THE STRENGTH OF THE EVIDENCE THROUGH THE LENS OF WHY THE

1   CRIME LAB WOULD MAKE ONE DECISION OVER ANOTHER.

2          THE COURT:  YOU COULD GO THERE.  I THINK IF HE'S

3   START SAYING, HEY, BECAUSE THIS CASE INVOLVES THIS AND THIS.

4   IF HE GOES THERE, I THINK HE'S RIGHT.  BUT IF HE GOES TO SAY

5   WELL, YOU KNOW -- I THINK HE CAN TALK ABOUT BECAUSE IN MY

6   EXPERIENCE THESE CASES ARE JUST LOWER PRIORITY.  BUT YOU CAN'T

7   START COMMENTING ON, WELL, THIS CASE BECAUSE IT WAS FOUND

8   HERE, YOU KNOW, IF HE STARTS GOING IN TO THE SPECIFICS OF THIS

9   THEN HE WOULD ACTUALLY BE INVADING THE PROVINCE OF THE JURY

10  START TALKING ABOUT HOW WE ARE GOING TO INTERPRET THIS

11  EVIDENCE.  I'M GOING TO OVERRULE, I JUST DON'T WANT HIM

12  GOING -- I DIDN'T THINK HE WAS SO I DON'T --

13         MR. MCCARTHER:  CAN I LEAD HIM?

14         THE COURT:  YES.  I THINK THAT IS THE BEST WAY.

15  (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

16  BY MR. MCCARTHER:

17   Q   I BELIEVE WHAT I WAS ABOUT TO ASK, AND THIS WILL BE MY

18  LAST QUESTION.  IS BASED ON YOUR EXPERIENCE AND THE REVIEW OF

19  THE EVIDENCE PRESENTED TO THE JURY, THIS WOULD NOT BE A HIGH

20  PRIORITY KCPD REGIONAL CRIME LAB CASE, IS THAT CORRECT?

21   A   THAT IS CORRECT.

22         MR. MCCARTHER:  NOTHING FURTHER, YOUR HONOR.

23         THE COURT:  OKAY.  THANK YOU, COUNSEL.

24         MR. ERMINE, CROSS.

25              CROSS-EXAMINATION

1   BY MR. ERMINE:

2    Q    HEY THERE, DETECTIVE?

3    A    HI.

4    Q    NOW, YOU DIDN'T HAVE ANY DIRECT INVOLVEMENT IN THIS

5   CASE, RIGHT?

6    A    NO, I DID NOT.

7    Q    YOU WERE NOT A CASE AGENT ON THIS CASE, WERE YOU?

8    A    CORRECT.

9    Q    DO YOU HAPPEN THOUGH WHETHER THE FIREARM IN THIS CASE

10  WAS SUBMITTED FOR DNA ANALYSIS?

11   A    I DO NOT KNOW.

12   Q    OKAY.  AND JUST TO BE CLEAR YOU TESTIFIED THAT IT IS

13  POSSIBLE, EVEN THOUGH YOU WOULD CONSIDER THIS CASE TO BE A LOW

14  PRIORITY FOR THE REGIONAL CRIME LAB, YOU TESTIFIED THAT IT IS

15  POSSIBLE FOR YOU TO ASK FOR CASES TO BE PRIORITIZED, CORRECT?

16   A    YES.

17   Q    OKAY.  JUST OUT OF CURIOSITY, WHEN IS THE LAST TIME THAT

18  IN A CASE YOU WERE HANDLING, YOU REQUESTED DNA TO BE TAKEN OFF

19  OF A HANDGUN?

20   A    WHEN WAS THE LAST TIME?

21   Q    YES, SIR.

22   A    I ORDERED A REQUEST YESTERDAY.

23   Q    OKAY.

24       MR. ERMINE:  NOTHING FURTHER, YOUR HONOR.

25       THE COURT:  MR. MCCARTHER, ANY REDIRECT?

1        REDIRECT EXAMINATION

2    BY MR. MCCARTHER:

3    Q    THAT CASE THAT YOU SUBMITTED FOR DNA ANALYSIS YESTERDAY,

4    BASED ON YOUR TRAINING AND EXPERIENCE YOUR EXPECTATION IS, YOU

5    GOT MAYBE A 10 PERCENT CHANCE THAT THAT COMES BACK AS A HIT,

6    RIGHT?

7    A    CORRECT.

8              MR. MCCARTHER:  NOTHING FURTHER, YOUR HONOR.

9              THE COURT:  OKAY.  MR. ERMINE?

10             MR. ERMINE:  NOTHING FURTHER CROSS.

11             THE COURT:  OKAY.  DETECTIVE YOU CAN STAND DOWN.

12   THANK YOU.

13             GOVERNMENT CALL THEIR NEXT WITNESS.

14             MR. MCCARTHER:  THE UNITED STATES CALLS SPECIAL

15   AGENT TRAVIS VAS TO THE STAND.

16             THE COURT:  SIR, IF YOU WANT TO COME FORWARD RIGHT

17   THERE, SIR.  AND PLEASE RAISE YOUR RIGHT HAND TO BE SWORN BY

18   MY COURTROOM DEPUTY.  THANKS.

19                       TRAVIS VAS

20             CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, WAS

21   DULY SWORN, AND TESTIFIED AS FOLLOWS:

22             THE COURT:  YOU CAN HAVE A SEAT UP HERE.  WATCH YOUR

23   STEP AS YOU GO UP.  THANK YOU.  COUNSEL.

24                  DIRECT EXAMINATION

25   BY MR. MCCARTHER:

1    Q    SIR, CAN YOU PLEASE STATE YOUR NAME FOR THE RECORD?

2    A    TRAVIS STEVEN VAS.

3    Q    AND WHAT IS YOUR OCCUPATION?

4    A    I AM A SPECIAL AGENT WITH THE FINANCIAL PROTECTIVE

5    SERVICE.

6    Q    NOW, THE FEDERAL PROTECTIVE SERVICE, EXPLAIN THAT

7    AGENCY?

8    A    SUBMISSION OF THE FEDERAL PROTECTIVE SERVICE IS TO

9    SAFEGUARD EMPLOYEES AND VISITORS AND THE PROPERTY OF THE

10   FEDERAL GOVERNMENT.

11   Q    NOW, I BELIEVE YOU TESTIFIED YOU'RE SPECIAL AGENT WITH

12   FPS, RIGHT?

13   A    YES, SIR.

14   Q    AND THE OTHER INDIVIDUALS THAT HAVE TESTIFIED WHO WORK

15   WITH FPS, THOSE ARE INSPECTORS?

16   A    RIGHT.

17   Q    SO WHAT IS A DIFFERENCE BETWEEN THEIR JOB AND WHAT YOU

18   DO?

19   A    UNIFORM OFFICERS ARE USUALLY THE FIRST RESPONDERS.  THE

20   SPECIAL AGENTS USUALLY COME IN AFTER THE FACT AND START

21   PROCESSING THE CRIME SCENE AND THINGS OF THAT NATURE.

22   Q    AND HOW LONG HAVE YOU BEEN IN THAT POSITION?

23   A    ABOUT FOUR YEARS.

24   Q    WHAT TYPE OF CRIMES DO YOU INVESTIGATE?

25   A    WE DEAL WITH THEFTS, ASSAULTS, WEAPONS CHARGES, THREATS

1   TOWARDS GOVERNMENT EMPLOYEES, THINGS OF THAT NATURE.

2   Q    AND YOU ARE THE CASE AGENT ON THIS CASE?

3   A    I AM.

4   Q    AND WHAT IS THE CASE AGENT?

5   A    ESSENTIALLY WE HAVE TO KEEP THE CASE FILE INTACT.  MAKE

6   SURE THE EVIDENCE IS BEING PROCESSED.  ESSENTIALLY ANYTHING TO

7   ASSIST THE UNITED STATES ATTORNEY ASKS, WE MAKE SURE IT GETS

8   DONE.

9   Q    IN YOUR ROLE AS CASE AGENT HAVE YOU HAD OCCASION TO

10  REVIEW MR. EVERETT'S CRIMINAL HISTORY?

11  A    I HAVE.

12  Q    AND DID YOU DISCOVER ANY CONVICTIONS OF RELEVANCE?

13  A    THERE WAS ONE FELONY CONVICTION.

14          MR. MCCARTHER:  YOUR HONOR, MAY I APPROACH THE

15  WITNESS?

16          THE COURT:  YOU MAY.

17  BY MR. MCCARTHER:

18  Q    I'M HANDING YOU WHAT HAS BEEN PREVIOUSLY MARKED AS

19  GOVERNMENT'S EXHIBIT 15.  DO YOU RECOGNIZE THAT EXHIBIT?

20  A    I DO.

21  Q    WHERE DID YOU GET THAT DOCUMENT FROM?

22  A    I CONTACTED THE STATE OF KANSAS IN WYANDOTTE COUNTY

23  DISTRICT CLERK AND REQUESTED A COPY.

24  Q    AND IS THAT A CERTIFIED COPY OF THAT DOCUMENT?

25  A    IT IS.

1    Q    AND IS THAT THE CERTIFIED RECORD OF ONE OF DEFENDANT'S

2    PRIOR CONVICTIONS?

3    A    IT IS.

4              MR. MCCARTHER:  YOUR HONOR, AT THIS TIME I MOVE TO

5    ADMIT GOVERNMENT'S EXHIBIT -- I BELIEVE THAT IT'S 8.  NO, IT

6    IS 15, I'M SORRY.  15 INTO EVIDENCE.

7              MR. ERMINE:  YOUR HONOR, CAN WE APPROACH TO GET SOME

8    CLARIFICATION?

9              THE COURT:  YES.

10   (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

11   PROCEEDINGS WERE HELD.)

12             MR. MCCARTHER:  IT IS NOT MY INTENTION TO HAVE THIS

13   DOCUMENT SUBMITTED TO THE JURY.  IT IS SIMPLY FOR THE 404B.  I

14   AM GOING TO LEAD HIM THROUGH EXACTLY WHAT WE TALKED ABOUT AT

15   THE PRETRIAL.  THAT THIS IS A CRIME THAT WAS COMMITTED BY AND

16   THROUGH THE USE OF A DEADLY WEAPON OF A HANDGUN.

17             MR. ERMINE:  JUST WITHOUT WAIVING MY PREVIOUSLY MADE

18   OBJECTION TO 404B, I APPRECIATE THE GOVERNMENT DOING THAT.

19             THE COURT:  OKAY.

20   (THEREUPON; THE PROCEEDINGS RETURNED TO OPEN COURT.)

21             THE COURT:  GOVERNMENT'S EXHIBIT NO. 15 SHALL BE

22   ADMITTED.

23              (THEREUPON; GOVERNMENT'S EXHIBIT NO. 15 WAS THEN

24   ADMITTED INTO EVIDENCE BY THE COURT.)

25   BY MR. MCCARTHER:

```
1    Q    IS THE DATE OF CONVICTION ON THAT CERTIFIED CONVICTION

2    MAY 5th, of 2009?

3    A    It is, sir.

4    Q    And it's my understanding this is a conviction of a

5    crime -- and don't say the title of the crime, but this is a

6    conviction of a crime that was carried out by and through the

7    use of a deadly weapon, is that correct?

8    A    Yes, sir.

9    Q    And, in fact, it indicates that that crime was carried

10   out by and through the use of a handgun, is that correct?

11   A    That is correct, sir.

12   Q    Okay.  Are you familiar with the defendant in this case,

13   Mr. James Everett?

14   A    I am.

15   Q    Have you met the defendant before?

16   A    I have.

17   Q    And what was the context of that meeting?

18   A    We were transporting Mr. Everett from Lansing

19   Correctional Institute to this courthouse for his initial

20   appearance.

21   Q    Did you speak with Mr. Everett during that transport?

22   A    I did.

23   Q    And are you familiar with this voice?

24   A    I am.

25   Q    Is it your understanding that defendant has been
```

1    DETAINED IN -- ESSENTIALLY DETAINED IN CUSTODY SINCE MARCH

2    11TH, 2016, IN REGARDS TO THIS CASE?

3    A    YES, SIR.

4    Q    IS THERE ABILITY FOR PRISONERS TO MAKE PHONE CALLS WHILE

5    IN CUSTODY?

6    A    THERE IS.

7    Q    THEY CAN MAKE OUTGOING CALLS, RIGHT?

8    A    CORRECT.

9    Q    CAN THEY MAKE -- CAN INCOMING CALLS COME INTO THEM?

10   A    NO, SIR.

11   Q    ARE THE PHONE CALLS THAT ARE OUTGOING, ARE THEY

12   RECORDED?

13   A    THEY ARE RECORDED.

14   Q    ARE THEY STORED?

15   A    THEY ARE STORED.

16   Q    CAN YOU EXPLAIN TO THE JURY HOW THE JAIL PHONE CALL

17   SYSTEM WORKS EXACTLY?

18   A    SO EACH INMATE, THEY HAVE AN INMATE NUMBER THAT IS

19   ASSIGNED TO THEM, THEY ARE ALSO ASSIGNED A PIN NUMBER FOR

20   MAKING THESE PHONE CALLS.  WHENEVER THEY DO MAKE A CALL, THE

21   COMPANY THAT'S -- THE PHONE PROVIDER, IF YOU WILL, MATCHES

22   THOSE TWO UP TO MAKE SURE THAT IS THE PERSON, AND WHEN THOSE

23   CALLS ARE MADE THAT IS HOW A RECORD IS MADE INDICATING WHO IS

24   MAKING THE CALL.

25   Q    AND SO I BELIEVE IF I AM READING IT CORRECTLY, EVERY

1   TIME A PERSON WHO IS IN CUSTODY NEEDS TO MAKE AN OUTGOING

2   PHONE CALL, THEY HAVE A UNIQUE PIN NUMBER THAT THEY HAVE TO

3   INPUT THAT IS ASSOCIATED DIRECTLY TO THEM?

4   A    YES, SIR.

5   Q    AND THAT IS HOW THE COMPUTER SYSTEM KNOWS WHAT CALLS

6   THEY'RE MAKING AND WHAT CALLS ANYONE IS MAKING, IS THAT

7   CORRECT?

8   A    YES, SIR.

9   Q    IN YOUR ROLE AS CASE AGENT, DID YOU REQUEST

10  MR. EVERETT'S JAIL CALLS THAT HE MADE SINCE MARCH 11TH, 2016?

11  A    I DID.  I REQUESTED THE FIRST 90 DAYS OF HIM BEING IN

12  CUSTODY.

13  Q    AND IN THE FIRST 90 DAYS APPROXIMATELY, HOW MANY CALLS

14  WERE THERE?

15  A    I'D SAY OVER 100 FOR SURE.

16  Q    HAVE YOU REVIEWED THOSE CALLS?

17  A    I HAVE.

18        MR. MCCARTHER:  YOUR HONOR, MAY I APPROACH THE

19  WITNESS?

20        THE COURT:  YOU MAY.

21  BY MR. MCCARTHER:

22  Q    I'M HANDING YOU WHAT HAS BEEN PREVIOUSLY MARKED AS

23  GOVERNMENT'S EXHIBIT 12, 13, AND 14.  DO YOU RECOGNIZE THE

24  ITEM THAT I JUST HANDED TO YOU?

25  A    I DO.

1    Q    HOW DO YOU RECOGNIZE THAT ITEM?

2    A    IT'S THE PHONE CALLS THAT -- THE RECORDING OF THE PHONE

3    CALLS MR. EVERETT HAD MADE WHILE IN CUSTODY.

4    Q    AND IN FACT, THOSE ARE CLIPS OF SOME OF THOSE PHONE

5    CALLS, IS THAT FAIR TO SAY?

6    A    YES.  LOOKS LIKE THEY ARE CLIPS.

7    Q    AND WERE THEY PULLED FROM THE SYSTEM THAT YOU PREVIOUSLY

8    DESCRIBED?

9    A    YES.

10   Q    WHICH USED DEFENDANT'S SPECIFIC AND UNIQUE PHONE NUMBER?

11   A    YES.

12   Q    DO YOU RECOGNIZE THE PRIMARY VOICE THAT IS LISTED ON

13   THOSE JAIL CALLS?

14   A    THAT WOULD BE MR. EVERETT'S VOICE.

15        MR. MCCARTHER:  YOUR HONOR, AT THIS TIME I MOVE FOR

16   THE ADMISSION OF GOVERNMENT'S EXHIBIT 12 THROUGH 14 TO BE

17   ENTERED INTO EVIDENCE.

18        MR. ERMINE:  RENEW PREVIOUS OBJECTION.

19        THE COURT:  OBJECTION WILL BE NOTED FOR THE RECORD.

20   GOVERNMENTS EXHIBIT 12, 13, AND 14 SHALL BE ADMITTED.

21        (THEREUPON; GOVERNMENT'S EXHIBIT NO. 12, 13, AND 14

22   WERE THEN ADMITTED INTO EVIDENCE BY THE COURT.)

23   BY MR. MCCARTHER:

24   Q    ALL RIGHT.  AND I WANT TO TALK ABOUT EXHIBIT 12 FIRST.

25   DO YOU KNOW WHAT DATE THAT PHONE CALL IS FROM?

1   A    MARCH 20th, 2016, sir.

2   Q    And that is about nine days after this incident?

3   A    Yes, sir.

4   Q    And what Exhibit 12 is, it is a clip of the full call.

5   It is not every single word of the entire call?

6   A    That's correct.

7        MR. MCCARTHER:  Your Honor, at this time may I

8   publish Exhibit 12 to the Jury?

9        THE COURT:  You may.

10       (THEREUPON; Government's Exhibit 12 was then

11   published to the Jury in open court.)

12   BY MR. MCCARTHER:

13   Q    Special Agent Vas, did that appear to be the defendant

14   discussing the incident that took place on March 10, 2016?

15   A    Yes, it did.

16   Q    I want to move to Exhibit 13.  What date is Exhibit 13

17   from?

18   A    It was from April 30, 2016.  I'm sorry.  Correction.

19   March 30, 2016.

20   Q    March 30, 2016, correct?

21   A    Correct.

22   Q    So that would have been about 20 days after this

23   incident?

24   A    Yes, sir.

25   Q    Do you know who the defendant is talking to in Exhibit

1    13?

2    A    TIARA GRAY?

3    Q    HOW DO YOU KNOW THAT?

4    A    THE PHONE NUMBER IS 816-210-2996 WOULD BE THE OUTGOING

5    CALL THAT HE DIALED.  AND I KNOW THAT NUMBER TO BE ASSOCIATED

6    WITH HER FROM KANSAS CITY POLICE DEPARTMENT INCIDENT REPORT.

7    Q    AND IN FACT THAT IS THE SAME NUMBER THAT DETECTIVE

8    BAILEY TESTIFIED ON THE STAND TODAY, IS THAT CORRECT?

9    A    THAT'S CORRECT.

10   Q    DO YOU KNOW MR. EVERETT'S RELATIONSHIP TO MS. GRAY?

11   A    I BELIEVE BOYFRIEND, GIRLFRIEND.

12   Q    AND THIS IS A CLIP OF A WIRE CALL, IS THAT CORRECT?

13   A    CORRECT.

14          MR. MCCARTHER:  YOUR HONOR, PERMISSION TO PUBLISH

15   EXHIBIT 13 TO THE JURY?

16          THE COURT:  YOU MAY.

17          (THEREUPON; GOVERNMENT'S EXHIBIT NO. 13 WAS THEN

18   PUBLISHED TO THE JURY IN OPEN COURT.)

19   BY MR. MCCARTHER:

20   Q    SPECIAL AGENT VAS, DID THAT APPEAR TO BE A CALL WHERE

21   THE DEFENDANT IS DISCUSSING THE LEGAL THEORY OF THE CHARGE OF

22   FELON IN POSSESSION OF A FIREARM?

23   A    I BELIEVE THAT IS CORRECT.

24   Q    I WANT TO DISCUSS EXHIBIT 14.  WHAT DATE IS THIS CALL

25   FROM?

1    A    SIR, THIS WOULD BE FROM APRIL 30th, 2016.

2    Q    So this would have been approximately 50 days after this

3    incident?

4    A    Yes, sir.

5    Q    Do we know whom the defendant is talking to?

6    A    Again, the defendant is talking to Tiara Gray.  The

7    phone number dialed was 816-210-2996.

8             MR. MCCARTHER:  Your Honor, permission to publish 14

9    to the Jury?

10            THE COURT:  Yes.

11            (THEREUPON; Government's Exhibit No. 14 was then

12   published to the Jury in open court.)

13            MR. MCCARTHER:  Special Agent Vas, I don't have any

14   further questions, thank you.

15            THE COURT:  Thank you.  Mr. Ermine, cross.

16                    CROSS-EXAMINATION

17   BY MR. ERMINE:

18   Q    Good morning, Special Agent Vas.

19   A    Good morning, sir.

20   Q    I imagine as a case agent in this case you listened to

21   these calls quite a few times, correct?

22   A    That's correct, sir.

23   Q    So I just want to talk very briefly about each of them.

24            Now, in the first call it sounds like -- let me ask

25   you this, do you have any idea who Mr. Everett's is talking to

1   IN THAT FIRST CALL?

2    A    I DON'T RECALL OR I DON'T KNOW, SIR.

3    Q    OKAY.  IT SOUNDS LIKE AT THE BEGINNING OF THAT FIRST

4   CALL THERE IS A REFERENCE MADE TO AN ARTICLE, CORRECT?

5    A    I BELIEVE SO, SIR.

6    Q    AND WOULD YOU AGREE WITH ME ON THE SECOND CALL IT SOUNDS

7   LIKE A LOT OF THAT CALL IS MR. EVERETT READING FROM THE ARREST

8   WARRANT IN THIS CASE, CORRECT?

9    A    I COULDN'T SAY ONE WAY OR ANOTHER TO BE HONEST, SIR?

10   Q    OKAY.  AREN'T YOU THE CASE AGENT IN THIS CASE?

11   A    YES, SIR.

12   Q    DID YOU OBTAIN THE ARREST WARRANT IN THIS CASE?

13   A    I DID, SIR.

14   Q    SO YOU ARE FAMILIAR WITH THE ARREST WARRANT THEN?

15   A    YES, SIR.

16   Q    YOU'VE HEARD THE CALLS SEVERAL TIMES, RIGHT?

17   A    THERE ARE A NUMEROUS AMOUNT OF CALLS, SIR.

18   Q    I KNOW.  RIGHT.  OKAY.  WELL, THE JURY HAS HEARD THE

19   CALL.  WOULD YOU AGREE WITH ME THOUGH THAT HE IS READING FROM

20   SOME DOCUMENT THAT APPEARS TO BE REALLY THE NATURE OF THE

21   CHARGE AGAINST HIM, THAT IS BEING A FELON IN POSSESSION OF A

22   FIREARM, CORRECT?

23   A    IT DOES SOUND LIKE HE IS READING AT SOME POINT, SIR.

24   Q    IT SOUNDS LIKE HE IS TALKING ABOUT DEALING WITH THE

25   STATUTES, EVEN I THINK HE READS SOME OF THE STATUTES BY NAMES,

1    IDLE 18-922, FOR EXAMPLE?

2    A    YES, SIR.

3    Q    AND THEN HE GOES ON TO TALK ABOUT CERTAIN ASPECTS OF THE

4    LAW, LIKE CONSTRUCTIVE POSSESSION, CORRECT?

5    A    YES, SIR.

6    Q    NOW, IT SOUNDED LIKE IN THE THIRD CALL HE ALSO MENTIONS

7    AN ARTICLE.  DO YOU REMEMBER HIM MENTIONING THAT TOWARD THE

8    BEGINNING OF THE CLIP THAT HE HEARD IN THAT CALL?

9    A    IS IT A NEWSPAPER ARTICLE?

10   Q    YEAH.  ASKING MS. GRAY WHETHER SHE HAS LOCATED A NEWS

11   ARTICLE, CORRECT?

12   A    YES, SIR.

13   Q    NOW, I DO WANT TO GO BACK TO THE FIRST CALL BRIEFLY.  IN

14   ADDITION TO REFERRING TO A NEWS ARTICLE IN THE CALL, HE MAKES

15   MENTION SEVERAL TIMES OF A MOTION, DO YOU RECALL THAT FROM

16   LISTENING TO THE TELEPHONE CALL?

17   A    BRIEFLY, YES, SIR.

18   Q    AND HE KIND OF DESCRIBED THAT MOTION AS A MOTION FOR A

19   SOVRANTY, CORRECT?

20   A    YES, SIR.

21   Q    AND SOMETHING ABOUT REFUGEE STATUS?

22   A    STRAW MAN OR SOMETHING TO THAT EFFECT, SIR, YES.

23   Q    NOW, I DON'T WANT TO GET TOO FAR INTO THE WEEDS ON THIS

24   NEXT SET OF QUESTIONS.  MAYBE YOU KNOW AND MAYBE YOU DON'T

25   KNOW.  ARE YOU FAMILIAR WITH THE IDEA OF SOVEREIGN CITIZENS?

1    A    VERY BRIEFLY.

2    Q    I'M NOT TRYING TO SAY THAT YOU ARE AN EXPERT, AND I'M

3    REALLY NOT GOING TO GO ANY FURTHER THAN THIS.  COULD YOU JUST

4    TELL THE JURY WHAT YOU MIGHT UNDERSTAND IN YOUR EXPERIENCE

5    WHAT MIGHT A MOTION FOR SOVEREIGNTY BE?

6             MR. MCCARTHER:  OBJECTION.  WHAT IS THE RELEVANCE.

7             THE COURT:  I'M GOING TO OVERRULE NOW.  YOU CAN

8    ANSWER IF YOU CAN.

9    BY THE WITNESS:

10    A    TO THE BEST OF MY ABILITIES FROM WHAT I UNDERSTAND ABOUT

11    SOVEREIGN CITIZENS, THEY DON'T NECESSARILY BELIEVE IN THE

12    UNITED STATES GOVERNMENT RULES AND LAWS.  BUT AGAIN, I HAVE

13    HAD NO REALLY FORMAL TRAINING ON THE SUBJECT.

14    Q    RIGHT.  FAIR ENOUGH.  YOU KNOW, WOULD YOU AGREE WITH MY

15    CHARACTERIZATION AS ESSENTIAL IT IS KIND OF A WACKY, UNTRUE,

16    LEGAL THEORY, CORRECT?

17             MR. MCCARTHER:  OBJECTION, CALLS FOR A LEGAL

18    CONCLUSION.

19             MR. ERMINE:  YEAH, I'LL WITHDRAWAL THE QUESTION.

20             THE COURT:  YEAH, I'LL SUSTAIN THAT.

21    BY MR. ERMINE:

22    Q    AGAIN, YOU WERE THE CASE AGENT IN THIS CASE?

23    A    YES, SIR.

24    Q    DID YOU ASK FOR DNA TESTING TO BE DONE ON THE FIREARM IN

25    THIS CASE?

1    A    NO, I DID NOT.

2              MR. ERMINE:  NOTHING FURTHER, YOUR HONOR.

3              THE COURT:  MR. MCCARTHER, DO YOU HAVE ANY REDIRECT?

4              MR. MCCARTHER:  NO, YOUR HONOR.

5              THE COURT:  THANK YOU, SPECIAL AGENT VAS, YOU MAY

6    STEP DOWN.

7              GOVERNMENT CALL THEIR NEXT WITNESS.

8              MR. MCCARTHER:  YOUR HONOR, MAY WE APPROACH?

9              THE COURT:  YES.

10   (THEREUPON; COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

11   PROCEEDINGS WERE HELD.)

12             MR. MCCARTHER:  THE ONLY EVIDENCE THAT WE HAVE IS

13   ADMIT THE STIPULATION AND THEN THE GOVERNMENT INTENDS TO CLOSE

14   ITS CASE.

15             THE COURT:  OKAY.

16                       O0O

17                     CERTIFICATE

18

19             I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

20   FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

21   MATTER.

22        MAY, 11, 2017

23

24                     /S/ DENISE C. HALASEY
                        DENISE C. HALASEY, CCR, CVR-CM
                        UNITED STATES COURT REPORTER

25