IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No.  4:16-CR-00110-BCW-1 |
| | ) | March 29, 2017 |
| v. | ) | Kansas City, Missouri |
| | ) | CRIMINAL |
| JAMES EVERETT, | ) | |
| | ) | |
| Defendant. | ) | |

JURY TRIAL TRANSCRIPT - DAY 1
VOLUME 1 OF 2
BEFORE THE HONORABLE BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic voice writing
Transcript produced by computer

APPEARANCES

For Plaintiff:      MR. JEFFREY QUINN MCCARTHER
                    United States Attorney's Office - KCMO
                    400 E. 9th Street, 5th Floor
                    Kansas City, Missouri 64106

                    MS. COURTNEY R. PRATTEN
                    United States Attorney's Office - KCMO
                    400 E. 9th Street, 5th Floor
                    Kansas City, Missouri 64106


For Defendant:      MR. WILLIAM ERMINE
                    Federal Public Defender's Office - KCMO
                    818 Grand Avenue
                    Kansas City, Missouri  64106

Denise Carroll Halasey CCR, CVR-CM

1                    I N D E X

2    Description:                              Page:

3    Motion in Limines discussed:              4

4    Voir Dire:                                17

5    Jurors sworn:                             20

6    Instructions read by Court:               21

7    Opening by Mr. McCarther:                 21

8    Opening by Mr. Ermine:                    33

9    Joseph Foderaro
     Direct Examination by Ms. Pratten:        40
10   Cross-Examination by Mr. Ermine:          61
     Redirect Examination by Ms. Pratten:      63
11   Recross-Examination by Mr. Ermine:        65

12   Charles Schwarz
     Direct Examination by Ms. Pratten:        66
13   Cross-Examination by Mr. Ermine:          77

14   David Wright
     Direct Examination by Mr. McCarther:      81
15   Cross-Examination by Mr. Ermine:          97

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2    Description                          OFF'D      ADM'D

3    Government's Exhibit No. 4           44         44
     Government's Exhibit No. 10          58         58
4    Government's Exhibit No. 11          94         96

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>March 29, 2017</u>

1

2          (Proceedings began at 8:23 AM)

3          THE COURT:  Let the Court call the case.  This is

4    United States of America versus James Everett, Jr., Case No.

5    16-CR-00110.

6          Can I have parties enter their appearance for the

7    record, please?

8          MR. MCCARTHER:  Jeff McCarther on behalf of the

9    United States.  I'm joined at counsel table by Ms. Courtney

10   Pratten, Special Assistant United States attorney and Special

11   Agent Travis Vas from the Federal Protective Service.

12         THE COURT:  Okay.  Good morning.

13         MR. ERMINE:  Mark Ermine on behalf of Mr. Everett,

14   Mr. Everett is with me at counsel table as well as my

15   investigator, Allen Bush.

16         THE COURT:  Okay.  Well, good morning.

17         A few things.  Just pretrial I have to take up and

18   if there are other things let me know.  First, we have a

19   motion in limine filed by the defense with respect to those I

20   guess those jail tapes that were collected.  It is my intent

21   to grant the motion in limines.  I don't think they are

22   relevant.  I don't think -- well, let me put it this way.

23   Tape one and three, are arguably -- I don't know the

24   relevance.  Tape two, I think which goes to consciousness of

25   guilt, how much time I'd get.  Again, it's the Court's opinion

1  that that doesn't necessarily show consciousness of guilt, and

2  this Court's intent to grant that motion.

3          If, for some reason that matter comes up, just

4  approach the bench because these decisions aren't final.  But

5  if you feel they open the door.  Do you want to make a brief

6  record, Mr. McCarther?

7          MR. MCCARTHER:  I believe so, Your Honor.  Your

8  Honor, there are three different jail calls.  And I think

9  there's only one jail call that Mr. Ermine filed a motion in

10  limine on, and that is with respect to the first call.  Call

11  number one which took place on March 20th.

12          THE COURT:  Which is what?

13          MR. MCCARTHER:  I believe that is the one where he

14  is discussing the time he is looking at.  I think that is the

15  one you are referencing.

16          THE COURT:  Maybe I'm referencing that one.  I know

17  one kind of went to consciousness of guilt.

18          MR. MCCARTHER:  And I think that is the only one he

19  addressed in his motion.

20          THE COURT:  Is that the only one you addressed Mr.

21  Ermine?

22          MR. ERMINE:  It's jail call number three, Your

23  Honor, I think on the government's exhibit list.  On the new

24  exhibit list --

25          THE COURT:  -- give me the content of the in limine.

1          MR. ERMINE:  I can play it for you.

2          THE COURT:  No, just tell me.  Especially when I'm

3     going in your direction.  What is the content of it?  What

4     does it say?  Does he say, hey, I'm going to get this much

5     time?

6          MR. ERMINE:  Basically, yes, Your Honor.

7          THE COURT:  That stays out.  Now, those other two

8     calls, you didn't object to those?

9          MR. ERMINE:  I didn't object to those because I

10    didn't feel my objection was very strong to those, Your Honor.

11         THE COURT:  Okay.  Well, there you have it.  The one

12    stays out related to consciousness of guilt related to how

13    much time he can get.

14         MR. MCCARTHER:  And just so I know when I'm editing

15    these, is every statement that the defendant makes where he is

16    discussing the time that he might have to serve, specifically

17    to that.

18         THE COURT:  Yeah.

19         MR. MCCARTHER:  Because there are a couple of other

20    statements that he makes like, I have to bite this bullet that

21    I shot to myself, which I don't believe that goes to what

22    you're talking about.  I think you're saying specific to the

23    time.  Him talking about two years or three years that he

24    would have to serve.

25         THE COURT:  What are you referring to?

1          MR. MCCARTHER:  Throughout the course of the call

2     there are different statements that the defendant makes.

3     Towards the end of the call, the defendant makes a statement

4     to the person he is talking to is, listen, I'm just gonna have

5     to bite this bullet that I shot to myself, which I believe

6     goes directly to consciousness of guilt.

7          And the other portions that we had filed in the

8     opposition related to the defendant specifically talking

9     about, yeah, I'll have to two, maybe three years.  I'll cop

10     out and take a plea if they offer me three years.  I'd do

11     that.  Which we believe would go directly to consciousness of

12     guilt.  But I believe you are saying that's irrelevant to

13     that?

14          THE COURT:  Yeah, that stays out.

15          MR. MCCARTHER:  But the statement, bite this bullet

16     that I shot to myself, I don't know which way the Court was

17     leaning?

18          THE COURT:  Did you all write that in your motion

19     too?  I don't think I say that.

20          MR. MCCARTHER:  That was in our opposition, wasn't

21     it?

22          MS. PRATTEN:  Yes.  Yes.  And there is a portion

23     where he talks about that he would kill for his friends.  That

24     was one of the clips as well.

25          THE COURT:  Did you object to that?

1          MR. ERMINE:  I did object to that, Your Honor.  I

2    feel like that -- first of all, it's irrelevant because there

3    is no inference in the phone call that he is talking about

4    using any gun.  The context of the phone call frankly he is

5    talking to his brother and he is explaining how he is closer

6    with friends than he is with family.

7          THE COURT:  That doesn't come in.  The fact that he

8    would kill.  That doesn't come in.  I don't think it is

9    relevant.  And even if it relevant, I think it is highly

10   prejudicial.  You know, that doesn't come in.

11         Maybe I'm totally off, maybe I'm going on memory and

12   I shouldn't.  But with respect to -- I guess, you're objecting

13   to that and you are objecting to the fact that he mentioned

14   time, is that correct?

15         MR. ERMINE:  That's correct, Your Honor.  I think

16   that the time that he is talking about, I think that that is

17   first of all prejudicial.

18         THE COURT:  I agree.

19         MR. ERMINE:  Secondly, I've very concerned about

20   confusing the Jury.  In terms -- because once you introduce

21   the element of what he could possibly get for punishment, I

22   think it's right for confusion of the Jury.

23         THE COURT:  I agree.

24         Now, Mr. McCarther said the other thing, I think it

25   comes in.  Are we clear?  I just want to make sure.  So any

1  time in sentencing, that stays out.  The fact that, hey, I

2  would kill for my friend, that stays out, that's prejudicial.

3  But the other stuff comes in.

4          Now, if, for some reason, Mr. Ermine, you start

5  hearing something, object, we'll stop, and we'll approach,

6  okay?

7          MR. ERMINE:  Yes, sir.  I will.

8          THE COURT:  Now, Rule 404(b), you're going to let in

9  the prior, the aggravated robbery?

10          MR. MCCARTHER:  That's correct, Your Honor.  We

11  filed a notice.

12          THE COURT:  A long time ago.

13          MR. ERMINE:  Yes, discussing that aggravated

14  robbery.  And as we discussed in our pretrial conference much

15  like the Rashawn Long case, I believe --

16          THE COURT:  Rashawn Long was a little different

17  factually where the underlying were slightly different.

18          MR. MCCARTHER:  The underlying priors in Rashawn

19  Long, that was a drug and firearm case.  We didn't even have

20  the firearm, but it involved an unlawful use of a weapon

21  conviction, trafficking conviction, murder conviction, and an

22  armed criminal action conviction.  You allowed all of those

23  although we did have a limiting on the murder.

24          THE COURT:  Yes.

25          MR. MCCARTHER:  We did not call it a murder.

1        But in this case we have the defendant's knowledge

2   and intent in play.

3        THE COURT:  Mr. Ermine says it's really not in play,

4   although you want to get in an instruction that puts it

5   totally at play.  In your motion you suggest there is

6   knowledge and intent, and then you ask for an instruction that

7   puts knowledge and intent totally in play.

8        MR. ERMINE:  Well, first of all, my instruction

9   dealing with intent goes to the first count and not this count

10  because I -- the intent element on the two counts quite

11  different.  One being specific intent, this crime being

12  general intent.

13       THE COURT:  Well, you do have an instruction that

14  seeks at or near presence of a crime does not mean one, you're

15  putting that in intent, you're trying to suggest.  And so what

16  I'm saying is I think 404(b) does come in.  We're not going to

17  mention aggravated robbery, we're going to limit it to show

18  that it was an offense that involved a gun.  I don't know how

19  -- there is an eastern case I think -- and it's kinda like the

20  limiting instruction on the murder case.  I don't think the

21  aggravated robbery, you know, the fact is he used a gun.  I

22  think that goes more to -- I think the time limit, I think we

23  are fine there and when it occurred.  But I don't know the

24  aggravated robbery.  I think we can change that instruction to

25  show that, you know, I think you have an aggravated robbery

1  committed in Kansas where we put a crime committed with a gun

2  or something. I just don't want -- I don't think the

3  aggravated robbery is necessary. You see what I'm saying,

4  Mr. McCarther?

5  MR. MCCARTHER: I do. And my intent during trial

6  was simply read the charging language. I could excise the

7  aggravated robbery portion.

8  THE COURT: You were going to read the charging

9  language when?

10  MR. MCCARTHER: So the certified copy of the

11  conviction includes the exact charge that the defendant pled

12  to.

13  THE COURT: Yeah, but you suggest the stipulating.

14  If you stipulate to the fact that he has a prior conviction,

15  and you stipulate that is it related to -- we won't mention

16  the aggravated robbery. We stipulate to it, but we let the

17  gun portion of that obviously, then we don't get around that.

18  Because if you stipulate he has a prior, then there is no need

19  for that to come in.

20  MR. MCCARTHER: Right. And there is a stipulation

21  to the defendant's felony offense. As to 404(b) I guess just

22  want to know how we -- how do we talk about the offense

23  without mentioning that it was an aggravated robbery?

24  THE COURT: What are you trying to get into that

25  offense? Tell me where you are going?

1          MR. MCCARTHER:  The charging language essentially

2    says --

3          THE COURT:  Just because it's 404(b) and I let it in

4    doesn't mean that you get into every detail of that offense,

5    not to my understanding.

6          MR. MCCARTHER:  That's true.  The Eighth Circuit

7    precedent limits you at unless prejudicial what the offense

8    was and the charging language, that the defendant was

9    specifically convicted of, my intent was to read the charging

10   language, however, I can excise any mention of aggravated

11   robbery.  However, perhaps the Court should review the

12   language I intend to read and we can figure out how to

13   approach that.

14         THE COURT:  When you say reading, who are reading

15   this to?

16         MR. MCCARTHER:  The witness who introduces the prior

17   would actually read.  It's Count One listed on that first

18   amended information.

19         THE COURT:  I guess I'm still not following.

20   Because you have a witness that is going to -- what is the

21   purpose of the witness talking about this?

22         MR. MCCARTHER:  To introduce the certified record of

23   conviction.

24         THE COURT:  Because you are doing that for the

25   purpose of proving that he has a prior felony?

1          MR. MCCARTHER:  No.

2          THE COURT:  What is the purpose?

3          MR. MCCARTHER:  404(b).  For knowledge and intent to

4    possess a firearm under 404(b).  We've stipulated to the

5    felony.  This goes directly to 404(b) evidence.

6          THE COURT:  Which allows you if I understand to --

7    in this case if all corners, talk about a prior conviction

8    that goes to knowledge and intent?

9          MR. MCCARTHER:  Yes.

10          THE COURT:  I understand that.

11          MR. MCCARTHER:  And so my intent is to mention that

12    prior, but I need to be able to mention that it involved a

13    handgun.  And I just wanted to know how the Court wanted me to

14    address that?

15          THE COURT:  Well, I know you talk about the firearm

16    aspect of it.  I don't want the aggravated, the aggravated

17    robbery to be used in the course of committing an offense to

18    use a firearm involved.  You know, my point is it doesn't

19    matter what form we do it, I just know what I don't want you

20    to do.  The substance of this is -- because I think the

21    aggravated robbery portion of this is prejudicial.  I don't

22    think it needs to be -- just like in the murder case I had.  I

23    just don't.

24          MR. MCCARTHER:  I believe in the Long case we

25    addressed the murder by describing it as an offense committed

1    by and through the use of a deadly weapon, a handgun.

2              THE COURT:  Yeah, and that was similar to the

3    language that the ACA used on the state level.

4              MR. MCCARTHER:  If that's acceptable --

5              THE COURT:  That's find with me.  I think the point

6    is not to mention aggravated.  So to the extent we can do

7    that, we do that.

8              MR. MCCARTHER:  Okay.

9              THE COURT:  By and through the use of a weapon, I

10   think we do it similar to that, Mr. McCarther.

11             Counsel?

12             MR. ERMINE:  I just want to make sure my objection

13   remains.

14             THE COURT:  What is your objection?

15             MR. ERMINE:  I just want to make sure that I'm not

16   waiving even though I think the Court has proposed a solution.

17   I want to also object to Court's proposed solution just for

18   purposes of the record, and suggest that even that pair down

19   information given to the Jury, I think is still irrelevant,

20   unduly prejudicial, and does not meet the requirements of

21   40(b).  Because I do maintain that it is strictly propensity

22   evidence.  It goes to prove really nothing other than he had a

23   gun three years ago so he must have had a gun in March

24   of 2016.  I just want to renew that objection for the record.

25             THE COURT:  Yes.  That will be renewed, and again,

1   for the record.  The Court finds that it fits squarely within

2   404(b) in light of the case law of the Eighth Circuit.

3   Furthermore, I think in light of the instructions in which you

4   asked this Court to submit to the Jury it does go to knowledge

5   and intent.  So I think that in and of itself defeats the

6   argument, but nonetheless, objection made.

7           MR. ERMINE:  Thank you, Your Honor.

8           THE COURT:  Anything else for the record?

9           MR. ERMINE:  Your Honor, I do think that there is at

10  least one jury instruction issue that the Court should

11  consider taking up prior to the Jury coming in.

12          THE COURT:  What's that?

13          MR. ERMINE:  Because the question as to what the

14  elements are of the threatening a law enforcement officer

15  count.  Those are going to be read to the Jury as part of the

16  preliminary instruction.

17          THE COURT:  Maybe, maybe not.  Can I stop you there

18  because I can just short-circuit this a little bit quicker

19  probably?

20          MR. ERMINE:  Yes, sir.

21          THE COURT:  Why are we reading that?  I have never

22  done that.  Why am I reading the instructions on the elements

23  in the prelims?  I don't feel the need to.  Now you can make

24  your objection, but I don't think I going to.  Because that is

25  an issue we need to take up in terms of the elements.  You

1    don't have to say anything further, I already made my ruling.

2    I don't think there is -- why are we reading that up front?  I

3    think as I explain the crime, Mr. McCarther, I am going to

4    use -- did I get a statement on the case from you all?  I

5    think what I'm going to use is the charges itself.  Which it

6    doesn't give the elements, but it talks about the offense.  I

7    think the elements, especially when there as issue on that

8    right now, I would probably be more inclined if I resolve that

9    issue in my head with the elements, but I haven't, and because

10   I have never done that necessarily before, I don't think it is

11   necessary that I read that to the Jury at this point in time,

12   but be read to the Jury at the time that we submit the case.

13            MR. ERMINE:  Very well, thank you.

14            MR. MCCARTHER:  One final issue to take up and I

15   mentioned this at our pretrial conference.  The United States

16   moves to dismiss Count Three of the indictment.  We're not

17   intending on presenting any evidence and the evidence

18   regarding that count has been suppressed anyway by the Court's

19   order.  And so the United States formally moves for a

20   dismissal of Count Three which is a possession of a controlled

21   substance offense.

22            THE COURT:  Noted for the record.  Anything else?

23            MR. ERMINE:  No, sir.

24            THE COURT:  All right.  We're going to get the Jury

25   up.

Denise Carroll Halasey CCR, CVR-CM

1          Let me tell you guys, and this is not why, maybe a

2    little bit why.  We'll see how this plays out when we get the

3    Jury picked.  I have a -- I'm on a panel.  How did that work

4    out?  At 12:00.  It doesn't mean -- I'll make it on time.  I

5    told them I could be late, but hopefully I'll get the Jury all

6    seated, then I'll break them for lunch, and then that will be

7    the time I do what I have to do and then we'll come back.

8    Typically -- but it shouldn't interfere with this is my point.

9          Now, are we anticipating two days, like today and

10   tomorrow?

11         MR. MCCARTHER:  Yes, Your Honor.

12         THE COURT:  All right.  Okay.  Anything else?

13         MR. MCCARTHER:  And by what you just said is the

14   expectation that we open after lunch?

15         THE COURT:  Yes.  We always -- because we are going

16   to keep the Jury here, break for lunch which I always do, and

17   then we will read the instructions and open after lunch.

18         MR. MCCARTHER:  Thank you, Your Honor.

19         THE COURT:  Okay.  We'll get the Jury up just as

20   quickly as we can and we'll get going here shortly.

21         (THEREUPON; Voir Dire was conducted by the Court and

22   counsel.)

23         THE COURT:  Let's go on the record.  We have

24   plaintiff's preemptively strikes is Juror 7, 14, 20, 22, 27,

25   and 34.  And your alternate strike was 37.

1          Defendant's peremptory strikes are 8, 9, 11, 15, 17,

2     21, 23, 24, 26, and 30.  And the alternate is 36.

3          With that said, it looks like our final, our Jury is

4     made up of Juror 1, Juror 3, Juror 5, Juror 6, Juror 12, Juror

5     16, Juror 19, Juror 28, Juror 29, Juror 31, Juror 32, Juror

6     33, and the alternate is Juror 38.

7          Does that conform with what the parties have?

8          MR. MCCARTHER:  Yes, Your Honor.

9          MR. ERMINE:  Yes, Judge.

10         THE COURT:  Okay.  All right.  We'll get the Jury in

11    and then I will discharge the others.

12         (THEREUPON, the jury enters the courtroom;

13    WHEREUPON, the following proceedings were had in the

14    presence of the jury.)

15         THE COURT:  Okay.  I'm going to speak to the jurors

16    in the gallery.  As you can see we have our jury panel so that

17    means you are not impaneled to sit on this case.  And I want

18    to thank you for your service today.  Without your attendance

19    and your participation in the process our system wouldn't

20    work.  But at this time you are excused as jurors.  If, for

21    some reason, you need some written excuse you can go back to

22    the second floor.  But with that said, thank you again for

23    your participation and service, but you are free to go at this

24    time.

25         (THEREUPON; Voir dire panel exited the courtroom.)

1          THE COURT:  Ladies and gentlemen of the Jury, what

2    we're going to do is to take a recess for lunch.  We will take

3    probably about 55 minutes.  So I want to get started about

4    about 1:30.  There is a place to eat here.  If you have any

5    questions about where to eat, you can ask Mr. Baldwin.  When

6    we do recess, she will show you where the jury room is and

7    where you are to report in the morning.

8          When we get back and start what will happen is I

9    will read some instructions to you and the law to follow in

10   the case.  Then the attorneys will have the opportunity to

11   argue -- not argue, is to give their opening statements on

12   what they believe the evidence will show.  And then we will

13   start evidence at that time.

14         With that said, we will recess.  The Court again

15   reminds you of what you were told at the first recess of the

16   Court.  Until you retire to consider your verdict you must not

17   discuss this case among yourselves or with others or permit

18   anyone to discuss it in your hearing.  You should not form or

19   express any opinion about the case until it is finally given

20   to you decide.

21         (THEREUPON, the following proceedings were

22   adjourned.)

23         THE COURT:  Okay.  We'll get the Jury in and get

24   started.

25         (THEREUPON, the jury enters the courtroom;

1    WHEREUPON, the following proceedings were had in the

2    presence of the jury.)

3              THE COURT:  Welcome back.

4              Our first order of business is to have you all stand

5    and raise your right hand and be sworn in as jurors on this

6    case.

7              (THEREUPON; the Jury was sworn by the Court.)

8              THE COURT:  Thank you.  You can have a seat.  Just a

9    few comments.  Again, we'll take a break probably every hour

10   and 15 minutes to hour and a half.  Typically, we won't go any

11   longer than that.  Also -- I just lost my train of thought.

12   It will hit me later.

13             What we are gonna do now is the Court is going to

14   read to you the instructions, the submitted instructions.  The

15   attorneys will have the opportunity to make their opening

16   statements, and then the government will begin their evidence.

17             There may be a short break in between.  We are

18   having some technical difficulties and the government needs

19   that for their first witness, so we may have to probably stay

20   here in court while they switch out some cables and we will go

21   with it.

22             And will tell you at times there maybe and I'll read

23   this to you also, when we are at the bench.  If you have been

24   sitting down awhile and you want to stand and stretch while we

25   are talking, feel free to do so.

1          With that said the Court will read to you

2     instructions.

3          (THEREUPON; Instructions were then read in open

4     court to the Jury by the Court.)

5          THE COURT:  I just remembered what I failed to

6     remember and so I do want to say it.  In terms of your cell

7     phones, did you all get your cell phones back?  So you do have

8     them, good.  That's what I forgot.

9          With that said, Counsel for the government, would

10    you like to proceed, Mr. McCarther?

11         MR. MCCARTHER:  Yes, I would, Your Honor.

12         THE COURT:  Okay.

13         MR. MCCARTHER:  Give me a moment.

14         Good afternoon, ladies and gentlemen.  My name is

15    Jeff McCarther as I have said before.  I am joined at counsel

16    table by special assistant Ms. Courtney Pratton, also Special

17    Agent Mr. Travis Vas of the Federal Protective Service, and

18    Ms. Allyson Beyer, who is a paralegal in the office of the

19    United States Attorneys.

20         Now, before I get going with my opening statement

21    let me first say thank you to all of you for your service here

22    today.  I know that this could be a burden, sitting in a

23    courtroom for two days straight.  You are away from your

24    friends, your family, your job, but believe me when I tell you

25    that everyone in this courtroom does appreciate it.  So I just

1    wanted you to know that.

2            Now, this is my opening statement.  This is my

3    chance to tell you what I expect the evidence is going to be.

4    What you are going to see.  What you're going to hear.  And

5    what I think you should take away from this.

6            Now, as the prosecutor I have the burden in this

7    case.  It is the burden of reasonable doubt.  I need to prove

8    this case to you beyond a reasonable doubt.  I am comfortable

9    with this burden.  I am very comfortable with this burden

10   because of the evidence you are going to see in this case.  It

11   was based on the evidence that you are going to see that I

12   have charged Mr. Everett with two federal crimes.  That is

13   threatening a federal law enforcement officer and being a

14   convicted felon in possession of a firearm.

15           Now, let's jump into the story of this case.  About

16   I'd say three blocks from here at the Richard Bolling federal

17   building.  This is the building at 601 East 12th Street.

18   Richard Bolling federal building, and let me describe this

19   building.  It's about 18 stories high, it is about two blocks

20   wide, it is a massive building.  And in fact, it houses almost

21   3000 individuals a day.  We are talking about a dozen

22   different federal agencies.  We've got a cafeteria, a credit

23   union, a US Post Office, and there is even a daycare center

24   for the employees to drop their children off.  And as you

25   might have guessed, being a big federal building with multiple

1    federal agencies there are significant security protocols at

2    play at this building.  For instance, you cannot park

3    alongside the federal building unless you are an emergency

4    vehicle.  Only police officers and other law enforcement

5    officers, and ambulances and fire trucks and stuff like that

6    are able to park.  There are signs that say emergency vehicle

7    parking only.  Obviously, you don't want just random cars

8    parking up against a federal building.  When you walk into the

9    lobby there are private contract security guards to walk you

10   through metal detectors to check IDs.  They are there to

11   generally keep the peace in the building and to make sure that

12   everyone whose coming in is supposed to be there for a

13   specific reason.

14           Now, let's talk about another set of law enforcement

15   officers that are in the building.  That building also is the

16   headquarters for the Federal Protective Service in Kansas

17   City.  Now, the Federal Protective Service is in charge of

18   protecting not only the buildings, the federal offices

19   themselves, but the occupants inside of them.  So any issue,

20   any disturbance, any crime that takes place on federal

21   property, Federal Protective Service officers have

22   jurisdiction, they fall under the Department of Homeland

23   Security.  Now, they are going to play an important role in

24   this case.

25           But let's jump to the story of this case.  March

1   10th, 2016, it's approximately 8:30 a.m. and the defendant

2   pulls up in front of the federal building where it says

3   emergency vehicle parking only.  He parks, he is driving a

4   2007, silver Dodge Caliber.  He is the only occupant of the

5   car.  He gets out of the car and he goes inside.  You will see

6   surveillance of him parking, you will see surveillance of him

7   leaving his car and going inside.

8          The first witness you are going to hear from is one

9   of those contract security officers I spoke of.  PSO Joseph

10  Foderaro.  He was working that morning.  And as he is

11  escorting people in, going about their daily routine,

12  Mr. Everett walks in and he could tell -- Joseph Foderaro

13  could tell something was a bit off.  The defendant was looking

14  around.  He appeared agitated, angry, and he Joseph Foderaro

15  and he heads right towards him.  Here's what he asks him, he

16  says, I need to speak to a federal judge.  Now, this is odd?

17  Right?  But for a couple reasons.  One, there are no federal

18  judges in that building as you might have guessed.  They are

19  here.  They are here in this building.  But the impression

20  that Joseph Foderaro got was this guy was angry, this guy was

21  agitated, and he thought that there might have been -- that he

22  might have been on something, he wasn't sure.  But the other

23  PSO officers, they tell him, sir, one, there are no federal

24  judges here, but you have to leave.  He was causing a

25  disturbance, he was shouting at the top of his lungs about his

1    need to see a federal judge.  And so Mr. Mr. Everett turns and

2    he walks out of the building.

3              Now, the PSOs see Mr. Everett turn and walk out of

4    the building and go to a car that is parked alongside the

5    federal building.  Now, up to this point this is a man who had

6    come in, caused a disturbance, asked to see a federal judge,

7    and he had his car parked alongside a federal building.  So

8    what is the first thing they do?  They call up to the FPS

9    officers who are on the second floor in headquarters.  Four

10   FPS officers respond downstairs to the lobby and they go

11   outside.  Well, Mr. Everett has opened his car door but he

12   hasn't gone inside.  He is now in the street yelling in the

13   direction of the building, he is yelling at people passing by,

14   and the FPS officers have stepped outside and they are saying,

15   sir, if everything okay?  Mr. Everett sees those officers and

16   the first thing he does is he looks directly at FPS officer

17   David Wright.  You're going to see the surveillance footage of

18   this moment.  He looks at David Wright, of the four of these

19   people, and he does a beeline right towards him.  And you'll

20   see him walking really fast, fits clinched, right up to David

21   Wright.  To the point where David Wright starts backing up,

22   puts his hand on his taser, the guy keeps approaching.  He

23   pulls his taser out and aims it low.  Mr. Everett finally

24   stops in front of him.  Now, what Mr. Everett was saying as he

25   was approaching to other Federal Protective Service Officers

1    was I'm going to kick your asses.  I'm going to kick your

2    asses.  To David Wright, to FPS Officer David Wright, he says

3    I'm going to kill you.  And after David Wright had pulled out

4    his taser telling Mr. Everett to stop where he was,

5    Mr. Everett looks at him dead in the eye and he says, I'm

6    going to blow your fucking head off.

7           So sensing that there was a fight about to take

8    place, that Mr. Everett was not going to be calmed down,

9    another Federal Protective Service officer takes Mr. Everett

10   by the arms in an attempt to place him in cuffs for his safety

11   and the officer's safety.  Mr. Everett does not want to be

12   taken, did not want to be handcuffed, and so now he is trying

13   to pull his arms away.  And now other officers are saying,

14   stop, please stop.  Eventually this makes its way to the

15   ground and now they are wrestling around.

16          You can going to hear from two of the Federal

17   Protective Officers, not only David Wright, but you're also

18   going to be hearing from SPF Officer Schwarz, who was there

19   that day and participated in this confrontation.

20          And to be clear, these threats were taken very

21   seriously.  When they're on the ground wrestling around trying

22   to get control of Mr. Everett's hands a kind of panic happens

23   when Officer Schwarz and Wright see the defendant start to go

24   for his waistband.  Now this is a problem.  They are trained

25   to watch for this.  They are trained to keep people's hands

1   away from their clothing, away from their pockets, away from

2   their waistbands.  Finally, two other Kansas City Police

3   Department officers who had happened to just be walking by

4   come running over.  They engage with the defendant too.  It

5   takes six officers to finally get the defendant restrained and

6   in handcuffs.  Six officers.  The two KCPD officers are

7   detectives with the KCPD.  They are detectives Bailey and

8   Detective Watt.  You will hear from them and what they saw and

9   participated in that day.

10          Finally, the defendant is placed in handcuffs and

11  because of this man's behavior, because they were not sure if

12  he was on something, why he was so agitated, police protocol

13  dictated that he get him an ambulance first before he is taken

14  into custody.  So an ambulance is called.  You will see the

15  entire 16 minutes surveillance video.  From the time Mr.

16  Everett turns, engages with FPS Officer Wright, until the time

17  he is loaded into an ambulance.  Before he is loaded into an

18  ambulance there are people trying to talk with him.  There are

19  people trying to keep him from rolling around.  He is biting

20  at them, he is spitting at them, he is doing everything he can

21  to hurt them.  David Wright suffered injuries.  He will tell

22  you about those injuries that he suffered taking down Mr.

23  Everett.

24          Now, remember after Mr. Everett is loaded up into an

25  ambulance there is still his car parked there.  He is parked

1    in an emergency vehicle parking only.  This was a problem.

2    This car needed to be towed, because for one, it is illegal to

3    park there.  But, two, there is obviously -- this car has been

4    abandoned.  It has been pointed out that he was the guy that

5    drove there and obviously he is not going to be moving his car

6    anytime soon.  Officers Watt and Bailey ordered the car towed.

7    Now, before any car is towed they do what is call an

8    inventory.  Some of you might be familiar with this.  An

9    inventory is essentially taking an accounting of the items

10    that are in your car.  It is a liability issue for the KCPD.

11    They are required to do it anytime they tow because if someone

12    goes to the tow lot, they can't suddenly knock on KCPD door

13    and say that $10,000 diamond necklace I had in there it's

14    missing now, it's your fault and you lost it.  So before they

15    tow everything they have to write down everything that is in

16    that car that is of some value.

17          Now, remember when I said that the FPS officers had

18    to wrestle around with Mr. Everett.  That he went for his

19    waistband.  They checked him for weapons, there were no

20    weapons around his waistband.  Under the front seat of the car

21    he drove there was a 9 millimeter Ruger P95.  And they did a

22    criminal history check on Mr. Everett and realized he had a

23    prior conviction for what is called a felony.  A crime

24    punishable by more than imprisonment for over one year.  This

25    is a federal crime.  If you have been convicted of a crime

1    punishable by over a year in prison you are not allowed to

2    possess a firearm.  No if, ands or buts.

3            Now, as Detective Watt is inventorying this car he

4    sees in the backseat a car seat, a baby seat.  And so they

5    looked up the registration of the vehicle and it comes back to

6    somebody named Ms. Tiara Gray.  Now, you are going to know

7    about this person because this is the girlfriend of the

8    defendant.  They are together.  Detective Watt calls Ms. Gray

9    and says your car has been towed, do you want me to bring this

10   baby seat back to you?  She says, yes.  She confirms that Mr.

11   Everett had been driving her car.  At that point Detective

12   Watt takes the car seat back to Tiara and she again confirms

13   that Mr. Everett had possession of her car at that point.

14           Now, remember Mr. Everett is in the hospital right

15   now.  Once he is finished at the hospital, he is to be taken

16   into police custody.  But there is a problem with this.  There

17   wasn't a KCPD officer who was able to get to the hospital upon

18   his release.  Mr. Everett is released at 2:00 a.m. March

19   11th, and there is not officer to take him into custody.  Mr.

20   Everett presumably goes home.  The next day we charge Mr.

21   Everett in federal court and Detective Watt and Bailey

22   effectuate that arrest, and Mr. Everett is taken into custody

23   on March 11th, of 2016.

24           Now there are two additional important witnesses

25   that I'm going to have to discuss.  One is KCPD Detective

1    Frank Rorabough.  He is a 16 year veteran of the Kansas City

2    Missouri Police Department.  He is on the illegal firearm

3    squad.  It is likely that had this incident not happen on

4    federal property that he would've been the lead detective on

5    this case.  But what he is going to tell you about is related

6    to that question that I brought up earlier.  CSI, NCIS, this

7    DNA evidence.  He is going to tell you from his experience, he

8    has probably sent what he estimates 400 or 500 firearms for

9    fingerprint and DNA analysis.  He is able to get actual hits

10   on DNA only maybe one in ten.  And so this is why this

11   question is asked to try and tell you what the expectations

12   are.  One in ten do you ever get a DNA hit on a firearm.  Do

13   you know what the percentage is of actual fingerprints coming

14   up on firearms that are analyzed?  Of the 400 to 500 that

15   Detective Rorabough has had to analyze at the KCPD crime lab,

16   zero.  Not a single firearm has ever come back with a viable

17   fingerprints.  And so he is here because there is no DNA,

18   there is not fingerprint evidence in this case.  In fact, what

19   he is going to tell you, is that in this type of case, the

20   KCPD crime lab wouldn't even have analyzed this gun.  And so

21   this is the evidence that we have.

22           And you are going to hear from an eighth witness and

23   that is Special Agent Travis Vas.  He is familiar with the

24   defendant's criminal history.  And one of -- there is a

25   certified prior conviction in which we will present in this

1  court from May 5th, 2009, and that was for an offense

2  committed by and through the use of a deadly weapon from 2009.

3  And that deadly weapon was a handgun.

4         Now, last and final you are going to hear from a

5  ninth person.  I'm not gonna call him as a witness, but this

6  ninth person will be the defendant himself.  Now, as I told

7  you on March 11th, the defendant was taken into custody.  As

8  he was detained, and some of you may know this, your phone

9  calls may be recorded and stored.  There is a message before

10 you make any outgoing phone call that this phone call may be

11 monitored and recorded.

12        So Special Agent Vas went through all the phone

13 calls from the first 90 days of Mr. Everett's detention and he

14 has picked three for us to pick today.  And we have clipped

15 them together.  We have one from March 20th, where the

16 defendant appears to be talking to his brother.  And he says

17 quite a few things.  He recounts the incident.  Yeah, the

18 pistol wasn't on my hip, it was in the car.  I'm not worried

19 about them charging me, because I don't want to follow the

20 guidelines or the rules of this country.  Regarding his action

21 that day, yeah, that might've been a stupid move.  Regarding

22 Officer Wright pulling out his taser.  Do you remember that?

23 Here's what he says he said to Officer Wright.  I'm going to

24 hit you in your mouth, then I'm going to blow your mother

25 fucking brains out.  That's what he recounts to his brother

1    about what he told Officer Wright.  Regarding his charges he

2    says, I'm just going to have to bite this bullet that I shot

3    to myself, and it's my own damn fault that I am in here.

4         We had a second call from April 20th, taking place

5    approximately 40 days after the incident.  He is speaking with

6    his girlfriend, Ms. Tiara Gray.  And he is going over his

7    charges and he is saying, they charged me with possession of a

8    firearm, but they made a mistake, they should have charged me

9    with constructive possession of a firearm because the gun

10   wasn't on me, the gun was in the car.  My gun was in the car.

11   And so -- and by the way, that is legally not accurate,

12   constructive possession is possession.  That's the difference

13   between this pen that I have direct possession of, and if I

14   ran down to my car, put it in the car and came back, I'm still

15   in possession of this pen, right?  Because I still have access

16   to it because it is still in my car.  That will be the

17   difference we hit more at closing.

18        We have a third call from April 30th, this is 50

19   days after the incident.  And he is again talking with

20   Ms. Gray and they start to talk about these charges.  And

21   Mr. Everett says the following, hint, hint, hint, hint, who

22   did you let borrow your car the night before.  She says,

23   nobody.  And he says, you know, for being so intelligent you

24   don't know the game.  Here's what I need you to do.  Start

25   looking at the news and reading articles.  The next guy that

1    you see in news that gets caught, that's the guy who had it.

2    So you need to let me know who you're going to say so I can

3    know who I'm going to say.  That is the defendant's own voice.

4           Here is what I'm gonna say, the defendant committed

5    these crimes.  He is guilty of these offenses.  And this

6    evidence is not complex.  And as it is presented all I ask of

7    you right now is that you look at it through the filter of

8    common sense.  What makes sense in this case?  And as I said

9    before I'm going to speak to you one last time.  There is

10   going to be two closing arguments.  First, Ms. Pratton will

11   make a close, the defense attorney will make a closing

12   argument, and then I will be the last person to get to speak

13   with you during the second closing argument.  And I will make

14   a request at that time and that's that you find the defendant

15   guilty of all counts.  Thank you very much.

16           THE COURT:  Thank you, Mr. McCarther.

17           Mr. Ermine?

18           MR. ERMINE:  May it please the Court?

19           THE COURT:  It may.

20           MR. ERMINE:  Good afternoon, again, everyone.  My

21   name is Mark Ermine.  I represent Mr. Everett in this case.  I

22   want to echo the government's attorney.  Thank you for being

23   here.  It is incredibly important that you all are here.  And

24   we very much appreciate you giving up your time to pay close

25   attention to the evidence in this case.

1    I expect that over the next couple of days you are

2 going to hear from quite a few witnesses.  Government's

3 counsel just kind ran down the evidence.  I don't want to tell

4 the same story twice, but let me reiterate some of the points

5 that I think are particularly important for you all as you are

6 paying attention to the witnesses and listening and watching

7 all of the evidence in this case.

8    The evidence is going to show that Mr. Everett went

9 to the federal building that day.  The evidence is going to

10 show that he was looking for a federal judge.  You are going

11 to hear in some of these phone calls that counsel mentioned

12 that Mr. Everett was looking to file some sort of motion.

13 It's sounds as if he just mistakenly thought that the federal

14 judges were at the federal building instead of being here.

15 More importantly though, right when he got to the federal

16 building that day, something was clearly off.  Every witness

17 who was there is going to agree with that.  Everyone who saw

18 him right from the moment he arrived is going to testify that

19 he was acting erratically might be too soft of a word.  He was

20 yelling at people.  He was cursing and screaming at people.

21 People in the street, passers by, he is generally acting

22 bizarrely.  When he goes into the federal building, I think

23 that one of the witnesses is going to testify, he was even

24 slapping himself in the face.  Something is clearly not right

25 with Mr. Everett on March 10th, 2016.  So he does, he leaves

1    the lobby and then the Federal Protective Officers come out.

2    And Mr. Everett comes back.  They see him aways off and he

3    comes back.  Same thing is happening.  He is out in the

4    street.  Yelling at people, screaming, cursing, still acting

5    quite strangely.  As he is walking back up to the offices he

6    is muttering to himself.  I think the testimony will be that

7    he is muttering threats under his breath, muttering curses and

8    swearing under his breath.

9        The officers are justifiably quite concerned about

10   his state of mind.  So at this point Mr. Everett gets back up

11   to where the officers are and there is a bit of a skirmish

12   between him and the officers.  They ultimately do detain him.

13   You'll see all of this on video.  I don't need to go through

14   the details.  Government's counsel mentioned him reaching for

15   his waistband, you know, you can draw your own conclusions

16   based on the video.  I ask you to watch that video quite

17   carefully and see whether or not it actually matches up with

18   these details that the government's witnesses give you.  But

19   be that as it may, the officers are detaining him.  He is

20   ultimately restrained on the ground.  He continues to act

21   strangely once he is detained.  He is detained, by the way, by

22   six officers.  It takes six officers to detain.  I think that

23   some of the officers are going to testify about perhaps why it

24   would've taken six officers to detain him.  At any rate, once

25   he gets on the ground you'll see on the video and the officers

1   are going to testify, that he is banging his head on the

2   concrete at least twice. Something is clearly not right with

3   Mr. Everett that day.

4   The officers knew that something wasn't right with

5   him, that's why instead of being taken to the jail he is taken

6   by ambulance to Truman. You're going to see on the video that

7   the EMTs arrived. I expect you're going to hear testimony he

8   was threatening the EMTs. He was generally threatening

9   everyone that day. He is ultimately taken by ambulance to

10  Truman. You're going to hear from one of the FPS officers

11  that went with him to Truman. And was in the hospital room

12  with him. At the hospital room in the hospital Mr. Everett

13  continuing to act very strangely. He is still yelling and

14  cursing and threatening everyone. He is threatening nurses

15  and he is threatening EMTs, he is threatening the security

16  staff at the hospital, he is even threatening the doctors who

17  are trying to treat him. You are going to hear about how is

18  ultimately sedated and things like that at the hospital and

19  I'll talk more about that in closing.

20  So you have just heard me talk about how Mr. Everett

21  -- you know, Mr. Everett is charged with threatening of

22  federal law enforcement officer. I'm going to tell you he is

23  not guilty of that charge. But you just heard me talk about

24  how he was threatening everybody that day. And that's

25  something that is very important to remember about this case.

1    The government has to prove that Mr. Everett was threatening

2    those federal law enforcement officers because they were

3    federal law enforcement officers involved in their official

4    duties.  But as I said, the evidence is going to show that

5    Mr. Everett was indiscriminately threatening everybody within

6    earshot.  Everyone he saw, passersby on the street.  His state

7    of mind is very important.

8         I submit to you that at the end of the case I think

9    it will be clear, he didn't threaten these officers because

10   they were federal officers engaged in their official duty, he

11   threaten them because they happened to be there just like he

12   threaten everyone else that day.  And for that reason he is

13   not guilty of threatening federal officers.

14        I want to talk about this second count.  While he is

15   at Truman as government counsel says, they end up searching

16   this car and they find the gun under the front seat.  Now, he

17   is charged what knowingly possessing that firearm.  But there

18   is no physical evidence that is going to be presented to show

19   that he possessed that firearm.  You are not going to hear

20   about any DNA evidence.  You're not gonna hear about any

21   fingerprint evidence.  You are going to hear from a witness

22   whose only purpose is to testify about why they don't have

23   that evidence.  But you're not going to actually hear that

24   evidence.  There is going to be no evidence presented that

25   Mr. Everett actually knew that gun was there.

1    Government's counsel mentioned these phone calls.  I

2 do want you to pay very close attention to those phone calls.

3 Obviously, you know right now that those phone calls were all

4 made after Mr. Everett knew what he was charged with.  You are

5 going hear portions of those phone calls where there is a

6 discussion between Mr. Everett and the other person on the

7 phone about news articles.  And so you're going to hear

8 essentially that Mr. Everett has certain information about the

9 case via news articles.  So I want you to pay very close

10 attention to those phone calls and discern what is being said

11 and what is not being said.

12    At the end of the day though or I should say by the

13 end of the day tomorrow you will not have heard any evidence

14 that Mr. Everett was seen with the firearm.  You will not see

15 any physical evidence presented in this case that Mr. Everett

16 knew that there was a firearm under the seat of that car that

17 he was driving.  And as the government's counsel just told you

18 will have heard evidence that the car was registered to

19 somebody who is not Mr. Everett.

20    After considering the lack of the evidence in this

21 case, recognizing that there is no evidence showing that

22 Mr. Everett knew that that firearm was there, I will ask you

23 to render a verdict of not guilty on that count.  I'm going to

24 ask you to find Mr. Everett not guilty of both counts in this

25 case because he did not threaten a federal law enforcement

1    officer because that person was a federal law enforcement

2    officer.  He threaten everyone that day.  Keep in mind his

3    state of mind and there is going to be evidence about that.

4          He is not guilty of possessing this firearm.  There

5    is no evidence that he knew that there was a firearm in the

6    car that day.  Thank you very much.

7          THE COURT:  Thank you, Mr. Ermine.

8          Ladies and gentlemen of the Jury, we're going to

9    take just a quick recess.  I ask that you stay in the jury

10    room.  We are going to have the person come up from IT to work

11    on the TV.  We anticipate that it won't be long and then we

12    will get right back here and the government will start with

13    their evidence.  And we will recess at this time.

14    (THEREUPON, a short recess was had; WHEREUPON, the following

15    proceedings were had.)

16          THE COURT:  Okay.  Ladies and gentleman of the Jury,

17    I apologize for the long delay.  We promised you that it was

18    working properly, but we have had some technical difficulties.

19    What I failed to mention is that we will go no later than past

20    5:00 in the evening so you can plan accordingly.  Even when go

21    to deliberate, we will never go after 6:00.  So you all can

22    plan accordingly.

23          With that said, government, call you first witness.

24          MS. PRATTEN:  Thank you, Your Honor.  The government

25    calls Protective Service Officer, Joseph Foderaro.

1          THE COURT:  Okay.  Sir, if you can come forward and

2     raise your right hand to be sworn by my courtroom deputy.

3     Thank you.

4                        JOSEPH FODERARO

5          Called as a witness on behalf of the PLAINTIFF, was

6     duly sworn, and testified as follows:

7          THE COURT:  Thank you, Officer.  You can come up

8     here, and watch your step as you come up.  Counsel.

9                      DIRECT EXAMINATION

10    BY MS. PRATTEN:

11    Q    Good afternoon.  Can you go ahead and state your name

12    for the Court, please?

13    A    Joseph Michael Foderaro the 3rd.

14    Q    Okay.  And you are a Protective Service Officer?

15    A    Yes, ma'am.

16    Q    Okay.  And who do you work for?

17    A    A company called VTSGI?

18    Q    What kind of company -- did you say FTSGI?

19    A    VTSGI.  It is a contracted security company.

20    Q    Okay.  So you are a Protective Service Officer with

21    VTSGI?

22    A    That's correct.

23    Q    Okay.  And who does VTSGI contact with?

24    A    We contract with the federal government.

25    Q    Various federal buildings?

1    A    Yes, ma'am.

2    Q    Just in Kansas City?

3    A    No, we also do St. Louis I believe.  And then we also do

4    some outlying areas in Des Moines and in Wichita, Kansas.

5    Q    Okay.  So is one of the buildings they contract with the

6    Richard Bolling federal building?

7    A    That's correct.

8    Q    And where is this located?

9    A    It is located at 601 East 12th Street.

10   Q    Downtown Kansas City, Missouri?

11   A    Yes, ma'am.

12   Q    And approximately where is that building in relation to

13   this building?

14   A    I would say a couple blocks south.

15   Q    Is this where you are assigned specifically to work

16   security?

17   A    Yes, ma'am?

18   Q    How long have you been providing security for the

19   Bolling building?

20   A    I've been providing security for that building for about

21   18 months now.

22   Q    Now, let's talk a little bit about your job as a

23   protective service officer.  What kind of training did you

24   undergo to become a protective service officer?

25   A    This is different types of training that we under go.

1    We do OC baton training, we do self aid training, we do heart

2    start, ADT training, we do x-ray and walk-through magnetometer

3    training for visitor screening.

4    Q    Okay.  And did you have initial training period before

5    you started?

6    A    Yes, I did.  It was about three and half weeks.

7    Q    Okay.  And then do you have periodic refreshers as well?

8    A    Yes, ma'am.

9    Q    Okay.  Do you train on a weapon or have you trained on a

10   weapon?

11   A    Yes, we do.  I am trained on a 40 caliber Smith & Wesson

12   and we had initial training with that firearm at the very

13   beginning in our training period.  And the every five months I

14   do a refresher training with the firearm and then every year I

15   am trained with KCPD as well.

16   Q    Okay.  And what is that kind of training with KCPD?

17   A    It is a four hour class.  For the first three hours or

18   so it is more of like a classroom, firearm safety.  And then

19   the last half of the class is where you actually go out and

20   you fire the course, course of fire to see if you can qualify

21   with the weapon.

22   Q    And just to kind of spell everything out.  KCPD, Kansas

23   City Police Department, is that correct?

24   A    That's correct.

25   Q    Okay.  Let's talk a little bit about the Bolling

1    building where you work.

2           MS. PRATTEN:  Permission to approach, Your Honor?

3           THE COURT:  Yes.

4    BY MS. PRATTEN:

5    Q    I'm going to go ahead and hand you what has been

6    previously marked as Governments Exhibit 4.  What is that that

7    I just handed you?

8    A    This one right here?

9    Q    Well for the moment you can talk in the mic?

10   A    This is a photo of the Richard Bolling Federal Building.

11   Q    From overhead?

12   A    Yes, ma'am.

13   Q    Okay.  Does that picture fairly and accurately represent

14   the Richard Bolling Federal Building and immediate

15   surroundings as you recall them on March 10th, 2016?

16   A    Yes, it does.

17   Q    And to be clear was this photo, this photo wasn't

18   necessarily taken on that day, right?

19   A    Yes, that's correct.  It wasn't taken on that date

20   specifically.

21   Q    Okay.  But it represents the scene as you recall it that

22   day?

23   A    Yes.

24   Q    Would this demonstrative aid assist you and your

25   testimony as you talk to us today?

1  A    Yes.

2          MS. PRATTEN:  Your Honor, I move to admit into

3  evidence what has been previously marked as Government's

4  Exhibit 4.

5          MR. ERMINE:  No objection.

6          THE COURT:  Government's Exhibit 4 shall be

7  admitted.

8          (THEREUPON; Government's Exhibit No. 4 was then

9  admitted into evidence by the Court.)

10          MS. PRATTEN:  May I have permission to publish that,

11  Your Honor?

12          THE COURT:  You may.

13  BY MS. PRATTEN:

14  Q    And what I will ask you to do is if you can step around

15  from the stand and take the microphone with you and the

16  pointer that I handed you.  And I'm going to ask you to

17  identify a few of the locations that we talk about by putting

18  the pointer on that location.

19          THE COURT:  Let me ask you, can the Jury see?  Can

20  you see that find?  If you guys are fine then I'm okay.  Is

21  that's probably the best in light of everything.

22          THE WITNESS:  Is this better?

23          THE COURT:  Yes, thank you.

24  BY MS. PRATTEN:

25  Q    Okay.  On this photograph can you go ahead and point out

1    where the Richard Bolling Federal Building is?  Draw a circle

2    around it with the laser?

3     A    The building is -- it would be right here.  This is the

4    main building.

5     Q    Okay?

6     A    Yeah, that's the main building right there.  That's 12th

7    Street, there's the lobby and then there is the other lobby

8    right there.

9     Q    So you said 12th Street is a street right above it

10    near the top of the drawing?

11    A    That's correct.  This is 12th Street right here.

12    Q    Okay.  And you said the lobby is right in front of kind

13    of that large white object which is the federal building?

14    A    Yes, ma'am.

15    Q    And there are a number of vehicles that seem to be

16    parked on 12th Street immediately to the left of the Bolling

17    Building, is that correct?

18    A    Yes, ma'am.  Right here?

19    Q    Yes?

20    A    Yes.

21    Q    Is that a parking lot in that area?

22    A    Now, ma'am.  That is not a parking lot.  It is a marked

23    emergency vehicles only.

24    Q    Okay.  Thank you.  You can go ahead and return to your

25    seat now, thanks.

1          So let's focus a little more in on the morning of

2    March 10th, 2016.  What is your normal shift?

3     A     My normal shift is I work Thursdays and Fridays, 0530 to

4    1830.  And then on Saturdays 0530 to 1800.

5     Q     Okay.  And were you working the morning of March 10th,

6    2016?

7     A     Yes, I was.

8     Q     Specifically around the hour of 8:30 to 9:30 a.m.?

9     A     Yes, ma'am.

10    Q     And what duties were you performing at approximately

11    that time?

12    A     I was the head entry security guard.  I was working the

13    lobby at the time and greeting visitors as they came into the

14    building.

15    Q     Okay.  So you were working at the 12th Street entrance

16    to that building?

17    A     That's correct.

18    Q     Okay.  In the lobby?  And you said you were the head

19    individual at that time?

20    A     Yes, ma'am.  The point PSO.

21    Q     So how many other individuals were working there that

22    morning?

23    A     There was myself and three other security guards working

24    at that time.

25    Q     Okay.  And what specifically were you doing.

1   A     I was greeting visitors as they came into the building.

2   And I was directing individuals to either be screened if they

3   were a visitor or to come on into the building if they had a

4   federal ID.

5   Q     Okay.  So does everyone who enters that building at that

6   entrance need to show an ID?

7   A     That's correct.

8   Q     Okay.  And my understanding from your testimony is that

9   there is one of two ways that they can enter, right?

10  A     Yes, ma'am.

11  Q     So the screen you talked about, what is that?

12  A     The visitor screening it is very similar to what people

13  come through if they are coming to this building.  There is an

14  x-ray machine, we ask them to empty their pockets of any metal

15  items, and they put their objects onto the belt of the x-ray

16  machine, we scan the items, and then the individual also walks

17  through a walk through a walk through metal detector to make

18  sure that there are no items on them that alarms.  If they do

19  alarm me, they do a secondary screening with the hand wand.

20  Q     Okay.  And this is the entrance of someone I think you

21  said does not have a federal ID, right?

22  A     That's correct.

23  Q     So this would be individuals who perhaps are not working

24  in that building?

25  A     Possibly. yes.

1   Q   Okay. Or maybe somebody who works there who forgot

2   their ID?

3   A   Yes.

4   Q   Okay. And then there is the separate entrance for

5   people who have government ID?

6   A   Yes, ma'am.

7   Q   And what are the procedures to get in there?

8   A   If they have a valid federal ID they show their ID to

9   us, and then once we make sure that is a valid government,

10   federal ID, we let them pass.

11   Q   Okay. So that morning on the 10th, between 8:30 and

12   9:00 approximately, do you recall encountering an individual

13   who you later discovered was James Everett at the entry point

14   there?

15   A   Yes, I do recall.

16   Q   Okay. You interact with a lot of individuals, is that

17   true? Do you interact with a lot of individuals?

18   A   Yes, I do.

19   Q   In that part of your job?

20   A   Yes.

21   Q   Okay. In that particular time in the morning, is that a

22   common time for there to be a higher population?

23   A   It is one of our busier moments. We have people coming

24   around from other buildings utilizing the cafeteria for

25   breakfast. We also have individuals dropping off their

1    children at the daycare that we have at that facility.

2    Q    Okay.  So you interact with a lot of individuals, but

3    this who you later discovered as James Everett, that sticks

4    out in your mind as someone you interacted with?

5    A    That's correct.

6    Q    Okay.  Why, why would this individual stick out?  Why

7    does this individual stick out as someone you interacted with?

8    A    The individual came into the building, and normally when

9    we get visitors to come into the building, you know, their

10   demeanor is very calm.  They are just -- I don't really want

11   to say normal, but you know, they are -- I would say with that

12   individual he was angry.  He seemed that he was angry.  It

13   wasn't a normal -- for what the visitors that we have that

14   comes into the building.

15   Q    So it wasn't your typical encounter?

16   A    It wasn't a typical encounter, no.

17   Q    Okay.  Had you ever seen this individual before?

18   A    I had not.

19   Q    Did any of the other PSO's that were with you indicate

20   that they had ever seen this individual?

21   A    No.

22   Q    Okay.  To see this individual that you encountered that

23   day sitting here in the courtroom?

24   A    I do.

25   Q    Okay.  Can you take a look around and can you identify

1  him by an article of clothing that he is wearing?

2  A    He is wearing a blue shirt.  He is sitting down right

3  there at the desk.

4  Q    Okay.

5        MS. PRATTEN:  Let the record reflect that the

6  witness has identified the defendant as the individual that he

7  interacted with at the Bolling Federal Building on the morning

8  of March 10th, 2016?

9        THE COURT:  The record will so reflect.

10 BY MS. PRATTEN:

11 Q    So when you and the other PSO's initially encounter the

12 defendant that morning, did he indicate why he was there?

13 A    When he entered the building he didn't first state what

14 he was doing there at the building.  He mentioned that he was

15 looking for a federal judge, but he seemed confused on why he

16 was there in the first place.

17 Q    Okay.  And I think a little earlier you said he appeared

18 angry, what gave you this impression?

19 A    When he walked into the building his fists were

20 clenched, he had a just an angry demeanor on his face, you

21 could tell by the way he was walking that -- just from my

22 point of view that he seemed like he was just enraged by

23 something.

24 Q    Okay.  Fist clenched, what else did you observe that

25 indicated that?

1 A When he walked into the building he first saw me.  We

2 kind of locked eyes and he looked right at me and said,

3 "There's that mother fucker right there."

4 Q Okay.  He said that to you?

5 A Yes.

6 Q What kind of -- how did he say that to you?  Loud,

7 quiet, could you describe that?

8 A He didn't say it loudly.  He was from me to you and

9 maybe like he said it to himself, but loud enough for everyone

10 to hear him.

11 Q Okay.  And then what happened after he said that?

12 A He approached me and with his fists clenched and his

13 demeanor, it seemed like a visible threat.  At that time --

14 Q A threat to you?

15 A Yes.

16 Q Okay.

17 A At the time that he was approaching me another PSO

18 protective security officer came up behind me on my right and

19 shouted at him to stop, and he stopped at that time.  He then

20 proceeded to talk to the PSO Marcus Williams.  And I radioed

21 for FPS assistance at that time.

22 Q Okay.  So proceeding to talk.  Could you hear what the

23 defendant was saying?

24 A I did hear him mention the federal judge which made us

25 think that he was looking for this building and not the

1    federal building at 601 because we don't have any -- there is

2    no courts down there I don't believe so.

3    Q    So initially he said he appeared angry and when he is

4    talking did you still observe him to appear angry?

5    A    Yes, yes, throughout the entire time he was -- his fists

6    were still clenched, he was just his body language was, just

7    gave off -- he was tense, very tense.

8    Q    Okay.  And was he actually permitted to access the

9    building?

10    A    No, he not.

11    Q    Okay.  Why not?

12    A    Well, just because of his behavior right off the bat.

13    We weren't going to allow that individual to enter the

14    building without further investigation.

15    Q    Okay.  What did he do when he was not permitted to enter

16    the building?

17    A    When I radioed for FPS, Marcus Williams told him that

18    there wasn't any federal judges at that location.  He turned

19    around and exited the lobby.

20    Q    Okay.  Were you able to see him when he left the lobby?

21    A    I'm sorry?

22    Q    Were you able to see him when he left the lobby?

23    A    Yes, I was able to see him.

24    Q    Okay.  And if we are looking at that photograph again of

25    the Bolling Building and the piece of the building that sticks

1   out that you have indicated is the lobby, there is the bottom

2   half of the lobby which backs against the federal building,

3   that leads into the federal building, right?

4   A    That's correct.

5   Q    And then there are three other walls.  Are those walls,

6   walls or can you see through them, are they glass?

7   A    They are all made of glass.

8   Q    Okay.  So you can see clearly see through them?

9   A    Yes.

10  Q    Okay.  And that was how you were able to view the

11  defendant when he left the building?

12  A    That's correct.

13  Q    Okay.  What did you see him do when he left the

14  building?

15  A    I saw him proceed to a vehicle that I believed was his.

16  Q    Can you describe the vehicle?

17  A    The vehicle was a four-door, gray sedan.

18  Q    Okay.  And where was this vehicle?

19  A    The vehicle was parked on the street right around this

20  area in the emergency vehicle only parking lot or parking

21  right along side the curve.

22  Q    Okay.  And what did he do when he approached the

23  vehicle?

24  A    He opened up the driver side door.  At that point when

25  -- it looked like he was getting something out of his car, but

1  I couldn't tell because he lowered himself after he opened the

2  door.  I lost sight of him so.

3  Q    Okay.  Now, you indicated that you called FPS, would

4  this be Federal protective Service?

5  A    Yes, ma'am.

6  Q    Okay.  And why did you call them?

7  A    Federal Protective Service, we have a protocol where if

8  there is any individual that is threatening that we would

9  observe to have any type of like maybe an angry body language,

10 they want us to call them to handle the situation.

11 Q    Okay.  So it is just a, a -- is it fair to say that it

12 is a different, different responsibilities?

13 A    Yes.

14 Q    So your responsibility is the entry point, is that fair

15 to say?

16 A    Yes, ma'am.

17 Q    And their responsibilities are to respond when you have

18 problems?

19 A    That's correct.

20 Q    Okay.  Were you their when they arrived?

21 A    I was.

22 Q    Do you know approximately how many people arrived?  How

23 many FPS officers?

24 A    I believe there four of them that arrived?

25 Q    And what information were you able to convey to them

1    about the situation?

2    A    I told them that the individual came in.  He was, he was

3    acting sporadic, he -- his body language indicated that he was

4    angry about something, but we had a hard time understanding

5    him, and before they were able to come down he had exited the

6    lobby and he was at a vehicle, and the vehicle was on the

7    sidewalk in the emergency vehicle only parking spots.

8    Q    And you were actually able to point him out them?

9    A    I was able to point where the vehicle was, but I don't

10   recall if he was standing up or in the vehicle at the time.

11   Q    Okay.  Did you actually see FPS encounter him?

12   A    I did.

13   Q    Okay.  Can you go ahead and describe the interactions

14   that you saw?

15   A    From what I saw the FPS officers, Federal Protective

16   Services Officers exited the lobby, and they started to walk

17   in the direction of Mr. Everett.  I witnessed Mr. Everett

18   leave his car or leave the car, and he started walking towards

19   the FPS officers.  It wasn't a normal walk, it was -- he was

20   moving quickly.  It wasn't a sprint or a run, but he was

21   moving quickly towards the FPS officers.

22   Q    Okay.  And did you see anything after that?

23   A    I saw them when Mr. Everett got closer to the FPS

24   officers, I could hear yelling, but I couldn't really make out

25   what was being said, it was muffled.

1    Q    Is that because he were inside still?

2    A    Yes, ma'am.  But I did here, I heard some muffled

3    yelling, I couldn't make out was being said.  I observed one

4    of the federal protective officers deploy his taser and

5    pointed it at Mr. Everett.

6    Q    Okay.  So you didn't actually -- did you actually see

7    him deploy it on the defendant or did you just see him pull it

8    out?

9    A    Just pulled it out.

10   Q    Okay.  What did you see after that?

11   A    I saw another one of the federal protective officers

12   move behind Mr. Everett.  And it looked like he grabbed both

13   of the individuals hands, and then they took him down to the

14   ground.

15   Q    Okay.  And what about after that?

16   A    After that you could tell that there was a struggle.  It

17   looks like they were struggling to keep him down on the

18   ground.  I also witnessed other KCPD, Kansas City Police

19   Officer crossing the street and helping the federal protective

20   officers subdue the individual.

21   Q    Okay.  And while this is all going on you are still

22   doing your regular duties as well of the entry point?

23   A    That's correct.

24   Q    Okay.  Eventually did you see the defendant leave the

25   scene?

1    A    The defendant leave the scene?  I saw him being put in

2    the back of an ambulance.

3    Q    Okay.  And eventually -- the vehicle that you observed

4    earlier, did you also see that leave the scene?

5    A    Yes, that vehicle was towed away.

6    Q    Okay.  Are you aware that there are surveillance cameras

7    that are located on top of the Richard Bolling Federal

8    Building in various locations?

9    A    I am.

10    Q    Okay.  And to your knowledge are they fully functional

11    and capable of recording events that happen at various

12    portions around the vicinity of the building?

13    A    Yes, ma'am.

14    Q    Are you aware whether they were fully functional and

15    capable that morning?

16    A    Yes, I am aware of that.

17    Q    And are you further aware that they were actually able

18    to capture footage of everything that you testified here

19    today?

20    A    Yes.

21    Q    Um, have you had a chance to review this footage prior

22    to trial?

23    A    I have.

24    Q    Okay.  Is the footage that you reviewed a complete and

25    accurate representation of the events as you recall them

1    happening that day?

2     A    Yes, ma'am.

3     Q    All right.  I'm going to hand you now what has been

4    previously marked as Government's Exhibit 10 and ask you to

5    take a look at this, and do you recognize that?

6     A    Yes, ma'am.

7     Q    And what do you recognize that to be?

8     A    It is the surveillance footage of the events that day.

9          MS. PRATTEN:  Okay.  Your Honor, I move now to admit

10   what has been previously marked as Government's Exhibit 10

11   into evidence.

12          MR. ERMINE:  No objection.

13          THE COURT:  Government's Exhibit 10 shall be

14   admitted.

15          (THEREUPON; Government's Exhibit No. 10 was then

16   admitted into evidence by the Court.)

17          MS. PRATTEN:  And permission to play and publish

18   this to the Jury now?

19          THE COURT:  You may.

20   BY MS. PRATTEN:

21    Q    Okay.  And before we start this footage, we're almost

22   there, I just want to note, you have viewed this before,

23   right?

24    A    I have, yes.

25    Q    So these clips that we are viewing, it is not a smooth,

1    nice video that we are all going to watch, correct?

2    A    That's correct.

3    Q    Okay.  It's a bunch of clips that are essentially put

4    together?

5    A    Yes, ma'am.

6    Q    Okay.  And the timestamps that we are going to see -- is

7    there a timestamp on this?

8    A    I think it might be on the upper left corner, but I'm

9    not sure.

10   Q    Okay.  And the timestamps, do you have any knowledge as

11   to whether these timestamps are generally accurate?

12   A    That timestamps are -- there's an issue with the

13   timestamps where there is about 20 to 25 minute discrepancy.

14   Q    Okay.  What is actually going to show here is not

15   necessarily correct?

16   A    With the time, no.  It could be off.

17   Q    Okay.  And one more question, do you know remember what

18   the defendant was wearing that morning?

19   A    Bluejeans, and I don't know, I think he might have had a

20   coat on, I'm not sure.

21   Q    When you reviewed this video and we're about to play it

22   right now, can you go ahead and point out when you see the

23   defendant enter the scene?

24        (THEREUPON, Government's Exhibit 10 was published to

25   the Jury in open court.)

1    BY THE WITNESS:

2    A    Yes.

3    Q    And this video is this kind of panning the front of the

4    building?

5    A    Yes, ma'am.

6    Q    Going back and forth?

7    A    Yes.

8    Q    Is that 12th Street right there?

9    A    That is 12th street.

10   Q    Are those the vehicles that you were talking about?

11   A    Yes, ma'am.

12        I wasn't sure of that individual --

13   Q    Okay.  That individual that we just saw in the corner of

14   the scene right there?

15   A    Correct.  That's the individual right there.

16   Q    Okay.  Now, we saw him coming towards the building a

17   couple minutes ago, and right now we are clearly see him going

18   away.  I'm going to ask you, these are two actually separate

19   clips, correct?

20   A    Yes.

21   Q    So his encounter wasn't the five seconds we just seen

22   reflected in the video?

23   A    No.

24   Q    And what is he doing right now?

25   A    He is back at the vehicle I described and he was -- we

1    could hear yelling outside, but it wasn't really clear since

2    we were inside the lobby.

3    Q    Okay.  And that is him on 12th Street right now?

4    A    That's correct.

5    Q    Okay.  Now, he is going back towards the federal

6    building?

7    A    Yes, ma'am.

8    Q    Okay.  So this would have been prior to when you saw him

9    interact with FPS officers?

10    A    Yes, that was prior.

11         MS. PRATTEN:  Your Honor, I don't have any further

12    questions right now.

13         THE COURT:  Thank you.  Mr. Ermine, cross?

14              CROSS-EXAMINATION

15    BY MR. ERMINE:

16    Q    When Mr. Everett came into the lobby of the federal

17    building you testified he seemed confused?

18    A    Yes, I did.

19    Q    And you mentioned that he seemed angry?

20    A    Yes.

21    Q    And you mentioned that he had a bit of a -- kind of a

22    threatening demeanor about him?

23    A    Yes.

24    Q    Was he yelling in the lobby?

25    A    He wasn't screaming in the lobby, but he had his voice

1  raised.

2  Q    And he was cursing too, wasn't her?

3  A    Yes.

4  Q    Would you say that he was just generally acting

5  belligerent?

6  A    Yes, I would.

7  Q    And while he was in the lobby, he actually slapped

8  himself in the face, didn't her?

9  A    Yes.

10  Q    Based on you seeing all this happen, it was your opinion

11  that he was under the influence of drugs, wasn't it?

12  A    Under -- in my opinion, no normal person would act like

13  that so I would assume that he was under the influence of

14  something.

15  Q    Okay.  And that is because he appeared to be yelling for

16  no reason, right?

17  A    Yes.

18  Q    And he wasn't complying with the commands that you all

19  were giving him, right?

20  A    That's correct.

21  Q    And when you saw him at the vehicle even you saw him

22  throwing things out of the vehicle into the street, right?

23  A    Yes.

24  Q    And you actually saw him shouting curse words at

25  passersby in the street, didn't you?

1   A    I'm not sure if they were curse words, but he was

2   yelling.

3   Q    Yelling at passersby?

4   A    Yes.

5   Q    And he was just generally uncooperative with any

6   commands that you were giving him that day, wasn't he?

7   A    That is correct.

8   Q    You never actually saw him with a firearm that did, did

9   you?

10  A    No.

11          MR. ERMINE:  No further questions.

12          THE COURT:  Ms. Pratten, any redirect?

13          MS. PRATTEN:  Yes, your Honor.

14          Your Honor, may I have one moment, please.

15          THE COURT:  Yes.

16                  REDIRECT EXAMINATION

17  BY MS. PRATTEN:

18  Q    All right.  If we could, Ms. Beyer, reboot that clip one

19  more time, please.  Thank you.

20          And again, I'm going to walk you through again real

21  quick what this clip entails, because it's a little quick and

22  minus audio, of course.

23          Okay.  So is this the point at which the

24  defendant -- a few minutes.  Okay.  Is that the point in which

25  he arrived at the building?

1    A    Yes.

2    Q    Okay.  And how long in realtime -- I see -- that is the

3    defendant exiting right now, right?

4    A    That's correct.

5    Q    Approximately how long in realtime would you say that

6    encounter in the lobby was?

7    A    I would say it is was less than five minutes.

8    Q    Okay.  And then at this point that is where you saw him

9    enter that vehicle?

10   A    That's correct.

11   Q    And in realtime, how long do you think he was there?

12   A    At the vehicle he might have been there for about a

13   minute or two.

14   Q    Okay.  And this is the scene that you have described on

15   the street?

16   A    Yes.

17   Q    What can approximate what the timeframe for this is

18   about?

19   A    Maybe 30 seconds or so.

20   Q    Okay.  And then again at this point just to clarify, is

21   the point which he reapproaches the federal building, correct?

22   A    That's correct.

23   Q    Okay.

24        MS. PRATTEN:  I have nothing further, Your Honor.

25   Thank you.

1          THE COURT:  Any recross?

2                    RECROSS-EXAMINATION

3    BY MR. ERMINE:

4    Q    I would like to clarify something with you.  You just

5    testified that he was at that vehicle in this video for a

6    minute and a half?

7    A    At the vehicle for about a minute or so.

8    Q    During this clip that we are seeing here?  Is that what

9    your testimony is?

10   A    Yes.

11   Q    Now, isn't this just showing -- this is just speeding

12   forward one second at a time, this video, correct?

13   A    I'm not sure what the gap is.

14   Q    And you have watched this video before, right?

15   A    I have.

16   Q    And you have paid attention to it enough to notice that

17   the timestamp is off, correct?

18   A    That's correct.

19   Q    But the timestamp is just off in terms of -- it's not

20   connected with realtime.  For instance, if the video said 8:30

21   in the morning, it doesn't necessarily mean the video was

22   taken at 8:30 in the morning, correct?

23   A    That's correct.

24   Q    But the timestamp at the top left is correct insofar as

25   it is measuring the passage of time, right?

1   A    Yes.

2   Q    So if the video shows that he at the car and is jumping

3   one second at a time, and he is only there for about ten still

4   images, that would be a passage of about 10 seconds, would it

5   not?

6   A    I believe so.

7            MR. ERMINE:  Okay.  Nothing further.

8            THE COURT:  Thank you, officer.  You can step down.

9            Government call their next witness.

10           MR. ERMINE:  Yes, Your Honor.  The government will

11  call Officer Charles Schwarz.

12           THE COURT:  Officer, if you can come forward and

13  raise your right hand to be sworn.  Thank you.

14                       CHARLES SCHWARZ

15           Called as a witness on behalf of the PLAINTIFF, was

16  duly sworn, and testified as follows:

17           THE COURT:  You can have a seat right here.  Watch

18  your step as you go up.  Counsel.

19                     DIRECT EXAMINATION

20  BY MS. PRATTEN:

21  Q    Good morning.

22  A    Good morning.

23  Q    I'm sorry.  Good afternoon.

24  A    Good afternoon.

25  Q    Um, can you go ahead and state your name for the Court?

1    A    Charles Schwarz.

2    Q    And who is your employer?

3    A    Department of Homeland Security, Federal Protective

4    Service.

5    Q    Okay.  Federal Protective Service, that's a component of

6    Homeland Security?

7    A    Sub-component, yes, ma'am.

8    Q    Okay.  Sub-component.  And how long have you worked for

9    FPS?

10   A    Three and half years.

11   Q    And what is your job title?

12   A    My job title is inspector.

13   Q    Okay.  As an inspector for FPS, what kind of training

14   did you have to go through to become an inspector of FPS?

15   A    The initial training is six months in total down in

16   Glynco, Georgia, at the federal law enforcement training

17   center.  The first three months is the uniform and police

18   training program, which includes federal law, use of force,

19   um, weapons training, physical techniques and written and

20   practical exercises.

21   Q    Okay.  So you said initial.  So do you also have

22   additional training?

23   A    Yes, ma'am.

24   Q    Okay.  What kind of additional training do you have?

25   A    Add-on is three weeks of it's called advanced -- excuse

1    me.  Advanced individualized training program.  That is

2    roughly three weeks where we cover policies.  And then rest is

3    an additional month and week of physical security training

4    program.  Once we leave Glynco, we come back and we go through

5    a 12 week -- excuse me.  12 week -- sorry, I can't think of

6    the word.

7    Q    More training?

8    A    Yes, it is kind of like a ride along.  I just can't

9    think of the name right now.

10   Q    So it's like a practical like training?

11   A    Yes, ma'am.

12   Q    Okay.  Thank you.  And what are your actual duties of

13   your job?

14   A    It's a two part.  First part is law enforcement.  We

15   cover any government leased or owned facility by general

16   services administration.  And then the second part is physical

17   security.  We conduct assessments on those facilities, looking

18   at fences, barriers, cameras, IDS systems, and things like

19   that.

20   Q    So when you say you cover government buildings or

21   government leased buildings, what do you mean by cover.

22   A    We conduct patrols, we respond to calls, we -- if there

23   is a counter measure, i.e, cameras, we come and take a look,

24   and we get technicians to come out and repair those counter

25   measures.  We're able to write tickets, and we just patrol.

1    Q    Okay.  So any kind of emergency at any federal building

2    around Kansas City, that your job?

3    A    Yes, ma'am.

4    Q    Okay.  Now, your physical office, where's that located?

5    A    It's located 601 East 12th Street, Kansas City,

6    Missouri.

7    Q    Is that at the Richard Bolling Federal Building?

8    A    Yes, ma'am.

9    Q    About two or three blocks from here?

10   A    Yes, ma'am.

11   Q    Give or take?

12   A    Yes, ma'am.

13   Q    Okay.  But your duties, if I understand you right, when

14   you respond to these calls, you go to any of the federal

15   buildings?

16   A    Yes, ma'am.  I have a building as far as Independence,

17   Kansas.

18   Q    Okay.  Let's talk a little bit about the Bolling in

19   particular.  About how many floors would you say are in this

20   building?

21   A    18 floors.

22   Q    18 floors?  Okay.  We kind of population is housed in

23   this facility?

24   A    Roughly 3500.

25   Q    Okay.  Roughly 3500.  Of those 3500 people, who are

1  these people?

2  A    You have Social Security Administration, National

3  Oceanic Atmospheric Agency, there is Army Corps of Engineers,

4  you have a daycare on the first floor, two credit unions, a

5  cafeteria, a snack shop, federal protective service and other

6  government regulation.

7  Q    And when you are naming these different federal

8  agencies, do some of them, like the Social Security

9  Administration, do they occupy more than one floor?

10  A    Yes, ma'am.

11  Q    And you said there was a day care on the first floor?

12  A    Yes, ma'am.

13  Q    And you said there is a credit union on the first floor?

14  A    There is a credit union on the first floor and on the

15  ground floor?

16  Q    Okay.  So some of these floors, are they open to the

17  public?

18  A    Yes, ground and first floor.

19  Q    All right.  And which floor are you located on?

20  A    We are located on the second floor.

21  Q    Okay.  And a rough guess, and I know already said this,

22  but how many people do you think on an average workday, um,

23  around 8:30 or 9:00 in the morning, about how many people do

24  you think occupy that building?

25  A    Roughly about 3500.

1    Q    Okay.  And I'm gonna show you what has been previously

2    admitted as Government's Exhibit 4 which is an ariel view of

3    the federal building.  Well, I want to show you Government's

4    Exhibit 4.  Just give me one second.

5            While we are getting that figured out, can you go

6    ahead and tell me how many entrances are actually entrances

7    that the public can enter through in the federal building?

8    A    Two entrances.

9    Q    Two entrances?

10   A    One off of 12th Street and one off of 13th Street.

11   Q    Okay.  One off of 12th Street and one off of 13th

12   Street?

13   A    Yes, ma'am.

14   Q    And these entrances are they both monitored by PSO's?

15   A    Yes, ma'am.

16   Q    And we heard earlier these are contracted individuals

17   that provide entry check?

18   A    Yes, ma'am.

19   Q    Okay.  So let's focus on -- do you recall the morning of

20   March 10th, 2016?

21   A    Yes, ma'am.

22   Q    Okay.  We're going to focus in on that right now.  And

23   I've got up there now, if you want to take a look at it, that

24   is the Exhibit No. 4 that I was talking about.  Um, there is a

25   little pointer right in front of you.  And if you want to lean

1    forward a little bit.  Can you show the Jury where the 12th

2    Street entrance that you are just talking about is located?

3     A    Right there.

4     Q    Okay.  And where is the other entrance that the public

5    can access the building from?

6     A    Right here.

7     Q    Okay.  And what street would that be down there?

8     A    That would be 13th Street.

9     Q    Okay.  Thank you.  So back to the morning of

10   March 10th, 2016, do you recall what hours you worked that

11   day?

12    A    At the time I was working 8:00 AM to 4:00 PM.

13    Q    All right.  Around the 8:30, 9:00 o'clock window, did

14   you respond to a call service at the Richard Bolling Federal

15   Building?

16    A    Yes, ma'am.

17    Q    Okay.  Go ahead and tell the Jury how that call came in?

18    A    At around 8:30 in the morning the PSO's in the 12th

19   Street lobby got on the radio and radioed to Battle Creek Mega

20   Center, which is located in Battle Creek, Michigan.  That is

21   our dispatch center.  They radioed in that they had a

22   disruptive individual in the lobby.  At that time, myself,

23   Inspector Yaden, Inspector Wright, and Inspector Patterson all

24   radio that they would be responding to help them.  So we

25   responded to the lobby.

1    Q    Okay.  And you said at least two or three other people

2  were with you?

3    A    Yes, ma'am, three.

4    Q    And you said you responded to the 12th Street lobby?

5    A    Yes, ma'am.

6    Q    Okay.  Did you eventually when you responded come into

7  contact with an individual you later found out to James

8  Everett?

9    A    Yes, ma'am.

10   Q    Okay.  Is that individual in this courtroom?

11   A    Yes, ma'am.

12   Q    Can you go ahead and identify him with an article of

13  clothing that he is wearing?

14   A    Yes, ma'am.  He is sitting down with the blue top.

15        MS. PRATTEN:  Okay.  Let the record reflect the

16  witness has identified the defendant as the individual he came

17  into contact with that morning?

18        THE COURT:  The record will so reflect.

19  BY MS. PRATTEN:

20   Q    Okay.  Had you seen the defendant prior to that morning?

21   A    No, ma'am.

22   Q    Okay.  Is the first place in which you encountered him

23  the lobby?

24   A    No, ma'am.  He was actually -- when we arrived in the

25  lobby, he was not in the lobby.  The PSO's in the lobby

1  pointed out towards the street and said the individual at the

2  time was out by his vehicle.

3  Q    Okay.  And can you describe his demeanor when you first

4  encountered him?

5  A    When we first encountered him I will explain it as a

6  little faster than a walk, slower than a run.  Almost kind of

7  like a skip with his hands down by his side with his fists

8  clenched coming toward us.  He was yelling something and we

9  couldn't really make it out at the time.  He got to us and he

10  started to curse.  He was very, very upset at an unknown

11  reason.

12  Q    Okay.  So when you responded to the lobby, you and the

13  other officers get the information you need from the other

14  officers, you exit the lobby, and then the defendant

15  approached you?

16  A    Yes, ma'am.

17  Q    In the manner you described?

18  A    Yes, ma'am.

19  Q    Okay.  Did you hear him say anything?

20  A    He said that -- as we walked outside he said, I'll beat

21  your ass.  Something to the effect of that.  Something else in

22  the effect of, I'll knock your fucking head off.  We tried to

23  talk to him and it just didn't work.

24  Q    Um, and he is saying this as he is coming towards you?

25  A    Yes, ma'am.  He was standing around three feet away from

1   us at this time coming up to us.

2   Q    Okay.  How he approached you, can you describe the speed

3   with which he approached you?

4   A    Not a run, in between a run and a walk.  Almost as a

5   skipping.

6   Q    Okay.  What did the -- what did you and the officers do

7   in response to this?

8   A    At this time Inspector Wright tried to calm him down.

9   It didn't happen.  Inspector Wright then pulled his taser and

10  pointed it as Mr. Everett.  As Inspector Wright had the taser

11  pointed at Mr. Everett, Mr. Everett, said, oh, you're going to

12  shoot me now.  I'll fucking kill you.  Inspector Yaden moved

13  to the back side of Mr. Everett because Mr. Everett was

14  pointing all of his attention of Inspector Wright.  Inspector

15  Yaden grabbed both of Mr. Everett's arms and tried to hold

16  them behind him to place cuffs on him.  At that time, Mr.

17  Everett tightened his muscles at the shoulders and tried to

18  separate his arms.  At that time I grabbed Mr. Everett by the

19  front collarbone area of the sweatshirt, Inspector Wright

20  holstered his taser and grabbed Mr. Everett's arm and tried to

21  trip Mr. Everett to get him to the ground.  Mr. Everett

22  stepped over, he did not fall the first time, it took a second

23  attempt, and for me to pull forward to get Mr. Everett to the

24  ground.  Once Mr. Everett was to the ground, Inspector Wright

25  was able to gain control of Mr. Everett's arm.  Except for he

1   was grabbing at his front waistband and holding onto it.  So I

2   tried to help Inspector Wright pry his hand off of his front

3   waistband.  Finally, we were able to get his hand from his

4   front waistband and able to get him handcuffed.  At this time

5   I stood up and looked up and the Kansas City Police Department

6   was already on scene helping us keep his legs under control.

7   Once we got up, I stood up, I noticed that there was blood on

8   my hand so I tried to stay back away from Mr. Everett.

9   Q    And that was your blood?

10  A    Yes, ma'am.

11  Q    Okay.  I think you mentioned he was grabbing his

12  waistband?

13  A    Yes, ma'am.

14  Q    Okay.  And you specifically took other actions, you and

15  the other officers, in response to this particular action?

16  A    Yes, ma'am.

17  Q    And why is that?

18  A    We are taught in our initial training young violators or

19  weapon violators will hide weapons in the front waistband.

20  That is a common place where that is held.  So we try to keep

21  hands away from those areas.

22  Q    And then you mentioned KCPD officers responded to the

23  scene?

24  A    Yes, ma'am.want?

25  Q    Do you know how many?  More than one?

```
1    A    More than one.  I believe there were two.

2    Q    Okay.  And you said you did -- sorry.  Did you receive

3    injuries?  Was that what that blood was?

4    A    Yes, ma'am.  I had a cut on my finger.

5    Q    Okay.  You sought medical attention for those?

6    A    Yes, ma'am.

7    Q    Okay.  During this entire encounter with him, I believe

8    you said you came on duty at 8:00, right?

9    A    Yes, ma'am.

10   Q    And so when it happened you were in your official

11   capacity performing your official duties?

12   A    Yes, ma'am?

13   Q    And you didn't get off duty, did you, during the entire

14   encounter?

15   A    No, ma'am.

16   Q    Okay.

17        MS. PRATTEN:  Your Honor, can I have a moment,

18   please?

19        THE COURT:  Yes.

20        MS. PRATTEN:  I don't have any further questions at

21   this time.

22        THE COURT:  Mr. Ermine, cross?

23            CROSS-EXAMINATION

24   BY MR. ERMINE:

25   Q    Inspector or officer?
```

1    A    Inspector, sir.

2    Q    Inspector Schwarz, when you first encountered Mr.

3    Everett, you testified he seemed upset, correct?

4    A    Yes, sir.

5    Q    And he was yelling?

6    A    Yes, sir.

7    Q    And as far you could tell there was no reason for him to

8    be acting that way, correct?

9    A    Yes, sir.

10   Q    So as you testified ultimately Mr. Everett is taken to

11   the ground, at that point an ambulance is called an EMT shows

12   up, correct?

13   A    Yes, sir.

14   Q    And Mr. Everett actually ended up going to Truman

15   Medical Center, correct?

16   A    Yes, sir.

17   Q    And in case we have some jurors that are not familiar

18   with Kansas City, that is a fairly big hospital just a few

19   blocks south, south of here, correct?

20   A    Yes, sir.

21   Q    And you know that Mr. Everett went to Truman Medical

22   Center because you actually went to Truman Medical Center, not

23   with him, but you followed along afterward, correct?

24   A    Yes, sir.

25   Q    And you had another inspector go with you to Truman

1  Medical Center, correct?

2   A    Yes, sir.

3   Q    To be with Mr. Everett there?

4   A    Yes, sir.

5   Q    And when you got to Truman Medical Center you went to

6  Mr. Everett's room, correct?

7   A    I was just outside of Mr. Everett's room.

8   Q    Okay.  And so you actually saw Mr. Everett strapped to

9  the bed there at Truman?

10   A    Yes, sir.

11   Q    And they -- your understanding was they had done that

12  because he was acting aggressively with the staff, right?

13   A    Yes, sir.

14   Q    And he was even threatening the staff there, wasn't he?

15   A    Yes, sir.

16   Q    And he had threatened the hospital security there,

17  didn't he?

18   A    Yes, sir.

19   Q    He even threatened the doctor?

20   A    Yes, sir.

21   Q    Now, while you are there, you saw Mr. Everett be

22  sedated, didn't you?

23   A    I didn't see him get sedated.  I knew they went in to

24  sedate him.  But I did not physically see him get sedated.

25   Q    And so then you know -- do you know why they sedated

1    him?

2              MS. PRATTEN:  Objection, speculation, Your Honor.

3              THE COURT:  Overruled.

4    BY MR. ERMINE:

5    Q    I'm just asking do you have personal knowledge as to why

6    they were sedating him?

7    A    I don't.

8    Q    Okay.  Did you hear any doctors comment about why they

9    were sedating him?

10             MS. PRATTEN:  Objection, Your Honor.  Hearsay.

11             MR. ERMINE:  Present sense.

12             THE COURT:  What is your question again?

13             MR. ERMINE:  I'm asking him if he heard any doctors

14   comment about why they were sedating him.

15   BY THE WITNESS:

16   A    I believe it was to calm him down.

17   Q    Okay.  Did they, for example, say why they were calming

18   him down?

19             MR. ERMINE:  Objection, Your Honor.

20             THE COURT:  I'm going to sustain that as to hearsay,

21   I'm presuming?

22             MS. PRATTEN:  Yes, Your Honor.

23             MR. ERMINE:  It is present sense, Your Honor.  He is

24   hearing these statements be made, it is a contemporaneous

25   statement.

1          THE COURT:  I'll overrule the objection.  I'll allow

2     him to answer.

3     BY THE WITNESS:

4      A    My understanding was they thought he was in some type of

5     drugs?

6      Q    That's correct.

7          MR. ERMINE:  Nothing further, Your Honor.

8          THE COURT:  Ms. Pratten?

9          MS. PRATTEN:  No, Your Honor.  Thank you.

10          THE COURT:  Okay.  Thank you, Inspector.  You can

11     stand down.

12          United States call their next witness.

13          MR. MCCARTHER:  Yes, Your Honor.  The United States

14     calls FPS Inspector -- well, former FPS Instructor, David

15     Wright.

16          THE COURT:  Sir, if you want to come and you can

17     come round this way here, and I'll have my courtroom deputy

18     swear you in.

19                    DAVID WRIGHT

20          Called as a witness on behalf of the PLAINTIFF, was

21     duly sworn, and testified as follows:

22          THE COURT:  Thank you, sir.  You can have a seat

23     here.  Watch your step as you go up.  Counsel.

24                  DIRECT EXAMINATION

25     BY MR. MCCARTHER:

1    Q    Sir, could you please state your name for the Jury?

2    A    David Wright.

3    Q    Could you spell your last name, please?

4    A    W-R-I-G-H-T.

5    Q    And is you current occupation, sir?

6    A    I am a security specialist at USDA Department of

7    Agriculture.

8    Q    How long have you been in that position?

9    A    Approximately eight or nine months.

10    Q    What were you doing before you worked in that field?

11    A    I was an FPS inspector?

12    Q    And how long had you been in that role as an FPS

13    inspector?

14    A    A little over three years, sir.

15    Q    Were you an FPS inspector as of March 10, 2016?

16    A    Yes, I was, sir.

17    Q    As part of the FPS, what we're your duties and

18    responsibilities in that role?

19    A    Protection of federal property, federal buildings,

20    federal employees, law enforcement investigations, patrol,

21    stuff like that, sir.

22    Q    What type of crimes did you investigate in that role?

23    A    Thefts, assaults, vehicle damage, property damage.

24    Q    And this would all have to do with federal facilities,

25    is that fair to say?

1   A    Yes, sir.

2   Q    During your time with FPS, would investigating specific

3   individuals around the federal building be part of your

4   official duties with FPS?

5   A    Yes, it would, sir.

6   Q    Would investigating hostile individuals at the federal

7   building be part of your official duties at the FPS?

8   A    Yes.

9   Q    And would investigating hostile individuals demanding to

10  see federal judges be part of your official duties?

11  A    Yes, sir.

12  Q    Where is the headquarters for the FPS, where you worked?

13  A    It is at 601 East 12th Street.  Approximately three

14  blocks down from here.

15  Q    And is that in the Western District of Missouri?

16  A    Yes, that is, sir.

17  Q    Now, we have heard some testimony about that building,

18  there are about a dozen federal agencies in that building, is

19  that correct?

20  A    I believe it is over a dozen.

21  Q    There's a post office in there?

22  A    Yes.  There is a couple civilian businesses, a couple of

23  banks, a day care, but mostly federal agencies and federal

24  tenants.

25  Q    Is your role in conjunction with those agencies and the

1 people who frequent that building, is your role to safeguard

2 those people that go in and out of the building?

3 A    Yes, sir, on a daily basis.

4 Q    And to safeguard the people who actually work in that

5 building, is that correct?

6 A    Yes, sir, employees and visitors.

7 Q    I want to go to March 10th, of 2016, do you remember

8 that date, sir?

9 A    Yes, I do.

10 Q    Were you working on that date?

11 A    Yes, I was.

12 Q    At approximately 8:30 a.m. did anything unusual happen?

13 A    I was sitting at my desk just normal every day at times,

14 and then get a call over the radio, the Protective Security

15 Officer requesting FPS response at the 12th Street lobby.

16 Q    And what did you do in response?

17 A    Myself, Inspector Dave Yaden, Inspector Charles Schwarz,

18 and Wesley Patterson, we all went downstairs, we are located

19 on the second floor, we all go downstairs and proceed to the

20 lobby.

21 Q    Now, when you get to the lobby what did you observe?

22 A    The Protection Security Officers pointing outside

23 towards the KCPD headquarters saying, that's the guy, that's

24 the guy.

25 Q    And what did you know about that guy at that point?

1    A    Nothing at that time.

2    Q    And so what did you proceed at that point?

3    A    We go -- I can't remember who was first who was second,

4  I was third, and Inspector Wes Patterson was fourth.  We go

5  out the door and we start walking towards the street.

6    Q    And as you began walking towards the street did you see

7  anything unusual?

8    A    Yes, sir.

9    Q    What did you see?

10    A    I saw an individual acting very erratic.

11    Q    That individual, did you wind up having a confrontation

12  with him?

13    A    Yes, I did, sir.

14    Q    That individual, is he sitting in this courtroom today?

15    A    Yes, he is, sir.

16    Q    Could you describe what he is wearing and where he is

17  seated?

18    A    Long sleeve button up, I believe it is stripes.

19    Q    And is he sitting at defense counsel table?

20    A    Yes, he is.

21         MR. MCCARTHER:  Your Honor, may the record reflect

22  that the witness has identified the defendant, James Everett?

23         THE COURT:  The record will so reflect.

24  BY MR. MCCARTHER:

25    Q    Okay.  So as you see this individual in the street, what

1  is you and your fellow officers response?

2  A    Inspector Dave Yaden goes to my right, Inspector Charles

3  Schwarz goes to my left, and I continue to walk straight.

4  Q    Were you saying anything to the defendant?

5  A    I hadn't made contact at that time.

6  Q    Had anyone made contact at that time?

7  A    Inspector Dave Yaden, he was he trying to establish

8  contact?

9  Q    And what was he saying to try and establish contact?

10  A    Sir, hey sir, sir, calm down.  Things like that.

11  Q    And in response to Inspector Dave Yaden attempting to

12  contact Mr. Everett, what did Mr. Everett do in response?

13  A    He walked very fast towards us, throwing up his hands

14  and arms, just hollering, not -- couldn't really understand

15  him.

16  Q    Was there a point where you could understand what he was

17  saying?

18  A    He was pretty close.

19  Q    For instance, did he made any specific statements to you

20  and your officers?

21  A    Most of it was unclear but I did hear I'm going to knock

22  your fucking head off, I'm going to fuck you up.

23  Q    And in fact, did he also tell you that he was going to

24  kill you?

25  A    Don't know why, he came straight towards me and I was

1    trying to keep a -- there's a concrete post right beside that

2    hold up the five polls in front of the building.  I was trying

3    to keep that concrete post between me and Mr. Everetts.  And

4    he kind of jumped, lounged closing the distance, and that is

5    when I pulled out my taser.

6    Q    And why did you pull out your taser?

7    A    Because I thought -- I didn't know what he was doing,

8    but he was closing the distance, and I thought that he was

9    going to do something to me, assault me.

10   Q    So after you pulled out your taser did the defendant say

11   anything to you specifically?

12   A    He dropped his hands, everything just calmed down for a

13   second, and he said, I'm going to fucking kill you.

14   Q    Did you think he was trying to intimidate you?

15   A    Yes.

16   Q    Why do you think that?

17   A    Just his entire demeanor that morning.

18   Q    Let me ask you this, did you think he was serious when

19   he told you that?

20   A    Yes.

21   Q    Why did you think he was serious?

22   A    He was just displaying symptoms of emotional, uh,

23   emotional distressed persons.

24   Q    Did he look like maybe he was on drugs too?

25   A    I -- he was completely --

1   Q    I don't want you to speculate, but he wasn't acting

2   normally, right?

3   A    No, it was not normal behavior.

4   Q    And just to be clear when you -- when he said these

5   things to you and your fellow officers, were you on duty?

6   A    Yes, I was.

7   Q    Were you engaged in the performance of your official

8   duties?

9   A    Yes, I was.

10  Q    Would protecting yourself through the use of a taser be

11  a part of your official duties of an FPS officer?

12  A    Yes, it is, sir.

13  Q    So let's talk about the takedown.  Now, there came a

14  point where you had to take the defendant to the ground, is

15  that fair to say?

16  A    Yes, sir.

17  Q    Where you believed your safety was at risk, is that

18  right?

19  A    Yes, sir.

20  Q    And when did that point come?

21  A    After Mr. Everett dropped his hands and said he was

22  going to, you know, made that comment.  Inspector Dave Yaden

23  tackled him from behind, held him by his, pretty much upper

24  torso.  That is when I holstered my taser, never fired it,

25  Inspector Dave Yaden said handcuff him.  I grab my handcuffs.

1    I go to put the first cuff on his left wrist and that is when

2    the individual started violently resisting.

3    Q    Why was the decision made to place Mr. Everett in

4    handcuffs?

5    A    He threatened law enforcement officers.

6    Q    Did you attempt to take Mr. Everett down?

7    A    Yes, I did.

8    Q    Was it easy?

9    A    No, it was not.

10   Q    Why wasn't it easy?

11   A    It took two leg sweeps from me on his side.  Inspector

12   Dave Yaden trying to push him.  And Inspector Charles Schwarz

13   trying to drag him down.

14   Q    Did he eventually go down?

15   A    Yes.

16   Q    Now, while he is down do you have full control of his

17   arms?

18   A    I had control of his left arm.

19   Q    Did at any point Mr. Everett reach towards any part of

20   his body that made you think your safety might be at risk?

21   A    I had his left arm splayed out perpendicular to his

22   body.  I -- one of the few times I looked up and saw Inspector

23   Dave Yaden, I heard him say waistband, waistband.  That is a

24   big indicator of possible weapon.  And then I saw -- I was so

25   focused on just holding Mr. Everett's left arm down to keep

1    him pinned to the ground.  And all I heard, you know, I heard

2    waistband, and then I saw Detective Dave Yaden struggling

3    trying to get his arm away from the front of his body.

4    Q    Now, you testified you heard Inspector Yaden yell,

5    waistband, waistband, are you trained to try and -- are you

6    trained that a person that you are interacting with going to

7    the waistband is a danger to you?

8    A    Yes.

9    Q    Explain that training?

10   A    Individuals -- most of the time they will either --

11   according to our training, they will either conceal weapons in

12   their pockets or their waistbands.  So we have to control

13   their hands to limit the exposure to those areas.

14   Q    Now, was the defendant finally restrained?

15   A    Yes.

16   Q    And I believe some additional officers came to help you

17   out, is that correct?

18   A    It was two KCPD officers.

19   Q    And that would be KCPD Detectives, Bradley Bailey and

20   Anthony Watt, is that correct?

21   A    Yes.

22   Q    After -- and I'm sorry.  When I say restrained, he was

23   placed in the handcuffs, correct?

24   A    Yes.

25   Q    After he was placed in handcuffs, was he still

1  struggling?

2  A    Yes, he was.

3  Q    How was he struggling?

4  A    So I transferred his arm, his left-hand and wrist to his

5  back, we were able to handcuff him.  I stand up and noticed I

6  had some blood on my hand.  I'm standing, you know, I'm

7  standing overhead and then I hear a thumb sound.  And I look

8  and it is the suspect headbutting the concrete/brick patio.

9  Q    So at that point you think, okay, this guy is not acting

10  normal, right?

11  A    That is correct.

12  Q    And probably before that you thought that?  You thought

13  he might actually be on a drug, right?

14  A    I --

15  Q    Right.  And I certainly don't want you to speculate.

16  Did he also try to attack you and your fellow officers while

17  he was restrained on the ground?

18  A    Yes, after he headbutted the ground the first time, I

19  tried to put my hand on his forehead so he wouldn't do that

20  and he snapped at me or bit at my hand.

21  Q    Was he able to bite your hand?

22  A    No.

23  Q    Did he try and spit at you or any of your fellow

24  officers?

25  A    Yes.  He tried spitting on my hand and -- we later ended

1    up putting a spit hood on him.

2    Q    And a spit hood, just briefly explain that to the Jury.

3    What is that?

4    A    A spit hood is a see through hood, if an individual is

5    spitting, you don't want to limit the -- possible -- diseases

6    transferred through saliva.  EMS typically has them in their

7    vehicles, and they will put them on the hood -- or around the

8    head and then the neck.

9    Q    Were you injured in this struggle?

10   A    Yes.

11   Q    How were you injured?

12   A    Cut up or skinned my hand on the brick taking the

13   individual down.  And bruises and scrapes across my kneecaps

14   and my shins.

15   Q    Now, an ambulance was called for the defendant, is that

16   correct?

17   A    Yes, it is, sir.

18   Q    Why was an ambulance called for the defendant?

19   A    For his safety.

20   Q    And is that because it is standard protocol when you

21   think someone is on drugs?  That you take them to an ambulance

22   before you actually take them into law enforcement custody?

23   A    Yes, sir.

24   Q    I want to talk about surveillance footage.  Are there

25   surveillance cameras outside of the Richard Bolling Federal

1  Building?

2   A    Yes, sir.

3   Q    Were those cameras functioning the morning of March

4  10th, 2016?

5   A    Yes, they were, sir.

6   Q    Is anyone actively monitoring these cameras at any given

7  point?

8   A    Yes, sir.  There is a protective security officer, one

9  of the guards on the ground level.

10   Q    And so am I correct, and I believe I heard earlier,

11  typically the cameras are rotating back and forth, is that

12  fair to say?

13   A    They can be programmed to look at certain areas or

14  certain paths or certain times, turn and basically do a big

15  loop.

16   Q    But in any given point, a protective service officer can

17  take control of the camera and focus it on one point, is that

18  right?

19   A    Yes, sir.  You can manually override it.

20   Q    And was there surveillance footage from this incident in

21  question from March 10th, 2016?

22   A    Yes, sir.

23   Q    Have you reviewed the footage from that morning?

24   A    Yes, sir.

25          MR. MCCARTHER:  Your Honor, can I approach the

Denise Carroll Halasey CCR, CVR-CM

1    witness?

2            THE COURT:  You may.

3    BY MR. MCCARTHER:

4    Q    I'm handing you what has been previously marked as

5    Government Exhibit 11.  Do you recognize that?

6    A    Yes, I do, sir.

7    Q    And how do you recognize that?  That is footage you have

8    reviewed, correct?

9    A    Yes, sir.

10   Q    And is the footage on Exhibit 11, does that fairly and

11   accurately portray the events that took place on March 10th,

12   2016, at approximately 8:30 in the morning?

13   A    Yes, sir.

14           MR. MCCARTHER:  Your Honor, at this time I move for

15   admission of Exhibit 11 into evidence.

16           MR. ERMINE:  No objection, but I would request a

17   break before we publish it.

18           THE COURT:  Okay.

19           MR. ERMINE:  It's about 16 minutes of video.

20           THE COURT:  Counsel, approach.

21   (THEREUPON; Counsel approached the bench and the following

22   proceedings were held.)

23           THE COURT:  Do you need a bathroom break?

24           MR. ERMINE:  Yes, sir.

25           THE COURT:  Okay.  We'll do that.

1          MR. MCCARTHER:  Let's just do that.  I have more

2    questions after the surveillance video is played, so we should

3    just do it now and then I can play the video and then I can

4    ask the questions.

5          THE COURT:  Okay.  We'll take about 15 minutes.

6    (THEREUPON; The proceedings returned to open Court.)

7          THE COURT:  Ladies and gentlemen of the Jury, we are

8    going to our afternoon recess at this time.  We will take no

9    longer than 15 minutes.  When we return we will have a video

10   that will be played.  So with that said, we will break at this

11   time.

12   (THEREUPON, the following proceedings were adjourned.)

13            (Proceedings began at 4:25 PM)

14         THE COURT:  Okay.  Mr. McCarther.  And I will remind

15   the witness that you are still under oath.

16         MR. MCCARTHER:  Thank you, Judge.

17   BY MR. MCCARTHER:

18   Q    There is an important question I need to ask.  What were

19   you wearing that day when you confronted the defendant?

20   A    My FPS uniform.

21   Q    Now, did you see Inspector Charles Schwarz this morning?

22   A    Yes, I did.

23   Q    So what he was wearing would that have been the same

24   type of uniform you were wearing?

25   A    Yes, sir.

1    Q    And it says police across the front?

2    A    I believe, yes.  DHS police.

3    Q    And so is there anything about that uniform that would

4    lead any one to believe you were anything but a police officer

5    or a police inspector?

6    A    There is no way they can confuse that.

7           MR. MCCARTHER:  Your Honor, with your permission,

8    may I publish Exhibit 11 to the Jury?

9           THE COURT:  You may.

10          MR. MCCARTHER:  Thank you.

11          (THEREUPON; Government's Exhibit No. 11 was then

12   published to the Jury in open court.)

13   BY MR. MCCARTHER:

14   Q    Allyson, can you do me a favor and rewind it to the

15   beginning and then pause.  I don't believe I brought this up

16   during your direct examination, but now that I see the video,

17   the defendant was heading towards you such the point that you

18   had to back up, is that right?

19   A    Yes, sir.

20   Q    Why did you back up?

21   A    I wanted the distance away from the individual.

22   Q    And did you back up because it looked like he was coming

23   to actually attack you?

24   A    That's what I believed, sir.

25   Q    I'd like to play this again but just the first 30

1  seconds or so.  Okay.  Thank you, Allyson.  You can pause it.

2         Were you made away of the vehicle the defendant

3  drove to the location in?

4  A    It was during the part where I was holding his feet

5  down, that's when I first heard about it.

6  Q    Were you subsequently informed that a firearm was

7  discovered under the front seat of that car?

8  A    I was holding his foot down and I heard that.

9  Q    And in this clip we have right here, the defendant said

10 he was going to kill you, is that right?

11 A    Yes, sir.

12 Q    And defendant said something like, I'm going to blow

13 your head off?

14 A    I want to knock your head off.

15 Q    And while he was on the ground he was reaching towards

16 his waistband, is that your testimony?

17 A    Yes, sir.

18 Q    And there was a gun located in the car he drove there in

19 about 100 feet away, is that right?

20 A    About 100 feet.

21         MR. MCCARTHER:  Your Honor, I have no further

22 questions at this time.

23         THE COURT:  Thank you.  Mr. Ermine, cross.

24                CROSS-EXAMINATION

25 BY MR. ERMINE:

1    Q    Your office is located on the second floor of the

2    federal building or was at that time, was what was at the time

3    correct?

4    A    Yes, sir.

5    Q    And you got a call to come down to the lobby because

6    there was a guy acting very crazy down there, right?

7    A    I can't remember the exact call.

8    Q    Okay.  Ultimately you went down to the lobby and you

9    went outside, correct?

10   A    Yes, sir.

11   Q    And right when he saw you, he was yelling, right?

12   A    Yes, sir.

13   Q    And screaming profanity?

14   A    Yes.

15   Q    And as soon as he saw you he was muttering and yelling

16   threats, wasn't her?

17   A    Throwing his arms up, hollering and screaming.

18   Q    Okay.  Try as you might, he just would not be calmed

19   down, would he?

20   A    That is when Inspector Dave Yaden was trying to initiate

21   contact.

22   Q    Right.  And as we see here, that is when he was taken to

23   the ground, right?

24   A    When he went around those barriers kind of went for me.

25   Q    Right.  So when he is taken to the ground -- and we saw

1 on this video and I think you testified as well, he actually

2 slammed his forehead against the ground, didn't he?

3 A    Yes, he did, sir.

4 Q    He did that twice, didn't he?

5 A    I just recall the first one.

6 Q    I think the ground there is concrete, right?

7 A    Concrete/brick.

8 Q    Ultimately -- well, I should, now, when he was on the

9 ground and you testified that he was reaching for his

10 waistband, correct?

11 A    Yes, sir.

12 Q    There was no gun found in his waistband, was there?

13 A    No, sir.

14 Q    When the paramedics arrived as we see on this video, you

15 were still in close proximity to this whole thing, weren't

16 you?

17 A    Holding his feet, sir.

18 Q    Did you him threaten the paramedics that were on the

19 scene?

20 A    I don't recall the paramedics.

21 Q    Okay.  You wrote a report in this case, didn't you?

22 A    I'm sorry?

23 Q    You wrote a report in this case?

24 A    Yes, I did, sir.

25 Q    As part of your training -- we heard a little bit about

1    the training that the FPS officer go through.  Part of the

2    training is about report writing, isn't it?

3     A    Yes, sir.

4     Q    So one of the reasons that you want to write a report is

5    essentially what we are here for today, right?

6     A    Yes, sir.

7     Q    When you come testify you want to be able to remember

8    something that happen in this case over a year ago, right?

9     A    Yes, sir.

10         MR. ERMINE:  I'm not going to mark this because I

11   don't plan of admitting it.  Can I approach the witness and

12   show him this?

13         THE COURT:  Notwithstanding that, and I understand

14   that, why don't we mark it for purposes of the record.

15         MR. ERMINE:  I have a sticker handy and I will mark

16   this as Defendant's Exhibit No. 1.

17         THE COURT:  And it's typically consecutive.  So why

18   don't you mark that as Defendant's Exhibit 100.

19         MR. ERMINE:  Yes, Your Honor.  I'll mark this

20   Defendant's Exhibit 100.

21   BY MR. ERMINE:

22    Q    You testified just moments ago, you don't remember

23   whether he was threatening the paramedics that were there,

24   correct?

25    A    I do not recall if he did or didn't.

1    Q    Let me show you what I have marked as Defendant's

2    Exhibit 100.  Let me ask you first, does this appear to be the

3    report that you wrote?

4    A    Yes, it is.

5    Q    And so looking at this report does this report refresh

6    your recollection about whether he threatened and EMS that

7    were at the scene?

8    A    Yes, I wrote, "I then saw EMS arrive on scene.  Then

9    with a stretcher EMS was trying to talk to the suspect and he

10   tried to spit on EMS and making more verbal threats."

11             MR. ERMINE:  Nothing further, Your Honor.  Thank

12   you.

13             THE COURT:  Any redirect?

14             MR. MCCARTHER:  One moment, Your Honor.

15             THE COURT:  Okay.

16             MR. MCCARTHER:  Your Honor, I have no redirect.

17             THE COURT:  Okay.  Thank you, sir.  You can stand

18   down.

19             Ladies and gentlemen of the jury, it is about ten

20   till five and there is no use to attempting to put on another

21   witness.  With that said, we are going to adjourn for the

22   evening.

23             I will tell you we will start back up at 9:00

24   tomorrow.

25             With that said, the Court again reminds you of what

1    you were told at the first recess of the Court.  Until you

2    retire to consider your verdict you must not discuss this case

3    among yourselves or with others or permit anyone to discuss it

4    in your hearing.  You should not form or express any opinion

5    about the case until it is finally given to you decide.  Do

6    not do any research or investigation on your own about any

7    matter regarding this case or anyone involved with the trial.

8    Do not communicate with others about the case by any means.

9    Do not read, view, or listen to any newspaper, radio,

10    electronic communication from the Internet or television

11    report of the trial.

12           MS. BALDWIN:  All rise.  Court is in recess.

13    (THEREUPON, the following proceedings were adjourned.)

14

15                       <u>CERTIFICATE</u>

16

17           I certify that the foregoing is a correct transcript

18    from the record of the proceedings in the above-entitled

19    matter.

20

           August 11, 2017

21

22           <u>/s/ Denise C. Halasey</u>
              Denise C. Halasey, CCR, CVR-CM

23              United States Court Reporter

24

25

Case 4:16-cr-00110-BCW  Document 139  Filed 08/18/17  Page 102 of 103

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Denise Carroll Halasey CCR, CVR-CM