IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         ) No.  4:16-CR-00110-BCW-1
                               )      March 30, 2017
            v.                 )      Kansas City, Missouri
                               )      CRIMINAL
JAMES EVERETT,                 )
                               )
            Defendant.         )


JURY TRIAL TRANSCRIPT - DAY 2
VOLUME 2 OF 3
BEFORE THE HONORABLE BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic voice writing
Transcript produced by computer




APPEARANCES

For Plaintiff:        MR. JEFFREY QUINN MCCARTHER
                      United States Attorney's Office - KCMO
                      400 E. 9th Street, 5th Floor
                      Kansas City, Missouri 64106

                      MS. COURTNEY R. PRATTEN
                      United States Attorney's Office - KCMO
                      400 E. 9th Street, 5th Floor
                      Kansas City, Missouri 64106


For Defendant:        MR. WILLIAM ERMINE
                      Federal Public Defender's Office - KCMO
                      818 Grand Avenue
                      Kansas City, Missouri  64106

1                    I N D E X

2   Description:                                  Page:

3   Argument by counsel:                          4

4   Bradley Bailey
    Direct Examination by Ms. Pratten:           19
5   Cross-Examination by Mr. Ermine:             43
    Redirect Examination by Ms. Pratten:         57
6
    Anthony Watt
7   Direct Examination by Mr. McCarther:         59
    Cross-Examination by Mr. Ermine:             74
8
    Matthew Wilson
9   Direct Examination by Ms. Pratton:           75
    Cross-Examination by Mr. Ermine:             82
10
    Frank Rorabaugh
11  Direct Examination by Mr. McCarther:         84
    Cross-Examination by Mr. Ermine:             93
12  Redirect Examination by Mr. McCarther:       94

13  Travis Vas
    Direct Examination by Mr. McCarther:         95
14  Cross-Examination by Mr. Ermine:             104

15  United States Rests:                         110

16  Defense motion for directed verdict:         111

17  Defendant made aware of his rights:          114

18  Instructions Conference:                     117

19  Instructions read to the Jury:               131

20  Closing argument by Ms. Pratton:             132

21  Closing argument by Mr. Ermine:              141

22  Closing argument by Mr. McCarther:           151

23  Question by the Jury:                        157

24  Question by the Jury:                        159

25

1                    E X H I B I T S

2      Description                         OFF'D      ADM'D

3      Government's Exhibit No. 5, 6, 7, 8    35         35
       Government's Exhibit No. 1             38         38
4      Government's Exhibit No. 2, 3          42         42
       Government's Exhibit No. 9             82         82
5      Government's Exhibit No. 15            98         98
       Government's Exhibit No. 12, 13, 14   102        102
6      Government's Exhibit No. 16           109        109

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          March 30, 2017

2          THE COURT:  Just general questions I want to talk to

3     you about.  The intoxication defense you object to, but the

4     evidence seems clear that it should go.  Do you disagree?

5          MR. MCCARTHER:  I profoundly disagree.  The

6     threshold for the intoxication defense is incredibly high.

7     There must be evidence presented that the defendant -- that it

8     was impossible for him have to form this specific intent.  And

9     the Eighth Circuit case law that actually discusses the

10    intoxication defense --

11         THE COURT:  -- hold on.  Hold on.  You said that it

12    must be impossible for him -- I don't think the intoxication

13    says the defense says what you just said.

14         MR. MCCARTHER:  It does, Your Honor.

15         THE COURT:  Well, I know they use the word

16    impossible but I think they use it in another manner and not

17    the manner you suggest.  Do you have it in front of you?

18         MR. ERMINE:  I have a case that I think is relevant

19    to the question.  First of all, the underlying idea is that

20    trial judges should be liberal in permitting the defendant's

21    theory of defense to be explained to the Jury.

22         THE COURT:  Sure.

23         MR. ERMINE:  So that is kinda the ground work that

24    we're working with you.  This is a case called the United

25    States versus Faye, 668 F2d, 375.  This case is from 1981

1    actually.  And in this case it says a criminal defendant's

2    entitled to an instruction theory defense even where the

3    defendant didn't testify he was intoxicated, evidence can

4    support a finding that he was in fact intoxicated.  And as a

5    result there is a reasonable doubt that he lacked specific

6    intent to do bodily harm.  I think that we have to make a

7    threshold showing.  I think we have done it this point.  I

8    think we are doing more with the witnesses today that he was

9    intoxicated.  And then that is enough for it to go to the Jury

10   to answer the question.

11          THE COURT:  Yeah.  So when you say makes it

12   impossible for the defendant --

13          MR. MCCARTHER:  Yes.

14          THE COURT:  -- hold on.  Stop shaking your head

15   until I finish my thing.  The impossibility doesn't come, it

16   has some higher threshold that's impossible.  The

17   impossibility comes when the Jury says, well, it was

18   impossible for him to do it.  They'll make a determination

19   based on what they believe.  The argument is entitled it

20   seems, that, hey, there is no evidence that he was

21   intoxicated.  Yeah, he was doing strange bizarre behavior, but

22   I don't think that negates necessarily the Court giving the

23   instruction.

24          But anyway, I'll let you go now, Mr. McCarther.

25          SPEAKER3:  Thank you, Your Honor.  Your Honor, the

1  Eighth Circuit case -- the intoxication jury instructions

2  including the notes of use dictate that the defendant must

3  present evidence in fact that the defendant it was -- that it

4  would've been impossible --

5          THE COURT:  The defendant must present evidence?

6          MR. MCCARTHER:  That there must be evidence that

7  shows that it was impossible, in fact, for the defendant to

8  form the requisite intent.

9          THE COURT:  Hold on.  Let me stop.  It was

10  impossible for him.  So in order to give that you must show

11  that it was impossible for him.  What are you saying?  That

12  you're saying that it was impossible for the defendant to form

13  the requisite specific intent.  The evidence has to show that

14  it was impossible?

15          MR. MCCARTHER:  Yes.

16          THE COURT:  What I'm suggesting is -- well, you have

17  to have evidence of intoxication alcohol some heightened

18  state, and then the Jury would make a determination was it

19  impossible based upon the evidence that I heard.  Is that your

20  understanding, Mr. Ermine?

21          MR. ERMINE:  Yes, sir.

22          THE COURT:  Or are you just agreeing with me because

23  I'm on your side.

24          MR. MCCARTHER:  Your Honor --

25          THE COURT:  Okay.  So tell me how -- because the

1    notes on use even the instruction.  Being under the influence

2    of alcohol, drugs, provides the legal excuse for the

3    commission of a crime only if the affect of the drug makes it

4    impossible.  So that goes to the Jury to determine whether it

5    was a impossible or not based upon the relevant factor.  I

6    don't think -- and show me the case and I want to read it that

7    says the defense has to show it was impossible for him for me

8    to get -- then why would we give the instruction?  Because we

9    would already -- I would have made a determination that it was

10   impossible if I -- do you understand?  So if I determine it

11   was impossible than I say, I would direct you out because I'm

12   saying it was impossible.  That doesn't even go to the Jury.

13   That doesn't even make sense to me.

14        MR. MCCARTHER:  It, it -- here's how it makes sense.

15   The objection that I filed to the defendant's intoxication

16   instruction lists two Eighth Circuit cases where they say,

17   what we absolutely don't want is a jury to speculate as to

18   whether or not it would've been impossible, there must be

19   direct evidence that it would have been -- based on

20   intoxication that it would have been impossible to form the

21   specific intent.  And now what that essentially means -- and

22   the cases where this occurs we have testimony from the

23   defendant side, from doctors, experts.  In this case we are in

24   the theory of realm of speculation.  No one in this courtroom

25   can tell me whether Mr. Everett was on a narcotic.  What

1    narcotic it was and what amount, what effect that has on

2    defendant in regard to his memory. We're basically -- neither

3    Mr. Ermine or myself can tell the Jury, he took drugs. I have

4    no idea. I don't know what amounts. There is no expert

5    testimony. And in the cases you see where this intoxication

6    instruction is actually ruled on there is expert testimony or

7    the defendant himself testifies, yes, I took drugs, it had

8    this affect on me. There is no evidence in that case -- in

9    this case of that happening. Not to mention the fact there is

10    counter evidence that shows that he in fact remembers

11    everything that happened.

12        THE COURT: That's part of your lawyering, your

13    arguing and pled to the Jury that it's not impossible because

14    in fact this. The argument you made to me, I would suggest

15    it's the argument you make to the Jury. Here's why. That's

16    what I'm suggesting and let me hear from Mr. Ermine, because I

17    want to get going at 9:00. And I'll look at those cases

18    again, Mr. McCarther.

19        MR. ERMINE: Again, I don't think the case law quite

20    goes that far. I mean, I saw cases where the victim and like

21    an attempted rape case --

22        THE COURT: But what do you say about that? That

23    there is no evidence to suggest the impossibly of him -- I see

24    where Mr. McCarther is going. It seems a bit counterintuitive

25    in the instruction, but his argument is this, there's no

1    evidence to suggest that there is some impossibility because

2    we don't have anything here.  We don't have -- we don't know

3    what he took.  We know he is acting bizarre.  We know he is

4    doing bizarre things.  Know we did get that one statement in,

5    the hearsay thing I let in, the present sense impression.

6    What did they say in the hospital?  What did the doctor say?

7            MR. ERMINE:  That he was going to be sedated so he

8    could come down from the drugs that were in his system.

9            THE COURT:  Okay.  Drugs that were in his system?

10           MR. ERMINE:  Right.

11           THE COURT:  So even with that, Mr. McCarther can say

12   we know drugs in his system, we don't know them drugs did to

13   him, the affect that it had on him.

14           MR. ERMINE:  I don't think there is any burden on me

15   to prove specifically what drug was in his system.  I think we

16   are going to hear testimony today actually that based on

17   training and experience law enforcement who, you know, they

18   love to come in and testify based on their training and

19   experience about people being under the influence, they're

20   going testify consistently with that.

21           THE COURT:  Fair enough.  I know where we are at on

22   this.  You can make one last comment.

23           MR. MCCARTHER:  That statement by Inspector Schwarz

24   as to what the physician said was not for the truth of the

25   matter asserted.  If we remember there was a hearsay

1   objection, that got in under present sense impression.  So Mr.

2   Ermine cannot now use that for the fact of the defendant's

3   intoxication.  As of right now we have no factual evidence

4   that the defendant took drugs.

5              THE COURT:  There is evidence to suggest that a

6   reasonable person can determine when you have your witnesses

7   -- one of them but the other -- that he is clearly not at --

8              MR. MCCARTHER:  We have speculation, Your Honor.

9              THE COURT:  -- well, what is evidence?  That is what

10  juries do.  That's what I decided.  I mean, based on what your

11  reasoning, you're acting like it's not reasonable for anyone

12  in this case to expect this guy was higher than a kite.  I

13  don't know.  Reasonable people can disagree.  I don't think

14  every person would agree with your assessment of what is

15  coming.  I'm done arguing about it.  I'm going to read the

16  case law and I'm going to do it.  I'm done.  Now, I'm gonna

17  read the case law and I'm done.

18             Now, let's talk about why do you need a separate

19  instruction relevant to at or near present near the scene?

20  Isn't that part of the constructive possession?

21             MR. ERMINE:  Well, first of all I think that if it

22  were part of that constructive possession instruction that you

23  wouldn't see cases where court's have given that instruction

24  and it has been approved.

25             THE COURT:  Well, just because you've given it and

1      approved, I think there are a lot of things that I can give

2      that the Eighth Circuit will approve.  It doesn't make it

3      necessarily or make it necessarily right.

4              MR. ERMINE:  I have to agree with you.  But I think

5      that in terms of the defense with regard to the gun, I mean,

6      our theory of the defense is essentially they have to prove

7      more than simply he is present.  And you know, the government

8      has been teeing up their argument on that issue from the

9      outset through voir dire.  So I think that the Court giving an

10     instruction about -- it's an accurate statement of law, first

11     of all, so I think the Court giving an instruction that is an

12     accurate statement of the law is important.

13             THE COURT:  But if it's part of another instruction

14     -- just like the fact that he doesn't testify.  We don't set

15     that out.  It is language at the bottom of that.  We don't

16     have to put it in five different spots.  There is no need to.

17             MR. ERMINE:  Well, I think that constructive,

18     actual, it's a rather long instruction.

19             THE COURT:  Okay.  I'll take a look at it again.

20     I'm leaning that way.

21             Let me ask you again on this intoxication, even if I

22     did give it, and I'm not there yet, even if I did give it, why

23     would I give it singly?  Because intoxication goes to specific

24     intent.  The gun charge is not a specific intent.

25             MR. ERMINE:  Right.

1          THE COURT:  That can be general intent.  So that can

2     be confusing to a jury if we say this level of intoxication is

3     such.  If anything, I would add it as part of the one charge

4     and not the other.  And we have got to make it clear that this

5     intoxication would not relate to the gun charge which is a

6     different intent.  What you agree?

7          MR. ERMINE:  Right.  I completely agree.  The

8     instruction I submitted is tailored specifically to the Count

9     One.  I think it mentions Count One two or three times in

10     that.

11          THE COURT:  Okay.  I just want to make sure that

12     that doesn't confuse and apply to Count Two.

13          MR. ERMINE:  I agree.

14          THE COURT:  Otherwise I would put it at the end of

15     like the verdict director which is another issue in terms of

16     the elements.

17          MR. ERMINE:  I agree.  And in the instruction I

18     submitted on intoxication, I attempted to identify the element

19     that is specific intent.  So I intentionally took the Eighth

20     Circuit model and modified it to being specific to not only

21     that count, Count One, but the specific intent element.  So

22     the Court can take a look at that as well.

23          THE COURT:  And I'll tell you all other instructions

24     I modified just naturally to Eighth Circuit.  So I know you

25     submitted some, they are all modified to Eighth Circuit.  I

1   just go Eighth Circuit.

2          The last question that I'm leaning with the

3   government is the elements.  Yours are slightly different.

4          MR. ERMINE:  Well --

5          THE COURT:  I think the government is right.

6          MR. ERMINE:  I think they are wrong.

7          THE COURT:  Okay.

8          MR. ERMINE:  We don't actually disagree as to what

9   the elements are I don't think.  We disagree as to how the

10  Court should delineate the elements.

11         THE COURT:  Okay.

12         MR. ERMINE:  The reason why I suggested what I

13  suggested is, first of all there is a case from within this

14  circuit, it's a District Court case, where the elements were

15  set out in the way that I set them out.

16         THE COURT:  Who did that?

17         MR. ERMINE:  I think I want to say Idaho off the top

18  of my head.  I've cited it in my instruction.

19         The other reason why I think it is important kind of

20  gets to what you're saying about specific intent.  It helps to

21  delineate four elements instead of two because then you can

22  break out what is the element that requires the specific

23  intent.  So I feel like my instruction does a better job there

24  of setting those out so that we can isolate that element that

25  the Jury has to find.  And the government's element which well

1      -- several different things under element two.  So that is why

2      I have done it that way.

3              THE COURT:  Okay.  I think that's all I have.

4              MR. ERMINE:  I wanted to raise something with the

5      Court if I could?

6              THE COURT:  Relative to the instructions?

7              MR. ERMINE:  No.  Different.

8              THE COURT:  Okay.  So first, anything else with the

9      instruction?  I cut you off.  Tell me Mr. McCarther, I know

10     you were aching to say -- tell me.  I think you would go back

11     to intoxication.

12             MR. MCCARTHER:  And I can comment on both

13     instructions but regarding the intoxication instruction, there

14     is authority out of this district from a January 2016, United

15     States versus Michael Garrett, that was a Judge Ketchmark

16     case, in which the defendant wanted the intoxication

17     instruction and the evidence was overwhelmingly stronger in

18     that case.  The defendant actually had people come in and

19     testify as to the prescription drugs the defendant was taking.

20     Other witness who could -- other witnesses for the defense who

21     could testify as to his state the night in which the incident

22     occurred, and the judge in that case determined there was too

23     much speculation, there was not enough hard evidence of the

24     exact drugs and what amounts --

25             THE COURT:  Did that case come down from the Eighth

1   Circuit?

2           MR. MCCARTHER:  No, that case was not.

3           THE COURT:  Am I bound by Judge Ketchmark?

4           MR. MCCARTHER:  You are not.

5           THE COURT:  Okay.

6           MR. MCCARTHER:  I would just say as persuasive

7   authority there is a case out of this district.

8           THE COURT:  Do the element one.

9           MR. MCCARTHER:  Right.  Instruction with Count One.

10  The instruction that I submitted to the Court comes straight

11  out of the only published set of criminal jury instruction

12  that had this specific offense delineated.  And that was out

13  of the district of South Carolina that publishes their own set

14  of jury instructions.  It's gone over by all of their District

15  Court judges, federal practitioners in their circuit, and so I

16  listed that one because that is the one that has been looked

17  over by numerous practitioners and approved.  And so that's

18  the one I submitted.

19          I am not familiar with this one from the district of

20  Idaho, but I am much more comfortable going with one that has

21  been approved and published by the district of South Carolina.

22          THE COURT:  What circuit is District of Idaho?  Do

23  you know?  Is that Ninth?

24          MR. MCCARTHER:  The Ninth.

25          THE COURT:  What circuit is South Carolina?

1        MR. MCCARTHER:  Fourth.

2        THE COURT:  Okay.  Not that that matters.  I was

3    just curious.  Thank you all I appreciate it.  And I look at

4    that intoxication because you do bring that nuance argument

5    that I didn't have.  So I will look at the impossibility

6    element of that.

7        MR. MCCARTHER:  Thank you, Your Honor.

8        MR. ERMINE:  Just one brief thing.

9        THE COURT:  Yes.

10        MR. ERMINE:  With regard to these phone calls,

11    Mr. Everett has asked me to -- in light of the Court's ruling

12    yesterday, has asked me to ask the Court to consider prior to

13    the government playing these phone calls to review them en

14    camera to decide whether they are unduly prejudicial.  Whether

15    they are probative of some fact and to make a ruling on the

16    phone calls or I should say the clips of the phone calls prior

17    to them be played for the Jury.  I would ask the Court to

18    consider reviewing that evidence before it comes in front of

19    the Jury to make sure that the Court is satisfied that there

20    not unduly prejudicial or actually probative.

21        THE COURT:  Well, I thought I was satisfied in light

22    of what you asked the Court to review, and what the Court

23    ruled, I ruled according.

24        MR. ERMINE:  Well, yes, sir.  And I understand that

25    and I appreciate that.

1          THE COURT:  It's like taking every bit of evidence

2     and making some en camera.  Everything actually evidence is

3     always prejudicial to your client.  The question is is it

4     over, you know, what particular would you like me?  I'm not

5     going to sit and just view a video tape.  I think you have

6     articulated, I think I sustained a couple of objections.  I

7     overruled and allowed other things to come in.  I don't know.

8     If there is something specific I think you make the argument

9     and the Court might look at that.  But what I'm not going to

10    do is just go in the back room right and just look over.

11    Target me with something or identify something.

12         MR. MCCARTHER:  Your Honor, I would, I would simply

13    note that defense counsel has had the calls for quite some

14    time.  Especially the ones that we were going to play.  We

15    have actually discussed between ourselves which portions of

16    these calls we felt were relevant which I clipped out.  In

17    fact, the call that we referenced yesterday has already been

18    edited and we have it ready to play.  What I would note is

19    opening statements have already been made.  I have discussed

20    the calls and the content of those calls.  So for those to

21    suddenly be ruled -- I understand that Mr. Ermine is doing

22    this on behalf of his client because his client is pushing for

23    this, but I would say this is rather unfair to the prosecution

24    now that I have made promises to the Jury regarding those

25    calls to suddenly pull them away for a ruling that the

1  defendant has -- it's gonna hurt him in some way.

2          THE COURT:  Let me tell you what -- what is that?

3  Are you going to read something to me.

4          MR. ERMINE:  And really I think I'm talking about

5  the stuff the government referenced in opening statements

6  frankly.  There are going to be statements in some of these

7  calls where he says things like, I'm going to have to bite

8  this bullet I shot to myself.  So there are --

9          THE COURT:  -- we talked about those yesterday and I

10  considered them.  And I overruled your objection and I allowed

11  them to do it.  If that's one I think the Court ruled on that

12  yesterday.  The record will be clear.  What's another?

13          MR. ERMINE:  And I think the government has excised

14  based on the ruling yesterday any comments about the amount of

15  time that he might be looking to serve, correct?

16          MR. MCCARTHER:  I have done that.

17          THE COURT:  That is out.

18          MR. ERMINE:  Okay.  That being the case I'll just

19  say -- I'll renew my suggestion that the Court review en

20  camera.  I understand the Court is not likely to grant that.

21          THE COURT:  Okay.  Duly noted.  Well, at least from

22  what I heard I went over those and we did it in court

23  yesterday.  Okay.  We're going to get the Jury up as quickly

24  as we can.

25          Are you guys ready to go?  Mr. McCarther?

1         MR. MCCARTHER:  Yes, Your Honor.

2         THE COURT:  Mr. Ermine?

3         MR. ERMINE:  Yes, Your Honor.

4         THE COURT:  Okay.

5    (THEREUPON, the jury enters the courtroom; WHEREUPON, the

6    following proceedings were had in the presence of the jury.)

7         THE COURT:  Good morning all.  We'll get going this

8    morning.

9         Government call their next witness.

10        MS. PRATTEN:  Your Honor, the government calls

11   Kansas City Police Detective Bradley Bailey to the stand.

12        THE COURT:  Detective, if you want to come around

13   this way, sir.  I'm going to have you stop right there and

14   turn to my courtroom deputy and raise your right-hand and be

15   sworn.

16                      BRADLEY BAILEY

17        Called as a witness on behalf of the PLAINTIFF, was

18   duly sworn, and testified as follows:

19        THE COURT:  Thank you, Detective, you could have a

20   seat right here.  Watch your step.  Counsel.

21                   DIRECT EXAMINATION

22   BY MS. PRATTEN:

23    Q    Good morning.

24    A    Good morning.

25    Q    Can you go ahead and state your name for the record?

1    A    Bradley Bailey.

2    Q    And where are you employed?

3    A    Kansas City Police Department.

4    Q    And how long have you been with Kansas City Police

5    Department?

6    A    A little over seven years.

7    Q    And what unit are you currently in?

8    A    Currently I'm assigned to our violent crimes gang squad

9    within our violent crimes enforcement division.

10   Q    How long have you been assigned to that squad?

11   A    Assigned to the squad approximately eight months.

12   Q    Okay.  In that particular unit?

13   A    A little -- about two and a half years.

14   Q    Okay.  So what are your duties as a member of that unit?

15   A    Primarily to collect, analysis, and disseminate

16   intelligence information to our Police Department and other

17   agencies, as well as the identification apprehension of

18   subjects involved in violent crimes.

19   Q    What kind of initial training did you undergo to become

20   a Kansas City Police Officer?

21   A    All sworn officers for our department are required to

22   complete about seven and a half months of academy training.

23   Which consists of training in various fields and in

24   disciplines such as legal, and law application, driving,

25   defensive tactics, firearms, and other criminal justice topics

1  and subjects.

2  Q    Okay.  And do you undergo annual training as well?

3  A    Yes, we do.

4  Q    Can you go ahead and tell us just a little bit about

5  that?

6  A    All department members are required to complete annual

7  refresher training which last approximately two to three days

8  and it gives updates on various topics such as changes in laws

9  as well as remedial training on firearms, defensive tactics,

10  and other topics.  We're also required to qualify on our

11  firearms, depending on what firearms are carried, at least two

12  times a year.

13  Q    And what is the topic defensive tactics?

14  A    Essentially control techniques for fiscal

15  confrontations, handgun retention, ground fighting, and things

16  of that nature.

17  Q    Okay.  On March 10, 2016, were you a member of that

18  unit -- I'm sorry.  You said the violent crimes enforcement?

19  A    Yes, I was.

20  Q    And what was your -- what is usual shift right now?

21  A    Currently is 7:30 to 3:30 in the afternoon.

22  Q    Is that what it was back on March 10, 2016?

23  A    Yes, it was.

24  Q    Were on duty that day?

25  A    Yes, I was.

1    Q    Okay.  Between the hours of 8:30 and 9:00 a.m. of March

2    10, did you find yourself in the vicinity of the Richard

3    Bolling Federal Building?

4    A    I did.

5    Q    Where were you?

6    A    I was next door at the Jackson County courthouse at 415

7    East 12th Street.

8    Q    Okay.  Were you -- about that time were you outside the

9    courthouse?

10    A    Yes.

11    Q    Okay.  So you could -- could you see the Bolling

12    Building from where you were standing?

13    A    Yes.

14    Q    And were you alone?

15    A    No, I was not.

16    Q    Who was with you?

17    A    My partner at the time, Detective Anthony Watt.

18    Q    Was he a member of the same unit?

19    A    Yes, he was.

20    Q    Okay.  What were you guys doing at that time?

21    A    We were walking from the courthouse where our office was

22    at that time to our patrol vehicle which was parked on Locust

23    Street between the courthouse and Richard Bolling Federal

24    Building.

25    Q    Okay.  And did you encounter anything unusual as you

1  were walking towards your vehicle?

2  A    Yes, we did.

3  Q    What did you encounter?

4  A    As we approached our vehicle as I said it was is parked

5  on Locust, our attention was directed to a black male subject

6  that we overheard screaming and yelling and observed running

7  around in the street a long 12th Street just east of Locust.

8  Q    So you heard him yelling?

9  A    First we heard him yelling, it got our attention, it was

10 loud yelling and screaming to make out various words of

11 profanity.  And once we observed the subject we observed him

12 to be acting erratically, waving his arms around, running

13 about in the street.

14 Q    Is that individual that you are referring to, is he

15 sitting here in the courtroom today?

16 A    Yes, he is.

17 Q    Can you please point him out and describe him by listing

18 an article of clothing he is wearing?

19 A    At the table behind you, wearing a light green shirt,

20 black male with a short haircut.

21        MS. PRATTEN:  Your Honor, can the record please

22 reflect that the witness identified the defendant as the

23 individual that he observed that morning?

24        THE COURT:  The record will so reflect.

25 BY MS. PRATTEN:

1    Q    So you mentioned that he was yelling and screaming in

2    the middle of the street?

3    A    Yes.

4    Q    Did he appear to be directing these comments to any one

5    in particular?

6    A    From our vantage point from where we were at, we were

7    unable to determine that at the time.

8    Q    Okay.  And what did you -- did you say you and Detective

9    Watt?

10    A    Yes.

11    Q    Okay.  What did you and Detective Watt do in response of

12    your observations of the defendant?

13    A    Based on our observations we weren't sure if the subject

14    was involved in some sort of a disturbance or another issue

15    was going on.  We were a short distance away and as we were

16    kind of monitoring visually the subject, we observed him to be

17    walking east towards the front entrance of the federal

18    building.  At that time we got inside our patrol vehicle and

19    drove north on Locust Street and turned right on 12th Street

20    to see if we could again maintain or obtain visual contact of

21    the subject.

22    Q    So you're walking from the courthouse to your patrol

23    vehicle and you see him -- would it be accurate to say a

24    little bit north of where you are sitting?

25    A    Yes, just to the north and to the east.

1  Q    Okay.  And then you see him start to head towards the

2  entrance of the federal building on 12th Street?

3  A    Yes, to the east on foot.

4  Q    So both of you get in your patrol vehicle and

5  essentially just turn the corner?

6  A    Yes.  We were probably about 40 to 50 yards south of the

7  intersection of 12th Street where we were parked.  We drove to

8  the intersection in the east direction of where we observed

9  the subject walking.

10  Q    Okay.  So from the time you initially saw him and

11  getting in your car, and then did you see him again after

12  that?

13  A    Yes, we did.

14  Q    Did you briefly lose sight of him while you guys were

15  getting into your patrol vehicle and turning the corner?

16  A    Yes, we did.

17  Q    Okay.  So what did you -- where did you park at that

18  point?

19  A    After we turned on to 12th Street we proceeded east,

20  roughly about 7500 yards, directly between our police

21  headquarters and the Richard Bolling Federal Building.  As we

22  are looking around for the individual I observed him walking

23  wests towards the front doors of the federal building.  We

24  parked our car just west of where we could be parallel with

25  the front door of the federal building facing east on 12th

1   Street.

2   Q    So were you in your patrol vehicle when you observed him

3   walking aggressively?

4   A    Yes.

5   Q    Okay.  And what about his demeanor gave you the

6   indication that he was walking aggressively?

7   A    He appeared to be swinging his arms in a very active

8   manner.  Still waving his arms and as we opened our window to

9   confirm that that was the male based on the description we'd

10  seen, again, we heard him yelling and screaming.

11  Q    Were you able to distinguish what he was yelling and

12  screaming?

13  A    Just loud inaudible comments at that point.  Various

14  words of profanity.  I don't recall specifically which words

15  were being said, but it was very apparent that the subject was

16  agitated for some reason.

17  Q    Okay. Was he yelling and screaming at that point at

18  anyone in particular?

19  A    We observed him as he was walking towards the front door

20  of the federal building, we saw him come in contact with four

21  uniformed Department of Homeland Security Federal Protective

22  Service Officers who were standing just outside the entrance.

23  Q    Okay.  You say uniform.  So can I take you to literally

24  mean that they were in some sort of uniform?

25  A    Yes, they were.

1    Q    Readily identifiable as law enforcement officers?

2    A    Yes, they were.

3    Q    Did you know these guys?

4    A    No.

5    Q    You just could tell?

6    A    Yes, they were wearing dark blue uniforms with law

7    enforcement style bullet resistant vests with Department of

8    Homeland Security and police markings on them.

9    Q    Okay.  So not members of KCPD, like you?

10   A    Correct.

11   Q    Okay.  Go ahead and describe the interactions that you

12   saw him take with regard to these officers?

13   A    While the officers were speaking with him, at that point

14   we had exited our patrol vehicle to again determine what was

15   going on with the subject.  As we were walking towards the

16   officers we continued to hear the subject yelling and

17   screaming.  The officers were telling him to calm down.  Still

18   continued more inaudible comments made by the subject.  At

19   that point as we were continuing to walk towards him on the

20   sidewalk area, I observed at least one of the officers tell

21   him to place his hands behind his back and move behind him to

22   do such.  While they are trying to maintain physical control

23   of him and place him in handcuffs, the male started to

24   physically resist their movements at which time a physical

25   struggle ensued, and they escorted him to the ground using

1    defensive tactics control techniques.

2    Q    Okay.  Did you ever have physical contact with him?

3    A    Yes, I did.

4    Q    Okay.  Did detective Watt ever have physical contact

5    with him?

6    A    Yes, he did.

7    Q    Can you tell the Jury about how you and Detective Watt

8    ended up being involved in this?

9    A    Yes.  As I stated as we were walking towards the FPS

10   officers and the subject, we observed the physical

11   confrontation --

12   Q    I'm sorry, were you walking at a normal pace?

13   A    Yes, at that point we were walking.

14   Q    Okay.  Kind of getting a feel of what is going on before

15   you decide to jump in?

16   A    Yes.

17   Q    And I'm sorry.  Please go on.

18   A    And they escorted the subject to the ground.  We ran up

19   to assist in physically controlling the male.  As we were

20   approaching the male was continuing to scream.  Refusing to

21   place his hands behind his back.  He was kicking his feet

22   around.  He continued to refuse to place his hands behind his

23   back.  At that point Detective Watt and I maintained control

24   of the subject's feet while the FPS officer placed him in

25   handcuffs.

1    Q    Okay.  And why were you guys doing this?

2    A    To physically assist them in maintaining control of the

3    suspect as they placed him in handcuffs based on his physical

4    and resisted demeanor.

5    Q    Okay.  Are you aware whether any one was injured in this

6    physical altercation?

7    A    I was not aware of any injuries.

8    Q    Okay.  But you were actually involved in this struggle?

9    A    Yes, I was.

10   Q    Actively involved in a fluid situation?

11   A    Yes.

12   Q    So it doesn't necessarily mean that no one was injured?

13   A    Correct.

14   Q    And ultimately the defendant ended up being transported

15   away from the scene, correct?

16   A    Yes.

17   Q    Did you see this?

18   A    Yes, I did.

19   Q    Okay.  Um, how did he leave the scene?

20   A    Via Kansas City Fire Department ambulance.

21   Q    Okay.  So someone called the ambulance?

22   A    Yes, I did.

23   Q    You called the ambulance?

24   A    Yes.

25   Q    Okay.  And why did you call for an ambulance?

1    A    Based on our previous observations of the subject, the

2    demeanor, state of mind, as well as his actions in contact

3    with him, both physically and as I said as his demeanor.  They

4    resembled behaviors consistent with someone under the

5    influence of either alcohol or an unknown substance, possibly

6    narcotics or to be having similar behaviors of someone under

7    mental distress.

8    Q    And you didn't actually see him ingest any narcotics?

9    A    No, I did not?

10   Q    Were you able to observe -- I guess, since you saw him

11   taken away by an ambulance, were you able to observe his

12   interactions with the emergency medical personnel?

13   A    Yes, I was.

14   Q    Okay.  Can you describe what you saw in regard to his

15   interactions?

16   A    Yes.  Based on his behavior at the scene he was

17   continuing to scream and shout.  He was also spitting saliva

18   at the scene.  A cloth protective spit mask, if you call it,

19   was placed on him for protective reasons for all the parties

20   involved.  After he had been placed on the stretcher to be

21   transported for an evaluation he had to be physically

22   restrained on the stretcher.  He continued to shout and scream

23   and make attempts to spit which were prohibited by the mask,

24   he was still shouting and cursing and yelling all the way to

25   and inside the ambulance.

1    Q    Okay.  And after he left the scene you actually remained

2    there, right?

3    A    I did.

4    Q    Okay.  And you were involved with the towing of the

5    vehicle, right?

6    A    Yes, I was.

7    Q    Did you actually call in the tow?

8    A    Yes.

9    Q    And where was this vehicle?

10    A    The vehicle was parked on 12th Street on the South curb

11    just to the west of where the front door of the federal

12    building is.  This area is directly between the federal

13    building and Kansas City Missouri Police headquarters, and has

14    clear posted signs stating that it is emergency vehicle

15    parking only?

16    Q    Okay.  And what vehicle was this?

17    A    A silver Dodge Caliber Sedan.

18    Q    Um, why did you end up towing this vehicle from the

19    scene or calling a tow I should say?

20    A    The vehicle was illegally parked in a clearly posted

21    area, and believed to be an abandoned.

22    Q    Did you have reason to believe that it was associated

23    with the defendant.

24    A    Yes, I did.

25    Q    And since he was gone, you didn't see any one else that

1  was going to take this vehicle?

2  A    No.

3  Q    Was this done pretty much immediately after he left the

4  scene?

5  A    Shortly thereafter, yes.

6  Q    Why the speed?

7  A    Based on where the vehicle was parked, it was

8  prohibiting access to other emergency vehicles who may need to

9  arrive or park in the area being at either building or other

10 emergency responded vehicles.

11 Q    Okay.  Were you able -- sorry.  Prior to it towing, what

12 is the next -- you call and you tow, what is the next step you

13 do when you are trying to remove a vehicle?

14 A    We complete a parking violation citation for the

15 vehicle, as I said, due to it being illegally parked, at that

16 point we had to order the tow for the vehicle, and conduct an

17 inventory search of the vehicles contents in accordance with

18 our department towing policy.

19 Q    And why do you do an inventory?

20 A    Essentially to determine if there is any contraband or

21 items of investigated nature within the vehicle.  As well as

22 to document any personal property of the owner or the driver

23 or the occupants that is inside the vehicle.  That information

24 is recorded on our towing sheet which is a department report

25 that is on file at the tow lot as well.  Essentially, all

1   contents are recorded on that form to verify any follow up

2   with the owner occupants claiming that items may or may not be

3   inside the vehicle when it was towed.  It is a written record.

4   Q    Okay.  And were you able to determine at any point who

5   the vehicle was registered to?

6   A    Yes, we were.

7   Q    Who did you determine it was registered to.

8   A    The Missouri temporary tag that was on the vehicle was

9   registered to a Tiara Gray with an address of Kansas City,

10  Missouri, of 2063 East 37th Street.

11  Q    You didn't see Ms. Gray in the facility?

12  A    No.  From the time we arrived on scene until the time

13  the vehicle was towed, no other persons arrived at the vehicle

14  or in the area claiming to mention to of ownership or no

15  contact at the scene was made with Ms. Gray.

16  Q    Okay.  So let's go back to this inventory of the

17  contents.  Did you find anything of as you said investigative

18  interest as you were conducting the inventory?

19  A    Yes, we did.

20  Q    What did you find?

21  A    As we started the inventory search of the interior of

22  the vehicle we discovered a silver and black handgun

23  underneath the driver's seat of the vehicle.

24  Q    Okay.  What did you do with it once you found it?

25  A    The handgun was removed from the vehicle and secured for

1  safety purposes.  It was found to have one round in the

2  chamber as well as additional rounds in the magazine of the

3  weapon.

4  Q    Okay.  And what did you do with it after you secured it?

5  A    At that point we placed it in a brown paper property bag

6  and secured it in the trunk of our patrol vehicle.

7  Q    Okay.  And is that to preserve for evidentiary purposes?

8  A    It could be, yes.

9  Q    I'm going to ask you, there is a stack of papers right

10  next to you and I'm going to ask you to pick that up.  Can you

11  flip through and please find what is marked on the bottom on a

12  little label as Government's Exhibit 5 through 8?  Can you

13  take a look at those and tell me what they are?

14        First of all, are those photographs?

15  A    Yes, they are.

16  Q    Did you take them?

17  A    Yes, I did.

18  Q    So you are familiar with the objects that are detailed

19  therein?

20  A    Yes, I am.

21  Q    And are those photographs a fair and accurate

22  depiction -- what are they a depiction of?

23  A    The photographs are of the Ruger firearm that we

24  recovered from inside the vehicle.

25  Q    Okay.  Is it a fair and accurate depiction of that

1  Ruger?

2  A    Yes.

3  Q    That was recovered from the vehicle that you ultimately

4  towed that day?

5  A    Yes.

6        MS. PRATTEN:  I move to admit into evidence what has

7  been marked as Government's Exhibit 5 through 8, Your Honor.

8        MR. ERMINE:  Your Honor, can we approach?

9        THE COURT:  Yes.

10 (THEREUPON; Counsel approached the bench and the following

11 proceedings were held.)

12        THE COURT:

13        MR. ERMINE:  I'm going to object to the photos just

14 for purposes of the record based on our motion to suppress.

15        THE COURT:  Okay.

16        MR. ERMINE:  Just for purposes of the record.  I'm

17 objecting to the admission of the photos.

18        THE COURT:  Thank you.

19 (THEREUPON; The proceedings returned to open Court.)

20        THE COURT:  Government's Exhibit 5, 6, 7, and 8 will

21 be admitted.

22        MS. PRATTEN:  Permission to publish, Your Honor?

23        THE COURT:  You may.

24        (THEREUPON; Government's Exhibit Nos. 5, 6, 7, and 8

25 were then admitted into evidence by the Court.)

BY MS. PRATTEN:

1   Q    Okay.  I'm going to place on here what has been marked

2   as Government's Exhibit 5 first?

3   A    Okay.

4   Q    Marked and admitted.  Can you go ahead and describe what

5   is in this photograph?

6   A    Yes, it is the Ruger semi-automatic handgun, an empty

7   magazine from the weapon, as well as eight live rounds of

8   ammunition.

9   Q    Okay.  And now I'm going to put up what has been

10  previously marked as Government's Exhibit 6.  Can you go ahead

11  and just tell us quickly what is in that one as well?

12  A    Yes, this is the same firearm magazine, as well as eight

13  rounds of live ammunition.

14  Q    Okay.  Would you say it's just a little more zoomed in

15  on the Ruger word there which is on the handle?

16  A    Yes, correct.

17  Q    Okay.  All right.  And this is Government's Exhibit

18  No. 7.  Can you go ahead and tell us what that is a photograph

19  of?

20  A    Yes.  This is a close-up photograph of the serial number

21  of the firearm.

22  Q    Okay.  Can you actually -- I know it may be a little bit

23  difficult, but can you read that?

24  A    Yes.  316-67472.

1    Q    Okay.  And is this the same serial number that you

2  would've noted on your reports?

3    A    Yes.

4    Q    Okay.  And just one more time can you go ahead and

5  explain to us what is marked as Government's Exhibit 8?

6    A    Yes.  This is the opposite side of the handle and slide

7  of the Ruger semi-automatic handgun.

8    Q    Okay.  Thank you.  All right.  I'm now going to hand you

9  what has been previously marked as Governments Exhibit No. 1.

10   A    Okay.

11   Q    All I want you to do is take a look at it yourself and

12  then just pause.  Do you recognize what is in that box?

13   A    Yes, I do.

14   Q    How do recognize it?

15   A    This is the firearm that was recovered from the vehicle

16  and the same firearm from the photos that were just reviewed.

17   Q    Okay.  So does that have the same make, model, serial

18  number, that is listed in your report, and at the same one

19  that we just spoke about it?

20   A    Yes, it is.  Ruger P95, semi-automatic handgun.  Serial

21  number, 316-67472.

22   Q    Okay.  And did you alter it or do anything with it the

23  day that you collected it?

24   A    No, I did not.

25   Q    Okay.  Once seized you said I believe your earlier

1    testimony was that you placed it in a property bag?

2    A    Correct.

3    Q    Okay.  And preserved it for evidentiary value?

4    A    Yes, I did.

5    Q    Okay.  And today does it look to be in substantially the

6    same condition that it was the day that you collected it?

7    A    Yes, it does.

8          MS. PRATTEN:  Okay.  Your Honor, I move to admit

9    into evidence what has been previously marked as Government's

10   Exhibit No. 1.

11         MR. ERMINE:  Can we approach?

12         THE COURT:  Yes.

13   (THEREUPON; Counsel approached the bench and the following

14   proceedings were held.)

15         THE COURT:  I'm assuming same objection related to

16   the suppression issues?

17         MR. ERMINE:  Yes, sir.  Just renewing that

18   objection.

19         THE COURT:  The objection is noted and overruled,

20   and it will be admitted.

21   (THEREUPON; The proceedings returned to open Court.)

22         THE COURT:  Government's No. 1 shall be admitted.

23         (THEREUPON; Government's Exhibit No. 1 was then

24   admitted into evidence by the Court.)

25         MS. PRATTEN:  Permission to publish to the Jury,

Denise Carroll Halasey CCR, CVR-CM

1    Your Honor?

2            THE COURT:  You may.

3    BY MS. PRATTEN:

4     Q    Okay.  Can you go ahead and hold that box up and display

5    it for the Jury, please?

6     A    Yes.

7     Q    Okay.  And I see -- I note that there the firearm and

8    the magazine, and then there is a yellowish envelope in there.

9    What is in there?

10    A    Correct.  The live rounds of ammunition that were

11   recovered from the firearm.

12    Q    Okay.  Thank you.  I'm gonna take that from you right

13   now.  All right.

14           Moving on.  Were you also involved in the subsequent

15   apprehensive and arrest of the defendant which took place the

16   following day?

17    A    Yes, I was.

18    Q    Okay.  Was anyone with you when you were involved in

19   that?

20    A    Detective Watt.

21    Q    Okay.  Same Detective Watt that was with you the day

22   before?

23    A    Yes.

24    Q    Were you guys actually partners at the time?

25    A    Yes, we were.

1  Q    And what address did you guys report to execute the

2  apprehension and arrest of the defendant?

3  A    2063 East 37th Street.

4  Q    Is this the same address that the vehicle that you towed

5  the day before was registered to, is that correct?

6  A    Yes.

7  Q    Okay.  And was the defendant there?

8  A    He was not present at the address.

9  Q    Okay.  When you got there, what did you guys do?

10 A    We made contact with Tiara Gray who was the resident at

11 the address as well as the owner of the vehicle that we had

12 towed the day prior.  She advised that the defendant was not

13 present at the address and proceeded to call him on her

14 cellular phone to try and determine his location.

15 Q    And were you able to determine what Tiara Gray's

16 relationship was to the defendant?

17 A    I believe she said they were boyfriend and girlfriend

18 involved in some sort of relationship.

19 Q    Based on the information that she gave you were you able

20 to ultimately apprehend him?

21 A    Yes, we were.

22 Q    All right.

23         MS. PRATTEN:  Your Honor, may I have a moment,

24 please?

25         THE COURT:  You may.

1    BY MS. PRATTEN:

2    Q    I jumped a little too fast into admitting this entire

3    box.  I'm gonna bring you back a little bit more to the

4    contents of this box, okay?

5    A    Yes.

6    Q    All right.  We did briefly touch on this but I just want

7    to clarify some things.  Other than the firearm, that we have

8    already admitted, you said there were two other elements that

9    were in that box, right?

10   A    Yes.

11   Q    Okay.  And that would be the magazine and the

12   ammunition?

13   A    Yes.

14   Q    And in substantially the same condition as when you

15   retrieved it that day?

16   A    Yes, to my knowledge.

17   Q    As to the ammunition and as to the magazine?

18   A    Yes.

19   Q    Okay.  And you didn't alter it in anyway when you

20   collected either item?

21   A    I have not, no.

22   Q    Okay.  And today do both items look to be the same?

23   A    Yes, they do.

24   Q    Okay.  And I know that this is little bit in the weeds,

25   but can you just actually pick up the envelope and peek inside

1   to over cover our basis?

2           Okay.  Are all your previous conclusion accurate as

3   to that's the ammunition and how much you remember collecting?

4   A    Yes.  There are eight live rounds of ammunition in this

5   envelope.  Same rounds that were photoed.

6   Q    Okay.

7           MS. PRATTEN:  Your Honor, at this time I'm going to

8   move to admit what has been previously marked as Exhibit 2 and

9   3 pertaining to the magazine and the ammunition into evidence?

10          THE COURT:  And the Court will recognize that there

11  is standing objection with respect to Exhibits 1, 2, and 3, as

12  well as 5 through 8.  Same objection applies so it will be

13  ongoing.

14          MR. ERMINE:  Thank you.

15          THE COURT:  Thank you.  Government's Exhibits 2 and

16  3 shall be admitted.

17          (THEREUPON; Government's Exhibit Nos 2 and 3 were

18  then admitted into evidence by the Court.)

19  BY MS. PRATTEN:

20  Q    And I just have one more question remaining for you at

21  this point in time.  Were you able to get a phone number, a

22  contact number for Ms. Tiara Gray?

23  A    Yes, we were.

24  Q    And do you remember what that was?

25  A    I don't recall the specific phone number.

1          MS. PRATTEN:  Your Honor, may I approach the

2    witness?

3          THE COURT:  Yes.

4    BY MS. PRATTEN:

5     Q    Did you make a report on this case?

6     A    Yes.

7          MS. PRATTEN:  May I hand him his report, Your Honor?

8          THE COURT:  Typically I like to mark it and approach

9    him with another exhibit number.  I think 20 is our next

10   number I think.

11   BY MS. PRATTEN:

12    Q    All right.  I'm going to go ahead and hand you what has

13   not been admitted, but it has been marked as Government's

14   Exhibit 20, and I'd like for you to take a look at this?

15    A    Okay.

16    Q    Okay.  In looking back over that exhibit, I'm going to

17   take that from you right now, can you at this point go ahead

18   and recall what Ms. Tiara Gray's phone number is?

19    A    Yes, area code, 816-210-2996.

20    Q    Okay.

21         MS. PRATTEN:  Your Honor, I don't have any further

22   questions.

23         THE COURT:  Okay.  Thank you.  Mr. Ermine, Cross.

24                   CROSS-EXAMINATION

25   BY MR. ERMINE:

1   Q    Good morning, Detective.

2   A    Good morning.

3   Q    On March 10, 2016, the first time you saw Mr. Everett,

4   you testified he was running toward people in the area of

5   12th Street, correct?

6   A    Yes.

7   Q    And you heard him shouting profanity at people too,

8   right?

9   A    Yes.

10  Q    And those people weren't all SPF officers, he was

11  generally shouting and shouting at folks on the street, wasn't

12  he?

13  A    From my observations he was shouting at unknown persons

14  who were in the area.

15  Q    Okay.  And I know that you were part of the group of --

16  it was six people who ultimately took Mr. Everett to the

17  ground, correct, and kept him on the ground?

18  A    Yes.

19  Q    Yourself and five other law enforcement officers, right?

20  A    Yes.

21  Q    And so you were holding one of his feet down, correct?

22  A    Yes.

23  Q    And when he was on the ground did you hear him say

24  something that he was over at a friend's house smoking Kush?

25  A    Yes.

1   Q    Now, you have been involved in law enforcement for

2   several years, correct?

3   A    Yes.

4   Q    And you work on the violent crimes squad, right?

5   A    Yes.

6   Q    And as part of your job duties you deal regularly with

7   people who are involved or suspected with being involved in

8   narcotic activity, correct?

9   A    Yes.

10  Q    In your training and experience, what is Kush, what does

11  that mean?

12  A    Kush is another term for a certain grade of marijuana.

13  Q    And it is slang for a high grade of marijuana, isn't it?

14  A    In many cases, yes.

15  Q    Now, keeping on your training and experience, you

16  testified that based on your training you believed that

17  Mr. Everett was under the influence of some drug that day,

18  right, or he was having a mental lapse?

19  A    Some alcohol, drugs, an unknown substance, or some sort

20  of a mental lapse.

21  Q    Okay.  And again, that is based on your training?

22  A    Correct.

23  Q    And your seven years of experience in law enforcement?

24  A    Yes.

25  Q    And based on the way that you saw him acting that day,

1  right?

2  A    Yes.

3  Q    His demeanor?

4  A    Yes.

5  Q    His behavior?

6  A    Correct.

7  Q    Would you also say in your training and experience that

8  perhaps the fact that it took six law enforcement officers to

9  hold him on the ground might be indicative of his being under

10  the influence of some drug?

11  A    That would be correct.

12  Q    And in fact, you where I guess I would say so sure that

13  he was having some sort of spell if you will that you called

14  an ambulance for him to be taken from the scene via ambulance

15  instead of taking him to jail, right?

16  A    We were unsure as to what substance if any he was under,

17  but for precautionary reasons we requested an ambulance to

18  respond and evaluate his condition.

19  Q    Okay.  So the ambulance folks, the EMT show up, right?

20  A    Yes.

21  Q    And we saw the video yesterday, there are many people on

22  the scene who are attempting to restrain Mr. Everett, correct?

23  A    Yes.

24  Q    So there is law enforcement of various stripes, right?

25  A    Correct.

1    Q    KCMO-PD, FPS, maybe even some Jackson County folks, lots

2    of people on the scene, right?

3    A    Yes, there were.

4    Q    And now there's several EMTs on the scene as well,

5    correct?

6    A    Yes.

7    Q    And so even after as we saw on the video, even after

8    Mr. Everett is restrained, he is still shouting at everyone,

9    correct?

10   A    Correct.

11   Q    He is shouting at the EMTs, correct?

12   A    Yes.

13   Q    And he was even spitting on folks, right?

14   A    Correct.

15   Q    He's spitting at the EMTs?

16   A    Yes.

17   Q    To the point where he actually had to have a split hood

18   put on him, right?

19   A    Yes.

20   Q    In the midst of all of this while he was on the ground,

21   did you see him bang his head on the concrete?

22   A    I don't recall.

23   Q    Okay.  Do you recall whether he had to be restrained to

24   prevent him from banging his head on the ground?

25   A    I don't remember.

1   Q   Okay.  Shifting gears and moving a little bit forward of

2   the events that day.  You testified I think that you were the

3   person that actually found and took custody of the firearm,

4   correct?

5   A   Yes.

6   Q   And just to make sure that everyone is on the same page

7   here, that firearm was found underneath the seat in a car,

8   right?

9   A   Yes, underneath the driver's seat.

10  Q   And the car is registered you find through official

11  records to Tiara Gray, correct?

12  A   Yes.

13  Q   Now, when you took custody of the firearm, did you put

14  gloves on?

15  A   Yes.

16  Q   Why did you put gloves on before you picked up the

17  firearm?

18  A   Typically based on some unfortunate experiences that I

19  have had searching cars and searching people I always wear

20  protective gloves just for unknown reasons that could come in

21  contact whether there be fluids or anything, and also to

22  preserve any evidentiary value of anything that is discovered

23  during the search.

24  Q   That is exactly right.  You want to wear gloves so that

25  your fingerprints don't get placed on that firearm, correct?

1    A    Yes.

2    Q    And you want to wear gloves so that your DNA doesn't get

3    placed on that firearm, correct?

4    A    Yes.

5    Q    Now, in your assignment in your seven years of

6    experience in law enforcement, we talked about how you deal

7    with narcotic cases, you also deal with firearm cases

8    routinely, correct?

9    A    Yes, I do.

10    Q    And you have throughout your career, right?

11    A    Yes.

12    Q    I would imagine that you training and experience in

13    dealing with firearm cases, correct?

14    A    Yes, I do.

15    Q    Loads of it I am sure.  And so you have training about

16    how to essentially gather evidence, right, and part of the

17    training involves putting on gloves, and as you said, your

18    experience involves the necessity of putting on gloves,

19    correct?

20    A    Yes.

21    Q    So you're aware then in your experience here as a

22    detective in the violent crimes squad, that DNA testing can be

23    done on firearms, correct?

24    A    Yes.

25    Q    And this is not something right -- let me ask it this

1  way.  The Kansas City Police Department has the capacity to

2  order DNA testing on firearms, correct?

3  A    Yes.

4  Q    And you all have a crime lab where that testing is done,

5  you don't actually do the testing, but a crime lab does that

6  testing, correct?

7  A    Correct.  We also have certified officers that are

8  trained in DNA collection whether it be various forms of

9  evidence or crime scenes as well.

10  Q    Okay.  Are you trained in DNA collection?

11  A    I am not.

12  Q    Have you ever collected DNA from a firearm?

13  A    I have not.

14  Q    Are you generally aware of the process that happens when

15  DNA is collected from a firearm?

16  A    General process, yes.

17  Q    Okay.  So let's talk about the general process.

18  Generally speaking, there is a swab, correct, it looks like a

19  Q-tip?

20  A    Yes.

21  Q    And that swab is -- some solution is attached to the end

22  of that swab, correct?

23  A    To my knowledge, yes.

24  Q    And then the swab is just grazed over whatever surface

25  is being tested, correct?

1   A    Yes.

2   Q    So that gathers the DNA and than it is placed into a

3   little tube for 0safekeeping, correct?

4   A    To my knowledge, yes.

5   Q    And then that tube is just kind of stored, right, until

6   later it is tested, right?

7   A    Yes.

8   Q    Now, have you ever had occasion to collect DNA from a

9   suspect?

10  A    I have not personally, no.

11  Q    Have you see it done?

12  A    Yes, I have.

13  Q    Okay.  So the process to collect DNA from a suspect is

14  very similar to the process to collect DNA from a firearm,

15  correct?

16  A    Yes.

17  Q    Again, there is a swab, right?

18  A    Yes.

19  Q    And the swab is, generally speaking, placed in the

20  suspect's mouth, correct?

21  A    In many cases, yes.

22  Q    And it is like a two second process and it is taken out,

23  right?

24  A    Yes.

25  Q    Placed in a tube?

1    A    Yes.

2    Q    Store it away, right, and those two things can be sent

3    to the crime lab and the crime lab does their magic and

4    figures out whether there is DNA on the gun, compares against

5    the DNA from the suspect, correct?

6    A    Yes.

7    Q    And that sort of thing happens with some frequency in

8    Kansas City, doesn't it, in firearm cases?

9    A    Correct.

10        MR. ERMINE:  Nothing further, thank you.

11        MR. MCCARTHER:  May we approach?

12        THE COURT:  Yes.

13   (THEREUPON; Counsel approached the bench and the following

14   proceedings were held.)

15        MR. MCCARTHER:  Your Honor --

16        THE COURT:  -- hold on.  If this is about this

17   witness then Ms. Pratten -- what is this related to?

18        MR. MCCARTHER:  I think it's generally about this

19   Court's order.  This Court ordered in conjecture with Judge

20   Larson's R&R, that all statements that the suspect made on the

21   ground were to be suppressed which is why we didn't bring it

22   up.  Mr. Ermine, I believe, just opened the door to

23   discussions about statements made while the defendant was on

24   the ground by having this witness testify that the defendant

25   had been smoking Kush.

1         Now, we were under an order that we could not go

2   into that statement, and I think now that that door has been

3   opened, we can now talk about other statements the defendant

4   made.

5         MR. ERMINE:  I think there is an important thing

6   that the government's counsel is missing here.

7         THE COURT:  And Ms. Pratten should be arguing.  It's

8   her witness.

9         MR. MCCARTHER:  Right.

10        MR. ERMINE:  I think there something important that

11  has been missed, the statement that Judge Larson and that you

12  ordered to be suppressed is a statement dealing with the

13  firearm.  This is not that statement, it is a much different

14  statement.  Asking about the statement doesn't even begin to

15  approach the door to open.

16        THE COURT:  What are you trying to get in?

17        MS. PRATTEN:  The statement that he made on the

18  ground.

19        THE COURT:  About what?

20        MS. PRATTEN:  The firearm.  That's my car, I have a

21  firearm.

22        THE COURT:  No, no, no.  I agree with Mr. Ermine.

23  He has not opened that door.  I don't believe Larson's order,

24  which I adopted, suggests that.  So anything else?

25        MS. PRATTEN:  I would like to have him clarify the

1    statement that Mr. Ermine had him say.

2              THE COURT:  Clarify?

3              MS. PRATTEN:  Say the whole -- I was at my friend's

4    house smoking Kush.  The reference he referenced.  The entire

5    statement.

6              THE COURT:  Okay.  What's the entire statement?  I

7    don't know.

8              MR. ERMINE:  No one wants to say it, Your Honor,

9    because it includes a racial slur.  That's why I asked the

10   question I did because I didn't want to use a racial slur.

11             THE COURT:  Say the N-word.

12             MR. MCCARTHER:  I was --

13             THE COURT:  No, this is Ms. Pratten's witness.

14             MS. PRATTEN:  Your Honor, I can't recall exactly.

15             THE COURT:  Then I'm not -- if you can't remember

16   exactly what you want him to say, I'm not going to let you say

17   it.

18             MS. PRATTEN:  I was at my nigger's house smoking

19   Kush is what he said.  And that's what I want him to say.

20             THE COURT:  Why?

21             MS. PRATTEN:  He didn't say the full -- Mr. Ermine

22   said -- it's a little bit of a different characterization.  I

23   was at my friend's house smoking Kush.  And what he actually

24   said which is a -- it's not what he actually said.  What Mr.

25   Ermine said is not what he actually said.

1          THE COURT:  I don't want to speak for Mr. Ermine, I

2     think he was trying -- you know, you could say the N-word,

3     that's fine.  But you better instruct him because I think Mr.

4     Ermine did it for the sake of not saying the N-word here in

5     court.

6          MR. ERMINE:  That's exactly right.

7          THE COURT:  And the closest word he can gather from

8     that is my friend.  Which I would intend to associate the

9     N-word with my friend's house.  I don't know how it moves us

10     one way or the other or what it means at all.

11          MS. PRATTEN:  Okay.

12          THE COURT:  I mean, yes, if you want to say -- you

13     better make sure he says it.

14          MS. PRATTEN:  Yes, Your Honor.

15          THE COURT:  Okay.  Objection overruled.  I'm not

16     going to allow you to get into anything that relates to what

17     was suppressed.  If you want to bring the entirety of what he

18     said, you know, I think that's fine but -- okay.

19     (THEREUPON; The proceedings returned to open Court.)

20     BY MS. PRATTEN:

21     Q    Detective Bailey, I just have two general areas that I

22     want to touch on.  When you saw him interacting initially when

23     you and Detective Watt saw him interacting initially on 12th

24     Street, I believe the defense counsel brought up he was

25     yelling general things at people passing by, is that correct?

1    A    It appeared that way, yes.

2    Q    Okay.  Were any of these -- when he was yelling at

3    individuals were these like the prolonged interactions like

4    you saw with the FPS officers?

5    A    No, they were not.

6    Q    Okay.  So they were not focused and tailored on any

7    individuals?

8    A    They did not appear to be, no.

9    Q    Okay.  And then when you saw him interacting with the

10   FPS officers, this was actually a prolonged focused

11   interaction?

12   A    Yes, it was a direct verbal conversation or contact,

13   yes.

14   Q    And one more further thing, I believe Mr. Ermine brought

15   up a statement that the defendant made when he was on the

16   ground?

17   A    Yes.

18   Q    Do you recall that?

19         THE COURT:  Counsel, I'll let you lead him through

20   it so it would be said properly.  And I meant to clarify.  Do

21   you want to approach?  Counsel approach.

22   (THEREUPON; Counsel approached the bench and the following

23   proceedings were held.)

24         THE COURT:  If you want to make the statement that

25   he said, racial slur, at my friend's house.  Just say it so he

1    won't just out there say it because he doesn't know -- isn't

2    it true he actually said -- that's all I want.

3              MS. PRATTEN:  Okay.

4    (THEREUPON; The proceedings returned to open Court.)

5    BY MS. PRATTEN:

6    Q    All right.  Thank you for your patience through this?

7    A    You're welcome.

8    Q    I believe Mr. Ermine said something to the effect of,

9    the defendant said I was at my friend's house smoking Kush?

10   A    Yes.

11   Q    But is it true that what the defendant actually said

12   was, I was at my nigger's house smoking Kush?

13   A    Yes.

14             MS. PRATTEN:  Okay.  I don't have any further

15   questions.  Thank you.

16             THE COURT:  Mr. Ermine.

17             MR. ERMINE:  Brief follow-up, Your Honor.

18                    RECROSS-EXAMINATION

19   BY MR. ERMINE:

20   Q    I neglected to ask you Detective Bailey, just to

21   reiterate, you are the one that collected the gun in this

22   case, correct?

23   A    Yes.

24   Q    Did you request that DNA swabs be taken off the gun?

25   A    I don't remember.

1          MR. ERMINE:  Nothing further, Your Honor.

2          THE COURT:  Counsel, approach for a moment.

3     (THEREUPON; Counsel approached the bench and the following

4     proceedings were held.)

5          THE COURT:  Maybe I wasn't clear, my suggestion was

6     not to that you say it because that was my whole point.  My

7     suggestion that you say, didn't he say the N-word as a racial

8     slur?

9          MS. PRATTEN:  I didn't understand.  I didn't

10    understand.

11         THE COURT:  I don't know.  That's what you guys -- I

12    don't see the point.  I don't see the relevance of it, I don't

13    see the need.  But if you want to say the whole thing then be

14    very -- I thought I was very clear, and I think I was very

15    clear --

16         MS. PRATTEN:  I didn't understand because --

17         THE COURT:  No, I'm not done yet.

18         Mr. Ermine wasn't doing it for the purpose not to

19    say that word.  And he said the friend word, which is next of

20    kin to the condonation of what it meant.  So I mean, you just

21    need to be very careful and make sure you listen to what the

22    Court says in terms of that.  All right.  We can move on.

23    (THEREUPON; The proceedings returned to open Court.)

24         THE COURT:  Thank you, Detective.  You can stand

25    down.

1          Government call their witness.

2          MR. MCCARTHER:  Thank you.  United States calls

3   Detective Anthony Watt to the stand, Judge.

4          THE COURT:  Sir, if you want to stop right there and

5   I'll have you turn to my courtroom deputy to be sworn.

6                        ANTHONY WATT

7          Called as a witness on behalf of the PLAINTIFF, was

8   duly sworn, and testified as follows:

9          THE COURT:  Watch your step as you go up.  Thank

10  you.  Counsel.

11                    DIRECT EXAMINATION

12  BY MR. MCCARTHER:

13  Q    Sir, can you please state your name for the Jury?

14  A    Detective Anthony Watt.

15  Q    And can you spell your last name, sir?

16  A    W-A-T-T.

17  Q    What is your occupation?

18  A    Kansas City Police Department officer.

19  Q    What is your entire length of service in law

20  enforcement, sir?

21  A    In May of this year it will be 13 years.

22  Q    And what is your current role with the KCPD right now?

23  A    Right now I'm assigned to an investigation unit, Kansas

24  City Violent Crimes Enforcement Division.

25  Q    And how long have you been on that unit?

1    A    Since November of 2012.

2    Q    And so that would've been the unit you would've been a

3    part of on March 10, 2016, is that correct?

4    A    Yes.

5    Q    I want to jump to March 10th, 2016, do you remember that

6    day?

7    A    Yes.

8    Q    Were you working on that date?

9    A    Yes.

10   Q    At approximately 8:30 in the morning did anything

11   unusual happen to you?

12   A    Yes.

13   Q    What did you see?  What happened?

14   A    Detective Bailey and I were just leaving our office and

15   we were going to our patrol car.  We observed a black male in

16   the middle of the street yelling and screaming.

17   Q    Did you investigate?

18   A    Yes.

19   Q    And what -- how did you proceed?

20   A    We went on and got into our patrol vehicle, made the

21   corner right there at 12th and Locust.  We were pretty much

22   facing east bound when we observed an unknown black male

23   standing aggressively, yelling and screaming at -- for

24   officers in front of the federal building.

25   Q    And would that be the Richard Bolling Federal Building?

1   A    Yes.

2   Q    And to your knowledge is that at 601 East 12th Street,

3   Kansas City, Missouri?

4   A    Yes.

5   Q    Is that in the Western District of Missouri?

6   A    Yes.

7   Q    Let me ask this, that man that you observed that morning

8   is he present in the courtroom today?

9   A    Yes.

10  Q    Can you describe where he is sitting, at what he is

11  wearing?

12  A    He is sitting to the left of me.  It looks like he may

13  have a tie and a green buttoned up shirt.

14       MR. MCCARTHER:  Your Honor, let the record reflect

15  that the witness has identified the defendant, James Everett

16  Junior?

17       THE COURT:  Notwithstanding the fact that I don't

18  think he has a tie, I think he has sufficiently identified

19  him.  Never the less, the record will reflect that the witness

20  has made the in court identification of the defendant,

21  Mr. Everett.

22       MR. MCCARTHER:  Thank you, Your Honor.

23  BY MR. MCCARTHER:

24  Q    The Richard Bolling Federal Building, where is that in

25  relation to the Jackson County Courthouse?

1    A    It sits just east of the Jackson County Courthouse.

2    Q    So where you are describing you can see as you left the

3    Jackson County Courthouse, is that fair to say?

4    A    Yes.

5    Q    I want to talk about what happened after you viewed this

6    confrontation between the defendant and FPS inspectors.  What

7    did you observe the defendant do when he was front of the FPS

8    inspectors?

9    A    He was standing, he had both his hands clenched.  There

10   were four officers surrounding him, they were giving him

11   verbal commands.  At this point in time when I exited the

12   passenger side of the vehicle of our vehicle is where we

13   started making an approach towards Mr. Everett and the four

14   officers is when they were trying to get him in custody.

15   Q    And as you saw them trying to get him in custody, what

16   did you say in response?

17   A    Detective Bailey and I proceeded to join because they

18   did have him on the ground.  They were still trying to get him

19   into custody and into handcuffs.  At this time Mr. Everett was

20   physically resisting.  He began to spit.  He began to scream,

21   curse, and he was trying to get back up, stand back up.

22   Q    Was it hard to restrain the defendant?

23   A    Yes.

24   Q    Why was it hard to restrain the defendant?

25   A    I don't know if it was just so many hands involved that

1    was trying to control, but at that particular time he was

2    pretty much trying to get back in this stance.  That was when

3    I took his right leg from underneath him and tried to get him

4    back on the ground.

5    Q    Was the defendant finally restrained?

6    A    I'm sorry?

7    Q    Was the defendant finally restrained?  Was he placed in

8    handcuffs?

9    A    Approximately about two or three minutes later.

10   Q    Now, while he was on the ground in handcuffs, did he

11   attempt to assault you or the other officers that were on the

12   scene?

13   A    Yes, sir.

14   Q    How so?

15   A    He began spitting.  He was spitting blood.  He actually

16   spit on I believe two officers.  There was other officers that

17   arrived, KCPD officer that arrived at the scene.  I can

18   remember one particular KCPD officer, a female, that he was

19   actually trying to bite her.

20   Q    So he was trying to spit on and bite at you and your

21   fellow officers, is that fair to say?

22   A    Yes.

23   Q    And in fact, because of that, he had to have a spit mask

24   put on him, right?

25   A    Yes.  That is when the Kansas City fire department, EMS

1  team arrived at the scene.

2  Q    Okay.  So EMS arrives on the scene, and then Mr. Everett

3  is loaded on an ambulance and he is taken from the scene to

4  the hospital, is that correct?

5  A    Yes.

6  Q    All right.  So I want to talk about the car left at the

7  scene.  Was there a silver Dodge caliber found parked along

8  12th Street that day?

9  A    Yes.

10  Q    And what brought that car to your attention?

11  A    The door was open.

12  Q    And what else?

13  A    There was -- the officers that were there at the scene

14  explained to us that on video they observed Mr. Everett

15  exiting that vehicle.

16  Q    And in fact they observed him pull up in that vehicle,

17  isn't that correct?

18  A    Yes.

19  Q    Was that vehicle parked legally?

20  A    No, sir, it wasn't.

21  Q    Why wasn't the car parked legally?

22  A    It was parked where police marked vehicles are supposed

23  to park at.  Kansas City police department vehicles were

24  supposed to park.

25  Q    Did you determine that car needed to be towed?

1    A    Yes.

2    Q    Why did you determine that car needed to be towed?

3    A    Because of the location of where it was parked at.

4    Q    Prior to any tow that is ordered by the KCPD, do you

5    take an accounting of what is actually in the vehicle?

6    A    Yes, by policy we have to do an inventory.

7    Q    And why do you do an inventory?

8    A    The inventory is pretty much for us and also for the

9    person that we are towing the vehicle from so we can get an

10   accountability of the things left in the vehicle when it goes

11   to the tow lot.

12   Q    So this is kind of a liability policy, right?

13   A    Yes.

14   Q    You don't want owners of vehicles coming back to you and

15   saying, you know, my $10,000 necklace is gone from the

16   vehicle, right?

17   A    Correct.

18   Q    Did you find anything of interest under the front seat

19   of that car?

20   A    Yes, underneath the front seat of the driver's seat of

21   the vehicle was a semi-automatic handgun.

22   Q    And your recollection, would that have been a Ruger

23   model P95, 9-millimeter pistol, serial number 316-67472?

24   A    Yes.

25   Q    In your training and experience have you inventoried

1   vehicles before?

2   A    Yes.

3   Q    Have you found firearms in vehicles that you have

4   inventoried?

5   A    Yes.

6   Q    In your training and experience under the front of the

7   driver's seat, is that a typical place that you will find a

8   firearm?

9   A    Yes.

10   Q    And in your training and experience, is under the front

11   seat of a car a typical place people who have firearms put

12   their guns?

13   A    Yes.

14   Q    Why do you think that is?

15   A    From my understanding I believe that it makes it easier

16   for that person to get to that handgun.

17   Q    I want you to reference Exhibits 5 through 8.  They

18   should be up there on the stand with you.  It should be in

19   that stack of papers.

20        Do you recognize what is shown in Exhibits 5 through

21   8?

22   A    Yes.

23   Q    I am now showing Exhibit 5.  Is this the firearm that

24   you recovered under the seat of the 2007 Dodge Caliber.

25   A    Yes.

1    Q    Is that also the same for what is depicted in Exhibit

2   No. 6?

3    A    Yes.

4    Q    And Exhibit 7?

5    A    Yes.

6    Q    And Exhibit 8, is that the same firearm?

7    A    Yes.

8    Q    I'm going to zoom in on something here.  What does it

9   say on the side of that gun?

10   A    Ruger, Prescott, Arizona, USA.

11   Q    Prescott, Arizona.  Why would it say Prescott, Arizona

12  on the side of that gun?

13   A    That is where the gun was manufactured at.

14   Q    So at some point if the life of that gun, it would have

15  come from Arizona to Missouri, is that right?

16   A    Yes.

17        MR. MCCARTHER:  Your Honor, may I approach the

18  witness?

19        THE COURT:  You may.

20  BY MR. MCCARTHER:

21   Q    I'm handing you now what is been marked as Government's

22  Exhibit 1 through 3.  Can you take a look at those exhibits,

23  please.  In the box, sir.

24        Are Exhibits 1 through 3 the firearm magazine and

25  ammunition that you recovered on March 10, 2016?

1   A    Yes.

2   Q    All right.  I want to go back to talking about the car.

3   Now, who is the vehicle ultimately register to?

4   A    The vehicle came back to a Ms. Gray.

5   Q    And what is your understanding of the relationship to

6   the defendant?

7   A    Boyfriend, girlfriend.

8   Q    Did you wind up contacting her on March 10th, 2016?

9   A    Yes.

10  Q    Why did you contact her?

11  A    The reason for it because doing the inventory we

12  observed a car seat.

13  Q    I'm sorry.  What about the car seat would make you want

14  to contact the owner?

15  A    We wanted to know what child was involved, and if that

16  child -- just out of courtesy to give that car seat back to

17  Ms. Gray in case she needed to transport the child anywhere.

18  Q    And how did you contact her?

19  A    Doing the inventory we found some registration paperwork

20  and so when we ran the temporary tag that was on the vehicle

21  it came back to her.  We had access to a computer inside the

22  vehicle, that access to the computer allowed us to run her

23  name to see if she was involved in any reports and we were

24  able to retrieve a phone number.

25  Q    And did you wind up placing a phone call to Ms. Gray?

1    A    Yes, sir.

2    Q    And during that call did she acknowledge in anyway that

3    Mr. Everett had had her car?

4              MR. ERMINE:  Objection.  Calls for hearsay.  Can we

5    approach?

6              THE COURT:  Okay.

7              MR. MCCARTHER:  There is a statement that is going

8    to come later that I believe Mr. Ermine is referencing here.

9    This is not that point.  This is just the point where

10   Detective Watt is asking Ms. Gray whether -- where to take the

11   car seat to which is the same address that comes back as the

12   location --

13             THE COURT:  I thought the question elicited what did

14   she tell.  Notwithstanding a statement I think in and of what

15   the question solicited is objectionable as hearsay.  Unless

16   there is some exception.

17             MR. MCCARTHER:  As to this point of the interaction,

18   I can lead him through this.  But as to the next point where

19   he actually approaches Ms. Gray at her house, she makes a

20   statement to the effect of so James did it again.  Which I am

21   not trying to get in for the truth of the matter asserted.  I

22   am trying to get it in for acknowledgment that Ms. Gray had

23   let Mr. Everett borrow her car.  I'm not having her say -- I'm

24   not having him talk about that.

25             THE COURT:  He's going to say that she said he did

1    it again?

2          MR. MCCARTHER:  During the next interaction, yes.

3          THE COURT:  He's going to say that?

4          MR. MCCARTHER:  Yes.

5          THE COURT:  And you're saying it's not for the truth

6    of the matter asserted, it's because there is a hearsay

7    exception that allows that which is what?  What is the

8    exception?

9          MR. MCCARTHER:  The exception is I'm not eliciting

10   that statement for the truth of it.  I'm not eliciting it to

11   show that Mr. Everett had done something again.  I'm eliciting

12   it for her acknowledgment that James had her car.

13         THE COURT:  What do you say to that?

14         MR. ERMINE:  Well, I think I have two arguments to

15   that.  First of all it doesn't prove that.  It is not a

16   statement, he had my car again.  One can draw any inference

17   that they wanted to from it.  If she had so something -- I

18   don't know.  I can imagine statements that would possibly be

19   admissible, but I don't think this is actually is a statement

20   that shows what the government says it shows.  So that's the

21   first thing first.

22         THE COURT:  With respect to its going to show?

23         MR. ERMINE:  I mean, I understand why the government

24   is arguing, her saying he did it again is not offered to show

25   that he did it again.  There is no mention of the car in that

1   statement.  So I think first of all, it is hearsay, because it

2   is gonna be taken as a statement tending to show that he did

3   it again.

4           But secondly, it definitely does not show that he

5   borrowed the car again, because there's nothing about the car

6   in that statement.

7           THE COURT:  I don't even know why he said it.  I

8   mean, she says he did it again, I don't even know the context.

9           MR. MCCARTHER:  He returns the car seat to her at

10  her home because her car has been towed.

11          THE COURT:  I know that.

12          MR. MCCARTHER:  So like it is directly about the

13  car.

14          THE COURT:  No, I'm going to sustain the objection.

15          MR. MCCARTHER:  Thank you.

16  (THEREUPON; The proceedings returned to open Court.)

17  BY MR. MCCARTHER:

18  Q    So again we were talking, you made contact with Ms. Gray

19  in order to return her car seat, is that correct?

20  A    Yes.

21  Q    Did you subsequently go to her home to return that car

22  seat?

23  A    Yes.

24  Q    And where did you go to return that car seat?  Was it

25  the same address listed in your report?

1  A    Yes.  It was the apartments.  I want to say 2036 East

2  37th Street.

3  Q    So I want to talk about what happened later that night.

4  Now, it is your understanding that Mr. Everett was taken to

5  Truman Medical Center, is that correct?

6  A    Yes.

7  Q    And he was released from Truman Medical Center later

8  that night, is that right?

9  A    Yes, I believe later on that morning, probably the next

10  day about 2:00 or 3:00 o'clock in the morning.

11  Q    Was there supposed to be a KCPD officer sitting on him

12  ready to take him into custody?

13  A    It was our understanding that not a KCPD officer, but

14  maybe a Jackson County officer.

15  Q    And what happened?

16  A    The hospital notified different districts trying to

17  figure what is going on because they were getting ready to

18  release Mr. Everett, and they wanted to know if there was a

19  sit with him.  And they wasn't able to make contact with

20  Jackson County police officers or officers or deputies,

21  therefore, the hospital said they had to release him.

22  Q    But the intention would've been for Mr. Everett to go

23  into a 24 hour hold, is that correct?

24  A    Yes.

25  Q    And that would've been to investigate the crimes that we

1    are investigating here today?

2    A    Yes.

3    Q    Now, the next day Mr. Everett was charged up here by the

4    US attorney's office, is that right?

5    A    Yes.

6    Q    And on that day, an arrest warrant is issued, correct?

7    A    Yes.

8    Q    And on the next day, March 11, 2016, did you seek to go

9    arrest Mr. Everett?

10   A    Yes.

11   Q    And where did you go?

12   A    We went to 2036 East 37th Street.

13   Q    Did you find Mr. Everett there at first?

14   A    No.

15   Q    Was it apparent that is where he lived though?

16   A    Yes.

17   Q    And was it apparent that he shared a home with Ms. Gray?

18   A    Yes.

19   Q    So where eventually did you arrest the defendant?

20   A    39th and Garfield.

21   Q    And why would you go there to arrest the defendant?

22   A    He was there exiting the BP gas station smoking a

23   cigarette.

24   Q    And it was Ms. Gray that told you where he was, is that

25   correct?

1    A    Yes.

2          MR. MCCARTHER:  No further questions at this time,

3    Your Honor.

4          THE COURT:  Thank you.  Mr. Ermine, cross.

5                    CROSS-EXAMINATION

6    BY MR. ERMINE:

7    Q    Detective, when you first saw Mr. Everett that day, you

8    testified he was in the middle of the street, right?

9    A    Yes.

10   Q    Was it 12th Street?

11   A    Yes, sir.

12   Q    And he was yelling?

13   A    Yes, sir.

14   Q    Was he shouting profanity at folks?

15   A    There was no one around him at that time.  He was just

16   yelling.

17   Q    Okay.

18         MR. ERMINE:  Nothing further, thank you.

19         THE COURT:  Mr. McCarther, do you have any redirect?

20         MR. MCCARTHER:  No, Your Honor.

21         THE COURT:  Can I have counsel, approach?

22   (THEREUPON; Counsel approached the bench and the following

23   proceedings were held.)

24         THE COURT:  Who is doing the next witness?

25         MS. PRATTEN:  I am, Your Honor.

1       THE COURT:  How long do you think your that witness

2  will take?

3       MS. PRATTEN:  I would guess my direct my be 15

4  minutes.

5       THE COURT:  Okay.  We'll let's see where we end up.

6  Maybe we will break before your cross.

7  (THEREUPON; The proceedings returned to open Court.)

8       THE COURT:  Government call your next witness.

9       MS. PRATTEN:  Government will call Matt Wilson to

10  the stand.

11       THE COURT:  Okay.  Mr. Wilson, if you want to come

12  around this way, sir, and stop right there and raise your

13  right hand to be sworn by my courtroom deputy.  Thank you.

14                      MATTHEW WILSON

15       Called as a witness on behalf of the PLAINTIFF, was

16  duly sworn, and testified as follows:

17       THE COURT:  And sir, you can have a seat right up

18  here.  Watch your step as you go up.  Counsel.

19                    DIRECT EXAMINATION

20  BY MS. PRATTEN:

21   Q    Good morning.

22   A    Good morning.

23   Q    Can you state your name for the record, please?

24   A    Matthew Wilson.

25   Q    Where are you employed?

1    A    I'm a Special Agent with the Federal Bureau of Alcohol,

2    Tobacco, Firearms and Explosives.

3    Q    And you said Special Agent, is that with the ATF?

4    A    Yes, ma'am.

5    Q    How long have you been with ATF?

6    A    Approximately 15 and a half years.

7    Q    And as a Special Agent with ATF, what are your duties

8    and responsibilities?

9    A    We are tasked with enforcing the federal arms arson and

10   explosive laws.

11   Q    All right.  Have you held any other positions with the

12   ATF?

13   A    I am.  Besides just being a regular street agent, I am

14   also a Firearms Interstate Nexus expert.

15   Q    And what does a firearms and explosives Nexus person do?

16   A    An Interstate Nexus expert makes determinations on

17   firearms as to where they are made and there -- where they are

18   made, and how the traveled interstate commerce.  Interstate

19   commerce simply means that a particular product was made in

20   one place and traveled to another.  Not necessarily concerned

21   with how it traveled, but just the fact that it was made in

22   one place and moved to another.

23   Q    So in your position you take actually firearms and you

24   examine them to answer that question?

25   A    Correct.

1   Q    Okay.  Have you ever received any special training

2   regarding firearms?

3   A    I have.

4   Q    When?

5   A    I have received -- all ATF agents receive a two-week

6   course during our ATF Academy on firearm identification and

7   how to identify basic firearms.  I received a weeklong basic

8   interstate Nexus school in our firearms technology center in

9   Martinsburg, West Virginia.  I have been to advance Nexus

10  schools where we tour manufacturing facilities to see the

11  actual manufacturing process.  And I have toured several of

12  those to include Smith & Wesson, Ruger, Charter Arms, and

13  numerous others.  And then I have also been to a 10 day

14  advance firearms school on how firearms work and function and

15  so on.

16  Q    Okay.  And so I believe one of the manufacturing

17  facilities that you toured you said is Ruger?

18  A    I have been to Ruger facility, yes.

19  Q    So clearly you are familiar with this manufacture?

20  A    I am.

21  Q    How many Rugers do you think you have seen during your

22  time in law enforcement?

23  A    Probably between 100 and 150 or more.

24  Q    And how many of those do you think you have examined in

25  your capacity as a Nexus expert?

1    A    That is as an Nexus expert.  In my career, in almost 20

2    years of law enforcement I've see several hundred Ruger.  But

3    to examine as a Nexus expert between 100 and 150.

4    Q    Okay.  So have you ever personally used of Ruger?

5    A    I believe that I shot one years ago.  And I own a Ruger

6    rifle, yes.

7    Q    Have you ever testified in federal or state court as an

8    expert regarding the location of where a firearm has been

9    manufactured?

10   A    I have.  I have testified as an expert both here in the

11   Western District of Missouri and in the District of Kansas.

12   Q    So both federal court?

13   A    Yes.

14   Q    How many times do you think you have done that?

15   A    Approximately seven.

16   Q    Can you describe the procedures you follow when you get

17   a firearm in and when you are trying to determine where it is

18   manufactured.

19   A    Yes.  Domestic made firearms are required to have

20   certain information.  You have to have the name of the

21   manufacturer, the city and state where the manufacturer is,

22   model, caliber and a serial number.  On foreign-made firearms

23   plus the city and state of the importer that brought it into

24   the United States.  So once I get a firearm I start looking

25   for that information.  I start looking at the markings on the

1    firearms.  Both -- if they are written words, and then I also

2    look for symbols or different -- if it's Russian I will look

3    for the Cyrillic manufacturer marks.  I will look for the --

4    if it is a European made firearm, you have to have European

5    proof marks to show it has been tested by the government.  So

6    I will look for those.  So I'll just look for any markings

7    that maybe on the firearm.  I will make note of those markings

8    and then use those markings to determine where the firearm was

9    made or who made it and where.

10   Q    Okay.  What kind of research -- sorry.  What kind of

11   resources do you consult when you are conducting this type of

12   examination?

13   A    I will conduct -- ATF maintains a database of firearm

14   manufactures, plus I have different books that I will consult.

15   Both being standard catalog of firearms, the Book Of Gun

16   Values.  If the company itself has a firearm that is made or a

17   book made about their firearm, I will consult those.  Ruger's

18   has got a book, Ruger A Man And His Guns, about Bill Ruger and

19   his company.  I will look at those.  I will check with open

20   sources on the Internet.  There is a lot of research that can

21   be done.

22   Q    Okay.  And right next to you sitting on the witness

23   stand is a box.  And a portion of that box has been admitted

24   as Government's Exhibit No. 1.  Do you see that?

25   A    Yes.

1    Q     And what is it?

2    A     It is Ruger P95 9-millimeter pistol, serial number

3    316-67472.

4    Q     Have you ever examined that particular weapon?

5    A     I have.

6    Q     Okay.  And based on your examination it's your opinion

7    this weapon meets the definition of a firearm?

8    A     It does.

9    Q     Okay.  And in that it is designed to or readily be

10   converted to expel a projectile by action and explosive.  Is

11   that an accurate definition of a firearm?

12   A     That it.

13   Q     And that's what that is?

14   A     Correct.

15   Q     Okay.  Based on your examination and research do you

16   have an opinion about where that gun was manufactured?

17   A     I do.

18   Q     And what is your opinion?

19   A     This firearm was made in Arizona.

20   Q     Okay.  And since it is now located in the state of

21   Missouri would this have traveled interstate commerce?

22   A     It has.

23   Q     Okay.  Are there, in fact, any Rugers that are

24   manufactured in the state of Missouri?

25   A     No, there are not.

1  Q    Okay.  Did you memorialize your opinions after your

2  examination in a report?

3  A    Yes, ma'am.

4  Q    Okay.  And you generally do that?

5  A    Yes.  Whenever I look at a firearm and made a

6  determination, I usually write a report on it.

7          MS. PRATTEN:  Your Honor, may I have permission to

8  approach the witness?

9          THE COURT:  You may.

10  BY MS. PRATTEN:

11  Q    I just handed you what is previously marked as

12  Government's Exhibit 9.  Are you familiar with what I just

13  handed you?

14  A    Yes, ma'am.

15  Q    And what is that document?

16  A    This is the report that I wrote about my examination.

17  This is my interstate nexus report on the firearm.

18  Q    Okay.  Is that a document that you would normally

19  prepare in the ordinary scope of your duties as a nexus

20  examiner?

21  A    Yes, it is.

22  Q    And it is a regular part of your duty to maintain and

23  keep records like that?

24  A    It is.

25  Q    Okay.  Is that document the type that would be kept

1 generally under your personal custody and control?

2 A    Yes, it was in the case file, yes.

3         MS. PRATTEN:  Your Honor, I move at this time to

4 admit Government's Exhibit 9 into evidence.

5         MR. ERMINE:  No objection.

6         THE COURT:  Government's Exhibit No. 9 shall be

7 admitted.

8         (THEREUPON; Government's Exhibit No. 9 was then

9 admitted into evidence by the Court.)

10         MS. PRATTEN:  Your Honor, I don't have any further

11 questions at this time.

12         THE COURT:  Okay.  Thank you.  Mr. Irvine?

13                 CROSS-EXAMINATION

14 BY MR. ERMINE:

15 Q    Ruger is a major manufacturer of firearms in the United

16 States, correct?

17 A    I'm sorry.  I didn't hear you.

18 Q    Ruger is a major manufacturer of firearms in the United

19 States, correct?

20 A    Yes, sir.  The last year totals came out they were the

21 number one manufacturer in the United States.

22 Q    Okay.  Now, your role in this case is extremely limited,

23 right?  All you do is look at Ruger P95s, generally -- well,

24 let me start over.  First, you figure out whether the gun

25 involved in this case is a Ruger P95, correct?

1   A    Yes, I will look at it and determine what it is.

2   Q    What it is.  Right.  And then you -- all you do is take

3   that information whether generally that firearm was

4   manufactured in Missouri or elsewhere, correct?

5   A    Correct.

6   Q    So you being on this case has nothing to do with

7   figuring out whether Mr. Everett possessed this Ruger or not,

8   does it?

9   A    No, it does not.

10          MR. ERMINE:  Thank you, nothing further.

11          THE COURT:  Ms. Pratten, do you have any redirect?

12          MS. PRATTEN:  No, Your Honor, thank you.

13          THE COURT:  Sir, you can stand down.

14          Why don't we do this and take our morning recess.

15   We will start back up about 10:35.

16          With that said, the Court again reminds you of what

17   you were told at the first recess of the Court.  Until you

18   retire to consider your verdict you must not discuss this case

19   among yourselves or with others or permit anyone to discuss it

20   in your hearing.  You should not form or express any opinion

21   about the case until it is finally given to you decide.  Do

22   not do any research or investigation on your own about any

23   matter regarding this case or anyone involved with the trial.

24   Do not communicate with others about the case by any means.

25   Do not read, view, or listen to any newspaper, radio,

1  electronic communication from the Internet or television

2  report of the trial.

3          MS. BALDWIN:  All rise.  Court is in recess.

4  (THEREUPON, the following proceedings were adjourned.)

5          THE COURT:  Government, call you next witness.

6          MR. MCCARTHER:  Thank you, Your Honor.  We call

7  Detective Frank Rorabaugh to the stand.

8          THE COURT:  Detective, if you can come forward and

9  raise your right hand so my courtroom deputy can swear you in.

10 Thank you.

11                    FRANK RORABAUGH

12         Called as a witness on behalf of the PLAINTIFF, was

13 duly sworn, and testified as follows:

14         THE COURT:  Sir, you can take a seat up here.  Watch

15 your step.  Thank you.  Counsel.

16                   DIRECT EXAMINATION

17 BY MR. MCCARTHER:

18  Q    Sir, could you please state your name for the Jury?

19  A    My name is Frank Rorabaugh.

20  Q    How do you spell your last name, sir?

21  A    R-O-R-A-B-A-U-G-H.

22  Q    What is your occupation?

23  A    I'm a detective with the Kansas City Missouri Police

24 Department.

25  Q    What is your entire length of service in law

1    enforcement?

2    A    A little bit over 15 years.

3    Q    And what is your current assignment with KCPD?

4    A    I'm a detective assigned to the illegal firearms squad.

5    Q    What of the other positions that you've held within

6    KCPD?

7    A    To begin, I was a patrol officer and I worked nights.  I

8    then went to the homicide unit as a detective within the

9    assault squad.  I then went back to patrol for a couple of

10   months before taking a position as a proactive community

11   officer for a couple years.  I then became a detective again

12   working basically gun crimes.

13   Q    This is illegal firearm squad, was it known as a

14   different name at any point?

15   A    Yes.

16   Q    What was that?

17   A    The squad I work for has changed name several times.

18   Initially we were the area command unit.  We then were the

19   violent crimes administrative squad, and we are now illegal

20   firearms squad.

21   Q    And as part of the illegal firearms squad, what type of

22   crimes do you investigate?

23   A    I handle mostly the illegal possession of firearm cases

24   both state and federal level.

25   Q    And how long have you been associated with -- despite

1    the change in name, how long have you been associated with

2    this unit?

3    A    We created the unit in November of 2012.

4    Q    So approximately four and a third years, would you say?

5    A    Yes, sir.

6    Q    How many times have you testified in court?

7    A    Over a 100.

8    Q    I want to talk about firearms because you brought that

9    up.  During your service in law enforcement how many firearms

10   involved offenses have you investigated?

11   A    Well, if you include my time in patrol responding on

12   different calls for service regarding firearms as well as

13   within the assault squad, well over a 1,000.

14   Q    What type of firearm offenses have you investigated?

15   A    Murder, aggravated assault, robberies, and then

16   obviously the possession of firearms regarding the different

17   laws.

18   Q    And that would include convicted felons in possession of

19   firearms, correct?

20   A    Yes, sir.

21   Q    Have you been trained in the field of firearms

22   investigations?

23   A    Yes.

24   Q    What type of training have you received?

25   A    I went to the original police academy back in 2001 and

1   2002.  I've been trained by the ATF in Washington DC.  We have

2   yearly in-service training and regular legal updates as laws

3   change.

4   Q    How many firearms base arrests would you say you have

5   made in your career?

6   A    I would estimate between 300 to 400 arrests that I've

7   actually made the arrest on those cases.

8   Q    I want to talk about the KCPD crime lab.  What is the

9   KCPD Regional Crime Lab, what is that?

10  A    It is our department's crime laboratory where we have

11  people who investigate all kinds of stuff related to different

12  crimes.  So we have everything from fingerprint and DNA

13  analysis to firearms examiners, crime scene technicians.  We

14  have it all housed in one location.

15  Q    Have you ever submitted any firearms to the KCPD Crime

16  Lab for DNA and/or fingerprint analysis?

17  A    Yes.

18  Q    Approximately how many firearms have you submitted for

19  those analysis?

20  A    I would say 500 to 600.

21  Q    500 to 600 separate firearms you have submitted over the

22  course of your career to the KCPD Regional Crime Lab?

23  A    Yes.

24  Q    And this is for DNA and/or fingerprint analysis?

25  A    Yes.

1    Q    How many of those firearms that you submitted to the

2    KCPD crime lab were they able to get a usable fingerprint off

3    of?

4    A    I have never received a fingerprint hit on a firearm in

5    my career.

6    Q    So zero out of 500 to 600?

7    A    That's correct?

8    Q    What is your opinion on the effectiveness of fingerprint

9    analysis and as it relates to firearms?

10    A    We don't have much luck with firearms because of the

11    texture that is often on the firearm.  Like I said, I don't

12    believe much in it because I have never actually gotten

13    fingerprint on a gun.

14    Q    I believe you testified approximately 500 to 600 you

15    submitted for DNA analysis, is that right?

16    A    Yes.

17    Q    What percentage of those firearms that you submitted to

18    the KCPD Crime Lab, have you been able to get any usable DNA

19    off of?

20    A    Of those firearms, we put in a lab request on pretty

21    much all of them.  Often times the test aren't done because of

22    other evidence in the case.  But of the ones that are done, I

23    would say one in every ten I get a usable DNA hit.

24    Q    So what is your opinion of the effectiveness of DNA

25    analysis when it comes to firearms investigations?

1  A    It can be very valuable, but it is not something that I

2  can rely on in most cases.

3  Q    So this notion that someone can't possess an item unless

4  their fingerprint or DNA is on that item, what is your opinion

5  on that notion?

6  A    My experience, you know, it's almost a last resort

7  ordering the DNA.  The rest of the investigation is much more

8  important in determining whether somebody possessed or owned a

9  firearm.  There is a lot that goes into it.  There are some

10  people that they are call secretors where their DNA is much

11  more readily available and is transferred to items much easier

12  than other people.  In fact, we have certain people on the

13  police department that their DNA shows up in many crime

14  scenes, just simply the fact that they show up on the call for

15  service, their DNA is transferred to items very easily.

16  Q    And I would say there is probably people on the other

17  side of the spectrum too, is that a fair analysis?

18  A    Yes, absolutely.

19  Q    So people on the other side, their DNA would not show up

20  on anything, is that fair?

21  A    I wouldn't say, wouldn't show up on anything, but it is

22  much -- it is not very common that their DNA is transferred.

23  Q    The items that you do submit for DNA testing, what is

24  the typical timeframe that you would get from the time you

25  submit it to the time you actually get a DNA lab report back?

1  A    If there is no exigent circumstances, if I don't have a

2  reason that the case needs to be rushed through the process,

3  it takes in excess of a year?

4  Q    On average excess of an entire calendar year?

5  A    Yes, sir.

6  Q    Are illegal gun possession crimes considered a high

7  priority for the KCPD Regional Crime Lab?

8  A    They are not.

9  Q    Why is that?

10  A    Our crime lab is geared towards working violent crime so

11  they always take priority over our cases.  If there are

12  exigent circumstances in our cases, then I can on a

13  case-by-case basis contact our lab and request that it be

14  speed up and prioritized.  But in general our cases fall at

15  the end of the cue.

16  Q    Now, we talked about you submitted firearms to the KCPD

17  Regional Crime Lab.  Are there cases where -- I'll ask at this

18  way.  Does the Regional Crime accept all the firearms you

19  submit to it for DNA and fingerprint analysis?

20  A    No.

21  Q    Why wouldn't they?

22  A    Just because of resources and time.

23  Q    Do they review the evidence in cases?

24  A    Yes, they do.

25  Q    Have you reviewed the evidence that has been presented

1    to the Jury in this case?

2     A    Yes, I have.

3     Q    Is this a case that the KCPD Crime Lab would have as a

4    high priority?

5     A    No.

6     Q    Why not?

7          MR. ERMINE:  Your Honor, can we approach?

8          THE COURT:  Yes.

9    (THEREUPON; Counsel approached the bench and the following

10   proceedings were held.)

11         THE COURT:  What is your objection?

12         MR. ERMINE:  Your Honor, I think he is essentially

13   eliciting legal conclusions from the witness.  So I think he's

14   gonna have the witness essential testify about the strength of

15   the government's evidence to try and show why they didn't run

16   scientific testing in this case.

17         THE COURT:  Mr. McCarther?

18         MR. MCCARTHER:  It's the process of the regional

19   crime lab.  That's why he has been asked to testify.  He's

20   been listed as an expert.

21         THE COURT:  Seems like he is going to why they

22   wouldn't prioritize this.  I don't know if that goes

23   necessarily -- I know all the time they wouldn't -- it's

24   because they are prioritize the higher cases.

25         MR. ERMINE:  I agree with that, Your Honor, I think

1    he can testify generally speaking where the criteria -- which

2    he has already testified to.  But the question that was just

3    asked was did you review the file in this case, why wouldn't

4    the crime lab have done, had accepted a request in this case.

5    So he is essentially calling an outside witness that had

6    nothing to do with the investigation in this case, to comment

7    on the strength of the evidence through the lens of why the

8    crime lab would make one decision over another.

9            THE COURT:  You could go there.  I think if he's

10   start saying, hey, because this case involves this and this.

11   If he goes there, I think he's right.  But if he goes to say

12   well, you know -- I think he can talk about because in my

13   experience these cases are just lower priority.  But you can't

14   start commenting on, well, this case because it was found

15   here, you know, if he starts going in to the specifics of this

16   then he would actually be invading the province of the jury

17   start talking about how we are going to interpret this

18   evidence.  I'm going to overrule, I just don't want him

19   going -- I didn't think he was so I don't --

20           MR. MCCARTHER:  Can I lead him?

21           THE COURT:  Yes.  I think that is the best way.

22   (THEREUPON; The proceedings returned to open Court.)

23   BY MR. MCCARTHER:

24   Q    I believe what I was about to ask, and this will be my

25   last question.  Is based on your experience and the review of

1   the evidence presented to the Jury, this would not be a high

2   priority KCPD Regional Crime Lab case, is that correct?

3    A     That is correct.

4          MR. MCCARTHER:  Nothing further, Your Honor.

5          THE COURT:  Okay.  Thank you, counsel.

6          Mr. Ermine, cross.

7                    CROSS-EXAMINATION

8   BY MR. ERMINE:

9    Q     Hey there, Detective.

10   A     Hi.

11   Q     Now, you didn't have any direct involvement in this

12  case, right?

13   A     No, I did not.

14   Q     You were not a case agent on this case, were you?

15   A     Correct.

16   Q     Do you happen though whether the firearm in this case

17  was submitted for DNA analysis?

18   A     I do not know.

19   Q     Okay.  And just to be clear you testified that it is

20  possible, even though you would consider this case to be a low

21  priority for the Regional Crime Lab, you testified that it is

22  possible for you to ask for cases to be prioritized, correct?

23   A     Yes.

24   Q     Okay.  Just out of curiosity, when is the last time that

25  in a case you were handling, you requested DNA to be taken off

1  of a handgun?

2  A    When was the last time?

3  Q    Yes, sir.

4  A    I ordered a request yesterday.

5  Q    Okay.

6        MR. ERMINE:  Nothing further, Your Honor.

7        THE COURT:  Mr. McCarther, any redirect?

8                    REDIRECT EXAMINATION

9  BY MR. MCCARTHER:

10  Q    That case that you submitted for DNA analysis yesterday,

11  based on your training and experience your expectation is, you

12  got maybe a 10 percent chance that that comes back as a hit,

13  right?

14  A    Correct.

15        MR. MCCARTHER:  Nothing further, Your Honor.

16        THE COURT:  Okay.  Mr. Ermine?

17        MR. ERMINE:  Nothing further cross.

18        THE COURT:  Okay.  Detective you can stand down.

19  Thank you.

20        Government call their next witness.

21        MR. MCCARTHER:  The United States calls Special

22  Agent Travis Vas to the stand.

23        THE COURT:  Sir, if you want to come forward right

24  there, sir.  And please raise your right hand to be sworn by

25  my courtroom deputy.  Thanks.

TRAVIS VAS

1

2          Called as a witness on behalf of the PLAINTIFF, was

3   duly sworn, and testified as follows:

4          THE COURT:  You can have a seat up here.  Watch your

5   step as you go up.  Thank you.  Counsel.

6                    DIRECT EXAMINATION

7   BY MR. MCCARTHER:

8    Q   Sir, can you please state your name for the record?

9    A   Travis Steven Vas.

10   Q   And what is your occupation?

11   A   I am a Special Agent with the Financial Protective

12   Service.

13   Q   Now, the Federal Protective Service, explain that

14   agency?

15   A   Submission of the Federal Protective Service is to

16   safeguard employees and visitors and the property of the

17   federal government.

18   Q   Now, I believe you testified you're Special Agent with

19   FPS, right?

20   A   Correct.

21   Q   And the other individuals that have testified who work

22   with FPS, those are inspectors?

23   A   Right.

24   Q   So what is a difference between their job and what you

25   do?

1   A   Uniform officers are usually the first responders.  The

2   Special Agents usually come in after the fact and start

3   processing the crime scene and things of that nature.

4   Q   And how long have you been in that position?

5   A   About four years.

6   Q   What type of crimes do you investigate?

7   A   We deal with thefts, assaults, weapons charges, threats

8   towards government employees, things of that nature.

9   Q   And you are the case agent on this case?

10  A   I am.

11  Q   And what is the case agent?

12  A   Essentially we have to keep the case file intact.  Make

13  sure the evidence is being processed.  Essentially anything to

14  assist the United States attorney asks, we make sure it gets

15  done.

16  Q   In your role as case agent have you had occasion to

17  review Mr. Everett's criminal history?

18  A   I have.

19  Q   And did you discover any convictions of relevance?

20  A   There was one felony conviction.

21          MR. MCCARTHER:  Your Honor, may I approach the

22  witness?

23          THE COURT:  You may.

24  BY MR. MCCARTHER:

25  Q   I'm handing you what has been previously marked as

1   Government's Exhibit 15.  Do you recognize that exhibit?

2   A    I do.

3   Q    Where did you get that document from?

4   A    I contacted the state of Kansas in Wyandotte County

5   District clerk and requested a copy.

6   Q    And is that a certified copy of that document?

7   A    It is.

8   Q    And is that the certified record of one of defendant's

9   prior convictions?

10  A    It is.

11       MR. MCCARTHER:  Your Honor, at this time I move to

12  admit Government's Exhibit -- I believe that it's 8.  No, it

13  is 15, I'm sorry.  15 into evidence.

14       MR. ERMINE:  Your Honor, can we approach to get some

15  clarification?

16       THE COURT:  Yes.

17  (THEREUPON; Counsel approached the bench and the following

18  proceedings were held.)

19       MR. MCCARTHER:  It is not my intention to have this

20  document submitted to the Jury.  It is simply for the 404(b).

21  I am going to lead him through exactly what we talked about at

22  the pretrial.  That this is a crime that was committed by and

23  through the use of a deadly weapon of a handgun.

24       MR. ERMINE:  Just without waiving my previously made

25  objection to 404(b), I appreciate the government doing that.

1          THE COURT:  Okay.

2    (THEREUPON; The proceedings returned to open Court.)

3          THE COURT:  Government's Exhibit No. 15 shall be

4    admitted.

5          (THEREUPON; Government's Exhibit No. 15 was then

6    admitted into evidence by the Court.)

7    BY MR. MCCARTHER:

8    Q    Is the date of conviction on that certified conviction

9    May 5th, of 2009?

10   A    It is, sir.

11   Q    And it's my understanding this is a conviction of a

12   crime -- and don't say the title of the crime, but this is a

13   conviction of a crime that was carried out by and through the

14   use of a deadly weapon, is that correct?

15   A    Yes, sir.

16   Q    And, in fact, it indicates that that crime was carried

17   out by and through the use of a handgun, is that correct?

18   A    That is correct, sir.

19   Q    Okay.  Are you familiar with the defendant in this case,

20   Mr. James Everett?

21   A    I am.

22   Q    Have you met the defendant before?

23   A    I have.

24   Q    And what was the context of that meeting?

25   A    We were transporting Mr. Everett from Lansing

1   correctional institute to this courthouse for his initial

2   appearance.

3   Q    Did you speak with Mr. Everett during that transport?

4   A    I did.

5   Q    And are you familiar with this voice?

6   A    I am.

7   Q    Is it your understanding that defendant has been

8   detained in -- essentially detained in custody since March

9   11th, 2016, in regards to this case?

10  A    Yes, sir.

11  Q    Is there ability for prisoners to make phone calls while

12  in custody?

13  A    There is.

14  Q    They can make outgoing calls, right?

15  A    Correct.

16  Q    Can they make -- can incoming calls come into them?

17  A    No, sir.

18  Q    Are the phone calls that are outgoing, are they

19  recorded?

20  A    They are recorded.

21  Q    Are they stored?

22  A    They are stored.

23  Q    Can you explain to the Jury how the jail phone call

24  system works exactly?

25  A    So each inmate, they have an inmate number that is

1    assigned to them, they are also assigned a pin number for

2    making these phone calls.  Whenever they do make a call, the

3    company that's -- the phone provider, if you will, matches

4    those two up to make sure that is the person, and when those

5    calls are made that is how a record is made indicating who is

6    making the call.

7    Q    And so I believe if I am reading it correctly, every

8    time a person who is in custody needs to make an outgoing

9    phone call, they have a unique pin number that they have to

10   input that is associated directly to them?

11   A    Yes, sir.

12   Q    And that is how the computer system knows what calls

13   they're making and what calls anyone is making, is that

14   correct?

15   A    Yes, sir.

16   Q    In your role as case agent, did you request

17   Mr. Everett's jail calls that he made since March 11th, 2016?

18   A    I did.  I requested the first 90 days of him being in

19   custody.

20   Q    And in the first 90 days approximately, how many calls

21   were there?

22   A    I'd say over 100 for sure.

23   Q    Have you reviewed those calls?

24   A    I have.

25            MR. MCCARTHER:  Your Honor, may I approach the

1   witness?

2           THE COURT:  You may.

3   BY MR. MCCARTHER:

4   Q    I'm handing you what has been previously marked as

5   Government's Exhibit 12, 13, and 14.  Do you recognize the

6   item that I just handed to you?

7   A    I do.

8   Q    How do you recognize that item?

9   A    It's the phone calls that -- the recording of the phone

10  calls Mr. Everett had made while in custody.

11  Q    And in fact, those are clips of some of those phone

12  calls, is that fair to say?

13  A    Yes.  Looks like they are clips.

14  Q    And were they pulled from the system that you previously

15  described?

16  A    Yes.

17  Q    Which used defendant's specific and unique phone number?

18  A    Yes.

19  Q    Do you recognize the primary voice that is listed on

20  those jail calls?

21  A    That would be Mr. Everett's voice.

22          MR. MCCARTHER:  Your Honor, at this time I move for

23  the admission of Government's Exhibit 12 through 14 to be

24  entered into evidence.

25          MR. ERMINE:  Renew previous objection.

1          THE COURT:  Objection will be noted for the record.

2     Governments Exhibit 12, 13, and 14 shall be admitted.

3          (THEREUPON; Government's Exhibit No. 12, 13, and 14

4     were then admitted into evidence by the Court.)

5     BY MR. MCCARTHER:

6     Q    All right.  And I want to talk about Exhibit 12 first.

7     Do you know what date that phone call is from?

8     A    March 20th, 2016, sir.

9     Q    And that is about nine days after this incident?

10    A    Yes, sir.

11    Q    And what Exhibit 12 is, it is a clip of the full call.

12    It is not every single word of the entire call?

13    A    That's correct.

14         MR. MCCARTHER:  Your Honor, at this time may I

15    publish Exhibit 12 to the Jury?

16         THE COURT:  You may.

17         (THEREUPON; Government's Exhibit 12 was then

18    published to the Jury in open court.)

19    BY MR. MCCARTHER:

20    Q    Special Agent Vas, did that appear to be the defendant

21    discussing the incident that took place on March 10, 2016?

22    A    Yes, it did.

23    Q    I want to move to Exhibit 13.  What date is Exhibit 13

24    from?

25    A    It was from April 30, 2016.  I'm sorry.  Correction.

1    March 30, 2016.

2    Q    March 30, 2016, correct?

3    A    Correct.

4    Q    So that would have been about 20 days after this

5    incident?

6    A    Yes, sir.

7    Q    Do you know who the defendant is talking to in Exhibit

8    13?

9    A    Tiara Gray?

10    Q    How do you know that?

11    A    The phone number is 816-210-2996 would be the outgoing

12    call that he dialed.  And I know that number to be associated

13    with her from Kansas City Police Department incident report.

14    Q    And in fact that is the same number that Detective

15    Bailey testified on the stand today, is that correct?

16    A    That's correct.

17    Q    Do you know Mr. Everett's relationship to Ms. Gray?

18    A    I believe boyfriend, girlfriend.

19    Q    And this is a clip of a wire call, is that correct?

20    A    Correct.

21            MR. MCCARTHER:  Your Honor, permission to publish

22    Exhibit 13 to the Jury?

23            THE COURT:  You may.

24            (THEREUPON; Government's Exhibit No. 13 was then

25    published to the Jury in open court.)

1    BY MR. MCCARTHER:

2     Q    Special Agent Vas, did that appear to be a call where

3    the defendant is discussing the legal theory of the charge of

4    felon in possession of a firearm?

5     A    I believe that is correct.

6     Q    I want to discuss Exhibit 14.  What date is this call

7    from?

8     A    Sir, this would be from April 30th, 2016.

9     Q    So this would have been approximately 50 days after this

10   incident?

11    A    Yes, sir.

12    Q    Do we know whom the defendant is talking to?

13    A    Again, the defendant is talking to Tiara Gray.  The

14   phone number dialed was 816-210-2996.

15            MR. MCCARTHER:  Your Honor, permission to publish 14

16   to the Jury?

17            THE COURT:  Yes.

18            (THEREUPON; Government's Exhibit No. 14 was then

19   published to the Jury in open court.)

20            MR. MCCARTHER:  Special Agent Vas, I don't have any

21   further questions, thank you.

22            THE COURT:  Thank you.  Mr. Ermine, cross.

23                    CROSS-EXAMINATION

24   BY MR. ERMINE:

25    Q    Good morning, Special Agent Vas.

```
1    A    Good morning, sir.

2    Q    I imagine as a case agent in this case you listened to

3    these calls quite a few times, correct?

4    A    That's correct, sir.

5    Q    So I just want to talk very briefly about each of them.

6         Now, in the first call it sounds like -- let me ask

7    you this, do you have any idea who Mr. Everett's is talking to

8    in that first call?

9    A    I don't recall or I don't know, sir.

10   Q    Okay.  It sounds like at the beginning of that first

11   call there is a reference made to an article, correct?

12   A    I believe so, sir.

13   Q    And would you agree with me on the second call it sounds

14   like a lot of that call is Mr. Everett reading from the arrest

15   warrant in this case, correct?

16   A    I couldn't say one way or another to be honest, sir?

17   Q    Okay.  Aren't you the case agent in this case?

18   A    Yes, sir.

19   Q    Did you obtain the arrest warrant in this case?

20   A    I did, sir.

21   Q    So you are familiar with the arrest warrant then?

22   A    Yes, sir.

23   Q    You've heard the calls several times, right?

24   A    There are a numerous amount of calls, sir.

25   Q    I know.  Right.  Okay.  Well, the Jury has heard the
```

1    call.  Would you agree with me though that he is reading from

2    some document that appears to be really the nature of the

3    charge against him, that is being a felon in possession of a

4    firearm, correct?

5    A    It does sound like he is reading at some point, sir.

6    Q    It sounds like he is talking about dealing with the

7    statutes, even I think he reads some of the statutes by names,

8    Idle 18-922, for example?

9    A    Yes, sir.

10   Q    And then he goes on to talk about certain aspects of the

11   law, like constructive possession, correct?

12   A    Yes, sir.

13   Q    Now, it sounded like in the third call he also mentions

14   an article.  Do you remember him mentioning that toward the

15   beginning of the clip that he heard in that call?

16   A    Is it a newspaper article?

17   Q    Yeah.  Asking Ms. Gray whether she has located a news

18   article, correct?

19   A    Yes, sir.

20   Q    Now, I do want to go back to the first call briefly.  In

21   addition to referring to a news article in the call, he makes

22   mention several times of a motion, do you recall that from

23   listening to the telephone call?

24   A    Briefly, yes, sir.

25   Q    And he kind of described that motion as a motion for a

1  sovranty, correct?

2  A    Yes, sir.

3  Q    And something about refugee status?

4  A    Straw man or something to that effect, sir, yes.

5  Q    Now, I don't want to get too far into the weeds on this

6  next set of questions.  Maybe you know and maybe you don't

7  know.  Are you familiar with the idea of sovereign citizens?

8  A    Very briefly.

9  Q    I'm not trying to say that you are an expert, and I'm

10  really not going to go any further than this.  Could you just

11  tell the Jury what you might understand in your experience

12  what might a motion for sovereignty be?

13        MR. MCCARTHER:  Objection.  What is the relevance.

14        THE COURT:  I'm going to overrule now.  You can

15  answer if you can.

16  BY THE WITNESS:

17  A    To the best of my abilities from what I understand about

18  sovereign citizens, they don't necessarily believe in the

19  United States government rules and laws.  But again, I have

20  had no really formal training on the subject.

21  Q    Right.  Fair enough.  You know, would you agree with my

22  characterization of it as essential it is kind of a wacky,

23  untrue, legal theory, correct?

24        MR. MCCARTHER:  Objection, calls for a legal

25  conclusion.

1          MR. ERMINE:  Yeah, I'll withdrawal the question.

2          THE COURT:  Yeah, I'll sustain that.

3     BY MR. ERMINE:

4      Q    Again, you were the case agent in this case, right?

5      A    Yes, sir.

6      Q    Did you ask for DNA testing to be done on the firearm in

7     this case?

8      A    No, I did not.

9          MR. ERMINE:  Nothing further, Your Honor.

10          THE COURT:  Mr. McCarther, do you have any redirect?

11          MR. MCCARTHER:  No, Your Honor.

12          THE COURT:  Thank you, Special Agent Vas, you may

13     step down.

14          Government call their next witness.

15          MR. MCCARTHER:  Your Honor, may we approach?

16          THE COURT:  Yes.

17     (THEREUPON; Counsel approached the bench and the following

18     proceedings were held.)

19          MR. MCCARTHER:  The only evidence that we have left

20     is to admit the stipulation, and then the government intends

21     to close its case.

22          THE COURT:  Okay.  Why don't we do this, we

23     probably -- do you want to do that now and then I'll send them

24     off to lunch?

25          MR. MCCARTHER:  Yes.

1              THE COURT:  Do you anticipate -- I'm going to make

2      record with you.  Do you anticipate any evidence?

3              MR. ERMINE:  No, sir.

4              THE COURT:  Okay.  We will do this.  Finish off the

5      instructions and have them take an hour a little bit more

6      before they come back.

7      (THEREUPON; The proceedings returned to open Court.)

8              THE COURT:  Mr. McCarther.

9              MR. MCCARTHER:  Your Honor, I have a stipulation

10     that the parties have agreed to.  It's called a stipulation

11     regarding prior felony convictions.  It is Government's

12     Exhibit 16.  Both parties have agreed to it's admissibility

13     and so I formally request admission of Government's Exhibit 16

14     into evidence?

15             MR. ERMINE:  No objection.

16             THE COURT:  Government's Exhibit No. 16 shall be

17     admitted.

18             (THEREUPON; Government's Exhibit No. 16 was then

19     admitted into evidence by the Court.)

20             MR. MCCARTHER:  May I publish to the Jury and read

21     it into the record?

22             THE COURT:  Yes, You can read it into the record.

23             (THEREUPON; Government's Exhibit No. 16 was then

24     published to the Jury in open court.)

25             MR. MCCARTHER:  It has the title of the case United

1    States versus James Everett Jr., Case No. 16-00110-01.  And it

2    states as follows, stipulation regarding prior felony

3    conviction.  It stipulated and agreed by and between the

4    parties the plaintiff, the United States of America, and the

5    defendant, James Everett Jr., that at the time of the offenses

6    alleged in the indictment the defendant had been convicted of

7    a felony offense for which he could receive a term of

8    imprisonment greater than one year.  It is agreed by and

9    between the parties that the stipulation may be marked as an

10   exhibit, admitted into evidence, and read to the Jury.  It is

11   signed by myself, Jeffrey Hugh McCarther, the defendant, James

12   E. Everett Jr., and the defendant's attorney, Mr. William M.

13   Ermine.

14           THE COURT:  Okay.

15           MR. MCCARTHER:  Your Honor, with that the United

16   States rests its case.

17           THE COURT:  Okay.  Thank you.

18           Ladies and gentlemen of the Jury, at this time the

19   government rests.  And I think it would be appropriate to take

20   our afternoon break.  And we will take approximately an hour.

21   We are nearing the conclusion of this case, whereas the Court

22   will read to you the instructions, the parties will argue the

23   case, and then you will recess to deliberate.  There will be

24   some matters that we have to take up in between, but I think

25   about an hour.  And if, for some reason, we run a little

1    longer, we will make sure to the extent we can to keep you

2    updated on what we are doing out here.  We will be working

3    throughout this period of time.  With that said, we will

4    recess at this time.

5    (THEREUPON, a short recess was had; WHEREUPON, the following

6    proceedings were had.)

7            THE COURT:  First of all, are there any oral motions

8    to be made?

9            MR. ERMINE:  Your Honor, thank you.  I would like to

10   move for a judgment of directed verdict at this time.

11           Among other things the government has failed to

12   prove its case.  Specifically with regard to Count One, the

13   government among other things has failed to prove that

14   Mr. Everett threatened these law enforcement officers with the

15   intent to impede them.  The government has failed to prove

16   that he threatened because they are or were working in their

17   capacity as federal law enforcement officers, and the

18   government has otherwise failed to prove the requisite

19   specific intent on that count.

20           With regard to Count Two, among other things the

21   government has failed to prove that Mr. Everett knowingly

22   possessed the firearm in this case.  The government has

23   presented no evidence tending to show that Mr. Everett knew

24   that the firearm was in the car.  And for those reasons and

25   for the general reasons that the government has failed to meet

1    its burden in this case, we ask for a directed verdict at this

2    time.

3              THE COURT:  Thank you, Mr. Ermine.  Mr. McCarther.

4              MR. MCCARTHER:  We oppose the defendant's objection.

5    If we want to talk about Count One of the indictment,

6    threatening a federal law enforcement officer.  As to the

7    first element that is that the defendant threatened to assault

8    a federal protective service officer.  I believe there was

9    substantial testimony as to the statements that he made to the

10   service officers.  There was surveillance video of the actual

11   interplay between the defendant and the FPS officer.  So that

12   extent, element two, is that the defendant did so with the

13   intent to impede, intimidate or interfere with such official

14   while the official was engaged in the performance of official

15   duties.  As it was testified by many of the FPS officers they

16   were duty at the time.  Part of their responsibility is to

17   protect federal property and the individuals in federal

18   property, and that engaging with hostile individuals in from t

19   of federal property is a part of the performance of their

20   official duties.  FPS Inspector Wright specifically said that

21   he believes that the defendant was making these threats to him

22   because the defendant was attempting to intimate him.  Now,

23   granted there is circumstantial evidence as to the defendant's

24   intent as Your Honor is well aware.  Intent is rarely proven

25   with direct evidence.  And so in this case I think there is

1   substantial circumstantial evidence to prove it.

2           As far as Instruction No. 2, there has been a

3   stipulation to element one, a felon in possession of a

4   firearm.  We just read that into evidence.

5           As far as element three, there is significant

6   evidence that the gun had crossed a state line at some point,

7   including Detective Watts testimony, Special Agent Wilson's

8   testimony, and the gun itself which is marked with a Prescott,

9   Arizona stamp.

10          As to element two that the defendant thereafter

11  knowingly possessed a firearm.  Again, we have substantial

12  testimony that the defendant actually came to the federal

13  building in a vehicle, a firearm was found under his seat.  We

14  have testimony from Detective Watt saying this is a place

15  where a lot of people put their firearms to have quick access

16  to it.  As well as the phone calls where we hear defendant's

17  voice himself alluding to this firearm that was in the car.

18  Now, again when it comes to intent, a lot of times intent is

19  proven with circumstantial evidence.  Here we actually have

20  the defendant talking about the gun in the car.  I believe the

21  United States has more than met its burden when it comes to

22  proving up these elements in order to be sent to a Jury.

23          THE COURT:  Okay.  Defense motion for judgment of

24  acquittal at the close of the government's evidence will be

25  overruled or denied.  I think this case is submissible.

1           With that said, let me go over a few things.

2    Mr. Everett, sir, are aware of your rights with respect to

3    testifying and not testifying?

4           MR. EVERETT:  Yes, Your Honor.

5           THE COURT:  And you do understand if you choose you

6    have a right to testify, you understand that?

7           MR. EVERETT:  Yes, Your Honor.

8           THE COURT:  And if you do testify then the

9    government would be able to cross-examine you about any priors

10   that you may have, you understand that?

11          MR. EVERETT:  Yes, Your Honor.

12          THE COURT:  And have you talk to your attorney about

13   the right to testify?

14          MR. EVERETT:  Yes, Your Honor.

15          THE COURT:  Okay.  And you understand if you choose

16   not to testify the Court will instruct the Jury not to hold

17   your right not to testify against you.  They can't consider

18   that in their deliberation, you understand that?

19          MR. EVERETT:  Yes, Your Honor.

20          THE COURT:  Do you have any questions of the Court

21   or any questions with respect to your right to testify or not

22   testify?

23          MR. EVERETT:  No, your Honor.

24          THE COURT:  Okay.  So my understanding is that you

25   at this time you chose not to testify, is that correct?

1       MR. EVERETT:  Yes, Your Honor.

2       THE COURT:  Okay.

3       Anything else for the record from the parties?

4       I think what we will do is we will get the

5  instructions together and I will come with my ultimate

6  decision with respect to the elements and the intoxication

7  instruction.

8       Typically, what I'll do in our instruction

9  conference -- I'll talk to you all about that.  I think we

10  talked as much as we can.  I will go through and if there is

11  any objection to the instruction, just do it at the time.

12  Sometimes it will be a general instruction if you like for

13  everything, and then a specific instruction as I start to go

14  through.  I will number them according to my number system,

15  but I refer back to how you guys number them when I go

16  through.  So we can take that up.  So we'll do that.

17       Let me ask this while we are out here so we get this

18  resolved.  How much time do you all think you need to argue

19  this case?

20       MR. MCCARTHER:  And when it comes to closing

21  argument, I assume the time we say is the time we intend to

22  split between first close and second close?

23       THE COURT:  Yes, total time.

24       MR. MCCARTHER:  Total time, 30 minutes, Your Honor.

25       THE COURT:  Do you know my general rule?

```
1          MR. MCCARTHER:  No.

2          THE COURT:  And this came from Judge Maurer and I

3    will tell you it is true.  Judge Maurer is an admiral, he's in

4    the senate, he's a judge.  He said people should get -- give

5    your attorneys ten minutes per day.  And so we had a half a

6    day yesterday, and half a day today.  Now, I'm not suggesting

7    I give you ten minutes, but I think 30 is beyond pail.

8          MR. MCCARTHER:  25, Your Honor?

9          THE COURT:  No.  I think 20 is sufficient.  And

10   that's two days worth.  And we haven't had two days worth of

11   testimony.  We only have about a day.  Mr. Ermine -- I know

12   what you want Mr. McCarther.  Let's see what you want, Mr.

13   Ermine?

14         MR. ERMINE:  I thought I was going to be reaching by

15   asking for 15, Your Honor.

16         THE COURT:  You were.  But I will compromise and

17   will do 20 minutes.

18         MR. MCCARTHER:  Your Honor, would you like our time

19   splits now?

20         THE COURT:  Yes.  Who is going to go first?

21         MR. MCCARTHER:  First close will be Ms. Countney

22   Pratton.

23         THE COURT:  And Ms. Pratton, how much time are you

24   going to take off of the 20?

25         MS. PRATTEN:  15 minutes.
```

1          THE COURT:  And what are you warnings?

2          MS. PRATTEN:  Can I have a five minute and a two

3     minute, Your Honor.

4          THE COURT:  Okay.  I will say time and if you go

5     over you are eating into Mr. McCarther's time.  And Mr.

6     McCarther you will have five minutes.  And do you want a

7     warning?

8          MR. MCCARTHER:  Yes, please, two minutes.  And also

9     just to clarify, if she goes under do I get that time rolled

10    back to me?

11         THE COURT:  If she goes under?  Yeah.  I'll tell you

12    how much time you have.  So you want a two minute warning.

13         MR. MCCARTHER:  And just to clarify that is a verbal

14    warning, right?  That's not the light?

15         THE COURT:  Verbal, yes.  And Mr. Ermine?

16         MR. ERMINE:  I'll take a five minute warning.

17         THE COURT:  Okay.  Thank you.

18    (THEREUPON, the following proceedings were adjourned.)

19          (Proceedings began at 1:11 PM)

20         THE COURT:  Okay.  I have given you the instructions

21    I plan on reading.  So as we go through give me your

22    objections.  I left some for the intoxication.  I think we

23    have argued that on the record.  We can sum it up again, if

24    you would like, Mr. McCarther.  And I think, also, on the

25    verdict directors I use the suggested form in which the

1   government gave.  And then I also gave the mere presence

2   instructions.  But there can be other objections, but those

3   are the notable ones we have talked about.

4           Previously read, I will give Instruction No. 1 is

5   Plaintiff's Instruction No. 3 which is Eighth Circuit Model

6   Criminal Jury Instructions 1.1.

7           Also previously read as Instruction No. 2, is Eight

8   Circuit Model Jury Instructions 1.3.  And that is Plaintiff's

9   Instruction No. 5 as they submitted to the Court.

10          Instruction No. 3, previously read will be Eighth

11  Circuit 1.05 which is submitted in Plaintiff's Instruction No.

12  6.

13          Instruction No. 4, previously read Eighth Circuit,

14  modeled after Eighth Circuit Jury Instructions 1.6,

15  Plaintiff's No. 7 submitted.  That will be Instruction 4.

16          Instruction No. 5, Eighth Circuit 1.07, Plaintiff's

17  Instruction No. 8.  That will be given as Instruction No. 5.

18          Instruction No. 6, previously read as Eighth Circuit

19  Model Jury Instruction 1.08 submitted by the plaintiff as

20  Instruction No. 9.

21          Instruction No. 7, Eighth Circuit Jury Instruction

22  1.09, submitted as Plaintiff's Instruction No. 10.  That will

23  be given as Instruction No. 7.

24          The Court will start reading with Instruction No. 8,

25  which is Eighth Circuit 3.01 submitted by the Plaintiff as

1    Instruction No. 15.

2              Instruction No. 9, Eighth Circuit Jury Instruction

3    2.03 submitted by the Plaintiff as Instruction No. 12.  That

4    will be given as Instruction No. 9.

5              Given as Instruction No. 10, will be Eighth Circuit

6    Jury Instructions 2.07 submitted by the Plaintiff as

7    Instruction No. 21.  That will be Instruction No. 10.

8              Instruction No. 11, Eighth Circuit 2.08 submitted as

9    Plaintiff's Instruction No. 13 -- now, look at that.  You guys

10   both of you look at that and particular the government.  I

11   changed it to reflect -- and if you have any thoughts on that,

12   but I think that would be a fair way to reflect it.  But I am

13   open for thoughts.  What do you think too, Mr. Ermine, with

14   respect to that?

15             MR. ERMINE:  I think that just for purposes of the

16   record, I'm not waiving any potential appeal issues.  I would

17   object to the inclusion of Instruction No. 11.

18             THE COURT:  Based upon the 404(b), notwithstanding

19   that?

20             MR. ERMINE:  The actual contents of it.

21   Notwithstanding that objection I don't have any further

22   problems with it.

23             THE COURT:  Okay.  That will be noted for the

24   record.

25             Instruction No 12, Eighth Circuit 3.02 submitted as

1   Plaintiff's Instruction No. 16.  That will be given as

2   Instruction NO. 12.

3           Instruction No. 13 will be Eighth Circuit 3.03 and

4   that was submitted as Plaintiff's Instruction No. 17.

5           Instruction No. 14 will be Eighth Circuit 3.04

6   submitted as Plaintiff's Instruction No. 19.

7           The reasonable doubt Instruction 3.11 submitted by

8   the Plaintiff as Instruction 27, that will be Instruction 15.

9           You know, Instruction No. 16 will be Eighth Circuit

10  4.01 submitted as Plaintiff's Instruction No. 22.

11          You know, I don't know, and I am open.  I don't

12  think it is harmful.  I don't know about -- typically, we

13  don't give two.  I think that is the trailer language on one

14  of the verdict directors.  And let me see.  Hold on.  Am I

15  right?  Yeah, there is no burden.  I don't know if it is

16  necessary to give it twice.  Look at that.  What do you all

17  think?  You see there at the very last part of it, there is no

18  burden which is the same instruction as the separate

19  Instruction 16.  I don't think it's a huge deal, but just any

20  thoughts?

21          MR. MCCARTHER:  Your Honor, I think it is reflected

22  in numerous other instructions.  I don't think it is

23  necessary.

24          THE COURT:  As Instruction 16?  Standing alone is

25  what you're saying?

1           MR. MCCARTHER:  Yes.  It's already been touched on

2    in 16.

3           THE COURT:  So you're saying I can take it out of

4    19?

5           MR. MCCARTHER:  Right.

6           THE COURT:  Mr. Ermine?

7           MR. ERMINE:  I think if the Court were inclined to

8    take it out of one place, I would probably take it out of 19

9    and leave it in 16.  I say that only because my recollection

10   of the instruction manual it says to give this specific

11   instruction when the defendant doesn't testify.  So I do think

12   a stand alone instruction is definitely --

13          THE COURT:  It says give it when requested.

14          MR. ERMINE:  Yeah, and we definitely request it.

15          THE COURT:  Yeah, I just thought -- okay.  I'll take

16   it out of 19.

17          16 will be given 4.01.

18          Instruction No. 17 is Eighth Circuit 4.10 which is

19   submitted as Plaintiff's Instruction No. 20.

20          Instruction No. 18 is 4.17 submitted as Plaintiff's

21   Instruction No. 18.  That is modeled after Eighth Circuit.

22          Instruction No. 19 is 3.06 submitted as Plaintiff's

23   Instruction No. 23.  And the Court will exclude that language

24   at the end.

25          Instruction No. 20 is the first verdict director

1    patterned after the District of South Carolina, Pattered

2    Instructions 2016, 18 U.S.C. 115(a)(1)(b).  It is Plaintiff's

3    Instruction No. 24.  That will be given as Instruction No. 20.

4    Mr. Ermine?

5            MR. ERMINE:  Your Honor, I do object.  I think that

6    my instruction is a better delineation of the elements.  It

7    makes things more clear for the Jury.  Setting out the

8    elements as four individual elements instead of two elements.

9    So I do make that objection to Instruction No. 20.

10           THE COURT:  Go ahead, Mr. McCarther.

11           MR. MCCARTHER:  Your Honor, I don't know if this is

12   the appropriate time to argue, but I do have an argument

13   regarding the burden of prove behind this instruction.  And I

14   don't know if you would like to take -- I have no problem with

15   the form of the instruction, but something that was stated in

16   opening I think is merited to be brought up now before

17   closing.

18           THE COURT:  What do you want to talk about?  I guess

19   I'm a little confused.

20           MR. MCCARTHER:  Here's what I want to talk about.

21   The defendant -- I'm sorry.  The defense counsel in opening

22   stated that there was no proof and it was the government's

23   burden to prove that the defendant threatened the federal

24   protective officers because they were protective officers.

25   That is not the burden of proof however in these instructions.

1    And I just want to note that to the extent that that is stated

2    in closing, I think that is an objection as to a misstatement

3    of the law.

4             THE COURT:  If they say it in closing?

5             MR. MCCARTHER:  Right.

6             THE COURT:  What is your opinion?

7             MR. ERMINE:  I disagree.  I think it's an exact

8    statement of what the law is.

9             THE COURT:  Is what?  Say it again?

10             MR. ERMINE:  The government has to prove that Mr.

11   Everett threatened these federal law enforcement officers with

12   the specific intent -- of course, we're not going to tell the

13   Jury about that.  With the intent to impede or intimidate, et

14   cetera, those officers, while the officers are engaged in

15   their official duty.  So as I mentioned in my opening and as I

16   intend to mention again in my closing, the government has the

17   burden to prove that Mr. Everett threatened those officers

18   with the intent to impede them why they were engaged in their

19   official duties.

20             MR. MCCARTHER:  That's different than what I'm

21   saying.

22             THE COURT:  What are you saying?

23             MR. MCCARTHER:  I'm saying in opening Mr. Ermine

24   said the government had to prove that he threatened these

25   officers because they were federal officers.  And I am arguing

1  that is not the burden of proof.  The burden of proof is only

2  that he did threaten, that he threatened someone that happened

3  to be a federal officer, and he did so while those officers

4  were engaged in the performance of their official duties.

5        THE COURT:  Well, I'm not sure what he argued.

6  That's not evidence, I mean, it's not opening.  I'm not

7  sure -- I think we splitting hairs here.  I suspect if that

8  objection is made I would tell the Jury you are to follow the

9  instructions of law submitted to you by the Court.  Make your

10  objection at the time, McCarther, and maybe it will come

11  clearer to the Court.

12        MR. MCCARTHER:  And to the extent I make a citation

13  to the record, there is a case on point, it's an Eleventh

14  Circuit case, United States versus Berkey, 936 F2d, 529,

15  pinpoint at 531 to 532.  This involved a threat to a federal

16  judge.  And the Court in that case instructed the Jury that as

17  a matter of law it is not necessary for the government to

18  prove that the defendant knew he was threatening a judge.

19        THE COURT:  So your argument is that he knew -- are

20  you suggesting that the argument is going to make, he didn't

21  know they were --

22        MR. MCCARTHER:  Right.

23        THE COURT:  Oh, and he can't make that argument?

24        MR. MCCARTHER:  Exactly.

25        MR. ERMINE:  And I'm not going to argue that.  I

1    mean, frankly, I'm going to argue that he threatened everybody

2    whether they were federal law enforcement officers or not.

3    And let the Jury decide whether he threatened them in their

4    official duties.

5              THE COURT:  There you have it.

6              MR. MCCARTHER:  There we have it.

7              THE COURT:  All right.

8              Instruction No. 21, Eighth Circuit 9.06, the

9    Defendant's proposed Jury Instruction 6, the Court -- the

10   intoxication defense instruction, it is the Court's intent to

11   submit.

12             You know, I talked to Judge Ketchmark.  I think

13   factually I looked at some of the cases.  I think the case

14   that is cited is slightly different than the facts are here.

15   The one case dealt with the intoxication.  I think it's

16   different circumstances here.  I think in that case from what

17   I read it was a situation where there was evidence of

18   intoxication.  He said he was drinking all day.  But there

19   really wasn't any other corroborating evidence.  I mean, one

20   witness said, I've known him for years, he wasn't intoxicated.

21   I think that's different factually than what we have here.  I

22   think everyone here had some question about his intoxication.

23   And when I say intoxication, I'm not specific to alcohol, but

24   I'm just saying his intoxicated state that he was in.  Whether

25   it would by -- and it seems here to be by some narcotic or

1    substance as the detective said.  I think that is a matter for

2    the Jury.  And I disagree that the evidence has to be a such

3    that the Court -- well, which I'm making a determination.  My

4    determination is based on the impossibility that the drug

5    caused the -- or lack there of of the requisite intent to do

6    what he did.  I think there is argument, just as you argued to

7    the Court on why you think the Court should exclude it, is the

8    very argument the Court believes you should be making to the

9    Jury and let them decide on whether that played any factor in

10   his intent.  But go ahead.

11            MR. MCCARTHER:  Your Honor, I object to the giving

12   of the instruction.  I don't believe that the defendant has

13   met the threshold for the giving of this instruction.  There

14   is some speculation evidence that was out there that the used

15   some drug.  We don't know what drug.  We don't know in what

16   amount.  We don't know the affect of that drug.  There's been

17   no testimony from the defendant as to whether or not he was

18   conscious or able to interpret the events that were happening

19   during March 10th, of 2016, and whether that was a proximate

20   cause of the drug that he allegedly took.  I think we are

21   entering this kind of realm of speculation.  And the Eighth

22   Circuit standard as noted in United States versus Kenyon,

23   that's 481 F3d 1054.

24            THE COURT:  Doesn't Kenyon cite Phelps?  Or is it

25   vice versa?

1        MR. MCCARTHER:  Kenyon cites Phelps because Kenyon

2   is from 2007.

3        THE COURT:  Okay.

4        MR. MCCARTHER:  And in Kenyon they dictate a

5   standard that there must be some evidence offered at trial

6   that the defendant was intoxicated to the point of completely

7   lacking the capacity to form the requisite intent.  We're

8   essentially giving this instruction, we're going to allow the

9   Jury to speculate whether he did or he didn't, because there

10  is nothing that they can point to in the record to say, oh,

11  because of that now we know whether or not he lacked the

12  requisite intent.

13       THE COURT:  You made your record.  I think nothing

14  can be further from the truth with respect to -- I think a

15  reasonable person can come.  And when you come to in

16  particular speculation, in that case when they were

17  speculating -- I think it was Phelps, but when they were

18  speculating about it, it was the evidence that suggested it

19  was mere speculation that they were under.  And I think that

20  court rightly ruled and I don't think my ruling here is

21  contrary to that in speculation.  And I think it is overplayed

22  in this particular situation and they way -- I don't need to

23  comment, you have made your record.  So the Court is going to

24  give that instruction for all the reasons stated.

25       Instruction No. 22, Eighth Circuit 6.18.922(a)

1    submitted as Plaintiff's Instruction No. 25 will be given as

2    Instruction No. 22.

3              With respect to Instruction No. 23 that is Eighth

4    Circuit 8.02 submitted as Plaintiff's Instruction No. 26.

5              The Instruction No. 24, Eighth Circuit 9.05, based

6    upon the United States 239 F3d 968, Eighth Circuit 2001 case.

7    That is submitted as Defendant's Instruction No. 5.  That will

8    be Instruction No. 24.

9              MR. MCCARTHER:  Your Honor, may I make a record?

10              THE COURT:  Yes.

11              MR. MCCARTHER:  Your Honor, I believe Instruction

12   No. 24 is unnecessary as it is included in the definition of

13   possession.

14              THE COURT:  Okay.  That will be given as instruction

15   No. 24 over objection.

16              Instruction No. 25 will be Eighth Circuit 3.1

17   Instruction number -- submitted as Instruction No. 28.

18   Following that will be the verdict forms for Count One and for

19   Count Two.

20              Any other record you all would like to make with

21   respect to the instructions after than what has been made?

22   Mr. Ermine?

23              MR. ERMINE:  No, Your Honor.

24              THE COURT:  Mr. McCarther?

25              MR. MCCARTHER:  No, Your Honor.

1          THE COURT:  Okay.  We will get the one change to

2   exclude that one and then we will get going in the next ten

3   minutes or so.  I'll probably not wait until we copy them off

4   for the Jury, but I will have them go back with the Jury and

5   we'll go from there.

6          MR. MCCARTHER:  I was just going to request that my

7   instructions be unstabled by Maggie, but I think I missed.

8          THE COURT:  That's fine.  We'll put them in a clip.

9   Okay.  We'll get ready to go.

10          MR. ERMINE:  And Judge, just a procedural matter.

11   Obviously, we have to rest and then I will renew my motion for

12   directed verdict.

13          THE COURT:  Yeah, just renew it up here at the bench

14   and we will do it up here and then we will go.

15          MR. ERMINE:  Okay.  Thank you.

16   (THEREUPON, the jury enters the courtroom; WHEREUPON, the

17   following proceedings were had in the presence of the jury.)

18          THE COURT:  Okay.  Ladies and gentlemen of the Jury,

19   thank you for your patience.  At our break we were able to

20   make a determination that the case when you come back out we

21   would be able to read you the instructions and the parties

22   would argue the case.  We're at that point, but before we do

23   so, Mr. Ermine?

24          MR. ERMINE:  Your Honor, at this time, the defense

25   rests.

1          THE COURT:  Okay.  Thank you.  Can I have counsel

2     approach?

3     (THEREUPON; Counsel approached the bench and the following

4     proceedings were held.)

5          MR. ERMINE:  At this time I will renew my motion for

6     directed verdict for all the same reasons I previously

7     mentioned.

8          MR. MCCARTHER:  And for all the same reasons that I

9     mentioned before, I oppose that motion.

10          THE COURT:  Judgment for acquittal at the close of

11     all the evidence will be denied or overruled at this time.

12     Thank you.

13     (THEREUPON; The proceedings returned to open Court.)

14          MR. MCCARTHER:  Okay.  Ladies and gentlemen of the

15     Jury, I will read to you the instructions of law and then the

16     attorneys will have the opportunity to argue this case to you.

17          But before I do so I just want to make a few

18     comments.  You'll all be provided with the instructions to

19     take back with you to the jury room.  Whoever you select as

20     the foreperson will take possession of what I call the blue

21     copy.  I call it the blue copy because there is blue numbering

22     on those instructions.  And they also contain the verdict

23     forms.

24          We have taken breaks from time to time.  You are

25     able to do so under the direction of your foreperson.

1   However, if you do take breaks you are not to start

2   deliberating until all of you are back together.

3         You've heard all the evidence, and again, I'm about

4   to read the instructions.  That everything you need and

5   everything I have for you to decide this case.  There are a

6   number of items that were received into evidence by this

7   Court, do your best to describe them and the Court will make

8   sure it provides those items to you.  Ms. Baldwin will not be

9   able to answer questions, but you will have forms if you have

10   a question for the Court, and I will do my best to respond to

11   it and answer it appropriately with any request that you have.

12         Now, there is no time limitation on the amount of

13   time that you deliberate.  The parties deserve and need your

14   full measure of your attention as you attempt to resolve the

15   case.

16         At this time -- the Court will not read the previous

17   instructions that have previously been read.  And I will start

18   reading with Instruction No.  8.

19         (THEREUPON; Jury Instructions were then read to the

20   Jury by the Court.)

21         THE COURT:  Ms. Pratten?

22         MS. PRATTEN:  Thank you, Your Honor.  May it please

23   the Court?

24         THE COURT:  It may.

25         MS. PRATTEN:  Thank you.

1      Ladies and gentlemen of the Jury, I know it's been

2  said before and I'm going to say it one more time, everyone in

3  this courtroom thanks you for your time and attention to this

4  matter that you have given today and yesterday.

5      Yesterday when Mr. McCarther opened our proceedings

6  he talked to you about a burden.  He talked to you about the

7  burden that we, him, myself, and the other members of the

8  government's team had to prove beyond a reasonable doubt that

9  on March 10th, 2016, the defendant committed two federal

10  crimes when he showed up at the Richard Bolling Federal

11  Building downtown.  And Mr. McCarther said he was comfortable

12  he this burden.  He was comfortable carrying it, he was

13  comfortable throughout the trial, and he remains comfortable

14  right now.  And his comfort is because he reviewed all the

15  evidence that we presented to you in the last -- yesterday and

16  today.  He reviewed it and it formed the basis of the charges

17  that were brought against the defendant, before we even got

18  here.  Now, the defendant is charged as you know with two

19  counts via federal indictment.  And the Judge read you the

20  elements which the government would have to prove for you to

21  be able to conclude that the defendant actually did commit

22  these crimes that he is charged with.  And I'm going to place

23  a copy of the instructions, and this is what the Judge just

24  read for you, the specific elements that pertain to the first

25  count, which is threatening a law enforcement officer.  There

are two elements. One, that the defendant threatened to assault a Federal Protective Service Officer. And the second one has to deal with his intent, the defendant's intent when he issued this threat. You can go ahead, you've had this read to you, and you just did a few minutes ago, and you are going to have a copy of this that you can consult when you go back into your deliberations.

So right now I'm going to take the opportunity to review the evidence with you that you saw and that you heard in the last couple days.

And we started the proceedings with a Protective Service Officer Foderaro. He stood up here yesterday on the stand and he set the scene for you. He gave you a picture of what you could anticipate. He opened the narrative. He used the map and give you a general idea of how the federal building is laid out. And he put you in the time and place. He is a trained law enforcement officer and he functions as you know as the first line of defense to protect the federal building that we have been talking about the last couple of days. And this federal building, he talked to you a little bit about it and you got some more detail when you heard from our second witness FPS Officer Schwarz. But from the two of them you can gleam that the federal building that we are talking about is a big structure, it is 18 floors, it's got a lot of different agencies. Social Security, the Army Corps of

1  Engineers, they both mentioned there is a daycare on the first

2  floor.  There are areas that are accessible to the public

3  which they talked about the different facilities that are on

4  the ground and first floor.  And they both conveyed to you

5  very well the idea that this is a very populated, busy place

6  with a lot of people, and that is the whole reason that we

7  have layers of protection around this place.

8         And PSO Foderaro informed you again that he is the

9  first line of defense him and others like him at the 12th

10 Street entrance.  And he brought you to the morning on March

11 10th, of 2016, where he was the first one to encounter the

12 defendant.  And he testified to the fact that the defendant

13 entered the lobby at the 12th Street entrance.  And he was

14 stopped by PSOs like everyone is when you enter that building,

15 and he appeared agitated and angry.  And this stuck out to him

16 because this is not a typical interaction those PSO's have

17 with the probably 100s of people that come to that building

18 every day.  And he said that he actually stopped the defendant

19 and the other officers around him because his demeanor, again,

20 this is a sensitive building, this is a large building, lots

21 of people there that are necessary to protect.  And him and

22 the other PSOs listened to what the defendant gave as his

23 reason for being there.  You heard him testify the fact that

24 the defendant wanted to see a federal judge.  And he was

25 turned away.  His behavior was erratic.  There are no federal

judges.  You've heard multiple witnesses testify that this is

not the building that he needed to go to to meet that need.

And PSO Foderaro watched as the defendant left the lobby

because as you heard him say it is a glassed in area and he

actually saw him go to a car.  And this car that he testified

seeing the defendant go to as you have heard many witnesses

say it was parked in an area, it's not a parking lot.  So it

is not as if he went to a place and we lost site of him, this

is a clearly marked emergency vehicle area.  And because based

on his training and his responsibility to protect the people

in that building, he went ahead and called up to the federal

protected services which is another layer of protection that

is afforded to the occupants of that building.

          And you heard from our second witness, FPS Officer

Schwarz, who is a member of this FPS team and a member of this

second layer of protection for that building, that he was one

of the recipients of this call.  He was sitting in his office

on the second floor of the Bolling building and him and his

other FPS officers received a call for assistance down in the

lobby.  And you heard him testify that himself and a couple

other officers responded down to the lobby, and the PSOs went

ahead and directed them out to where the defendant was.  They

were actually able to point out this is the individual who

appeared in our lobby and we think we need some further

investigation into this.  Because he was behaving oddly and he

1   is coming to a federal building and he is clearly still on the

2   grounds.  And then they directed him to him.

3        You then you heard FPS Officer Schwarz that him and

4   other FPS officers exited the lobby and that they then saw the

5   defendant comes towards them.  And you heard both him and the

6   following witness, FPS Officer Wright, saying this wasn't a

7   I'm going to walk up to you and we are going to have an

8   encounter.  This was a fast-paced approach.  You saw how FPS

9   Officer Schwarz was dressed.  He was not dressed like any of

10  us.  There was no confusion about who these officers were.

11  You saw in the video, everybody had a uniform.  And clearly

12  these are uniformed law enforcement personnel, even if you

13  didn't know who they were, DHS or FPS of KCPD, you saw these

14  individuals and nobody has any doubt that these are law

15  enforcement officials.

16        And then Officer Schwarz testified to the fact that

17  as the defendant was nearing the officers when they stepped

18  out of the lobby, he could observe that the defendant was

19  muttering.  Was saying things to the effect -- he said some of

20  it they could not understand it, but he got comments like, I'm

21  going to kick your ass, I'm going to knock your head off.  And

22  these is just kind of muttering as he is coming towards them.

23  And then for whatever reason he observed the defendant zero in

24  on FPS Officer Wright, just another member of the team.  You

25  heard Wright testify, I didn't know this guy, and we had no

1 evidence that the defendant actually knew him either. But for

2 whatever reason out of the four officers that reported, he

3 focused in on FPS Officer Wright.

4       Let's talk a little bit about what Wright told us.

5 Yesterday he got up. Also a trained law enforcement officer,

6 also a member of the FPS team, that second layer of security,

7 specifically assigned to protect, not just that building, but

8 other federal buildings in the Kansas City area. And he also

9 talked to you specifically like about the pace that the

10 defendant approached him and the other officers with. And

11 that that was a little faster. And you, yourselves, saw him

12 approach them on the surveillance video. And he talked about

13 the muttered threats. And he confirmed with that that he was

14 dressed similar to what you saw Officer Schwarz dressed

15 yesterday in his uniform, and similar to what you saw on the

16 surveillance camera. And he said -- he also commented that he

17 zeroed in on me. And you saw on the video and you heard him

18 testified to the fact that I backed up. Backing up when

19 someone is approaching you in an aggressive manner, in an

20 angry manner, that is a natural response to a threat. Nobody

21 is going to stand here, most people I would say, it's a

22 reasonable inference to say nobody is going to stand here and

23 let you just come at me without, you know, reacting in some

24 way. So him backing up like you saw on the surveillance and

25 then pulling out his taser, that was a direct response to the

1    threat that he felt as an officer responsible for keeping the

2    grounds in front of the federal building in good order.

3            And he zeroed in on him, and like I said and like

4    you heard him testify to and like you saw on the surveillance,

5    you saw him draw his taser.  Again, as a response to what he

6    felt was a threat.  And at that point --

7            THE COURT:  Five minutes, counsel.

8            MS. PRATTEN:  -- the officer testified to the fact

9    that the defendant stopped, and he specifically said, I'm

10   going to fucking kill you.  And you heard further testimony

11   from the rest of the witnesses that he continued to spit and

12   he continued to kick and he continued to bite as the EMS

13   officers responded and took him away from the scene.  And all

14   throughout this there is no calming down.  This continues.

15           So let's move on to the second charge he is charged

16   with.  And that is being a felon in possession of a firearm.

17   And there are three counts to this crime.  One, like the Judge

18   pointed out and like you've heard, that he has been convicted

19   of a crime punishable for imprisonment for over year.  And you

20   know, nobody is arguing about that.  We all know and that has

21   been proven.

22           As to Three, you heard Matt Wilson get up there and

23   testify to the fact that this firearm you saw, you've seen

24   pictures of it, you saw it.  This was not made in Missouri, it

25   is clearly in Missouri, this firearm has traveled interstate

1    commerce.  So the only question remaining to you is regards to

2    Element Two which is the possession part.

3           And I'm quickly -- you're going to have a copy of

4    this when you go back again, like I stated with these other

5    two section I've shown you.  Your questions about possession.

6    Did the defendant possess this firearm.  The law recognizes

7    several kinds of possession.  That is the rule that the Judge

8    read to you -- I'm sorry, the instruction that the Judge read

9    to you.  That is clear.  There is actual possession.  We

10   didn't find the gun on him, no one said they found the gun on

11   him.  Actual possession isn't the question, it is constructive

12   possession.  Constructive possession, like you're gonna read,

13   is a person has both the power and the intention at a given

14   time to exercise dominion or control over a thing.

15          What kind evidence did you see that points to the

16   fact that the defendant had constructive possession over this

17   firearm?  You know that he arrived at the federal building.

18   People have identified the vehicle in which he came as

19   belonging to his girlfriend, Tiara Gray.  Everybody knows that

20   he came in that vehicle.  You saw surveillance were he is by

21   the vehicle.  And you actually heard that the car is

22   registered to her, and there's no question Tiara Gray was at

23   the time his girlfriend.

24          You saw surveillance where he is going back, like I

25   said.  And then you heard from the KCPD officers that they

1   actually did tow, because they couldn't leave the car parked

2   there, it's just not an area where you park.  It's not a

3   parking lot.  And as a result of that they had to tow it.  And

4   they had to conduct an inventory.  And in the course of the

5   inventory you heard they had to do a search.  And under the

6   driver's seat where the defendant sat when he entered the

7   federal building.

8           THE COURT:  Two minutes.

9           MS. PRATTEN:  Thank you.

10          And where the defendant was seen fussing around when

11  he was in the surveillance video.  You saw they found a

12  firearm.  Again, you heard the jail calls.  You heard him

13  speaking with his girlfriend Tiara Gray in the third call.

14  You heard him say to her, hint, hint, who did you loan your

15  car to?  She said, nobody.  He said later said in the

16  conversation, hint, hint, who did you loan your car to?  And

17  then he proceeded to say, watch the news, the next guy who

18  comes up that's who you loaned the car to.  So you see him

19  talking about an explanation as to why the firearm could not

20  be his.  And you see him talking in the call one and call two,

21  again, about the encounter with the law enforcement office,

22  the law enforcement officers, and in call two you heard him

23  talking about the fact that we should have charged him with

24  constructive possession.

25          So ladies and gentlemen, I'd ask you to take a look

1    at all the evidence that as been submitted to you when you go

2    back there.  All the evidence that supports each and every one

3    of these elements have been proven.  And I ask you to return a

4    verdict of guilty on both counts.

5                    THE COURT:  Okay.  Thank you, counsel.

6                    Mr. Ermine?

7                    MR. ERMINE:  May it please the Court?

8                    Ladies and gentlemen of the Jury, unfortunately I'm

9    tethered to this microphone because I'm unable to project my

10   voice.  So thank you for your attention during the case.

11   Thank you for your attention now.  On behalf of Mr. Everett,

12   we very much appreciate that.

13                   This is the last chance I'm going to have to speak

14   to you on behalf of Mr. Everett.  The government's attorney

15   will have a chance to give you a brief rebuttal to whatever it

16   is that I say.  But this is my last opportunity to speak to

17   you so I want to thank you very much for your jury service and

18   thank you for paying such good attention during the case.

19                   I'm going to start off talking to you about the

20   first count in this case, threatening a federal law

21   enforcement officer.  I told you during the opening statement

22   that Mr. Everett is not guilty of this charge.  I deliberately

23   didn't tell you that he is innocent.  There is a difference

24   between innocent and being not guilty.  Perhaps it is a more

25   meaningful difference to people who are lawyers and judges

1    than it is to you all, but in this case it is very

2    significant.  Because I'm not trying to argue that Mr. Everett

3    didn't do anything wrong on March 10, 2016.  I'm not trying to

4    argue that he wasn't at the federal building.  I'm not even

5    trying to argue that he didn't threaten these folks or really

6    everyone he saw that day.  The point that I have made I think

7    during the trial, I mentioned it during my opening statement,

8    is that he is not guilty of this offense because the

9    government can't prove the elements.  You see in these

10   instructions, you heard from the Judge, government's counsel

11   talk to you about elements.  The elements of a crime or kind

12   of like the ingredients to a cake.  You have certain things

13   that must go into it or you are not going to end up with a

14   cake.  If you don't have all the elements of the cake you can

15   still bake it, you might end up with something, but it's not

16   going to be the cake.  Elements of crimes are very similar

17   there.

18          In this case the government has to prove to you

19   beyond a reasonable doubt these elements.  Element One is

20   really not in play here.  I think the evidence is pretty clear

21   Mr. Everett threatened as far as we can tell every single

22   person that he encountered that day.  He threatened law

23   enforcement of various stripes, whether they are federal or

24   local.  He threatened EMTs.  He threatened nurses at Truman

25   Medical Center.  He threatened doctors at Truman Medical

1  Center.  I think the evidence was that he even threatened

2  people that weren't there.  He is threatening passersby on the

3  street.  When he first walked up to the FPS officers, he is

4  muttering things under his breath.  He is cursing, he is

5  yelling, and muttering threats to himself even.  So Element

6  One is not really at issue in this case.

7          What is significant though is Element Two.  He has

8  to make those threats with the intent to impede intimidate,

9  interfere with these officers while they are engaged in their

10 officials duties on account of their official duties.  This is

11 where it is very important to take note of the fact that he

12 threatened everybody that day.

13         The government has to prove to you that he

14 threatened the officers in their official capacity as

15 officers.  You just heard the Judge give you the instruction

16 right after this one addressing intoxication.  You heard from

17 I think every witness with the exception with perhaps the ATF

18 agent who examined the firearm.  Everyone who saw Mr. Everett

19 that day, based on their training and experience as law

20 enforcement officers, for 7 years, 13 years, when they saw

21 Mr. Everett they thought that he was under the influence of

22 something that day.  They thought that he was on drugs.  They

23 thought that he was having some sort of mental break.  I think

24 as the Judge instructed you, you can bring your common sense

25 to this as well.  You saw the video.  You saw Mr. Everett

1    stare down face-to-face with the officer pointing a taser

2    right at him.  And essentially he did not react.  He just

3    stood there with his hands by his side.  You can make that

4    determination based on all of the evidence whether you feel

5    like the evidence is sufficient to show that Mr. Everett was

6    intoxicated or under the influence of some drugs that day.

7    And this is extremely important.  Because the government has

8    the burden to prove to you that he threatened these officers

9    with the intent to intimidate them.  But the Court has

10   instructed you and this instruction tells that if he is under

11   the influence of the drug, such that it was impossible for him

12   to form that intent, that he is not guilty of that offense.

13           So let's talk a little bit more about this evidence.

14   The first witness that we heard testify, Foderaro, he

15   testified that right when he saw Mr. Everett, Mr. Everett said

16   he wanted to see a federal judge.  Mr. Everett is acting

17   erratically, bizarrely, crazily, whatever adverbs you want to

18   say.  He is clearly in the wrong building to see a federal

19   judge.  He doesn't even seem to know where he is.  He is

20   trying to file some nonsensical motion, and he is acting very

21   strangely.  You heard Detective Bailey, who has seven years of

22   experience and deals with people in narcotic situations all

23   the time, he testified that in his training and experience

24   based on Mr. Everett's demeanor that Mr. Everett was under the

25   influence of something that day.  You heard from the FPS

1   Officer Schwarz who actually went to the Truman Medical

2   Center, to the hospital with Mr. Everett.  He was there in the

3   hospital with Mr. Everett as he was being sedated so that he

4   could come down from the drugs in his system.  You actually

5   even heard on the phone calls that the government presented

6   Mr. Everett state that he didn't know how he got home that

7   night.  You saw in the video Mr. Everett dropping things,

8   throwing things in the street, picking them up in the middle

9   of the street.  There is more than sufficient evidence here to

10  demonstrate that Mr. Everett was not in his right mind that

11  day as a result of intoxication.

12          And so is Mr. Everett an innocent person?  We have

13  heard, you know, some of the language he used in talking with

14  people on the telephone.  Some of the way that he described

15  people.  We are not here arguing that Mr. Everett is an

16  innocent person.  Should he been intoxicated that day at that

17  federal building trying to find a federal judge to file some

18  nonsensical motion?  No, he shouldn't have done that.  Should

19  he have been in the street shouting profanity to everyone?

20  No.  Should he have been muttering threats to himself,

21  threatening pedestrians, threatening federal officers,

22  threatening KCPD people, threatening EMTs, everyone else he

23  encountered?  No, he shouldn't have done that.  But that

24  doesn't mean that he is guilty of this crime.  He is not

25  guilty of this crime.  Really for that very reason.  Because

1    the government can't prove that he was -- that both of these

2    elements were met, that he was making these specific threats

3    with the intent to intimidate or impede these federal officers

4    that day.  That is the difference between being innocent and

5    being not guilty.  And Mr. Everett is not guilty of

6    threatening a federal officer.

7            And now I want to talk to you about Count Two.  The

8    Judge just told you that in order to find Mr. Everett guilty

9    really of both counts, the government has to prove this beyond

10   a reasonable doubt.  They have to bring in to you evidence

11   that leaves you firmly convinced that Mr. Everett is guilty.

12   And with regard to Count Two, this firearm, they have to bring

13   in evidence to leave you firmly convinced that Mr. Everett

14   knowingly processed that firearm.  So what do we got?  The

15   mere presence of a defendant at a location where a gun is

16   found is not sufficient to establish beyond a reasonable doubt

17   that the defendant knowingly possessed the gun.  That is the

18   law.  That is the law that you have to follow in this case.

19   Did Mr. Everett knowingly possess a gun merely because he

20   happened to drive a car to the federal building and the gun

21   was later found under the seat.  Well, you actually heard from

22   some of the witnesses, at least one witness, where do people

23   normally keep their guns, he was asked.  They keep them under

24   the driver's seat of their car.  It is very common, in his

25   experience, to find people leaving guns under the driver's

1   seat of the car.  You heard from the ATF agent that Ruger was

2   the number one manufacturer of firearms in 2016 which is the

3   year when this case happened.  So it's not altogether unlikely

4   that there would be a Ruger found in the front seat of this

5   car.  What you didn't hear is any evidence at all that shows

6   that Mr. Everett on March 10th, 2016, knew that that firearm

7   was under the front seat of that car.  You heard evidence that

8   the car was registered to someone else.  Yeah, that person is

9   his girlfriend.  That doesn't prove that it is Mr. Everett's

10  firearm underneath the front seat of that car.  There has been

11  no evidence of proves that.

12          Now, we do have three, I'll say, categories of

13  evidence that the government is trying to bring in to shore up

14  the lack of physical evidence that they have in this case.  So

15  let's talk about it.  First of all, they made mention of

16  Mr. Everett's prior conviction from 2009 for an offense that

17  involved a firearm.  That doesn't prove anything.  It proves

18  that he was convicted of an offense in 2009 that involved a

19  firearm.  It doesn't prove anything about a state of mind or

20  his knowledge on March the 10th, 2016, though.  They brought

21  that in to distract you from the otherwise completely lacking

22  evidence.

23          What's the next thing that they are using?  They

24  have these phone calls.  I expect that the government's

25  counsel is going to get up and ask you to take a very good

look at these phone calls. Well, I guess you can't see the phone calls. A good listen, a good thought about the phone calls. let's think about them though. What do they really say? Now, the first call it doesn't say a whole lot. There is reference made in that call to a news article and a discussion about the contents of a news article. It doesn't actually prove anything that Mr. Everett knew. It proves perhaps what the substance of the news article was. That officers have found the gun in the front seat of this car. In that phone call Mr. Everett doesn't say it is his gun. He doesn't say he put it in the front seat of that car. It's just a recounting of what the news article says.

The second call is kind of similar. There is a recitation of what the arrest warrant says, but, of course, that's kind of like the indictment in this case, right? You all have been instructed now that the indictment is merely the charge and the arrest warrant is very similar. And there is Mr. Everett talking about legal theories. Things like this. Potential ways that he could defend against this charge which by the way he has pled not guilty to and we are trying right now.

And then there is a third phone. All right. Hint, hint, down goes Frazier. This is a -- not a serious phone call. I will ask you to keep in mind that even people who aren't guilty of crimes want to be found not guilty of a crime

1     when they go to court.  All right.  And he is talking on this

2     phone call to one of the people he is closest with, his

3     girlfriend at the time.  Essentially, lamenting his plight.

4     And you heard testimony that he is in custody.  He had been in

5     custody for quite sometime at that point.  That's perhaps the

6     most important thing about all three of these calls.  This

7     situation took place on March 10th, 2016.  The first phone

8     call that we have if I recall correctly, is about ten days

9     later.  He is talking about news articles.  The second phone

10    call we have is about March 30th.  So about 20 days later

11    he's talking about legal theories.  And then this third phone

12    call is April 30th, 2016, a month and 20 days later.  None of

13    these phone calls actually tell us anything about Mr. Everett

14    knew on March 10th, 2016.  Nothing about these phone calls

15    tends to show that he knowingly possessed a firearm on

16    March 10th, 2016.  None of these phone calls can replace the

17    fact that he is just as this instruction says, merely present

18    prison in proximity to a firearm being found.  So I submit to

19    you that none of these phone calls are of particular note when

20    it comes down to figuring out what Mr. Everett knew on

21    March 10th, 2016, with regard to that firearm.  None of these

22    phone calls answer that question.

23          But I tell you what would have answered that

24    question.  DNA evidence.  We heard from -- well, let me say it

25    this way.  Did you notice that the government called a witness

1    who was not involved in this case at all just to explain to

2    you why they don't have the best evidence they could've

3    possibly had?  They called Detective Rorabough who had nothing

4    to do with this case just to testify about why they didn't do

5    DNA testing in this case.  That is remarkable to me.  Instead

6    of actually investigating, finding the answers, bringing you

7    the best evidence that they could possibly muster --

8           THE COURT:  Five counsel.

9           MR. ERMINE:  -- thank you, Your Honor.

10         In an effort to leave you firmly convinced so that

11    you could go back to that jury room and not have any doubts at

12    all about what you're doing, instead of doing that, they

13    brought in a witness to testify about why they didn't do it.

14    Not only that, okay, he testified that they only get DNA ten

15    percent of the time.  That's not one percent.  Ten percent is

16    a significant number of cases.  If it's that meaningless, he

17    just did one yesterday.  He just requested DNA in another case

18    yesterday.

19         The government has the burden here.  It is their job

20    -- they say they are comfortable with it, right?  That's the

21    first thing they told you, they are comfortable with their

22    burden.  It's their job to bring in evidence to leave you

23    firmly convinced.  They could have gotten this evidence, they

24    didn't do with.  Instead they brought in witness for no other

25    reason than to testify about why they didn't do it.  They want

1   you know to find Mr. Everett guilty based on some phone calls

2   a month and half later to shore up their lack of

3   investigation, their lack of physical evidence in this case.

4           Ladies and gentlemen of the Jury, I ask you not to

5   do that.  I ask you to hold the government to their burden in

6   this case.  Mr. Everett is not guilty of knowingly possessing

7   that firearm.  There is no evidence showing that he possessed

8   that firearm on that day.  And so when you go back to

9   deliberate, I ask you to think about that lack of evidence

10  very carefully.  Think about why the government would call an

11  entire witness to testify about their lack of evidence.  And

12  to find Mr. Everett not guilty of possessing this firearm.

13  Again, I ask you to consider the elements very carefully with

14  regard to Count One and also find him not guilty of

15  threatening a federal law enforcement officer.

16          Thank you again for your service.  I don't et

17  another change to talk to you.  I appreciate it very much.

18          THE COURT:  Thank you, Mr. Ermine.

19          Mr. McCarther, you have five minutes and 30 seconds,

20  sir.

21          MR. MCCARTHER:  Thank you, Your Honor.  May it

22  please the Court?

23          THE COURT:  It may.

24          MR. MCCARTHER:  It's been a journey, ladies and

25  gentlemen, we're about at the end of it now.  If you remember

1   in opening, I made one request of all of you.  That when you

2   look at this evidence you look at it through that filter of

3   common sense.  It's really important.  You know, common sense

4   is that thing that you don't run out in front of traffic when

5   cars are whizzing by, when you're not drinking expired milk.

6   Here's the most important question, what is your common sense

7   tell you about defendant's theory?  That because the defendant

8   got high on drugs he has an excuse for committing crimes.

9   What does your common sense tell you about that?  It doesn't

10  pass the test for me.  And frankly, it doesn't pass the test

11  in the instructions of impossibility.  Let's take a look at

12  that.

13          The language of the instruction.  First line, being

14  under the influence of a drug provide the legal excuse for the

15  commission of the crime charged in Count One only if the

16  affect of the drug makes it impossible for the defendant to

17  have the intent to impede, intimidate, interfere with

18  impossible, beyond all possibility.  That he had no idea what

19  he was doing.  You know what evidence you saw that goes

20  immediately contrary to that?  All these calls.  He is able to

21  recount exactly, going to the federal building, looking for a

22  federal judge.  He is able to recount exactly what he told FPS

23  Officer David Wright.  I told him I was going to blow his

24  mother fucking brains out.  That is exactly what he says in

25  that call.  Does that sound like someone who it is impossible

1   for them to know what they are doing?  No.  It sounds like

2   someone trying to give you a reason to try and let them off

3   the hook.  Don't fall for it.

4           And let's talk about those calls.  He is recounting

5   the events.  He drove to the federal building.  He is able to

6   recount what he said.  This is not impossibility.  This man

7   knew what he was doing.  I don't care that he was high.  Yeah,

8   he probably was.  But is that a reason to say all your crimes

9   are excused and let's give you a key to the city?  No, that

10  doesn't pass the test.

11          And let's talk about what those other calls said.

12  He is asking his girlfriend to find someone in the news, find

13  an article, find someone who gets caught, someone who was

14  arrested, whoever that is, that is who you are going to say

15  had that gun, that's who you are going to say who borrowed

16  your car.  So let me know what you're gonna say so I know what

17  I'm gonna say.  Do these sound like the words of an innocent

18  man?  Or do these sound like someone who knows he is caught

19  and he is trying to find a way out of the trouble that he

20  knows he is in?

21          By the way, let's talk about that last argument that

22  defense counsel made.  I call it the sleight-of-hand argument.

23  We called Detective Rorabough because of that argument.

24  Remember those questions I asked in voir dire about CSI and

25  NCIS, how they make it seem like there's DNA on everything.

1   Their fingerprint is on everything.  There is always that spot

2   of blood on every single evidence on these TV shows.  And it's

3   just not the truth.  And gun crimes maybe get DNA maybe ten

4   percent of time.  Fingerprints, zero percent of the time.  Ut

5   the sleight-of-hand is this, I have possession of this pen,

6   right?  I am in direct possession, actual possession.  I could

7   throw it across the room, I can do what I want with it.  Now,

8   let's say I run down to my car and put it my cup-holder, and

9   run back up to you.  Am I still in possession of this pen?

10  Yes.  I am in constructive possession of this pen.  It's in a

11  place that I have access to and I know it's there.  If I run

12  to my hour and throw it inside, I'm still in constructive

13  possession.  If I drive down to Florida and throw it in a

14  storage locker, I am still in constructive possession.  The

15  things in your car, the things in your home, you are in

16  possession of those items.  Now, guess what?  Let's say

17  somebody finds this pen in my car that I knowingly put there

18  and they don't find my DNA, they don't find my fingerprints,

19  am I still in possession?  Yes.  That's the sleight-of-hand.

20  That's the sleight-of-hand that they just tried to run by you.

21  That if there is no DNA and no fingerprints, he couldn't have

22  possessed it.  Don't fall for that.  That is why Detective

23  Rorabough took the stand for that very argument.

24          Now here's your reasonable doubt instruction.  I

25  want you to pay close attention to it.  First line, reasonable

1    doubt is doubt based upon reason and common sense. I

2    emphasize common sense. It is not doubt based upon

3    speculation. The defense attorney just got up here and he

4    told you to speculate that that is somebody else's gun. Did

5    anyone stand up on the stand and say, oh, that's my gun by the

6    way?

7           MR. ERMINE: Your Honor, can we approach?

8           THE COURT: Yes.

9    (THEREUPON; Counsel approached the bench and the following

10    proceedings were held.)

11           MR. ERMINE: Your Honor, I don't like to object

12    during closings. I'm sorry. This is the burden shifting

13    argument.

14           THE COURT: Yeah.

15           MR. MCCARTHER: I was saying there was no evidence

16    to show that this gun belonged to any one else.

17           THE COURT: What do you want me to do?

18           MR. ERMINE: Just to stop him from arguing that.

19           MR. MCCARTHER: I was moving on.

20           THE COURT: Yes. You have 59 seconds left.

21           MR. MCCARTHER: Okay.

22    (THEREUPON; The proceedings returned to open Court.)

23           MR. MCCARTHER: Like I was saying, you are not

24    allowed to speculate in this case. There needs to be evidence

25    that you rely on. Don't just grab at different things around

1   and say, well, it could have been this person's gun or this

2   person's gun.  That is not how it works.  We are not allowed

3   to speculate here.

4           So was the defendant high on drugs?  I think so.  I

5   think he was.  But using drugs is not an excuse for committing

6   crimes.  You know, think of that, think of a crime, think of

7   someone committing a crime, now think of them being able to

8   just get high and now they have an excuse to commit the crime.

9   And maybe I just don't see it, but my view of it, and I was

10  thinking about this last night.  You know, I can barely sleep

11  during trial.  But it was, it was, this case is about

12  responsibility.  Whose responsible for the defendant using

13  drugs?  Is it you, it is me, is it the officers?  No, it is

14  his.  Who is responsible for the defendant using drugs and

15  committing crimes.  He is.  Hold him responsible for his

16  actions.

17          THE COURT:  Time counsel.

18          MR. MCCARTHER:  And with that I'd ask you for a

19  verdict of guilty on all counts.  Thank you.

20          THE COURT:  Thank you, counsel.

21          Ladies and gentlemen of the Jury, in a moment we

22  will adjourn for you to commence your deliberations.  But

23  first I look to Ms. Rarig.  Do you have anything back in the

24  jury room?

25          MS. RARIG:  I do.

1              THE COURT:  I'm going to have Ms. Baldwin escort you

2    back and then come back in court in front of me.

3              Well, Ms. Rarig, as you can see there are 13 jurors

4    in the jury box, but there are only 12 that go back to

5    deliberate.  Typically, we may have 14.  More common than you

6    would believe that for one reason or another, a Juror may not

7    be able to serve and an alternate comes into play.  This was a

8    shorter trial that's why we only had one alternate.  We

9    certainly appreciate your service.  We still can't do what we

10   do here without the time you spent.  Did you get snacks this

11   morning?

12             MS. RARIG:  I did.

13             THE COURT:  We won't charge you for any of that.

14             (laughing)

15             And I will talk to you a little further.  But at

16   this time we will recess for the Jury to commence their

17   deliberation.

18   (THEREUPON, a short recess was had; WHEREUPON, the following

19   proceedings were had.)

20              (Proceedings began at 4:18 PM)

21             THE COURT:  Okay.  We are on the record.  We have

22   two questions.  First question, the defense stated that

23   Mr. Everett threatened everyone, not just the federal agents.

24   Does that count or matter if I believe he threatened everyone

25   he came in contact with?  Not sure I understand exactly what

1  that means.  My intent is to say see attached.  It is the

2  Jury's responsibility to remember the evidence and follow the

3  Court's instructions.

4  MR. MCCARTHER:  Do you mind if we read the

5  instruction or I mean, the question?

6  THE COURT:  Go ahead.

7  MR. MCCARTHER:  Thank you.

8  THE COURT:  It's no different than what I read, but

9  you can go ahead and do it.

10  MR. MCCARTHER:  I'm just trying to capture the

11  meaning.

12  THE COURT:  Well, that's the whole point, I don't

13  have to understand it.  I'm directing them to see attached.

14  You see what I mean?

15  MR. MCCARTHER:  I just want to see if I could make

16  heads or tails of it.

17  THE COURT:  Well, second question, if we don't come

18  to a consensus by 6:00, what happens?  That can tell you

19  something right there too.  My intent on that is to let them

20  know that we adjourn for the evening and continue

21  deliberations in the morning.

22  MR. ERMINE:  I agree with that.

23  THE COURT:  I don't know.  I can't really decipher

24  what that means, but from my perspective I don't need to.  In

25  that I just have my standard, it's the Jury's responsibility

1    to remember the evidence and follow the Court's instruction.

2    After I do a couple of those they kind of laugh and realize

3    and figure out it is on them.

4            So the Court is going to respond if you don't come

5    to a decision we will adjourn for the evening and come back

6    tomorrow at 9:00 a.m. to commence deliberations.

7    (THEREUPON, a short recess was had; WHEREUPON, the following

8    proceedings were had.)

9            (Proceedings began at 4:27 PM)

10           THE COURT:  We have another question.

11           If the gun is in the car and I don't know about it,

12   would the legal definition of possession be the owner of the

13   car or the driver of the car?  Susan Thompson.  My response

14   will be see attached.  The attached sheet says, it is the

15   Jury's responsibility to remember the evidence and follow the

16   Court's instructions.

17           Mr. Ermine, it looks as though you want to say

18   something else?

19           MR. ERMINE:  My only thought was do we want to guide

20   them specifically to the verdict director?

21           THE COURT:  That's exactly what I don't want to do.

22   I tell them it is their responsibility to follow the law and

23   instruction.

24           MR. ERMINE:  You asked me Judge, I just answered.

25           THE COURT:  You gave me the look.  I wanted to hear.

1   I appreciate it.

2           MR. MCCARTHER:  Is there a chance that we can guide

3   them to the instruction on what the definition of possession?

4           THE COURT:  No.

5           MR. MCCARTHER:  Okay.

6           THE COURT:  They have everything they need.  If they

7   want the definition they go there.

8   (THEREUPON, a short recess was had; WHEREUPON, the following

9   proceedings were had.)

10          THE COURT:  It is their intent to adjourn this

11  evening and they will come back and commence deliberations

12  tomorrow at 9:00.  I will call them out and I will read them

13  an instruction and they will be adjourned for the evening.

14          MR. ERMINE:  Your Honor, should Mr. Everett be here

15  for this?  I think they might wonder where he is if he is not

16  here.

17          THE COURT:  Is he right there?

18          MR. ERMINE:  I think so.

19          THE COURT:  If he is right there, that's find.  I

20  just don't share that some concern.

21          MR. ERMINE:  Well, I think it might look a little

22  weird.  I would suggest an alternative that the Court can just

23  go back and tell them they are dismissed.

24          THE COURT:  No, we'll get him out here.  Well, if we

25  can't get him in here, I'll have you all leave the courtroom

Denise Carroll Halasey CCR, CVR-CM

1    and I'll bring the Jury in here.  Same thing.

2           Well, the Marshal's are transporting.  So I'll just

3    ask you all to leave the courtroom and I'll have the Jury come

4    in without you all here.  That way there is no wondering.

5           MR. ERMINE:  That would be fine with me.

6           THE COURT:  That's what we'll do.

7           MR. MCCARTHER:  Is there a specific time that you

8    would like the attorneys back in the courtroom tomorrow

9    morning?

10          THE COURT:  I'm going to tell the Jurors to be here

11   at 9:00.  So just as long as you make yourselves available.

12          MR. MCCARTHER:  Okay.  If you need us up here for a

13   record or anything else like that?

14          THE COURT:  I don't think so.

15          MR. MCCARTHER:  Okay.

16          THE COURT:  If you are up here, that's fine too.  I

17   don't have anything going on.  It's you're call and just be

18   available on your cell.

19   (THEREUPON, the jury enters the courtroom; WHEREUPON, the

20   following proceedings were had in the presence of the jury.)

21          THE COURT:  My understanding from Joella is that we

22   will adjourn for the evening.  We will come back tomorrow at

23   9:00.

24          But again, don't start deliberating until 12 of you

25   are back together.  Once you all 12 get here, let Ms. Baldwin

1  know so we can know that all 12 are here and that

2  deliberations are actually taken place.

3          With that said, the Court again reminds you of what

4  you were told at the first recess of the Court.  Until you

5  retire to consider your verdict you must not discuss this case

6  among yourselves or with others or permit anyone to discuss it

7  in your hearing.  You should not form or express any opinion

8  about the case until it is finally given to you decide.  Do

9  not do any research or investigation on your own about any

10 matter regarding this case or anyone involved with the trial.

11 Do not communicate with others about the case by any means.

12 Do not read, view, or listen to any newspaper, radio,

13 electronic communication from the Internet or television

14 report of the trial.

15          MS. BALDWIN:  All rise.  Court is in recess.

16 (THEREUPON, the following proceedings were adjourned.)

17

18                    CERTIFICATE

19          I certify that the foregoing is a correct transcript

20 from the record of the proceedings in the above-entitled

21 matter.

22

       August 17, 2017

23

                        /s/ Denise C. Halasey
24                      Denise C. Halasey, CCR, CVR-CM
                        United States Court Reporter

25